**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

      *Plaintiffs*,

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
ANTHONY ARAGON,
ULYSSES J. CHANEY,
MIGUEL "MICHAEL" RENE ELIAS,
CAROL FABRIZIO,
HEIDI HESS,
RITA LEWIS, and
JESSICA POCOCK, as members of the Colorado Civil Rights
Commission, in their official capacities, and
CYNTHIA H. COFFMAN, Colorado Attorney General,
in her official capacity;

      *Defendants*.

_____

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

_____

**INTRODUCTION**

1.     Lorie Smith is the sole owner and operator of 303 Creative LLC, a company specializing

in graphic and web design.

2.     Lorie is also a Christian who believes that God has called her to use her talents and her

company in a way that honors Him.

3.     Because of her religious beliefs and her desire to affect the current cultural narrative

regarding marriage that contradicts those beliefs, Lorie wants to use her talents and the

expressive platform she has in 303 Creative to celebrate and promote God's design for marriage as an institution between one man and one woman.

4.      Lorie believes that God is calling her to promote and celebrate His design for marriage by designing and creating custom wedding websites for weddings between one man and one woman only.

5.      As part of discharging her religious duty, Lorie also desires to explain her religious beliefs about marriage on her website and in communications with prospective clients, including why those beliefs prevent her from designing websites celebrating and promoting same-sex weddings.

6.      But Colorado law strips Lorie and 303 Creative of the freedom to choose what messages to create and to convey in the marriage context.

7.      Colorado law makes it unlawful for Lorie and 303 Creative to publish, display, or mail any communication stating that they will not design, create, or publish websites celebrating same-sex marriages.  *See* Colo. Rev. Stat. § 24-34-601(2)(a).

8.      Colorado law also makes it unlawful for Lorie and 303 Creative to publish, display, or mail any communication indicating that a person's patronage at 303 Creative is "unwelcome, objectionable, unacceptable, or undesirable" because of sexual orientation.  *See* Colo. Rev. Stat. § 24-34-601(2)(a).

9.      Therefore, Lorie and 303 Creative cannot explain on 303 Creative's website their religious belief that God designed marriage as an institution between one man and one woman and why they cannot create wedding websites promoting and celebrating any other conception of marriage.

10.     Colorado law also provides that if Lorie and 303 Creative design, create, and publish wedding websites celebrating and promoting marriages between one man and one woman, they must also willingly design, create, and publish wedding websites celebrating and promoting same-sex marriages.  *See* Colo. Rev. Stat. § 24-34-601(2)(a).

11.     Therefore, if Lorie and 303 Creative speak their desired message celebrating and promoting marriage between one man and one woman, Colorado law requires that they also be willing to speak messages they find highly objectionable and that contradict their sincerely held religious beliefs.

12.     Because Lorie and 303 Creative cannot speak messages promoting and celebrating conceptions of marriage contrary to their religious beliefs, Colorado law prevents them from expressing their desired message—that marriage is a God-ordained institution between one man and one woman—through the design, creation, and publication of wedding websites.

13.     If Lorie and 303 Creative were to convey their desired messages and decline to convey objectionable messages, they would face costly and onerous investigations, fines of up to $500 for each violation, and oppressive mandates—such as staff re-education training—that can themselves compel objectionable speech.

14.     Thus, solely because of Colorado law, Lorie and 303 Creative are refraining from expressing their views of God's design for marriage on 303 Creative's website and from offering their services to design, create, and publish wedding websites expressing their desired message celebrating and promoting marriage as an institution between one man and one woman.

15.     To restore their constitutional freedoms to speak their beliefs and not be compelled to speak messages contrary to those beliefs, and to ensure that other creative professionals in

Colorado have the same freedoms, Lorie and 303 Creative ask this Court to enjoin Colo. Rev. Stat. § 24-34-601(2)(a) and declare that it violates their rights.

## JURISDICTION AND VENUE

16.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

18.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims herein occurred within the District of Colorado and all Defendants reside in the District of Colorado.

## IDENTIFICATION OF PLAINTIFFS

20.     Plaintiff Lorie Smith is an evangelical Christian.

21.     She is a resident of the State of Colorado and a citizen of the United States of America.

22.     She is also the sole member-owner of Plaintiff 303 Creative LLC.

23.     303 Creative is a for-profit limited liability company organized under Colorado law.

24.     303 Creative's principal place of business is located in Colorado.

## IDENTIFICATION OF DEFENDANTS

25.     Aubrey Elenis, as Director of the relevant division of Colorado state government known as the Colorado Civil Rights Division, Colo. Rev. Stat. § 24-34-302, and as one with authority to enforce the law at issue, *see, e.g.*, Colo. Rev. Stat. §§ 24-34-302, 24-34-306, is named as a defendant in her official capacity.

26.     Commissioners Anthony Aragon, Ulysses J. Chaney, Miguel "Michael" Rene Elias, Carol Fabrizio, Heidi Hess, Rita Lewis, and Jessica Pocock, as members of the Colorado Civil Rights Commission with authority to enforce the law at issue, *see, e.g.*, Colo. Rev. Stat. §§ 24-34-305, 24-34-306, 24-34-605, are named as defendants in their official capacities.

27.     Colorado Attorney General Cynthia H. Coffman, as one with authority to enforce the law at issue, *see, e.g.*, Colo. Rev. Stat. § 24-34-306, is named as a defendant in her official capacity.

28.     All Defendants reside in the District of Colorado.

## STATEMENT OF FACTS

### Colorado Law Both Compels and Bans Speech

29.     Colorado's Anti-Discrimination Act ("CADA") bans discrimination in places of public accommodation that occurs "because of" disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

30.     A "place of public accommodation" includes "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public, including but not limited to any business offering wholesale or retail sales to the public."  Colo. Rev. Stat. § 24-34-601(1).

31.    This lawsuit challenges two provisions of CADA, both of which are codified in the same sentence of the law.

32.    The first provision provides that it is unlawful for a person to do the following:

> . . . directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

33.    This provision is codified at Colo. Rev. Stat. § 24-34-601(2)(a) and will be referred to as the "Banned-Speech Provision."

34.    CADA does not define "unwelcome," "objectionable," "unacceptable," or "undesirable."

35.    CADA does not include any standards or criteria for Defendants to abide by in determining whether a business's speech communicates that persons are "unwelcome," "objectionable," "unacceptable," or "undesirable."

36.    The second provision provides that it is "unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation . . . ." Colo. Rev. Stat. § 24-34-601(2)(a).

37.    This mandate, which compels expression when applied to expressive businesses, will be referred to as the "Compelled-Speech Provision."

38.     As used herein, references to "CADA" encompass both the Banned-Speech Provision and the Compelled-Speech Provision, as well as related provisions, such as those pertaining to CADA's enforcement.

39.     If Defendants become aware of an alleged violation of CADA, Defendants will investigate the alleged violation.

40.     If Defendants conclude that there has been a violation of CADA, Defendants will use their authority under CADA to end the violation.

41.     Defendants' power under CADA includes the ability to file a charge alleging discrimination.

42.     Defendants' power under CADA includes the ability to investigate charges of discrimination.

43.     Defendants' power under CADA includes the ability to determine whether probable cause exists for crediting charges of discrimination.

44.     Defendants' power under CADA includes the ability to hold hearings regarding charges of discrimination.

45.     Defendants' power under CADA includes the ability to issue subpoenas when evaluating charges of discrimination.

46.     Defendants' power under CADA includes the ability to compel mediation regarding charges of discrimination.

47.     Defendants' power under CADA includes the ability to determine whether the individual or business under investigation violated CADA.

48.     Defendants' power under CADA includes the ability to issue notices of a right to sue to those alleging a violation of CADA.

49.     Defendants' power under CADA includes the ability to issue cease-and-desist orders to prevent violations of CADA.

50.     Defendants' power under CADA includes the authority to issue orders requiring the charged party to "take such action" as Defendants may order.

51.     Remedial measures that Defendants have ordered in the past in enforcing CADA include those, such as re-education training, designed to indoctrinate persons charged with discrimination and compel them to profess Defendants' views on same-sex marriage and related subjects.

52.     Defendants order these remedial measures to change the beliefs and speech of the charged parties.

53.     Defendants even compel business owners to re-educate their staff, yet another form of compelled speech.

54.     If a person believes that an individual or business has violated the Banned-Speech Provision or the Compelled-Speech Provision, that person can seek redress in court and, upon a finding of a violation, the court shall fine the individual or business between $50.00 and $500.00 for *each* violation.

**Defendants Equate Opposing Same-Sex Marriage with Sexual Orientation Discrimination**

55.     Defendants interpret the Compelled-Speech Provision's ban on declining to provide services to people "because of" sexual orientation as including a ban on declining to provide

expressive services celebrating or promoting same-sex marriage because of political, moral, social, or religious objections to same-sex marriage.

56.     Defendants have publically taken this position in litigation.

57.     Because the Defendants consider it discrimination "because of" sexual orientation for a business to decline to provide expressive services promoting a same-sex marriage where it would provide expressive services promoting an opposite-sex marriage, the Banned-Speech Provision additionally bars public accommodations and their owners from publishing, circulating, issuing, displaying, posting, or mailing any communication that directly or indirectly indicates that the public accommodation will not provide expressive services that celebrate or promote same-sex marriage because of political, moral, social, or religious objections to same-sex marriage.

