**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:16-cv-02372-CBS

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

      *Plaintiffs*,

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
ANTHONY ARAGON,
ULYSSES J. CHANEY,
MIGUEL "MICHAEL" RENE ELIAS,
CAROL FABRIZIO,
HEIDI HESS,
RITA LEWIS, and
JESSICA POCOCK, as members of the Colorado Civil Rights
Commission, in their official capacities, and
CYNTHIA H. COFFMAN, Colorado Attorney General,
in her official capacity;

*Defendants*.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

---

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

THE PRELIMINARY INJUNCTION STANDARD .................................................... 9

ARGUMENT ........................................................................................................ 10

I.      Plaintiffs are Likely to Succeed on the Merits of Their Constitutional Claims ............... 10

        A.      Defendants' Application of CADA Violates Plaintiffs' First Amendment
                Rights to Freedom of Speech, the Press, and Expressive Association ................ 10

                1.      Applying CADA to Force Plaintiffs to Design Custom Wedding
                        Websites Promoting and Celebrating Same-Sex Weddings and to
                        Prohibit Them from Publishing Religious Speech About Marriage
                        Violates the Free Speech Clause ............................................... 10

                2.      Defendants' Application of CADA's Banned-Speech Provision
                        Violates Plaintiffs' Rights Under the Free Press Clause ................. 19

                3.      Defendants' Application of CADA's Compelled-Speech Provision
                        Violates Plaintiffs' Freedom of Expressive Association ................. 20

        B.      Defendants' Application of CADA Forces Lorie to Choose Between
                Operating an Expressive Business in Colorado and Her First Amendment
                Rights in Violation of the Unconstitutional Conditions Doctrine .................. 22

        C.      Defendants' Application of CADA Only to Expressive Businesses That
                Disfavor Same-Sex Marriage Violates the Equal Protection Clause ................ 23

        D.      Defendants' Application of CADA Fails Strict Scrutiny .............................. 25

II.     Plaintiffs are Experiencing, and Will Continue to Experience, Irreparable Harm as a
        Direct Result of Defendants' Unconstitutional Application of CADA ........................... 26

III.    The Equities Favor Enjoining Defendants' Unconstitutional Application of CADA ........ 27

IV.      Protecting Plaintiffs' Constitutional Rights Aligns with the Public Interest .................... 27

CONCLUSION .......................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases:**

*Agency for International Development. v. Alliance for Open Society International, Inc.*,
   133 S. Ct. 2321 (2013)................................................................................13, 16

*American Civil Liberties Union v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ...................................................................27

*Anderson v. City of Hermosa Beach*,
   621 F.3d 1051 (9th Cir. 2010) ........................................................... 12, 17-18

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002)......................................................................................11

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) ...................................................................27

*Board of Commissioners, Wabaunsee County. v. Umbehr*,
   518 U.S. 668 (1996).....................................................................................22

*Boy Scouts of America v. Dale*,
   530 U.S. 640 (2000)................................................................................16, 21

*Brown v. Entertainment Merchants Association*,
   131 S. Ct. 2729 (2011).................................................................................26

*Brown v. Entertainment Merchants Association*
   564 U.S. 786 (2011)......................................................................................11

*Buehrle v. City of Key West*,
   813 F.3d 973 (11th Cir. 2015) ........................................................... 12, 17-18

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S. Ct. 2751 (2014)............................................................................23, 25

*Campbell v. Robb*,
   162 F. App'x 460 (6th Cir. 2006) .................................................................14

*Church on the Rock v. City of Albuquerque*,
   84 F.3d 1273 (10th Cir. 1996) .....................................................................15

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)......................................................................................25

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985)..................................................................................23

*Clark v. Jeter*,
    486 U.S. 456 (1988)..................................................................................23

*Cressman v. Thompson*,
    719 F.3d 1139 (10th Cir. 2013) ...............................................................17

*Cressman v. Thompson*,
    798 F.3d 938 (10th Cir. 2015) ........................................................ *passim*

*Curtis Publishing Co. v. Butts*,
    388 U.S. 130 (1967)..................................................................................19

*DeBoer v. Village of Oak Park*,
    267 F.3d 558 (7th Cir. 2001) ...................................................................22

*Déjà Vu of Nashville, Inc. v. Metropolitan Government of Nashville*,
    274 F.3d 377 (6th Cir. 2001) ...................................................................27

*Derma Pen, LLC v. 4EverYoung Ltd.*,
    773 F.3d 1117 (10th Cir. 2014) .................................................................9

*Doe v. Shurtleff*,
    628 F.3d 1217 (10th Cir. 2010) ...............................................................11

*Elrod v. Burns*,
    427 U.S. 347 (1976)............................................................................22, 26

*Greene v. McElroy*,
    360 U.S. 474 (1959)..................................................................................22

*Hands on Originals, Inc. v. Lexington-Fayette Urban County Human Rights Commission*,
    No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015)...................................19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)....................................................................... *passim*

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)....................................................................................3

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) ...................................................................18

*Kaplan v. California*,
   413 U.S. 115 (1973)................................................................................11

*Knox v. Service Employees International Union, Local 1000*,
   132 S. Ct. 2277 (2012)............................................................................21

*Miami Herald Publishing Co. v. Tornillo*,
   418 U.S. 241 (1974)........................................................................... 18-19

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931)............................................................................ 19-20

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015)..............................................................................4

*Pacific Frontier v. Pleasant Grove City*,
   414 F.3d 1221 (10th Cir. 2005) ...............................................................28

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*,
   475 U.S. 1 (1985)..............................................................................13, 18

*Perry v. Sindermann*,
   408 U.S. 593 (1972).......................................................................... 22-23

*Plyler v. Doe*,
   457 U.S. 202 (1982)................................................................................23

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)................................................................................14

*Redgrave v. Boston Symphony Orchestra*,
   855 F.2d 888 (1st Cir. 1988) ...................................................................17

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) .................................................................3, 13, 15

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997)................................................................................11

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)................................................................................20

*Rosenberger v. Rector and Visitors of University of Virginia*,
   515 U.S. 819 (1995)................................................................................15

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011) ......................................................................12

*Texas v. Johnson*,
 491 U.S. 397 (1989) ......................................................................26

*Thornhill v. Alabama*,
 310 U.S. 88 (1940) .................................................................... 19-20