58.     Such barred communications include statements that a business and its owners cannot provide expressive services celebrating or promoting same-sex marriage because of their religious beliefs.

59.     Such barred communications include statements that a business and its owners believe that God designed marriage exclusively to be a union between one man and one woman and that any other conceptions of marriage are contrary to God's design.

60.     Such barred communications include statements that a business and its owners believe that marriages between one man and one woman offer benefits to society or children that same-sex marriages do not offer.

**Defendants Apply CADA in a Content and Viewpoint Based Manner**

61.     Defendants apply CADA in a way that allows certain views but punishes different views regarding marriage.

62.     Defendants' viewpoint-based application of CADA is illustrated by the decisions of the Colorado Civil Rights Division ("Division") and the Colorado Civil Rights Commission ("Commission") regarding complaints of discrimination made against four Colorado bakeries.

63.     The first Colorado bakery is Masterpiece Cakeshop, Inc., a public accommodation, which is owned and operated by Jack Phillips ("Phillips"), a Christian man.

64.     A same-sex couple entered Masterpiece Cakeshop to order a wedding cake that they intended to use to celebrate their wedding at a wedding reception.

65.     Because of his religious belief that God designed marriage to be a union between one man and one woman, Phillips respectfully declined to use his creative talents to create a wedding cake celebrating and promoting the marriage of the same-sex couple.

66.     Phillips, however, informed the couple that while his religious beliefs prevented him from creating the requested wedding cake, he could provide other baked goods to them.

67.     Despite this offer of service, the couple filed complaints with the Division alleging discrimination "because of" sexual orientation in violation of the Compelled-Speech Provision.

68.     Former Interim Director Jennifer McPherson, on behalf of the Division, issued a probable cause determination concluding that Masterpiece Cakeshop violated the Compelled-Speech Provision's prohibition of discrimination "because of" sexual orientation by declining to create the wedding cake due to Phillips and Masterpiece Cakeshop's religious beliefs about marriage.

69.     Phillips and Masterpiece Cakeshop challenged this determination, but Defendants maintained their position all the way to the Colorado Supreme Court where Phillips and Masterpiece Cakeshop's petition for writ of certiorari was denied on April 25, 2016.

70.     In defending themselves, Phillips and Masterpiece Cakeshop repeatedly expressed their willingness to serve everyone, regardless of sexual orientation, but their unwillingness to design and make cakes celebrating events or ideas that violate their Christian views.

71.     For example, Phillips and Masterpiece Cakeshop noted that they will not create cakes promoting Halloween, anti-American themes, anti-family themes, atheism, racism, or indecency.

72.     Despite these facts, Defendants maintained their position that Phillips and Masterpiece Cakeshop violated the Compelled-Speech Provision by declining to design and prepare the cake due to their objection to the cake's message, which promoted and celebrated same-sex marriage, and that determination was upheld by the Colorado Court of Appeals.

73.     During the pendency of Phillips' and Masterpiece Cakeshop's case, the Division considered claims of discrimination brought against three other Colorado bakeries.

74.     William Jack ("Jack"), a professing Christian, brought three complaints against the following public accommodations:  Azucar Bakery, Le Bakery Sensual, Inc., and Gateaux, Ltd.

75.     Regarding Azucar Bakery, Jack requested that the bakery provide him with price quotes for two cakes to express his religious views in opposition to same-sex marriage.

76.     Jack requested that both cakes be made to look like Bibles; that both cakes bear the image of two groomsmen with a red "x" over the image; and that the cakes include three citations to the Bible and their accompanying text that conveyed the religious basis for his opposition to same-sex marriage.

77.     Azucar Bakery said that it would not make cakes bearing the references to the Bible verses or the image that Jack requested.

78.     Jack then filed a "creed" discrimination claim with the Division under CADA's Compelled-Speech Provision.

79.     Defendants define CADA's prohibition on "creed" discrimination as encompassing "all aspects of religious beliefs, observances or practices, as well as sincerely-held moral and ethical beliefs as to what is right and wrong, and/or addresses ultimate ideas or questions regarding the meaning of existence, as well as the beliefs or teachings of a particular religion, church, denomination or sect."  3 CCR 708-1:10.2(H).

80.     Former Interim Director Jennifer McPherson, on behalf of the Division, issued a "No Probable Cause" determination regarding Jack's claim of "creed" discrimination.

81.     The Division reached this determination by concluding that Azucar Bakery did not refuse to make the cakes due to Jack's religion, but because Azucar Bakery objected to the message that would be expressed by the cakes.

82.     In concluding that Azucar Bakery did not commit religious discrimination by refusing to make a cake for a Christian that expressed religious messages in opposition to same-sex marriage, the Division also noted that the bakery was willing to make other goods for Christians.

83.     The matters involving Le Bakery Sensual, Inc. and Gateaux, Ltd. involved substantially similar facts, charges, rationales, and resolutions as those involved in the Azucar Bakery matter.

84.     Thus, the Division concluded that the three bakeries did *not* violate the Compelled-Speech Provision's prohibition of discrimination "because of" creed/religion when they refused to design and make a cake promoting religious messages opposing same-sex marriage because (1) their objection was message-based and (2) they gladly serve Christian customers who do not promote messages they find objectionable.  The Commission affirmed these determinations.

85.     In stark contrast, the Division and Commission concluded that Jack Phillips and Masterpiece Cakeshop violated the Compelled-Speech Provision's prohibition of discrimination "because of" sexual orientation because they declined to design and make a cake celebrating and promoting messages supporting same-sex marriage due to their objection to that message.  The Division and Commission reached this conclusion despite the fact that Phillips and Masterpiece Cakeshop happily serve gay and lesbian customers who are not asking them to promote messages they find objectionable.

86.     All four bakeries willingly served people that fell within the protected classifications of CADA, and objected to the requested cakes based on their message—not any protected status of the customers.

87.     However, when the requested message was one celebrating same-sex marriage, the Division and Commission concluded that declining to express it violates the Compelled-Speech Provision.

88.     Whereas, when the requested message was one opposing same-sex marriage, the Division and Commission concluded that declining to express it did not violate the Compelled-Speech Provision.

89.     Thus, Defendants force expressive businesses to express messages supporting same-sex marriage but they allow expressive businesses to refuse to express messages opposing same-sex marriage.

90.     This is a content- and viewpoint-based interpretation and application of CADA.

**Lorie Smith and Her Faith**

91.     Lorie Smith is a lifelong resident of Colorado, a devoted wife, a caring mother, and a dedicated Christian who is very involved in ministry.

92.     Although she is a daughter, a wife, and a mother, Lorie identifies first and foremost as a Christian—a follower of Jesus Christ.

93.     In addition to attending church and Bible study weekly, Lorie volunteers as an instructor in her church's ministry program for toddlers, leads multiple women's ministry events, and handles all of her church's print and electronic marketing and website outreach.

94.     Lorie's religious beliefs are central to her identity, her understanding of existence, and her conception of her personal dignity and autonomy.

95.     As a Christian, Lorie believes that her life is not her own, but that it belongs to God (1 Corinthians 6:19-20) and that He has called her to live a life free from sin (Romans 6:12-13).

96.     Lorie also believes that everything she does—personally and professionally—should be done in a manner that glorifies God.  (1 Corinthians 10:31; 2 Corinthians 5:15; Colossians 3:17; 1 Peter 4:11.)

97.     Lorie believes that she will one day give an account to God regarding the choices she made in life, both good and bad.  (2 Corinthians 5:10; Romans 14:12.)

98.     Lorie's understanding of what is sinful versus what is pure, lovely, admirable, excellent, or praiseworthy are rooted in the Bible and her personal relationship with Jesus Christ.

99.     Lorie believes that God instructs Christians to steward the gifts He has given them in a way that glorifies and honors Him.  (1 Peter 4:10-11.)

100.     Therefore, Lorie believes that she must use the creative talents God has given to her in a manner that honors God and that she must not use them in a way that displeases God.

**303 Creative:  Making Dreams Come True**

101.     Lorie has always been a creative, artistic, outgoing person, and has used and honed these traits at various companies in the fields of graphic design, website design, and marketing.

102.     She also developed her skills at the University of Colorado Denver, where she received a business degree with an emphasis in marketing.

103.     Desiring to have the freedom to use her creative talents to honor God to a greater degree than possible while working at other companies, Lorie started 303 Creative LLC.

104.     303 Creative is a business in Colorado that offers a variety of services to the public, including the following:  graphic design, website design, social media management and consultation services, marketing advice, branding strategy, training regarding website management, and innovative approaches for achieving client goals.

105.     As the sole owner and operator of 303 Creative, Lorie controls the scope, mission, priorities, services, and standards of 303 Creative.

106.     303 Creative does not employ or contract work to any other individuals, and Lorie is solely responsible for all of the services provided by 303 Creative.

107.     As required by her sincerely held religious beliefs, Lorie seeks to live her life and operate 303 Creative in accordance with the tenets of her Christian faith.

108.     One reason 303 Creative exists is to bring glory to God and to share His truth with its clients and the community by operating according to principles that honor and glorify God.

109.     To this end, Lorie and 303 Creative seek to fulfill Jesus' command to love their neighbors as themselves and to do unto others as they would have done unto themselves by serving their customers with love, honesty, fairness, transparency, and excellence.