*Verlo v. Martinez*,
 820 F.3d 1113 (10th Cir. 2016) ................................................ 26-27

*West Virginia State Board of Education v. Barnette*,
 319 U.S. 624 (1943) ...................................................................... 2-3

*Wooley v. Maynard*,
 430 U.S. 705 (1977) ....................................................................2, 16

*Yes On Term Limits, Inc. v. Savage*,
 550 F.3d 1023 (10th Cir. 2008) ......................................................25

**Statutes and Regulations:**

42 U.S.C. § 2000e-3 ...........................................................................26

C.C.R. § 708-1:10.2(H) .........................................................................7

Colo. Rev. Stat. § 24-34-306(2)(a) ............................................... 3-4, 20

Colo. Rev. Stat. § 24-34-306(9) ................................................... 3-4, 20

Colo. Rev. Stat. § 24-34-601(2)(a) ................................................ *passim*

Colo. Rev. Stat. § 24-34-602(1)(a) ............................................... 3-4, 20

Colo. Rev. Stat. § 24-34-605 ........................................................ 3-4, 20

## INTRODUCTION

This motion is about protected expression and Defendants' efforts both to coerce and squelch it.  Plaintiff Lorie Smith owns and operates Plaintiff 303 Creative LLC, a small business that specializes in graphic design, website design, marketing, social media management, and related consultation services.  Ver. Compl. ¶¶ 103-06.  Like many other creative professionals, Lorie started her own business to use her design skills in keeping with her unique artistic vision, which—in Lorie's case—is firmly grounded in her Christian faith.  Ver. Compl. ¶¶ 101-03.  This entrepreneurial venture would allow Lorie not just to *use* her talents in keeping with her faith but to *explain* on 303 Creative's website her reasons for (1) designing websites that spread messages aligned with her religious values and (2) declining to create those that do not.  Ver. Compl. ¶¶ 107-10, 113-17, 156-64.  But Defendants strip away Plaintiffs' freedom to do both.

Colorado's Anti-Discrimination Act ("CADA") bars businesses from discriminating on the basis of a person's disability, race, creed, color, sex, sexual orientation, marital status, and national origin or ancestry.  Colo. Rev. Stat.  § 24-34-601(2)(a).  This rule should not affect Lorie's religious practices because she decides what expression to create based on its message, not any prospective client's personal characteristics.[1]  Ver. Compl. ¶¶ 111-12.  But Defendant's interpretation of CADA puts Lorie at imminent risk of punishment.

Defendants apply CADA's ban on sexual orientation discrimination to require expressive businesses like 303 Creative that design, create, and publish protected expression promoting marriages between one man and one woman to do the same for same-sex marriages.  Ver.

---

[1]  For simplicity's sake, this memorandum refers to both Plaintiffs collectively as "Lorie" whenever possible.

Compl. ¶¶ 61-72, 85.  Whether a business cleans floors after a wedding ceremony or creates art celebrating it, Defendants treat them exactly the same, so long as they disfavor messages that promote same-sex marriage.  Ver. Compl. ¶¶ 61-89.  As a result, Defendants' interpretation of CADA requires 303 Creative to create graphic designs and custom webpages for same-sex wedding ceremonies if it does so for weddings between one man and one woman.  Ver. Compl. ¶¶ 55-57.  It further bans 303 Creative from making statements that suggest it will not create designs or custom webpages promoting and celebrating same-sex weddings.[2]  Ver. Compl. ¶¶ 7-9.  But expressive businesses, like secular bakeries, that refuse to send religious messages critical of same-sex marriage may create and speak freely because Defendants allow them to operate by different rules.  Ver. Compl. ¶¶ 74-84.

This application of CADA to Lorie and 303 Creative violates the First Amendment, the Unconstitutional Conditions Doctrine, and the Equal Protection Clause of the Fourteenth Amendment.[3]  A cardinal principle of the Free Speech Clause is that speakers—and, in particular, artists—have the right to control their own speech.  The government cannot compel creative professionals to remain silent or speak, let alone force them to send messages they find "morally objectionable."  *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977).  Yet Defendants have done just that.  They apply CADA to silence Lorie's religious speech about marriage and force her to create graphics, webpages, and text that celebrate a conception of marriage that violates her faith.  But the First Amendment's very purpose is to prevent such incursions into the

---

[2]  For the statements Lorie desires to publish, *see* Ver. Compl. Ex. B.

[3]  Plaintiffs raise other claims in their Verified Complaint, which they reserve the right to pursue in later stages of the case, but limit their request for a preliminary injunction to these three claims for the sake of brevity.

"sphere of intellect and spirit," which must be free "from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The Constitution protects this freedom for at least two reasons. First, art inherently involves the "subtle shaping of thought" and thus deserves strong protection. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). Here, Lorie wishes to design, create, and publish websites promoting biblical marriage for this very reason—to use her art to impact cultural thought regarding marriage. Ver. Compl. ¶¶ 3-4, 138-46.

Second, any attempt by the government to favor one viewpoint over another demands intense skepticism. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (explaining that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content" (quotation omitted)). Defendants are clearly playing favorites: they permit artists to speak and create messages favoring same-sex marriage and to decline promoting opposing messages but threaten with investigations, re-education training, and fines those who hold a contrary view and who object to promoting competing views. App. in Supp. of Pl.'s Mot. for Prelim. Inj. ("App.") 1-34. But unpopular speech is precisely what the First Amendment exists to protect. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (noting that free speech "shield[s] just those choices of content that in someone's eyes are misguided, or even hurtful"). When the government enforces ideological orthodoxy on any topic, no citizen is safe.

In this case, CADA and Defendants' discriminatory enforcement of it impose an impossible choice on Lorie. She can either (1) remain silent on the subject of marriage and abandon her right to create and publish the speech of her choosing, as directed by her religious

beliefs, or (2) speak out on the subject of marriage, exercise her right to create and publish the speech of her choosing, and incur investigations, re-education training, mandatory reporting, and fines of up to $500 for each violation of CADA.  Colo. Rev. Stat. §§ 24-34-306(2)(a), -306(9), -602(1)(a), -605; App. 15.   No American should be forced to choose between her freedom of speech and such punishments.   To prevent irreparable harm to their constitutional rights, Plaintiffs request a preliminary injunction enjoining Defendants from applying CADA to prevent them from (a) designing graphics and custom wedding webpages consistent with their religious beliefs about marriage and (b) publishing their desired statements about God's design for marriage.  *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015) ("[T]hose who adhere to religious doctrines, may continue to advocate … that, by divine precepts, same-sex marriage should not be condoned").