110.     One purpose of 303 Creative is to develop and design unique visual and textual expression to promote the purposes, goals, services, products, events, causes, values, and messages of its clients insofar as they do not, in the sole discretion of Lorie, (1) conflict with Plaintiffs' religious beliefs or (2) detract from Plaintiffs' goal of publicly honoring and glorifying God through the work they perform.

111.     Plaintiffs are willing to work with all people regardless of classifications such as race, creed, sexual orientation, and gender.

112.     Plaintiffs do not object to and will gladly create custom graphics and websites for gay, lesbian, or bisexual clients or for organizations run by gay, lesbian, or bisexual persons so long as the custom graphics and websites do not violate their religious beliefs, as is true for all customers.

113.     Lorie and 303 Creative are unwilling to use their creative services to promote purposes, goals, services, products, organizations, events, causes, values, or messages that conflict with Plaintiffs' beliefs.

114.     Among other things, Plaintiffs will decline any request to design, create, or promote content that: contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports the destruction of unborn children; incites violence; or promotes any conception of marriage other than as between one man and one woman.

115.     Therefore, Plaintiffs' "Contract for Services" includes the following provision:

> Consultant has determined that the artwork, graphics, and textual content Client has requested Consultant to produce either express messages that promote aspects of the Consultant's religious beliefs, or at least are not inconsistent with those beliefs.  Consultant reserves the right to terminate this Agreement if Consultant subsequently determines, in her sole discretion, that Client desires Consultant to create artwork, graphics, or textual content that communicates ideas or messages, or promotes events, services, products, or organizations, that are inconsistent with Consultant's religious beliefs.

116.    When considering a potential project, Lorie will view the prospective client's website (if applicable) and ask questions of the prospective client to assist in the vetting process of determining whether the requested project conflicts with Plaintiffs' religious beliefs and whether it is a good fit given Plaintiffs' skills, schedule, preferences, and workload.

117.    If Plaintiffs determine that they are unwilling to assist with a project promoting particular purposes, goals, services, organizations, products, events, causes, values, or messages they find objectionable, Plaintiffs endeavor to refer the prospective client to a different company that can assist them.

118.    There are numerous companies specializing in the areas of 303 Creative's specializations.

119.    Even if Plaintiffs were to hire additional employees or contract out work, it would violate their sincerely held religious beliefs to have the employees or independent contractors do work for Plaintiffs that Plaintiffs cannot do themselves due to their religious beliefs.

120.    Another purpose of 303 Creative is to develop and design unique visual and textual expression that promotes, celebrates, and conveys messages that promote aspects of Lorie's Christian faith.

121.    In furtherance of this end, 303 Creative regularly provides services to various religious and non-religious organizations that are advocating purposes, goals, services, events, causes, values, or messages that align with Plaintiffs' religious beliefs.

122.   One of 303 Creative's specializations is custom graphic design for use online and in print.

123.   One of 303 Creative's other specialties is custom website design and maintenance.

124.   All of the graphic designs Plaintiffs create are expressive in nature, as they contain images, words, symbols, and other modes of expression that Plaintiffs use to communicate a particular message.

125.   All websites designed by Plaintiffs are also expressive in nature, as they contain images, words, symbols, and other modes of expression that Plaintiffs use to communicate a particular message.

126.   The visual and textual content Plaintiffs produce in both graphic design and website design are their own expression.

127.   As a seasoned designer, Lorie helps individuals and entities implement the ideal websites and graphics—oftentimes by designing custom graphics and textual content for the unique needs involved—to enhance and effectively communicate the desired messages.

128.   Although clients often have a very basic idea of what they wish for in a graphic or a website and sometimes offer specific suggestions, Lorie's creative skills transform her clients' nascent ideas into pleasing, compelling, marketable graphics or websites conveying the intended messages.

129.   When designing and creating graphics or websites, Lorie is typically in close contact with her clients as they each share their ideas and collaborate to develop graphics or websites that express a message in a way that is pleasing to both Lorie and her clients.

130.    Lorie ultimately has the final say over what she does and does not create and over what designs she does and does not use for each website.

131.    For each website 303 Creative makes, Lorie typically creates and designs original text and graphics for that website and then combines that original artwork with text and graphics that Lorie had created beforehand or that Lorie receives from the client or from other sources. Lorie then combines the original text and graphics she created with the already existing text and graphics to create a wholly new, original website that is unique for each client.

132.    Each website 303 Creative designs and creates is an original, customized creation for each client.

133.    In her website design work, Lorie devotes considerable attention to color schemes, fonts, font sizes, positioning, harmony, balance, proportion, scale, space, interactivity, movement, navigability, and simplicity.

134.    Lorie also considers color, positioning, movement, angle, light, simplicity, complexity, and other factors when designing graphics.

135.    Lorie takes these factors and more into account to design websites and graphics that express the desired messages in a compelling manner.

136.    Every aspect of the websites and graphics Plaintiffs design contributes to the overall messages that Plaintiffs convey through the websites and graphics and the efficacy of those messages.

137.    Lorie personally devotes herself to her design work, drawing on her inspiration and sense of beauty to create websites and graphics that effectively communicate the intended messages.

**<u>303 Creative:  Promoting God's Design for Marriage</u>**

138.    Lorie believes that our cultural redefinition of marriage conflicts with God's design for marriage as a lifelong union between one man and one woman.

139.    Lorie believes that this is not only problematic because it violates God's will, but also because it harms society and children because marriage between one man and one woman is a fundamental building block of society and the ideal arrangement for the rearing of children.

140.    Lorie believes that our culture's movement away from God's design for marriage is particularly pronounced in the wake of the Supreme Court's *Obergefell v. Hodges* decision, which held that there is a constitutional right to same-sex marriage.

141.    Lorie believes that the graphic design, web design, and marketing talents God blessed her with equip her to convey messages to the public in a compelling way.

142.    Lorie's sincerely held religious belief is that she should use the talents God has given her to promote God's design for marriage.

143.    Lorie is compelled by her religious beliefs to accomplish this by expanding the scope of 303 Creative's services to include the design, creation, and publication of wedding websites.

144.    Consistent with her religious beliefs, Lorie desires to use her graphic design, web design, and marketing talents to promote and celebrate only marriages involving one man and one woman.

145.    The wedding websites Plaintiffs wish to design, create, and publish will promote and celebrate the weddings of unique one-man, one-woman couples.

146.   By celebrating and promoting the weddings of unique one-man, one-woman couples, Lorie and 303 Creative will be expressing messages that promote God's design for marriage as an institution between one man and one woman.

147.   By creating wedding websites, Lorie and 303 Creative will also be collaborating with individuals who are marrying and will be using their unique stories as source material to express Lorie's and 303 Creative's message celebrating and promoting marriage as a union of one man and one woman.

148.   The interaction between Plaintiffs and their clients who desire wedding websites will also allow Plaintiffs to strengthen and encourage marriages by sharing biblical truths with their clients as they commit to lifelong unity and devotion as man and wife.

149.   The wedding websites will always be expressive in nature, using text, graphics, and in some cases videos to celebrate and promote the couple's wedding and unique love story.

150.   All of these expressive elements will be customized and tailored to the individual couple and their unique love story.

151.   The messages communicated on the wedding websites will be Plaintiffs' speech.

152.   Viewers of the wedding websites will know that the websites are Plaintiffs' speech because all of the wedding websites will say "Designed by 303Creative.com."

153.   Even if this designation did not exist, many viewers of the wedding websites would still know that the websites are Plaintiffs' speech because couples that marry frequently inform their guests which entities provided services for the wedding and guests frequently make inquiries regarding the same.

154.    A true and correct copy of an example of the type of wedding website that Plaintiffs

desire to design for their prospective clients is attached as Exhibit A.[1]

155.    Plaintiffs are prepared to announce their services for the creation of wedding websites.

156.    In fact, Plaintiffs have already designed an addition to 303 Creative's website announcing

the expansion of their services to include custom wedding websites, but this addition is not yet

viewable by the public.

157.    A true and correct copy of this addition to the website is attached as Exhibit B.[2]

158.    This webpage expresses Plaintiffs' love for weddings and the unique story of love and

commitment told by each wedding and the wedding websites that describe them.

159.    The webpage also expresses Plaintiffs' religious motivation for creating wedding

websites.

160.    Plaintiffs' intended message of celebration and promotion of their religious belief that

God designed marriage as an institution between one man and one woman will be unmistakable

to the public after viewing the webpage.

161.    For example, the webpage states the following:

> I firmly believe that God is calling me to this work.  Why?  I am personally
> convicted that He wants me – during these uncertain times for those who believe
> in biblical marriage – to shine His light and not stay silent.  He is calling me to
> stand up for my faith, to explain His true story about marriage, and to use the
> talents and business He gave me to publicly proclaim and celebrate His design for
> marriage as a life-long union between one man and one woman.

---

[1] Exhibit A is a compilation of captured images of the website that are modified in size and scope
to enhance readability in printed form.

[2] Exhibit B is a compilation of captured images of the website that are modified in size and scope
to enhance readability in printed form.

162.    As part of Plaintiffs' religious calling to celebrate God's design for marriage and due to their sincerely held religious belief that they must be honest and transparent about the services that they can and cannot provide, the webpage also states that their religious beliefs prevent them from creating websites celebrating same-sex marriages or any other marriage that contradicts God's design for marriage.

163.    For example, the webpage states the following:

> These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs, so I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman.  Doing that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage – the very story He is calling me to promote.