## STATEMENT OF FACTS

Lorie Smith earned a degree from the University of Colorado Denver and worked for several years for traditional companies doing work in graphic design, website design, and marketing.  Ver. Compl. ¶¶ 101-02.  But she was never able to use her artistic abilities for a higher purpose in the way she always dreamed.  Ver. Compl. ¶ 103.  This troubled Lorie because her Christian faith teaches that every talent comes from God and should be used to honor Him.  Ver. Compl. ¶¶ 95-100.  So Lorie started her own small business, 303 Creative LLC, to have the freedom to incorporate her faith into her work.  Ver. Compl. ¶ 103.  She does so in many ways, including treating her customers with dignity and respect and being selective about the messages and events she creates and promotes—always ensuring they are consistent with her religious beliefs.  Ver. Compl. ¶¶ 109, 113-17, 130.

As 303 Creative's owner/operator and sole employee, Lorie was thrilled to use her experience with graphic design, website design, social medial management, and marketing to promote only messages aligned with her religious beliefs. Ver. Compl. ¶¶ 110, 113-14. To ensure this was the case and that all prospective clients were fully aware of 303 Creative's religious purpose, Lorie ultimately decided to include a special condition in its "Contract for Services" that allows the refusal to create any artwork, graphics, or textual content that communicates ideas or messages inconsistent with her beliefs. Ver. Compl. ¶ 115.

One key way Lorie felt called to serve God through her work was by designing, creating, and publishing custom wedding websites celebrating the union of a man and a woman. Ver. Compl. ¶¶ 141-46. Society's drift away from a biblical view of marriage was deeply troublesome to her. Ver. Compl. ¶¶ 138-40. Conveying the beauty of God's design for marriage by using her graphic design, web design, and marketing talents to celebrate the unique story of how a bride and groom met, fell in love, and got married was a perfect way for Lorie to convey her religious message about marriage in a compelling way. Ver. Compl. ¶¶ 144-47. All of 303 Creative's design work is artistic, expressive, and informational in nature, and its wedding websites would likewise use images, words, graphics, and other modes of expression to tell a couple's unique story. Ver. Compl. ¶¶ 124-126, 147. Lorie also plans to encourage her clients' marriages by sharing biblical truths with the bride and groom throughout the consultative process she uses to learn about them and their relationship. Ver. Compl. ¶¶ 141-42, 147-48.

So Lorie prepared a special addition to 303 Creative's website announcing the expansion of its services to include custom wedding websites. Ver. Compl. ¶¶ 156-57 & Ex. B. This webpage explains Lorie's excitement about the message of love and commitment told through

each couple's union and her desire to create a wedding website that expresses their distinctive story.  Ver. Compl. ¶ 158.   It describes Lorie's religious motivation for offering this artistic service and her goal that God's design for marriage between a man and a woman would be clear to anyone viewing the final product.  Ver. Compl. ¶¶ 159-61.   To be open and transparent about the services Lorie will provide, 303 Creative's website addition also explains that Lorie "will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman" because "[d]oing that would compromise [her] Christian witness and tell a story about marriage that contradicts God's true story of marriage—the very story He is calling [her] to promote."  Ver. Compl. ¶¶ 162-63.   Plaintiffs desire, and are prepared, to publish the religious speech contained on this website immediately.  Ver. Compl. ¶¶ 164, 180.

But 303 Creative's webpage for wedding website design services never saw the light of day because of Defendants' application of CADA.  Ver. Compl. ¶¶ 166-80.  CADA includes a provision—the Banned-Speech Provision—that makes it illegal

> directly or indirectly to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the … services … of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence … is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

Colo.  Rev.  Stat.  § 24-34-601(2)(a).   Another CADA provision—the Compelled-Speech Provision—makes it "unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the … services … of a place of public accommodation."  *Id.*

Defendants have interpreted these provisions as prohibiting expressive businesses from declining to create speech that celebrates same-sex marriage for religious or moral reasons. Ver. Compl. ¶ 55. But Defendants have allowed expressive businesses that support same-sex marriage to decline to create religious speech critical of the practice. Ver. Compl. ¶¶ 87-89. We know this to be true based on the Colorado Civil Rights Division's disposition of complaints filed against four different Colorado bakeries. When a Christian bakery—Masterpiece Cakeshop—declined to design and create a custom wedding cake for a same-sex marriage, the Civil Rights Division concluded that it engaged in illegal sexual orientation discrimination under CADA. Ver. Compl. ¶¶ 62-72; App. 1-16, 43-52. The Civil Rights Division found it immaterial that the Christian baker would serve anyone regardless of sexual orientation and that he simply could not promote a message at odds with his faith. Ver. Compl. ¶¶ 70-72, 85-86; App. 3, 5, 14, 44-46, 49-51.

Yet when a Christian customer later filed complaints against three other bakeries— Azucar Bakery, Le Bakery Sensual, Inc., and Gateaux, Ltd.—based on their refusal to create religious expression critical of same-sex marriage, the Civil Rights Division found no illegal discrimination under CADA based on creed. Ver. Compl. ¶¶ 73-84; App. 17-34. And it did so despite the fact that creed discrimination encompasses "all aspects of religious beliefs, observances, and practices … [including] *the beliefs or teachings of a particular religion*," 3 C.C.R. § 708-1:10.2(H) (emphasis added). The only way the Civil Rights Division could resolve these matters in favor of the three bakeries was by recognizing (1) a distinction between discriminating based on a customer's protected status and declining a commission based on a disagreeable message and (2) the significance of the secular bakeries' willingness to create other

items for a member of a protected class.  Ver. Compl. ¶¶ 81-84; App. 20.  But the Civil Rights Division applies these factors only to expressive businesses that approve of messages promoting same-sex marriage.  Ver. Compl. ¶¶ 86-89.  For the Christian bakery who disapproved of messages promoting same-sex marriage, they did not matter.  Ver. Compl. ¶¶ 70-72, 85; App. 5-6, 14, 44-46, 49-51.  In stark contrast to the Civil Rights Division's exoneration of three secular bakeries from creed discrimination charges, the Civil Rights Division ruled that the Christian bakery committed unlawful discrimination under CADA.  Ver. Compl. ¶¶ 84-89; App. 12-15, 46, 51.