164.    As part of their religiously-motivated speech, Plaintiffs desire to—and are prepared to—publish this webpage immediately.

**303 Creative:  Suffering from CADA's Usurpation of Freedom**

165.    As a Colorado place of business engaged in sales to the public and offering services to the public, 303 Creative is a "place of public accommodation" subject to CADA.  Colo. Rev. Stat. § 24-34-601(1), (2)(a).

166.    The Banned-Speech Provision makes it illegal for Plaintiffs to publish the webpage referenced in paragraphs 156–157.

167.    This is because the Banned-Speech Provision makes it unlawful for a public accommodation to publish, display, or post any written or electronic communication indicating that it will not provide expressive services celebrating or promoting a same-sex marriage that it will provide for marriages involving one man and one woman.

168.    Plaintiffs' webpage announcing their services includes such communications.

169.    The Compelled-Speech Provision also prevents Plaintiffs from publishing the website.

170.    If, as the website referenced in paragraphs 156–157 does, Plaintiffs were to offer their creative services for the design and creation of wedding websites celebrating and promoting marriages between one man and one woman, the Compelled-Speech Provision would require Plaintiffs to also provide their creative services for the design and creation of wedding websites celebrating and promoting other types of marriages, including those between people of the same sex.

171.    If Plaintiffs publish the website referenced in paragraphs 156–157, thereby advertising that they will design and create wedding websites, Plaintiffs will receive requests to provide those expressive services for same-sex weddings.

172.    It would violate their sincerely held religious beliefs to create a wedding website for a same-sex wedding because, by doing so, they would be expressing a message celebrating and promoting a conception of marriage that is contrary to God's design for marriage.

173.    Plaintiffs are unwilling to express a message celebrating and promoting any conception of marriage outside of the understanding of marriage as a union of one man and one woman.

174.    Not only would creating a wedding website for a same-sex wedding express a message that Plaintiffs are unwilling to express, but it would also undercut the effectiveness of Plaintiffs' desired expression promoting marriage as a union between one man and one woman, harm Plaintiffs' reputation among their Christian clients and friends, and adversely impact Plaintiffs' ability to share additional biblical truths with others.

175.    Therefore, if Plaintiffs begin creating wedding websites, they will only be able to create wedding websites celebrating and promoting marriages involving one man and one woman.

176.    However, the Compelled-Speech Provision, and Defendants' application thereof, does not allow Plaintiffs this freedom.

177.    Unwilling to violate their sincerely held religious beliefs, but similarly unwilling to violate CADA and suffer the consequences, Plaintiffs are compelled to refrain from publishing the website referenced in paragraphs 156–157 and from designing, creating, and publishing wedding websites that celebrate and promote marriages between one man and one woman.

178.    If not for CADA, Plaintiffs would have already made the webpage referenced in paragraphs 156–157 viewable to the public and begun offering their creative services for the design, creation, and publication of wedding websites that celebrate and promote marriages between one man and one woman.

179.    CADA is the only reason that Plaintiffs are not engaging in their desired religious, political, moral, and social speech promoting marriage as an institution between one man and one woman and expressing their opposition to same-sex marriage.

180.    If Plaintiffs obtain the relief requested in this Complaint, they will immediately publish the webpage referenced in paragraphs 156–157 and begin work designing, creating, and publishing wedding websites.

181.    Website design services are widely available from businesses in the State of Colorado and across the nation.

182.    For example, the online directory http://sortfolio.com/ lists 243 web design companies in Denver alone and hundreds more nationwide.

183.    Likewise, the online directory http://www.designfirms.org lists 131 web design companies in Colorado and 6,745 in the United States as a whole.

184.    The online directory http://unitedstateswebdesigndirectory.com further lists 127 web design companies in Colorado and 4,097 countrywide.

185.    Accordingly, persons will be able to easily access web design services to promote same-sex marriages if Plaintiffs are permitted to follow their convictions by declining to promote same-sex marriages while promoting marriages between one man and one woman.

**Expressive Businesses in Colorado Advocate for Same-Sex Marriage**

186.    As explained, CADA is preventing Plaintiffs from celebrating and promoting their religious views about marriage in the manner they desire.

187.    However, CADA allows other expressive businesses that are public accommodations under CADA to celebrate and promote their views about marriage.

188.    This distinction in treatment is based on the particular view that an expressive business holds regarding marriage.

189.    If an expressive business wishes to oppose same-sex marriage, Defendants, through CADA, silence them.

190.    If, however, an expressive business wishes to support same-sex marriage, Defendants allow them to do so.

191.    For example, Nicole Nichols Photography, a wedding photography company based in Denver, Colorado, has a history of advocating for and celebrating same-sex marriage.

192.    On October 22, 2010, the owner of Nicole Nichols Photography stated on her business's webpage that she photographed a gay wedding and loved how the pastor "focused his sermon on how normal a gay union is, perhaps not popular, but certainly just as normal as any two people

sharing their love & lives together.  Throughout history gays have always been a part of reality, and always will be, it[']s just unfortunate government & religion has not always recognized it."

193.   The   webpage   with   this   quote   is   available   here: http://nicolenichols.com/blog/weddings/wedding-gay-new-orleans/.

194.   On June 29, 2012, the photography company announced its participation in the Denver Pridefest and noted that the owner is "a big supporter of gay rights," is "a strong believer that ALL should have the right to marry whomever he or she wants," and believes that "love can change the world."

195.   The webpage with these quotes is available here:  http://nicolenichols.com/blog/special-events/denver-pridefest-co-gay-weddings/.

196.   The owner of the photography company also published the following statement celebrating the Supreme Court's *Obergefell* decision and advocating for the expansion of same-sex marriage to the remainder of the world:  "I'm so proud of not only our state of Colorado, but the nation, for finally legalizing gay and lesbian marriages.  All men and women should share the same rights that a legal marriage allows . . . .  Hopefully the rest of the world will soon follow."

197.   The   webpage   with   this   quote   is   available   here: http://nicolenichols.com/blog/weddings/denver-gay-wedding-photographer-denver-botanical-gardens-tivoli-hall/.

198.   Upon information and belief, many other Colorado expressive businesses and their owners promote their views in favor of same-sex marriage via the platforms of their public accommodations and publish their willingness to create expression celebrating those unions.

199.    Plaintiffs support the rights of these expressive businesses and their owners to express their beliefs and conduct their businesses in a way that promotes those beliefs and does not promote contrary beliefs.   Plaintiffs simply wish to enjoy those same freedoms.   Yet CADA strips Plaintiffs of these freedoms.   That is the foundational reason for this lawsuit – to restore Plaintiffs to an equal footing with other expressive business owners in regard to their right to express messages that are consistent with their beliefs, and to avoid expressing those messages that are not.

## ALLEGATIONS OF LAW

200.    Plaintiffs Lorie Smith and 303 Creative LLC are subject to and must comply with Colorado laws, including Colo. Rev. Stat. § 24-34-601(2)(a).

201.    At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to Defendants, which acted under color of a statute, regulation, custom, or usage of the State of Colorado.

202.    The impact of chilling and deterring Plaintiffs Lorie Smith and 303 Creative LLC from exercising their constitutional rights constitutes imminent and irreparable harm to Lorie Smith and 303 Creative LLC as a result of Defendants' policy and practice.

203.    Plaintiffs Lorie Smith and 303 Creative LLC have no adequate or speedy remedy at law to correct or redress the deprivation of its rights under the United States Constitution by Defendants.

204.    Unless the conduct of Defendants is enjoined, Plaintiffs Lorie Smith and 303 Creative LLC will continue to suffer irreparable injury.

## CAUSES OF ACTION

### First Cause of Action:
### Violation of the Free Speech and Free Press Clauses of the First Amendment of the United States Constitution:  Content and Viewpoint Discrimination, Compelled Speech, Expressive Association, Unconstitutional Conditions, Unbridled Discretion, and Overbreadth

205.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–204 of this Complaint.

206.    Plaintiff Lorie Smith is the sole owner and operator of Plaintiff 303 Creative, a closely-held limited liability company.

207.    Plaintiff Lorie Smith is a Christian who operates 303 Creative in accordance with her sincerely held religious beliefs.

208.    Plaintiffs, in accordance with their sincerely held religious belief that all of their actions must be in accordance with the teachings of the Bible and their understanding of God's plan, will only design, create, publish and sell custom websites that are consistent with their religious beliefs.

209.    It is the sincerely held religious belief of Plaintiffs that the only proper conception of marriage is a marital covenant between one man and one woman.

210.    Plaintiffs design, create, and publish artistic, custom websites promoting and celebrating various messages.

211.    In doing so, Plaintiffs create and promulgate speech.

212.    Each website Plaintiffs create is their own speech.

213.    Plaintiffs' custom websites, including the choice of graphics, format, sizing, color scheme, font size, font color, text, and interface; the process of designing and creating the

websites; the process of marketing, selling, and promoting the websites; the act of publishing the websites; and the business of designing, creating, publishing, and selling websites, all constitute protected speech under the First Amendment.

214.    When Plaintiffs design and create a wedding website, they intend to and are creating speech celebrating and promoting the wedding described on the website.

215.    Plaintiffs desire to design wedding websites to celebrate and promote their religious understanding of marriage as an institution between one man and one woman and as a fundamental building block of society.

216.    Plaintiffs also desire to use their talents and platform to disseminate their view of God's design for marriage as an institution between one man and one woman and the benefits that such marriages have for society.