303 Creative is in the same predicament as Masterpiece Cakeshop, the Christian bakery described above.  Ver. Compl. ¶¶ 63-72, 85-89.  It creates expression and is happy to serve all people without reference to personal characteristics, such as race, creed, sexual orientation, and gender.  Ver. Compl. ¶¶ 111-12.  What 303 Creative cannot do is create speech that promotes messages at odds with its faith.  Ver. Compl. ¶¶ 113-17.  This includes graphic designs and custom webpages that demean or disparage individuals, promote sexual immorality, support the destruction of unborn children, incite violence, or promote any type of marriage that is not between one man and one woman.  Ver. Compl. ¶ 114.  If a commission conflicts with its religious beliefs, Lorie will attempt to refer the prospective client to another graphic and website design company that can be of help.  Ver. Compl. ¶ 117.  But, according to Defendants, declining to create speech celebrating a same-sex marriage violates CADA.  Ver. Compl. ¶¶ 68-72; App. 5-6, 14-15, 46, 51.  This interpretation of CADA has severely chilled Plaintiffs' protected speech, particularly as CADA's Banned-Speech Provision bans 303 Creative from

directly or indirectly publishing any religious message that could conceivably make same-sex couples feel unwelcome.  Ver. Compl. ¶¶ 276-79.

303 Creative is a clear target of Defendants' rule that no expressive business may decline to create speech promoting same-sex marriage on religious or moral grounds or publicly communicate its religious and moral reasons for doing so.  Because of this looming threat, Lorie has not made viewable to the public the portion of 303 Creative's website that announces the availability of custom wedding websites and its religious reasons for creating only messages that promote marriage between a man and a woman.  Ver. Compl. ¶ 156.  But for Defendants' interpretation of CADA, Lorie would have already published this website and began offering creative services for the creation, design, and publication of wedding websites that promote marriages between one man and one woman.  Ver. Compl. ¶¶ 177-78.  CADA is the only reason that Lorie has not done so.  Ver. Compl. ¶ 179.  If Plaintiffs obtain the relief requested in their motion, Lorie will immediately publish the website described above and begin work creating, designing, and publishing wedding websites that communicate her religious view of marriage.  Ver. Compl. ¶ 180.

## THE PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, Lorie and 303 Creative must show:  (1) a likelihood of success on the merits, (2) irreparable harm, (3) the equities favor a preliminary injunction, and (4) an injunction is consistent with the public interest.  *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014).  All four requirements are satisfied here.

## ARGUMENT

I.    **Plaintiffs are Likely to Succeed on the Merits of Their Constitutional Claims.**

Plaintiffs are likely to succeed on the merits of their claim that Defendants' application of CADA to ban Lorie from (1) declining to create speech that celebrates same-sex marriage and (2) publishing speech that explains her religious reasons for doing so violates the First Amendment, the Unconstitutional Conditions Doctrine, and the Equal Protection Clause. Any one of these showings would justify a preliminary injunction; the presence of all three demands one.

> **A.    Defendants' Application of CADA Violates Plaintiffs' First Amendment Rights to Freedom of Speech, the Press, and Expressive Association.**

Defendant's application of CADA to Lorie and 303 Creative violates three rights guaranteed by the First Amendment:   (1) freedom of speech, (2) freedom of the press, and (3) freedom of expressive association, as explained below.

> **1.    Applying CADA to Force Plaintiffs to Design Custom Wedding Websites Promoting and Celebrating Same-Sex Weddings and to Prohibit Them from Publishing Religious Speech About Marriage Violates the Free Speech Clause.**

Defendants' application of CADA violates the Free Speech Clause of the First Amendment in at least three separate ways.   It constitutes prohibited content based discrimination against Lorie's religious speech about marriage.   What is more, it compels Lorie to engage in morally-objectionable speech promoting same-sex marriage and bans Lorie from publishing religious speech opposing same-sex marriage.

### a. The Free Speech Clause Protects Plaintiffs' Right to Speak and Create Art.

Lorie's custom wedding webpages, which are composed of images, words, graphics, and other modes of expression, are pure speech protected by the First Amendment. Ver. Compl. ¶ 124; *see Cressman v. Thompson*, 798 F.3d 938, 952 (10th Cir. 2015) (explaining that "[t]he concept of pure speech is fairly capacious" and citing examples). Although the freedom of speech extends well "beyond written … words," it unquestionably includes them. *Hurley*, 515 U.S. 569. The text Lorie writes celebrating the union of a man and a woman, as well as the script Lorie authors explaining her religious reasons for declining to promote same-sex marriage, is thus unquestionably protected by the First Amendment. Ver. Compl. ¶¶ 156-61, 163.

So too are the custom graphics Lorie includes in her webpage designs. Ver. Compl. ¶ 127. For they are simply the modern version of visual media like "pictures, … paintings, drawings, and engravings" that courts have protected as speech for decades. *Kaplan v. California*, 413 U.S. 115, 119 (1973). Lorie's graphic designs are nothing less than "an artist's sale of [her] own original work," which always qualifies as pure speech because Lorie creates custom websites with the graphics in the first instance for each client. *Cressman*, 798 F.3d at 953; *see* Ver. Compl. ¶ 131.[4] While those websites may contain original and pre-existing

---

[4] Numerous courts have found electronic text, images, and graphics to be protected speech. *See, e.g., Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (video games are protected speech); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-51 (2002) (virtual child pornography is protected speech); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (noting that the internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue."); *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010) ("The Supreme Court has also made clear that First Amendment protections for speech extend fully to communications made through the medium of the internet.").

content, the website as a whole is a new, original creation.   Ver. Compl. ¶¶ 131-32.   The meaning of any pre-existing images and videos that Lorie incorporates into her custom website designs are significantly changed by the overarching context.   *See Hurley*, 515 U.S. at 569-70 ("[A] private speaker does not forfeit constitutional protection … by failing … to generate, as an original matter, each item featured in the communication.").   This artistic practice of web design is the digital equivalent of incorporating another's "pictorial rendition" into "a larger collage," an "expressive act" that the Tenth Circuit has acknowledged results in pure speech.   *Id*; *see* Ver. Compl. ¶¶ 132-37.