217.    It would violate Plaintiffs' religious beliefs and conflict with their message about marriage to design and create a wedding website for any wedding, such as a same-sex wedding, that does not celebrate the marital union of one man and one woman.

218.    Plaintiffs' design and creation of websites celebrating and promoting marriage between one man and one woman, and their decision to decline to design and create websites promoting any other conception of marriage, are protected by the First Amendment.

219.    Plaintiffs also wish to inform the public that they are unwilling to create speech for events promoting marriages that are not between one man and one woman, including same-sex marriages.  Along with this explanation, Plaintiffs wish to elucidate their religious reasons for not creating custom websites that violate their religious beliefs regarding marriage.

220.    Plaintiffs wish to make such statements on their website and in electronic communications with prospective clients.

221.    This desired speech is protected by the First Amendment.

**CADA is Content Based and Viewpoint Discriminatory**

222.    The First Amendment's Free Speech Clause prohibits laws that regulate protected speech based on its content or viewpoint.

223.    The Banned-Speech Provision is content-based because it regulates speech about a handful of topics—specifically disability, race, creed, color, sex, sexual orientation, marital status, national origin, and ancestry—while leaving as unregulated speech on the virtually unlimited number of other topics not listed in CADA.

224.    For example, the Banned-Speech Provision prohibits statements asserting that political positions supporting same-sex marriage are misguided but allows statements opposing other political positions of all sorts.

225.    This is content-based discrimination forbidden by the First Amendment.

226.    The Banned-Speech Provision is also viewpoint discriminatory.

227.    Defendants enforce the Banned-Speech Provision in a viewpoint discriminatory manner at least in relation to the topic of marriage.

228.    Defendants will not prosecute or threaten to prosecute under the Banned-Speech Provision expressive businesses or their owners that provide wedding services and state that they support same-sex marriage and create for and promote messages in favor of same-sex marriage.

229.    Defendants will, however, prosecute under the Banned-Speech Provision expressive businesses and their owners that provide wedding services and who state that they oppose same-

sex marriage, that they exclusively favor marriages between one man and one woman, or that they decline to express messages favoring same-sex marriage.

230.     Thus, in order to avoid prosecution and punishment, Colorado expressive businesses and their owners providing expressive wedding services must refrain from speaking messages that exclusively favor marriages between one man and one woman, that oppose same-sex marriage, or that decline to affirmatively promote or celebrate same-sex marriage.

231.     This singling out, punishing, suppressing, and deterring certain speech solely based on its viewpoint about marriage is unlawful viewpoint discrimination.

232.     If Plaintiffs were to make their desired statements, they would violate the Banned-Speech Provision's content- and viewpoint-based restrictions on speech and face investigation and other penalties for the violation.

233.     The Compelled-Speech Provision is also content and viewpoint based.

234.     The First Amendment prevents the government from compelling people to create, express, or support a message not of their own choosing or to speak when they would rather remain silent.

235.     Plaintiffs will only design and create wedding websites that promote and celebrate marriages between one man and one woman.

236.     If Plaintiffs enter the business of designing and creating wedding websites for weddings celebrating and promoting the lifelong commitment of one man and one woman, the Compelled-Speech Provision requires them to also design and create wedding websites celebrating and promoting same-sex weddings.

237.    Thus, the Compelled-Speech Provision requires Plaintiffs to engage in expression that they do not desire to convey—expression that violates their core religious beliefs—by requiring them to design and create websites celebrating and promoting same-sex marriage.

238.    If Plaintiffs begin designing and creating wedding websites, as they desire, they will be subject to penalties for declining to design and create websites that promote and celebrate a conception of marriage that violates their deeply held religious beliefs.

239.    The penalties that Plaintiffs may face for declining to promote messages they deem objectionable can include fines of up to $500 for *each* violation, Colo. Rev. Stat. § 24-34-602(1)(a), a costly and onerous investigation, Colo. Rev. Stat. § 24-34-306(2)(a), an order requiring them to comply with CADA, Colo. Rev. Stat. § 24-34-306(9), and an order requiring them to take a variety of steps, such as reporting their own behavior to the Commission, engaging in indoctrination training, and affirmatively informing the public that they lack the First Amendment right to decline to produce and promote objectionable messages, *see* Colo. Rev. Stat. §§ 24-34-306(9), 24-34-605.

240.    Notably, many of the potential penalties are themselves government-compelled speech.

241.    The content and viewpoint-based nature of CADA is further illustrated by the punishment Jack Phillips and Masterpiece Cakeshop received for declining to celebrate and promote messages favoring same-sex marriage while Colorado businesses such as Azucar Bakery were permitted to decline to promote messages opposing same-sex marriage.

242.    The fact that the Compelled-Speech Provision requires businesses to express messages consistent with government orthodoxy about same-sex marriage, while allowing them to decline to express messages contrary to such orthodoxy, is rank content and viewpoint discrimination.

**The Compelled-Speech Provision Violates Plaintiffs' Right to Free Association**

243.    The First Amendment prohibits the government from compelling persons to expressively associate with others in the process of creating and disseminating speech.

244.    The First Amendment also prohibits the government from banning people from expressively associating with others in the process of creating and disseminating speech.

245.    Plaintiffs engage in expressive association when they decide to accept a client and collaborate with them to use the client's unique story and wedding event as source material for Plaintiffs' creation of speech that furthers Plaintiffs' beliefs.

246.    The Compelled-Speech Provision harms Plaintiffs' ability to promote their beliefs about religion and marriage by requiring them to either decline to associate with clients and events that will help them promote messages celebrating marriages between one man and one woman or to willingly associate with clients and events that will require them to speak messages that completely contradict their desired messages.

247.    Plaintiffs cannot authentically or convincingly promote their beliefs about religion and marriage if they are forced to associate with clients or events that will require Plaintiffs to express contradictory messages about religion and marriage.

**CADA Conditions Benefits on Surrendering Rights**

248.    The First Amendment's Free Speech Clause prohibits the government from conditioning a benefit on the relinquishment of a constitutional right.

249.    CADA imposes a content and viewpoint-based litmus test on the ability of Coloradans to own and operate an expressive business.

250.    Plaintiffs have the First Amendment right to choose the content of their expression, to promote the messages they desire to promote, to participate in the creation of the speech they deem desirable, to exercise their religion by promoting messages consistent with their religious beliefs, and to decline to promote messages contrary to their religious beliefs.

251.    But the Compelled-Speech Provision mandates that Plaintiffs create messages celebrating and promoting same-sex marriage and the Banned-Speech Provision bars them from expressing their religious views about same-sex marriage, thereby unconstitutionally conditioning the receipt of an essential benefit—specifically, the right to make a living in the occupation of one's choice, the right to run a business, and the right to sell speech—on the willingness of Plaintiffs to surrender these First Amendment rights.

**CADA's Provisions Grant Defendants Unbridled Discretion**

252.    The First Amendment's Free Speech Clause prohibits the government from regulating expression based on guidelines that give officials unbridled discretion to arbitrarily allow some expression and prohibit other expression.

253.    In its application of the Compelled-Speech Provision, Defendants have shown that they have unbridled discretion to arbitrarily allow some expression and prohibit other expression.

254.    If an expressive business is asked to create expression consistent with the ideology of Defendants and inconsistent with the beliefs of the expressive business, Defendants can oftentimes punish the expressive business if it adheres to its beliefs by declining to create the objectionable expression.

255.    Defendants can do so by saying that the business owner declined to create the requested expression "because of" the protected classification of the customer rather than the objectionable nature of the message.

256.    Defendants' actions with respect to Jack Phillips and Masterpiece Cakeshop illustrate this point.

257.    However, if a prospective customer asks an expressive business to produce a message that the business *and* Defendants find objectionable, Defendants are happy to afford the business owner the right to decline the objectionable speech.

258.    Defendants can do so by saying that the business owner declined to create the requested expression due to the objectionable nature of the message rather than "because of" the protected classification of the customer.

259.    Defendants' actions with respect to Azucar Bakery and other bakeries illustrate this point.

260.    Thus, Defendants have unbridled discretion to determine arbitrarily that one declination to create objectionable speech is "because of" a protected classification, and therefore illegal under the Compelled-Speech Provision, and to determine that another declination is because of the objectionable nature of the speech rather than the protected classification of the customer.

261.    The Banned-Speech Provision also grants unbridled discretion to Defendants by making it unlawful for a public accommodation to "publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates . . . that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry."

262.   CADA does not define "unwelcome," "objectionable," "unacceptable," or "undesirable," and does not explain what statements "indicate" that someone would be unwelcome, objectionable, unacceptable, or undesirable "because of" a protected classification.

263.   This language allows Defendants to censor speech out of dislike for particular viewpoints, allows Defendants to hide inappropriate viewpoint discrimination behind this language, and prevents potential speakers from knowing whether their speech violates the law.

264.   Anytime a public accommodation or its owner opposes or criticizes someone's ideas, someone's beliefs, someone's actions, or someone's speech, Defendants could determine that that statement indicates someone is unwelcome, objectionable, unacceptable, or undesirable.

265.   Because almost any statement could violate the wide reach of the Banned-Speech Provision, Defendants have unbridled discretion to pick and choose which statements violate the law, thereby subjecting the First Amendment rights of Plaintiffs and similarly situated citizens to the whims of government officials.