In short, Lorie's business of graphic and webpage design is inherently expressive in every respect.   Ver. Compl. ¶¶ 124-25; c*f. Hurley*, 515 U.S. at 568 (recognizing that parades are inherently expressive).   Not only is Lorie's artistic and informational product expressive, so too is her artistic design process, and the business of creating graphics and webpages itself.   Ver. Compl. ¶¶ 127-37; *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("This Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment."); *Buehrle v. City of Key West*, 813 F.3d 973, 976 (11th Cir. 2015) ("We join the Ninth Circuit in holding that the act of tattooing is sheltered by the First Amendment, in large part because we find tattooing to be virtually indistinguishable from other protected forms of artistic expression."); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1063 (9th Cir. 2010) ("[T]he business of tattooing qualifies as purely expressive activity … and is therefore entitled to full constitutional protection ….").

The Free Speech Clause thus offers Lorie and 303 Creative strong protection against Defendants' speech-coercing and speech-squelching application of CADA.   *Cressman*, 798 F.3d

at 951 (noting that "'pure speech' activities are rigorously protected regardless of meaning"). Indeed, the right to speak and the right not to speak are simply two sides of the same coin. *See Agency for Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." (quotation omitted)). It would be utterly meaningless for Lorie to publish an explanation of why she cannot design websites for same-sex weddings if Colorado may force her to create them in practice. Ver. Compl. ¶ 163; *see Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1985) (explaining that free speech "protection would be empty" if "the government could require speakers to affirm in one breath that which they deny in the next").

    **b.**    **As Applied to 303 Creative, CADA Unconstitutionally Restricts Speech Based on Its Content.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. Defendants apply CADA in a content-based manner by targeting speech critical of same-sex marriage for censure and punishment, while allowing speech in favor of same-sex marriage to flourish. Ver. Compl. ¶¶ 68-72, 189-98; Aff. of Lorie Smith in Supp. of Pl.'s Mot. for Prelim. Inj. ("Aff.") ¶¶ 13-31; App. 35-42.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. Because CADA guards against discrimination based on a narrow set of characteristics, that is certainly true here. Colo. Rev. Stat. § 24-34-601(2)(a). Only ideas or messages related to

protected characteristics may implicate CADA's Banned-Speech or Compelled-Speech Provisions. For example, CADA does not require a Democrat speech writer to draft a speech for a Republican because political affiliation is not a protected characteristic. But sexual orientation is protected, so under Defendants' interpretation of CADA 303 Creative is forced to design, create, and publish custom wedding websites that promote and celebrate a same-sex wedding. Ver. Compl. ¶ 68; App. 14-15, 46, 51. In short, the message determines whether CADA applies. But the First Amendment does not allow Colorado to impose "special prohibitions on … speakers who express views on disfavored subjects" without first overcoming strict scrutiny. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992); *cf. Campbell v. Robb*, 162 F. App'x 460, 468 (6th Cir. 2006) (ruling that the Fair Housing Act's similar publication ban is content based).

The content-based nature of CADA is confirmed by Defendants' past enforcement actions. When a Christian bakery declined to design and create a cake celebrating a same-sex union because it communicated an unwelcome message about marriage, the Civil Rights Division ruled that it must "cease and desist from discriminating against … same-sex couples." App. 13, 15. But when three secular bakeries declined commissions to create cakes with a religious message critical of same-sex marriage for a Christian patron based on their unwelcome message, the Civil Rights Division found no evidence of unlawful discrimination because the "denial was based on the explicit message that the [customer] wished to include on the cakes." App. 20. This interpretation of CADA is inherently content based.

According to Defendants, whether an expressive business may decline a commission based on its message depends solely on its view of same-sex marriage. Expressive businesses that oppose same-sex marriage and decline an order based on its opposing message violate

CADA, whereas those who support same-sex marriage and decline an order based on its opposing message do not.  Ver. Compl. ¶¶ 63-89; App. 1-34, 43-52.  This is blatant viewpoint discrimination—the most egregious form of content discrimination possible—because Defendants differentiate among similarly situated expressive businesses based solely on their "specific motivating ideology or … opinion or perspective."  *Reed*, 135 S. Ct. at 2230 (quotation omitted); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279 (10th Cir. 1996) (explaining that viewpoint discrimination occurs when "[t]he prohibited perspective, not the general subject matter" trigger[s] the decision to bar … private expression (quotation omitted)).

Just as Defendants force artists to *create* expression celebrating same-sex marriage under the Compelled-Speech Provision, they apply the Banned-Speech Provision to ban any *speech* "directly or indirectly" suggesting artists—like Lorie—would decline such a commission based on their religious viewpoint. Ver. Compl. ¶¶ 57-58.  But when the government "favor[s] some speakers over others" due to preference for certain content—in this case, speech favorable towards same-sex marriage—strict scrutiny applies.  *Reed*, 135 S. Ct. at 2230 (quotation omitted).  And rightly so, for the First Amendment's very purpose is to prevent the government from wielding laws "to suppress disfavored speech."  *Id.* at 2229; *see also id.* (recognizing that content-based laws may serve "invidious, thought-control purposes" (quotation omitted)).

      **c.**      **Defendants' Application of CADA Unlawfully Forces 303 Creative to Create Speech.**

The Free Speech Clause grants "both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714. This latter aspect, known as the compelled speech doctrine, bars the government from coercing unwanted expression. *See Alliance for Open Soc.*, 133 S. Ct. at 2327 ("It is … a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." (quotation omitted)).

The First Amendment's ban on compelled speech applies just as strongly to public accommodation laws as it does to any other statute. For instance, the Supreme Court in *Hurley*, 515 U.S. at 572-74, held that Massachusetts' public accommodation law could not be used to force the organizers of a St. Patrick's Day parade to admit an LGBT contingent expressing an unwanted message. The Court held that any effort to declare the parade "sponsors' speech itself to be the public accommodation" was bound to fail because the state "may not compel affirmance of a belief with which the speaker disagrees." *Id.* at 573. Lorie, like the parade organizers in *Hurley*, has "the autonomy to choose the content of [her] own message" and cannot be compelled to express an unwanted message by the state. *Id.*; *see also See Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (invalidating public accommodation law for compelling speech).