**The Banned-Speech Provision is an Overbroad Prior Restraint on Speech**

266.   The Banned-Speech Provision is overbroad because it prohibits public accommodations from directly or indirectly publishing, circulating, issuing, displaying, posting, or mailing "any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual . . . because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry."

267.   This language applies to both expressive and non-expressive businesses.

268.    Nothing in the Banned-Speech Provision limits its scope to statements about non-expressive activities.

269.    This language is overbroad because it restricts the right of expressive businesses like newspapers, book publishers, printers, musicians, authors, movie studios, playwrights, web designers, and others to create speech and communicate it in accordance with their beliefs and to decline to speak and create speech that violates their beliefs.

270.    The Banned-Speech Provision is also overbroad because it prohibits public accommodations from "directly or indirectly" publishing, circulating, issuing, displaying, posting, or mailing "any written, electronic, or printed communication, notice, or advertisement that indicates . . . that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry."

271.    This prohibits too many protected statements—including political and religious ones—that oppose or criticize someone's ideas, beliefs, actions, or speech.

272.    It also prohibits too many protected statements—including political and religious ones—that exclusively favor someone's ideas, beliefs, actions, or speech.

273.    Further, the Banned-Speech Provision's restriction on communications that even "indirectly" communicate a barred message imperils even more protected expression because what constitutes an "indirect" communication is completely undefined and thus permits enforcement officials to hide their viewpoint discrimination.

**The Banned-Speech Provision Violates the Free Press Clause**

274.    The Free Press Clause prevents previous restraints upon publication and guarantees each individual's right to make their thoughts public before the community.

275.    The Free Press Clause protects Plaintiffs' right to discuss their religious beliefs about marriage on their website without previous restraint or fear of subsequent punishment by the government.

276.    Defendants unlawfully apply the Banned-Speech Provision to forbid Plaintiffs from publishing religious speech critical of same-sex marriage on their website because such speech might "directly or indirectly" indicate that requests for custom same-sex wedding websites would be "unwelcome, objectionable, unacceptable, or undesirable."

277.    Defendants' unlawful application of CADA to expressive activity is the only reason Plaintiffs have refrained from publishing speech on their website explaining their religious reasons for promoting only marriage between a man and a woman.

278.    Defendants' application of CADA to prevent Plaintiffs from engaging in the free and general discussion of public matters, like marriage, violates the Free Press Clause.

**The First Amendment Violations Chill Plaintiffs' Speech and Fail Strict Scrutiny**

279.    Absent the Banned-Speech and Compelled-Speech Provisions, Plaintiffs would immediately enter the field of promoting and celebrating marriages between one man and one woman through custom wedding websites.

280.    Plaintiffs are prepared to begin this work by making the website reflected in Exhibit B announcing their wedding-website design services available online for public consumption.

281.    The only things preventing Plaintiffs from designing and creating websites celebrating and promoting marriage as an institution between one man and one woman are the Banned-Speech Provision and the Compelled-Speech Provision and Defendants' application thereof in a way that punishes those who decline to celebrate and promote same-sex marriage.

282.    Because of CADA, Plaintiffs are chilled, deterred, and restricted from engaging in their desired expression celebrating and promoting marriage as an institution between one man and one woman.

283.    Plaintiffs currently suffer the ongoing harm of self-censorship of their desired, protected speech, in order to avoid penalties under the Compelled-Speech and Banned-Speech Provisions.

284.    The Banned-Speech Provision prohibiting statements indicating that someone is unwilling to celebrate and promote same-sex marriage and prohibiting other political, religious, or social commentary that may indicate that someone is "unwelcome, objectionable, unacceptable, or undesirable," and Defendants' enforcement of the Banned-Speech Provision, chills, deters, and restricts not only Plaintiffs' speech but the speech of third parties as well.

285.    If not for CADA, Plaintiffs would immediately publish on their website the webpage attached as Exhibit B announcing their desire to celebrate marriages between one man and one woman through the creation of custom wedding websites, their religious views regarding marriage, and their inability to celebrate same-sex marriages or other conceptions of marriage that are not between one man and one woman.

286.    Because CADA infringes First Amendment free speech rights, it must further a compelling interest in a narrowly tailored way.

287.    CADA does not serve any legitimate, rational, substantial, or compelling interest by forcing Plaintiffs to violate their First Amendment free speech or free press rights.

288.    CADA does not serve any legitimate interest in a narrowly tailored way by forcing Plaintiffs to violate their First Amendment free speech or free press rights.

289.    Defendants have alternative, less restrictive means to achieve any legitimate interests rather than forcing Plaintiffs to abandon their First Amendment free speech and free press rights.

290.    Accordingly, as applied to Plaintiffs, the Compelled-Speech Provision's requirement that Plaintiffs create custom websites celebrating and promoting same-sex marriage if they decide to create custom websites celebrating marriages between one man and one woman infringes Plaintiffs' rights to speak and refrain from speaking, and to associate or refrain from associating, as protected by the First and Fourteenth Amendments of the United States Constitution.

291.    Accordingly, facially and as applied to Plaintiffs, the Banned-Speech Provision's prohibition of statements indicating that someone is unwilling to celebrate and promote same-sex marriage and its prohibition on other political, religious, or social commentary that may indicate that someone is "unwelcome, objectionable, unacceptable, or undesirable" because they are part of a protected class violates Plaintiffs' right to speak freely as guaranteed by the First and Fourteenth Amendments of the United States Constitution.

292.    WHEREFORE, Plaintiffs respectfully ask that the Court grant the relief specified in the Prayer for Relief.

**Second Cause of Action:**
**Violation of Plaintiffs' First Amendment Right to Free Exercise of Religion**

293.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–204 of this Complaint.

294.    Plaintiffs' sincerely held religious beliefs prohibit them from celebrating or promoting messages contrary to their understanding of the teachings of the Bible.

295.    Plaintiffs sincerely believe that the Bible teaches that marriage is designed by God to be a lifelong union between one man and one woman only.

296.    Therefore, Plaintiffs cannot design a wedding website for a same-sex wedding because that requires Plaintiffs to promote and celebrate messages contrary to their religious beliefs.

297.    Plaintiffs hold sincere religious beliefs that require them to tell their clients and the general public that they cannot create custom expression that conflicts with their religious beliefs and the reasons they cannot create such custom expression.

298.    Plaintiffs would violate their religious beliefs if they misled their customers to think that they create custom expression celebrating and promoting same-sex marriage when they do not.

299.    Plaintiffs hold sincere religious beliefs requiring them to explain their religious beliefs about marriage and the religious reasons for and meaning of their expression.

300.    Plaintiffs' religious beliefs about marriage, expression, honesty, and business come from the Bible and Christian doctrine.

301.    The Compelled-Speech Provision forces Plaintiffs to choose between three unacceptable options:  (1) decline to create custom expression celebrating and promoting same-sex wedding ceremonies because of their religious beliefs and suffer investigation, prosecution, and penalties as a result; (2) violate their religious beliefs by creating custom expression celebrating and

promoting same-sex wedding ceremonies in order to comply with the law; or (3) restrict their religious exercise by refraining from using their God-given talents and platform to create custom expression celebrating and promoting marriages as God designed them.

302.    The Banned-Speech Provision forces Plaintiffs to choose between two impossible options:  (1) adhere to their religious beliefs, publish their religiously motivated and required statements, and suffer investigation, prosecution, and penalties; or (2) violate their religious beliefs and refrain from publishing their religiously motivated and required statements.

303.    The Compelled-Speech Provision violates Plaintiffs' right to the free exercise of religion by conditioning the right to own and operate a business that designs wedding websites celebrating and promoting marriage as God designed it on their willingness to violate their religious beliefs by celebrating and promoting same-sex marriage.

304.    The Banned-Speech Provision violates Plaintiffs' right to the free exercise of religion by stopping them from operating their business in an open and honest way by barring them from stating what messages they will not express due to their religious beliefs.

305.    The Banned-Speech Provision violates Plaintiffs' right to the free exercise of religion by preventing them from using their closely-held business as a platform to express their religious beliefs about marriage, the expression of which are religiously motivated.

306.    The Compelled-Speech Provision and Defendants' enforcement thereof impermissibly prefer some religious views over others by allowing those whose religion is consistent with same-sex marriage to own and operate an expressive business in the wedding industry while punishing those who own and operate marriage-related expressive businesses in accordance with their religious beliefs that prohibit them from celebrating or promoting same-sex marriage.

307.    The Banned-Speech Provision and Defendants' enforcement thereof impermissibly prefer some religious views over others by allowing those who own and operate public accommodations to express religious beliefs in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

308.    CADA is not facially or operationally neutral or generally applicable and imposes special disabilities on Plaintiffs due to their religious beliefs.

309.    CADA, facially and as applied by Defendants, is not neutral or generally applicable because Defendants enforce it through a system of individualized exemptions under which they assess the reasons for an exemption and grant exemptions for nonreligious reasons but not for religious reasons.

310.    CADA, facially and as applied by Defendants, is not neutral or generally applicable because it contains categorical exemptions, including one for any "church, synagogue, mosque, or other place that is principally used for religious purposes."  Colo. Rev. Stat. § 24-34-601(1).

311.    Given CADA's broad exemption for such religious entities, Defendants have no legitimate basis for refusing to extend a religious exemption to Plaintiffs who have at least as strong of a religious objection to celebrating and promoting same-sex marriage as any of the exempted entities and at least as strong of a religious motivation to express messages about their religious beliefs regarding God's design for marriage as any of the exempted entities.