A more straightforward violation of the compelled speech doctrine than Defendant's mandate that 303 Creative design, create, and publish custom websites celebrating same-sex weddings is hard to fathom. Making out a compelled-speech claim in the Tenth Circuit requires that "a party … establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman*, 798 F.3d at 951. All three factors are met here. First, 303 Creative's custom wedding websites are pure speech, as explained above. *See supra* Part I.A.1.

Second, it is clear that 303 Creative has strong religious objections to creating speech that promotes same-sex marriage.  Ver. Compl. ¶¶ 132-42, 151-56.  In fact, it desires to publish speech explaining that such unions "contradict[] God's true story of marriage—the very story He is calling [303 Creative] to promote."  Ver. Compl. ¶ 156.  Third, Defendants seek to compel 303 Creative to design, create, and publish that speech.  Defendants' prosecution of Masterpiece Cakeshop proves that they require expressive businesses that object to same-sex marriage—like 303 Creative—to create and publish speech promoting same-sex weddings if they create and publish speech celebrating weddings between one man and one woman.  *See supra* pp. 7-8, 14-15.  But the compelled speech doctrine prevents a speaker from "being forced to speak rather than to remain silent" about same-sex marriage.  *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (quotation omitted).

That is particularly true where, as here, the design, creation, and publication of artistic expression is concerned.  *See Redgrave v. Bos. Symphony Orchestra*, 855 F.2d 888, 905 (1st Cir. 1988) ("[T]he law's typical reluctance to force private citizens to act, … augments its constitutionally based concern for the integrity of the artist.").  The Free Speech Clause protects not only the pure speech 303 Creative creates, but also its process for creating that pure speech.  Ver. Compl. ¶¶ 123-37; *see Cressman*, 798 F.3d at 954 (noting that artistic "creation is itself an act of self-expression"); *Buehrl*e, 813 F.3d at 977 (refusing to "draw[] a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded." (quoting *Anderson*, 621 F.3d at 1061)).  Because Lorie wants to design custom webpages for the express purpose of honoring God's design for marriage, Ver. Compl. ¶¶ 2-4, 161, a critical part

of her creative process is subject matter selection:  Lorie will use the unique stories of marital unions between a man and a woman to communicate, in an engaging way, the beauty of biblical marriage to the public.  Ver. Compl. ¶ 147.  Modifying Lorie's artistic subject matter to include same-sex weddings fundamentally changes her message about marriage.  Weddings are inherently expressive events that celebrate "the uniting of two people in a committed long-term relationship."  *Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012).  It is impossible for Lorie to communicate that such unions should *only* be between a man and a woman if Colorado may force her to design and create custom websites promoting and celebrating same-sex weddings.  Ver. Compl. ¶¶ 160-63.  After all, Lorie is proud of her artistic work and an important means of defining her religious message about marriage is placing the text "Designed by 303Creative.com" on all of her custom wedding websites.  Ver. Compl. ¶ 152.

Defendants will invariably claim that these free speech protections do not apply because (1) Lorie's speech belongs to her clients and (2) 303 Creative is a for-profit business.  But neither argument holds water.   Federal courts have rejected the peculiar notion that free speech protections apply only to those who commission an expressive work and not to the artist who creates it.  *Buehrle*, 813 F.3d at 977 ("The First Amendment protects the artist who paints a piece just as surely as it protects … the buyer who purchases it …."); *Anderson*, 621 F.3d at 1062 (recognizing that both the artist and the patron "are engaged in expressive activity").  Moreover, *Hurley*, 515 U.S. at 574, made clear that freedom not to engage in or publish unwanted speech is "enjoyed by business corporations generally."  For at least forty years, the Supreme Court has defended for-profit businesses from compelled speech.  *See, e.g.*, *Pac. Gas*, 475 U.S. at 5-6 (protecting a for-profit electric company); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258

(1974) (shielding a for-profit newspaper).  In keeping with this precedent, a trial court in Kentucky invalidated the application of a public accommodation law to compel an expressive business to print t-shirts for a gay-pride festival.  *Hands on Originals, Inc. v. Lexington-Fayette Urban Cnty. Human Rights Comm'n*, No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015).[5]  This Court should do the same here because Defendants are compelling Lorie's speech in the same unlawful manner.

> ### 2.   Defendants' Application of CADA's Banned-Speech Provision Violates Plaintiffs' Rights Under the Free Press Clause.

The chief purpose of the Free Press Clause is "to prevent previous restraints upon publication."  *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931).  Although some perceive this clause as protecting only news media, the freedom of press is "a guarantee to individuals of their personal right to make their thoughts public and put them before the community."  *Curtis Pub'g Co. v. Butts*, 388 U.S. 130, 149 (1967).  It protects 303 Creative's right to publish religious speech on its website explaining why same-sex marriage should not be condoned without fear of retribution or censorship.  Ver. Compl. ¶ 163; *see id.* at 151 (explaining the right of free press protects speakers against "fear [of] physical or economic retribution solely because of what they choose to think and publish"); *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940) (noting the freedom of press protects the ability "to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment").

But Defendants apply CADA's Banned-Speech Provision to forbid Lorie from publishing religious speech critical of same-sex marriage on 303 Creative's website because that speech

---

[5]  The *Hands on Originals* opinion is available at http://perma.cc/75FY-Z77D.

might "directly or indirectly" indicate that requests for custom same-sex wedding websites would be "unwelcome" or "denied."  Colo. Rev. Stat. § 24-34-601(2)(a); *see* Ver. Compl. ¶¶ 57-58.  And they do so on pain of investigations, re-education training, reporting requirements, and fines of up to $500 for each violation.  Colo. Rev. Stat. §§ 24-34-306(2)(a), -306(9), -602(1)(a), -605; Ver. Compl. ¶¶ 50-54; App. 15.  Defendants' application of CADA to expressive businesses is the only reason that Lorie has not published speech on 303 Creative's website explaining her religious reasons for promoting only marriages between a man and a woman.  Ver. Compl. ¶¶ 178-80.  This restraint on Lorie's right to publish violates the Free Press Clause.  *See Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940) (explaining that "any action of the government" that prevents the "free and general discussion of public matters" violates the Free Press Clause).