312.    Additionally, Defendants apply CADA in a way that protects the religious beliefs of expressive business owners who share their views, but punishes expressive business owners who hold religious beliefs contrary to Defendants' views.

313.     For example, when an expressive business owner's religious beliefs prevent her from promoting and celebrating same-sex marriage, Defendants enforce the Compelled-Speech Provision in a manner that requires the expressive business owner to violate her religious beliefs by promoting and celebrating same-sex marriage if she wishes to be in the marriage industry.

314.     In contrast, when an expressive business owner's beliefs lead her to refuse to promote and celebrate a religious message opposing same-sex marriage, Defendants interpret the Compelled-Speech Provision as allowing the business to decline to create the message that both the business owner and Defendants find objectionable.

315.     CADA also violates Plaintiffs' free exercise rights under the hybrid rights doctrine because it implicates free exercise rights in conjunction with other constitutional protections, like the right to free speech.

316.     Plaintiffs' compliance with their religious beliefs constitutes a religious exercise under the First Amendment.

317.     CADA substantially burdens Plaintiffs' religious exercise.

318.     CADA imposes severe coercive pressure on Plaintiffs to change or violate their religious beliefs and chills and deters Plaintiffs' religious exercise by suppressing their religiously motivated and required messages.

319.     Absent the Compelled-Speech Provision, Plaintiffs would immediately act in accordance with their religious beliefs by entering the field of designing and creating wedding websites celebrating and promoting marriage as God designed it.

320.    Absent the Banned-Speech Provision, Plaintiffs would immediately speak and publish their religiously motivated and required messages about God's design for marriage and the religious reasons that they are unwilling to celebrate other views of marriage.

321.    If not for CADA, Plaintiffs would immediately publish on their website the webpage attached as Exhibit B announcing their desire to celebrate marriages as God designed them, their religious views regarding marriage, and their inability to celebrate same-sex marriages or other conceptions of marriage that are not between one man and one woman.

322.    Plaintiffs currently suffer ongoing harm because of CADA—namely, the self-censorship and suppression of their religiously motivated and required messages to avoid violating the law and incurring resulting penalties.

323.    Because CADA is not facially or operationally neutral or generally applicable and imposes special disabilities on Plaintiffs due to their religious beliefs, and because it also burdens other fundamental constitutional rights, it must further a compelling interest in a narrowly tailored way.

324.    Defendants do not serve any legitimate, rational, substantial, or compelling interest in forcing Plaintiffs to violate their religious beliefs by designing and creating a wedding website that celebrates and promotes same-sex marriage.

325.    Defendants do not serve any legitimate, rational, substantial, or compelling interest in forcing Plaintiffs to violate their religious beliefs by refraining from expressing their religiously motivated and required statements.

326.    To achieve any legitimate interests that Defendants may assert, Defendants have many alternative, less restrictive mechanisms available.

327.    Accordingly, as applied to Plaintiffs, the Compelled-Speech Provision violates their free-exercise rights.

328.    Accordingly, facially and as applied to Plaintiffs, the Banned-Speech Provision violates their free-exercise rights.

329.    WHEREFORE, Plaintiffs respectfully ask that the Court grant the relief specified in the Prayer for Relief.

**Third Cause of Action:**
**Violation of Plaintiffs' Fourteenth Amendment Right to Equal Protection**

330.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–204 of this Complaint.

331.  The government may not treat someone disparately as compared to similarly situated persons and businesses when such disparate treatment burdens a fundamental right.

332.  Plaintiffs are similarly situated to other persons and expressive businesses that provide marriage-related services and express religious and political messages about marriage.

333.  The Compelled-Speech Provision and Defendants' enforcement thereof treat Plaintiffs' religious and political speech and religious exercise differently from those similarly situated to Plaintiffs by permitting those whose religious and political beliefs support same-sex marriage to own and operate a marriage-related expressive business according to their religious and political beliefs without fear of punishment, while imposing penalties on those who own and operate marriage-related expressive businesses according to their religious and political beliefs that bar them from celebrating and promoting same-sex marriage.

334.  The Compelled-Speech Provision and Defendants' enforcement thereof make it illegal for public accommodations and their owners to decline to express views favoring one conception of marriage that they may find objectionable—namely, the view that it is good for two people of the same sex to marry—but permissible to decline to express views favoring a contrary conception of marriage that they may find objectionable—namely, the view that it is not good for two people of the same sex to marry.

335.  That CADA permits public accommodations to decline to express one view about marriage but does not allow them to decline to express another view about marriage is revealed

by the different outcomes reached by Defendants in applying the Compelled-Speech Provision to Masterpiece Cakeshop and the similarly situated Azucar Bakery, Le Bakery Sensual, Inc., and Gateaux, Ltd.

336.   The Banned-Speech Provision and Defendants' enforcement thereof treat Plaintiffs' religious and political speech and religious exercise differently from those similarly situated to Plaintiffs by permitting those whose religious and political beliefs support same-sex marriage to express their beliefs without fear of punishment, while imposing penalties on those who express political and religious beliefs opposing same-sex marriage.

337.   CADA, and Defendants' discriminatory enforcement thereof, violates several fundamental rights of Plaintiffs, such as their freedom of speech and free exercise of religion.

338.   When the enforcement of laws, like CADA, infringe on such fundamental rights, courts presume discriminatory intent.

339.   In this case, the presumption of discriminatory intent is borne out by Defendants' intentional discrimination against the rights of free speech and free exercise of religion by Plaintiffs and those like Plaintiffs who hold traditional Christian beliefs about marriage as an institution between one man and one woman.

340.   The discriminatory intent is also shown by the different outcomes reached by Defendants in applying the Compelled-Speech Provision to Masterpiece Cakeshop and the similarly situated Azucar Bakery, Le Bakery Sensual, Inc., and Gateaux, Ltd.

341.   Defendants lack any legitimate, rational, substantial, or compelling state interest for such disparate treatment of Plaintiffs.

342.    Defendants' disparate treatment of Plaintiffs is not narrowly tailored to further any legitimate government interest Defendants' may allege.

343.    CADA, as applied to Plaintiffs, therefore violates their right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

344.    WHEREFORE, Plaintiffs respectfully ask that the Court grant the relief specified in the Prayer for Relief.

**Fourth Cause of Action:**
**Violation of Plaintiffs' Fourteenth Amendment Right to Due Process**

345.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–204 of this Complaint.

346.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to due process of law, which includes the right to own and operate a business and earn a livelihood free from unreasonable governmental interference.

347.    CADA unreasonably interferes with Plaintiffs' due process rights by threatening them with punishment if they operate 303 Creative in accordance with their religious convictions.

348.    The Due Process Clause of the Fourteenth Amendment also prohibits the government from censoring speech or outlawing behavior pursuant to vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some expression and action and that fail to give speakers and actors sufficient notice whether their speech or actions violate the law.

349.    The Banned-Speech Provision contains vague language because it prohibits the publication of statements indicating that an individual is "unwelcome, objectionable, unacceptable, or undesirable" because that individual belongs to one of the particular classifications, such as "sexual orientation," covered by CADA.

350.    CADA never defines "unwelcome," "objectionable," "unacceptable," or "undesirable."

351.    CADA also fails to explain what statements indicate that someone is "unwelcome, objectionable, unacceptable, or undesirable" "because" that individual belongs to one of the classifications stated in CADA.

352.    CADA also fails to define what constitutes an "indirect" communication versus a "direct" communication.

353.   This vague language grants Defendants unbridled discretion to censor speech out of dislike for particular viewpoints and to hide their viewpoint discrimination behind vague language.

354.   This vague language, and Defendants' unbridled discretion to choose how to enforce the language, prevents potential speakers from knowing whether their speech violates the law.

355.   Anytime a public accommodation or its owner opposes or criticizes someone's ideas, someone's beliefs, someone's actions, or someone's speech, Defendants could determine that the statement communicates that a person is unwelcome, objectionable, unacceptable, or undesirable.

356.   Thus, citizens of common intelligence must guess about what it means to make a statement indicating that someone is "unwelcome, objectionable, unacceptable, or undesirable" because that person belongs to a protected classification and they will differ in the conclusions they reach in making this assessment.

357.   The Banned-Speech Provision provides insufficient warning or notice as to what expression is prohibited.

358.   Because almost any statement could violate the Banned-Speech Provision, Defendants must pick and choose which statements violate the law.

359.   Therefore, the rights of Plaintiffs and other Coloradans now turn on the whim of government officials, and Plaintiffs and other Coloradans therefore cannot know whether their desired speech violates the law.

360.   Because the Banned-Speech Provision does not provide sufficient clarity to those who desire to speak and empowers Defendants to impose severe penalties on speakers whose views

they disfavor, Plaintiffs have not and will not publish their desired statements about the speech they are unwilling to engage in and their religious views on marriage in order to avoid violating the law and incurring the accompanying penalties.

361. If not for the vagueness in the Banned-Speech Provision, Plaintiffs would speak their desired messages immediately.

362. The Banned-Speech Provision chills and deters Plaintiffs' speech.

363. Plaintiffs currently suffer ongoing harm because of the Banned-Speech Provision—namely, the self-censorship and suppression of their protected speech to avoid violating CADA and incurring penalties.

364. Because CADA chills, deters, and infringes on the due process rights of Plaintiffs and other citizens, CADA must further a compelling interest in a narrowly tailored way.