It is no answer to say that Lorie's speech may be proscribed because 303 Creative is a business or that CADA makes such speech about marriage illegal.  As the Supreme Court explained in *Near*, 283 U.S. at 720-21, over eighty years ago,

> [c]haracterizing [Plaintiffs'] publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint…. Nor can it be said that the constitutional freedom from previous restraint is lost because charges are made of derelictions which constitute crimes…. The freedom … from previous restraint has never been regarded as limited to such animadversions as lay outside the range of penal enactments.

### 3. Defendants' Application of CADA's Compelled-Speech Provision Violates Plaintiffs' Freedom of Expressive Association.

Implicit in the First Amendment is a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Lorie's collaboration with individuals who desire custom

wedding websites that reflect the beauty of God's design for marriage is expressive association of the classic sort between artist and patron. Ver. Compl. ¶¶ 127-31, 147; *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (noting that only "some form of expression" with others is required to raise a free association claim). Importantly, the freedom of expressive association includes a right "not to associate." *Id.* (quotation omitted). Defendants violate that right here by applying CADA's Compelled-Speech Provision to require Lorie to engage in expressive associations with persons seeking to promote a view of marriage that directly opposes her own.

Just like in *Dale*, where applying a public accommodation law to force the Boy Scouts to associate with a gay scoutmaster would send the conflicting message that "homosexual conduct [is] a legitimate form of behavior," *Dale*, 515 U.S. at 653, requiring Lorie to design, create, and publish custom websites celebrating same-sex weddings would send the message that she condones same-sex marriage. This would undoubtedly "affect[] in a significant way" Lorie's ability to reflect the unique beauty of one-man-one-woman marriage through the artistic design of custom wedding websites. *Id.* at 648; *see* Ver. Compl. ¶¶ 158-61. Indeed, it would force Lorie either "to propound a point of view contrary to [her] beliefs" or stop collaborating with those who share her expressive purpose of promoting only marriage between a man and a woman. *Dale*, 515 U.S. at 654; *see* Ver. Compl. ¶¶ 160-61. But "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012). As the Supreme Court held in *Dale*, CADA does not justify such a "severe intrusion" into Lorie's freedom of expressive association. 515 U.S. at 642.

**B.      Defendants' Application of CADA Forces Lorie to Choose Between Operating an Expressive Business in Colorado and Her First Amendment Rights in Violation of the Unconstitutional Conditions Doctrine.**

Defendants cannot force Lorie to forgo the exercise of her First Amendment rights as a condition of operating an expressive business in Colorado.  *See Greene v. McElroy*, 360 U.S. 474, 492 (1959) (noting that the "right … to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts" of the Due Process Clause); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (explaining the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests").  The unconstitutional conditions doctrine bars the state not just from prohibiting Lorie's exercise of her rights to free speech, the press, and expressive association outright, but also from "deter[ing], or chilling" the exercise of those rights.  *Bd. of Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (quotation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 358 n.11 (1976) (explaining the unconstitutional conditions doctrine applies "however slight the inducement … to forsake [constitutional] rights").  Here, Defendants have severely chilled Lorie's exercise of her First Amendment rights by applying CADA to force her to design, create, and publish custom wedding websites promoting same-sex weddings if she does so for weddings between one man and one woman.  Ver. Compl. ¶¶ 10-11.

A fundamental principle of First Amendment law is that the government may not dilute a private person's speech "by forcing the inclusion of all views on" a given topic.  *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (citing *Hurley*, 515 U.S. at 575-76).  Yet Defendants have conditioned Lorie's right to operate a business that creates expression about marriage between a man and a woman on her agreement to create unwanted expression about

same-sex weddings.  Ver. Compl. ¶¶ 6-13; *cf. Hobby Lobby*, 134 S. Ct. at 2783 (expressing concern that the Affordable Care Act would "effectively exclude [some religious] people from full participation in the economic life of the Nation.").  This indirect attempt to force Lorie to design and create speech promoting same-sex marriage, something Defendants plainly could not do directly, violates the unconstitutional conditions doctrine.  *See Perry*, 408 U.S. at 597 (explaining the government cannot deny a benefit to "produce a result [it] could not command directly") (quotation omitted)).

> **C.  Defendants' Application of CADA Only to Expressive Businesses That Disfavor Same-Sex Marriage Violates the Equal Protection Clause.**

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Distinctions among similarly-situated groups that affect fundamental rights "are given the most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), and discriminatory intent is presumed, *see Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) ("[W]e have treated as presumptively invidious those classifications that … impinge upon the exercise of a 'fundamental right.'"). Because Defendants' disparate application of CADA impinges Plaintiffs' rights to free speech, the press, and expressive association, discriminatory intent is presumed here.  *See supra* Part I.A.

Defendants apply CADA's Compelled-Speech Provision only to expressive businesses like 303 Creative that disfavor messages promoting same-sex marriage.  The *only* business that Defendants have prosecuted for declining to create speech promoting an unwelcome message is a Christian bakery that declined to create a custom wedding cake celebrating a same-sex marriage.  Ver. Compl. ¶¶ 63-72; App. 1-16, 43-52.  Defendants deemed three similarly situated secular bakeries who refused to create cakes criticizing same-sex marriage for a Christian patron

in compliance with CADA because (1) their denials were based on an unwelcome message and (2) the bakeries would create other items for Christians.  Ver. Compl. ¶¶ 80-84.  And Defendants have admitted that a bakery owned by an African-American could refuse to create a custom cake sending a white-supremacist message for the Aryan Nation and a bakery owned by a Muslim baker could reject a custom cake order from the Westboro Baptist Church denigrating the Quran, presumably for the same reasons.  App. 8-9.  But Defendants deemed it immaterial that the Christian bakery also declined to create a custom same-sex wedding cake based on its unwelcome message about marriage and was more than happy to create other items for gay and lesbian customers.  Ver. Compl. ¶¶ 66-69; App. 5.  303 Creative is in the exact same position:  it declines to create custom wedding websites promoting same-sex marriages but is happy to create other websites for gay and lesbian clients that do not conflict with its religious beliefs.  Ver. Compl. ¶¶ 110-14.  Yet Defendants apply CADA's Compelled-Speech Provision to force 303 Creative to design, create, and publish custom wedding websites promoting and celebrating same-sex weddings.