365. Defendants have no legitimate, rational, substantial, or compelling interest in stopping Plaintiffs from owning and operating a business and from earning a livelihood.

366. CADA and Defendants do not serve any legitimate interest in a narrowly tailored way by stopping Plaintiffs from owning and operating a business and from earning a livelihood.

367. Defendants do not serve any legitimate, rational, substantial, or compelling interest in using vague language to deter Plaintiffs from communicating as they desire.

368. The Banned-Speech Provision and Defendants do not serve any legitimate interest in a narrowly tailored way in using vague language to deter Plaintiffs' speech.

369. Defendants have many alternative, less restrictive mechanisms to achieve any legitimate interests.

370.    Accordingly, facially and as applied to Plaintiffs, the Banned-Speech Provision violates their right to due process as guaranteed by the Fourteenth Amendment of the United States Constitution.

371.    Accordingly, as applied to Plaintiffs, the Compelled-Speech Provision violates their right to due process as guaranteed by the Fourteenth Amendment of the United States Constitution.

**Fifth Cause of Action:**
**Fourteenth Amendment Substantive Due Process and Equal Protection Challenge to Denial**
**of Religious Identity, Personal Dignity, Personal Autonomy, and Personal Liberty**

372.　Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–204 of this Complaint.

373.　The Supreme Court's majority opinion in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), and other Supreme Court precedent, dictates that the Fourteenth Amendment protects the liberty of individuals to make choices central to their own dignity and autonomy, including choices that define their personal identity and beliefs.

374.　Lorie's religious understanding is that human dignity arises from God's creation of man in His own image.  *See* Genesis 1:26-27.

375.　Lorie understands that a Christian becomes a "new creation in Christ" and this knowledge is a key aspect of her identity as a Christian.  2 Corinthians 5:17.

376.　According to the Supreme Court's decision in *Obergefell*, the Fourteenth Amendment protects the rights of individuals to serve their God in accordance with the dictates of their own consciences, thereby allowing them to make the decisions that define their personal identity and inseparable religious beliefs.

377.　The Fourteenth Amendment, under longstanding caselaw, also guarantees the right to pursue one's entrepreneurial dreams, engage in the common occupations of life, operate a business, earn a livelihood, and continue employment unmolested.

378.　In the United States, the right to pursue one's entrepreneurial dreams is fundamental as a matter of history and tradition.

379.     The Fourteenth Amendment protects such personal rights essential to individuals' orderly pursuit of happiness.

380.     The desire of individuals to use their own talents and imaginations to pursue a livelihood is part of the deeply held ethos of the American dream.  To deny that dream to those with certain deeply held religious beliefs is to devalue their identity, dignity, liberty, and potential to find fulfillment, and imposes on them an abhorrent degree of stigma and injury.

381.     According to Supreme Court precedent, such as *Obergefell*, while a state can have its own views of the ideal ordering of society, when it imposes those beliefs through law with the necessary consequence of putting the imprimatur of the State on excluding people with certain personal beliefs from the pursuit of basic liberties, they demean and stigmatize those individuals in a manner forbidden by the Fourteenth Amendment.

382.     Under the Supreme Court's precedent, to deny certain people the right to engage in business in a way that is consistent with their own concepts of existence and identity is to deny them liberty, disparage their intimate personal choices and identity, and devalue their personhood.

383.     Lorie's religious beliefs, including her religious understanding about marriage as an institution between one man and one woman, are central to her dignity, autonomy, and identity. Mark 10:6-9; Ephesians 5: 31-33.

384.     Although she is a daughter, a wife, and a mother, Lorie identifies first and foremost as a Christian—a follower of Jesus Christ—and her decision to act consistently with her religious understanding of marriage defines her personal identity.

385.    Lorie's sincerely held religious understanding is that she must conduct herself in accordance with the teachings of the Bible whether at home or at work.  Colossians 3:23-25.

386.    Lorie cannot live consistently with her religious understanding and Christian identity if she is required to say or do things that are inconsistent with her faith or if she is forbidden to say or do what she desires to further or promote her Christian beliefs.

387.    Lorie's sincerely held religious understanding that God designed marriage as a lifelong institution between one man and one woman, and that any other conception of marriage violates God's plan, is inextricably intertwined with her own identity, beliefs, equal dignity as a citizen, and personal autonomy.

388.    Lorie's desire to engage in the marketplace by celebrating weddings as she believes God designed them is an expression of her personal identity and her religious understanding of marriage, both of which are central to her equal dignity as a citizen and personal autonomy.

389.    Lorie's decision to publically express her beliefs about marriage is a religious calling that defines her personal identity and beliefs and is central to her equal dignity as a citizen and personal autonomy.

390.    Lorie's ability to follow her chosen expressive profession, in keeping with her religious beliefs, free from unreasonable government interference also comes within the definition of "liberty" and "property" under the Due Process Clause.

391.    The Due Process Clause's definition of "liberty" further protects Lorie's right to express her religious understanding of marriage and establish her religious self-definition in the political, civic, and economic life of the larger community.

392.    The Compelled-Speech Provision's requirement that Lorie facilitate, participate in, celebrate, and promote same-sex weddings if she uses her business to celebrate and promote weddings that she believes are wonderful in the eyes of God devalues her self-identity, dignity, liberty, intimate personal choices, and personhood and instead denies her dignity as an equal citizen, stigmatizes her as a social pariah, disallows her from pursuing her chosen profession, and punishes her in violation of the Fourteenth Amendment.

393.    The Banned-Speech Provision's requirement that Lorie refrain from speaking about her religious understanding of marriage denies her the right to make intimate personal choices central to her equal dignity as a citizen, personal autonomy, identity, beliefs, liberty, and personhood and devalues her dignity as an equal citizen, stigmatizes her as a social pariah, disallows her from pursuing her chosen profession, and punishes her in violation of the Fourteenth Amendment.

394.    Because CADA infringes these rights under the Fourteenth Amendment, it must further a compelling interest in a narrowly tailored way.

395.    CADA does not serve any legitimate, rational, substantial, or compelling interest by forcing Lorie to abandon her religious identity, equal dignity as a citizen, personal autonomy, and liberty, and instead imposing gross stigma and denying Lorie's equal dignity as a citizen.

396.    In addition to CADA not serving a legitimate—let alone compelling—interest, it is not narrowly tailored to do so regardless.

397.    Defendants have alternative, less restrictive means to achieve any legitimate interest rather than forcing Lorie to abandon her religious identity, equal dignity as a citizen, personal autonomy, and personal liberty and face government-imposed stigma.

398.    Accordingly, as applied to Lorie, CADA denies Lorie the right to make intimate choices that define her religious identity, personal dignity, personal autonomy, and personal liberty and instead stigmatizes Lorie and denies her equal dignity as a citizen in violation of the Fourteenth Amendment of the United States Constitution.

399.    WHEREFORE, Plaintiffs respectfully ask that the Court grant the relief specified in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court to enter judgment against Defendants and to provide the following relief:

1.    A preliminary injunction and permanent injunction to stop Defendants and any person acting in concert with them from enforcing the Banned-Speech Provision facially, and as-applied to Plaintiffs' desired communications (a) promoting marriage exclusively as an institution between one man and one woman, (b) declining to create websites or graphics promoting events or ideas that violate their beliefs about marriage, such as websites for same-sex weddings, and (c) explaining their religious beliefs about what they can and cannot create;

2.    A declaration that the Banned-Speech Provision violates the United States Constitution's Free Speech Clause, Free Press Clause, Free Exercise Clause, Equal Protection Clause, and Due Process Clause facially, and as-applied to Plaintiffs' desired communications (a) promoting marriage exclusively as an institution between one man and one woman, (b) declining to create websites or graphics promoting events or ideas that violate their beliefs about marriage, such as websites for same-sex weddings, and (c) explaining their religious beliefs about what they can and cannot create;

3.      A preliminary injunction and permanent injunction to stop Defendants and any person acting in concert with them from enforcing the Compelled-Speech Provision to require Plaintiffs to create websites or graphics promoting events or ideas that violate their beliefs that marriage should only be an institution between one man and one woman, such as websites promoting same-sex weddings;

4.      A declaration that the Compelled-Speech Provision violates the United States Constitution's Free Speech Clause, Free Exercise Clause, Equal Protection Clause, and Due Process Clause when the Compelled-Speech Provision is applied to force Plaintiffs to create websites or graphics promoting events or ideas that violate their beliefs that marriage should only be an institution between one man and one woman, such as websites promoting same-sex weddings;

5.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

6.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

7.      That this Court award Plaintiffs' costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

8.      That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiffs; and

9.      That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 20th day of September, 2016.

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
Samuel D. Green (Arizona Bar No. 032586)
Katherine L. Anderson (Arizona Bar No. 033104)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org
sgreen@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
Rory T. Gray (Georgia Bar No. 880715)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org
rgray@ADFlegal.org

Michael L. Francisco (Colorado Bar No. 39111)
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
(303) 723-8679 (facsimile)
MLF@mrdlaw.com

Attorneys for Plaintiffs

## DECLARATION UNDER PENALTY OF PERJURY

I, LORIE SMITH, a citizen of the United States and a resident of the State of Colorado, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this <u>19th</u> day of <u>September</u>, <u>2016</u>, at <u>Littleton</u>, Colorado.

LORIE SMITH
303 CREATIVE LLC