Moreover, Defendants do not apply CADA's Banned-Speech Provision to expressive businesses that strongly advocate the acceptance of same-sex marriage and whose messages "directly or indirectly" indicate that requests from religious customers with opposing beliefs would be "unwelcome" or "denied."  Colo. Rev. Stat. § 24-34-601(2)(a); Aff. ¶¶ 13-31; App. 35-42.  Nicole Nichols Photography, a Denver-based photography company, for example, has published speech criticizing "religion" for "not always recogniz[ing]" same-sex marriage, praising the *Obergefell* decision, and announcing its participation in the Denver Pridefest.  Ver. Compl. ¶¶ 192-97; Aff. ¶¶ 26-31; App. 40-42.  But, just as with the three secular bakeries

discussed above, Defendants would consider this speech compliant with CADA. App. 17-34. Only speech by expressive businesses like 303 Creative that find same-sex marriage morally objectionable is banned. App. 1-16, 43-52. This disparate treatment of similarly situated expressive businesses for no rational, let alone compelling, reason violates the Equal Protection Clause.

### D. Defendants' Application of CADA Fails Strict Scrutiny

Because Defendants' application of CADA to Plaintiffs violates their fundamental constitutional rights, it must satisfy strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). To satisfy this standard, Defendants must show that their application of CADA is narrowly tailored to serve a compelling state interest. *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008). An interest in eliminating discrimination is not compelling in the abstract. The Court must "look beyond broadly formulated interests" in prohibiting discrimination and consider Defendants' interest in applying CADA to 303 Creative, "in other words, to look to [Defendants'] marginal interest in enforcing" CADA here. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014).

As the Supreme Court explained in *Hurley*, applying public accommodation laws to expressive activity does not serve a valid, let alone a compelling, state interest. 515 U.S. at 578-79 (it would be a "decidedly fatal objective" to apply a public accommodation law to coerce government-favored messages from speakers). CADA's failure to satisfy the compelling interest test is further cemented by the fact that custom wedding website designs are available from expressive businesses nationwide: allowing 303 Creative to speak freely will not limit anyone's

access to them.  Ver. Compl. ¶¶ 181-84.  Nor do Defendants serve a valid state interest by banning 303 Creative's publication of religious speech about God's design for marriage simply because others may find it "offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

CADA is also far from narrowly tailored.  Colorado could, for example, employ a far narrower publication ban, such as the one contained in 42 U.S.C. § 2000e-3, which relates only to discriminatory statements about employment—the means by which citizens support their families.  But instead, Colorado compels 303 Creative to design, create, and publish custom wedding websites promoting same-sex weddings—a pure luxury—against its will and bans it from publishing any speech that might "directly or indirectly" make some feel "unwelcome."  Such broad speech-coercing and speech-squelching measures are not tailored in any sense.  Defendants cannot demonstrate that they are "actually necessary" to solve "an 'actual problem,'" as the Constitution requires.  *Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2738 (2011).

## II.     Plaintiffs are Experiencing, and Will Continue to Experience, Irreparable Harm as a Direct Result of Defendants' Unconstitutional Application of CADA.

It is well established that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (alteration omitted).  Here, Defendants' unconstitutional application of CADA has, and continues to, directly result in Lorie (1) not engaging in speech by designing and creating custom wedding websites promoting marriage between a man and a woman, (2) not publishing the portion of 303 Creative's website announcing those services and expressing her religious beliefs about marriage, and (3) not associating with other persons for the purpose of expressing their shared

views about the beauty of God's design for marriage.  Ver. Compl. ¶¶ 177-80, 277, 279, 281, 285, 319-321.   This deprivation of 303 Creative's First Amendment rights to free speech, freedom of the press, and expressive association automatically establishes the irreparable injury required for a preliminary injunction.  *See Verlo*, 820 F.3d at 1127 ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012))).

**III.     The Equities Favor Enjoining Defendants' Unconstitutional Application of CADA.**

The equities in this case weigh decidedly in 303 Creative's favor.  As the Tenth Circuit explained in a comparable context, "[t]he threatened injury to [303 Creative's] constitutionally protected speech outweighs whatever damage the preliminary injunction may cause Defendants' inability to enforce what appears to be an unconstitutional" application of CADA.  *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999).  Here, Defendants can point to no "damage" to their interests whatsoever because they already permit expressive businesses who favor same-sex marriage to decline to create art expressing a contrary view.  A preliminary injunction will simply place 303 Creative—an expressive business with an opposing viewpoint—on equal footing.  Aff. ¶¶ 13-31; App. 35-42.  In short, "no substantial harm to others can be said to inhere in [the] enjoinment" of Defendants' unequal application of CADA.  *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001).

**IV.     Protecting Plaintiffs' Constitutional Rights Aligns with the Public Interest.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Verlo*, 820 F.3d at 1127 (quotation omitted).  As shown above, Defendants have violated, and will continue violating, Lorie's First and Fourteenth Amendment rights to create

and publish speech expressing the beauty of God's design for marriage and join in expressive associations with persons who share her expressive purpose. Because "[v]indicating [Lorie's] First Amendment freedoms is clearly in the public interest," *id.* (quoting *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005)), all four prongs of the preliminary injunction standard weigh in Plaintiffs' favor.

## CONCLUSION

This case is about speech and how much we value it. No matter how commendable their goals, Defendants cannot pursue them in an unconstitutional manner. Colorado may prohibit invidious discrimination without resorting to art manipulation, speech bans, and idea extraction. A preliminary injunction is warranted here to preserve Lorie's First and Fourteenth Amendment rights. Plaintiffs respectfully request that the Court issue one as soon as possible.

Respectfully submitted this 20th day of September, 2016.

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
Jonathan A. Scruggs (Arizona Bar No. 030505)
Samuel D. Green (Arizona Bar No. 032586)
Katherine L. Anderson (Arizona Bar No. 033104)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)

jtedesco@ADFlegal.org
jscruggs@ADFlegal.org
sgreen@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
Rory T. Gray (Georgia Bar No. 880715)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org
rgray@ADFlegal.org
Attorneys for Plaintiffs

Michael L. Francisco (Colorado Bar No. 39111)
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
(303) 723-8679 (facsimile)
MLF@mrdlaw.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20th, 2016, the foregoing was filed with the Clerk of

Court using the CM/ECF system. This Memorandum of Law in Support of Plaintiffs' Motion for

Preliminary Injunction will be served along with the Complaint and Summons via process server

to all defendants.

_s/ Jeremy D. Tedesco_

Jeremy D. Tedesco (Arizona Bar No. 023497)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org