**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:16-cv-02372-MSK-CBS

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

       *Plaintiffs*,

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
ANTHONY ARAGON,
ULYSSES J. CHANEY,
MIGUEL "MICHAEL" RENE ELIAS,
CAROL FABRIZIO,
HEIDI HESS,
RITA LEWIS, and
JESSICA POCOCK, as members of the Colorado Civil Rights
Commission, in their official capacities, and
CYNTHIA H. COFFMAN, Colorado Attorney General,
in her official capacity,

       *Defendants*.

---

**MEMORANDUM OF LAW IN REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................ 2

I.      Lorie is Likely to Succeed on the Merits of Her Constitutional Claims............................. 2

        A.      CADA Violates the First Amendment Because it Bans and Compels Speech....... 2

                1.      CADA Bans Lorie From Posting Her Religious Views on Marriage......... 2

                2.      CADA Compels Lorie to Design Websites for Same-Sex Weddings. ....... 3

                3.      Pure Speech is Not Subject to a "Reasonable Observer" Test................... 9

        B.      CADA Violates the First Amendment Right to Freedom of the Press by
                Barring the Content Lorie Wishes to Publish on Her Website. ........................... 11

        C.      CADA Violates the First Amendment Right to Expressive Association. ............ 12

        D.      CADA Violates the Equal Protection Clause Because the State Applies it
                Only Against Expression that Disfavors Same-Sex Marriage. ........................... 13

        E.      The State has Failed to Establish that it has a Compelling Interest in Forcing
                Lorie to Create Same-Sex Wedding Websites or that it Uses the Least
                Restrictive Means to Accomplish its Asserted Interests...................................... 14

        F.      Attempting to Avoid the Clear Holdings of the Supreme Court, the State Relies
                on a Misconstruction of Non-Binding State Court Cases.................................... 16

II.     Lorie is Currently Suffering Irreparable Harm Caused by CADA. ................................. 19

III.    Lorie Satisfies the Other Factors for a Preliminary Injunction to Issue. ......................... 20

CONCLUSION......................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. City of Hermosa Beach,*
   621 F.3d 1051 (9th Cir. 2010) ..........................................................................5

*Awad v. Ziriax,*
   670 F.3d 1111 (10th Cir. 2012) ......................................................................20

*Board of Directors of Rotary International v. Rotary Club of Duarte,*
   481 U.S. 537 (1987)..........................................................................................15

*Bob Jones University v. United States,*
   461 U.S. 574 (1983)..........................................................................................16

*Buehrle v. City of Key West.,*
   813 F.3d 973 (11th Cir. 2015) ...........................................................................5

*Burwell v. Hobby Lobby Stores,*
   134 S. Ct. 2751 (2014)..............................................................................1, 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)..........................................................................................14

*Citizens United v. Federal Election Commission,*
   558 U.S. 310 (2010)............................................................................................6

*City of Cleveland v. Nation of Islam,*
   922 F. Supp. 56 (N.D. Ohio 1995)..................................................................18

*Claybrooks v American Broadcasting Co.,*
   898 F. Supp. 2d 986 (M.D. Tenn. 2012)................................................... 18-19

*Craig v. Masterpiece Cakeshop, Inc.,*
   370 P.3d 272 (Colo. Ct. App. 2015) ...................................................... 3-4, 14

*Cressman v. Thompson,*
   798 F.3d 938 (10th Cir. 2015) ...........................................................................8

*Cressman v. Thompson*
   719 F.3d 1139 (10th Cir. 2013) .........................................................................9

*Boy Scouts of America v. Dale,*
   530 U.S. at 640 (2000)...............................................................................13, 16

*DeAngelis v. El Paso Municipal Police Officers, LLC*,
  51 F.3d 591 (5th Cir. 1995) ...........................................................................18

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006)........................................................................................15

*Hands on Originals, Inc. v. Lexington-Fayette Urban County Human Rights Commission*,
  No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015)...........................................18

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995)................................................................................. *passim*

*Knox v. Service Employees International Union, Local 1000*,
  132 S. Ct. 2277 (2012)....................................................................................12

*McDermott v. Ampersand Publishing, Inc.*,
  593 F.3d 950 (9th Cir. 2010) ..........................................................................18

*Miami Herald Publishing Co. v. Tornillo*,
  418 U.S. 241 (1974)..................................................................................... 6-7

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)............................................................................... 10-11

*Pacific Frontier v. Pleasant Grove City*,
  414 F.3d 1221 (10th Cir. 2005) ......................................................................20

*Pacific Gas & Electric Co. v. Public Utilities Commission of California.*,
  475 U.S. 1 (1986)............................................................................. 6-7, 10, 12

*PruneYard Shopping Center v. Robins*,
  447 U.S. 74 (1980)......................................................................................8, 12

*Reed v. Town of Gilbert*,
  35 S. Ct. 2218 (2015).......................................................................................1

*Riley v. National Federation of the Blind of North Carolina*,
  487 U.S. 781 (1988).........................................................................................6

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)........................................................................................15

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
  547 U.S. 47 (2006)....................................................................................... 7-8

*South Boston Allied War Veterans Council v. City of Boston*,
    297 F. Supp. 2d 388 (D. Mass 2003) ..............................................................19

*Schneider v. New Jersey*,
    308 U.S. 147 (1939)..........................................................................................13

*Spence v. State of Washington*,
    418 U.S. 405 (1974)............................................................................................9

*Steffel v. Thompson*,
    415 U.S. 452 (1974)..........................................................................................20

*Susan B. Anthony List v. Driehaus*,
    34 S. Ct. 2334 (2014)........................................................................................20

*Texas v. Johnson*,
    491 U.S. 397 (1989)............................................................................................9

*Wooley v. Maynard*,
    430 U.S. 705 (1977).....................................................................................4, 10

## Statutes

Colo. Rev. Stat. § 24-34-601(2)(a) ...............................................................3, 11
Colo. Rev. Stat. § 24-34-306(15)....................................................................13

## Other Authorities

Nicholas K. Geranios, Gay-wedding Bias Case Big Surprise to Florist, Seattle Times
    (April 22, 2015), available at http://www.seattletimes.com/seattle-news/gay-
    wedding-bias-case-big-surprise-to-florist. ......................................................17

Patrick Gregory, Meet the Florist Sued over Refusing a Same-sex Wedding Order,
    Bloomberg Law, (Oct. 31, 2016), http://www.bna.com/meet-florist-sued-
    b57982079128/ (last visited, Oct. 30, 2016)....................................................17

Scott Sloan, Hands On Originals T-Shirt Company Accused of Discrimination, Lexington
    Herald Leader, (March, 26, 2012), available at http://www.kentucky.com/
    news/business/article44164008.html ...............................................................17

Transcript of the July 25, 2014 Meeting of the Colorado Civil Rights Commission,
    excerpt available at 292a-294a, PDF page 284,
    http://www.adfmedia.org/files/Masterpiece CertPetition.pdf...........................17

## INTRODUCTION

This case boils down to one question:  is there room in our tolerant, diverse, and freedom-loving society for people with different views about the nature of marriage to establish their "religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community[?]"  *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751, 2785 (2014) (Kennedy, J., concurring).  The State's answer is "no."  Its view is that those who seek to establish their self-identity based on the millennia-old view that marriage is solely between a man and a woman may be coerced by law to express different views or be silenced.  This is contrary to the best of our historical and constitutional traditions, which mandate that citizens who hold minority views have room to express them and not be coerced, punished, and marginalized by the State.

But the State's approach here is even more problematic, for it grants free speech exemptions from the Colorado Ant-Discrimination Act ("CADA") to those expressive businesses that hold views on marriage it favors.  Indeed, those that support same-sex marriage and decline an order based on its opposing message do not violate CADA, but those that oppose same-sex marriage and decline an order based on its opposing message do.  Ver. Compl. Doc. No. 1 at ¶¶ 63-89; App. 1-34, 43-52.  Put another way, CADA forces those businesses that desire to create speech promoting one-man, one-woman marriage to also create speech promoting conceptions of marriage they disagree with, while those that desire to promote only same-sex marriage may do so.  The State is wielding CADA "to suppress disfavored speech," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2229 (2015), and to compel dissenting speakers to create speech that is "at least neutral toward … particular classes," both of which are "decidedly fatal objective[s]" under the

First Amendment.  *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995).

## ARGUMENT

Plaintiffs Lorie Smith and 303 Creative (hereinafter, "Lorie") are likely to succeed on the merits of their claims because CADA (1) bans Lorie from publishing a website that explains her religious motivation for designing, creating, and publishing custom wedding websites promoting marriages between one man and one woman and explaining her religious beliefs, which prevent her from promoting any other conception of marriage, and (2) forces Lorie to create websites promoting any conception of marriage—even those with which she disagrees—if she creates websites promoting marriages between one man and one woman.  This unlawful application of CADA to Lorie cannot survive strict scrutiny because Colorado cannot show that it is narrowly tailored to serve a compelling interest.  A preliminary injunction should issue.

## I.    Lorie is Likely to Succeed on the Merits of Her Constitutional Claims.[1]

### A.    CADA Violates the First Amendment Because it Bans and Compels Speech.

#### 1.    CADA Bans Lorie From Posting Her Religious Views on Marriage.

Lorie has designed a website that explains, among other things, her beliefs about marriage and her position on creating content that violates her beliefs.  MPI Doc. No. 7 at 20.  But Lorie cannot post these statements because CADA bans their content.  MPI Doc. No. 7 at 15, 19-20.  Lorie's website explains that while she is happy to serve any person, she is "not … able to create websites for same-sex marriages or any other marriage that is not between one man and one

---

[1] Notably, the State does not respond to, or acknowledge, Lorie's unconstitutional conditions claim.  MPI Doc. No. 7 at 22-23.  Thus, it should be deemed admitted.

woman" because "that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage."  Ver. Compl. Doc. No. 1 at ¶¶ 112, 163.  CADA, however, bans her from "directly or indirectly" publishing any communication "that indicates … an individual's patronage or presence … is unwelcome, objectionable, unacceptable, or undesirable because of … sexual orientation …." Colo. Rev. Stat. § 24-34-601(2)(a).

The State barely acknowledges this content-based and viewpoint-based speech ban.  *See* MPI Doc. No. 7 at 13-15 (establishing content and viewpoint based nature of CADA as applied to Lorie).  Instead, the State relies only on dicta from *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. Ct. App. 2015), to allege that Lorie *can* express her religious views about marriage.  Defs.' MPI Resp. Doc. No. 38 at 15.  Significantly, the publication ban was not at issue in *Masterpiece*.  Further, CADA's boundless terms (see above) and the State's position, which was affirmed in *Masterpiece*, that "discrimination on the basis of one's opposition to same-sex marriage is discrimination on the basis of sexual orientation" under CADA, *Masterpiece Cakeshop, Inc.*, 370 P.3d at 282, confirms beyond any doubt that Lorie's desired religious statements about marriage (*i.e.,* her intention not to design same-sex wedding websites, and her belief that same-sex marriage "contradicts God's true story of marriage,"  Ver. Compl. Doc. No. 1 at ¶ 163, violate the State's interpretation of CADA.  And, notably, the State does not disclaim any intent or ability to prosecute Lorie for publishing her desired speech.

**2.      CADA Compels Lorie to Design Websites for Same-Sex Weddings.**

The purpose and function of a website is to communicate.  Lorie uses her artistic and design skills to create beautiful custom wedding websites that communicate using words, images, and other modes of expression.  MPI Doc. No. 7 at 5-6, 11-13.  Just as a tattoo artists' designs are

protected and cannot be constitutionally treated as mere conduct, Lorie's custom-designed websites are pure speech as well.  *Id.* at 12.

The State does not deny that CADA compels Lorie to design websites for same-sex weddings but claims designing the website is not compelled speech because CADA only "requires that Plaintiffs not discriminate."  Defs.' MPI Resp. Doc. No. 38 at 9-10.  Lorie's custom web designs do not become non-expressive by framing their creation in terms of "not discriminating." Each one is unique, expresses a unique message, and contains "original text and graphics" created by Lorie.  Ver. Compl. Doc. No. 1 at ¶¶ 130-132.  The State's attempt to characterize its application of CADA to pure speech as mere nondiscrimination would be akin to saying that when New Hampshire compelled Mr. Maynard to speak its "Live Free or Die" message, it was not compelled speech; it just required him to attach the license plate to his car if he wanted to use public roads.  *Cf. Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

Tellingly, the State does not dispute the expressive nature of web design since it is clear that Lorie's custom wedding websites are protected.  MPI Doc. No. 7 at 11-13.  It instead attempts to distinguish analogous precedent where the Supreme Court held that laws like CADA violate the First Amendment when they are applied to compel or alter expression.[2]

The State, for example, argues that *Hurley* may be distinguished in two ways.  First, it states that *Hurley* was different because the statute there specifically "targete[d] speech itself," and here the State is not targeting speech but merely requiring non-discrimination in "business

---

[2] In support of its claim that compelling Lorie to create custom wedding websites promoting content with which she disagrees is constitutionally permissible, the State also affirmatively relies on *Masterpiece*, Defs.' MPI Resp. Doc. No. 38 at 9-10, which reserved judgement on whether CADA unconstitutionally compelled speech when "words" were involved, which they unquestionably are here.  *Masterpiece*, 370 P.3d 272 at 288.

operation[s]." Defs.' Resp. Doc. No. 38 at 11.  But the State is wrong.  In *Hurley*, the Supreme Court observed that Massachusetts' public accommodation law did "not, on its face, target speech or discriminate on the basis of its content."  515 U.S. at 572.  The Court's focus was instead on how Massachusetts had "*applied* [its law] in a peculiar way" to declare the parade "sponsors' speech itself to be the public accommodation" and to compel the parade organizer to express a message it did not want to express.  *Id.* at 57-73 (emphasis added).  The State is applying CADA in the exact same peculiar, speech-compelling manner here.  Yet, CADA is even worse because, unlike the law in *Hurley*, its publication ban facially regulates businesses' speech based on its subject matter and viewpoint.  *See* § I.A.1., *supra*.

There is no substantive difference between the unlawful speech-compelling application of the law to the parade organizer in *Hurley* and of CADA to Lorie.  It is mere obfuscation to allege that CADA is different because it applies to Lorie's "business operation."  As the Ninth Circuit has held, "the fact that the City's ban relates to [the expressive] *businesses* rather than the [expressive] process itself does not affect whether the activity regulated is protected by the First Amendment."  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062-63 (9th Cir. 2010).  And the expressive "process of creating a *pure* form of speech … and the product of these processes" are indistinguishable "in terms of the First Amendment protection afforded."  *Id.* at 1061.  *See also Buehrle v. City of Key W.*, 813 F.3d 973, 977 (11th Cir. 2015) (rejecting government's argument that it can regulate the process of creation but not the final creation because that would permit it to "ban a protected activity such as the exhibition of art [by] simply proceed[ing] upstream and dam[ming] the source").

Second, the State argues the Supreme Court's free speech analysis in *Hurley* is inapplicable because the public accommodation in *Hurley* was not operating for profit. Defs.' MPI Resp. Doc. No. 38 at 11.  But *Hurley* itself disavows this distinction, 515 U.S. at 574 (holding that the compelled-speech doctrine protects "business corporations generally and … ordinary people engaged in unsophisticated expression as well as … professional publishers"), and the claim directly conflicts with the "well settled" principle that "a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."  *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 801 (1988); *see also Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (collecting cases affirming that "First Amendment protection extends to corporations.").

Ironically, after asserting that Lorie's for-profit status deprives her of First Amendment protection under *Hurley*, the State attempts to distinguish two cases where for-profit businesses brought successful compelled speech claims after the government required them  to communicate unwanted third-party messages:  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (government may not require a newspaper to include a third party's writings in its editorial page) and *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (government may not require a business to include a third party's expression in its billing envelope).  Defs.' MPI Resp. Doc. No. 38 at 11-12.  The State claims that in both cases "the government required a speaker to disseminate a third party message *along with its own protected speech*."  Defs.' MPI Resp. Doc. No. 38 at 12 (emphasis added).  This distinction was not relevant to the Supreme Court's analysis.  And no court has ever suggested that the government may compel speech so long as it is not compelled "along with" the individual's own speech.  Nor is this attempted

distinction factually accurate because Lorie does speak her own message, MPI Doc. No. 7 at 11, and CADA compels her to, in the State's words, "disseminate a third party message [celebrating same-sex marriage] along with [her] own protected speech" celebrating marriage between one man and one woman.  Defs.' MPI Resp. Doc. No. 38 at 12.

The application of CADA is even more egregious here than the compelled speech at issue in *Hurley*, *Tornillo*, and *Pacific Gas*.  In those cases, the First Amendment was violated when the government required a speaker merely to host a third party's unwanted message.  But CADA compels Lorie to actually create speech with which she disagrees.  It is as if the parade organizers in *Hurley* were forced not only to admit the LGBT group in the parade but also to create the LGBT marchers' banners for them. *Cf. Hurley*, 515 U.S. at 572-73.

The State's reliance on *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), to assert that CADA regulates only conduct and not content, Defs.' MPI Resp. Doc. No. 38 at 12, is inapposite.  *FAIR* involved military recruiters' equal access to a room on campus in which to meet with students. *See id.* at 58.  Law schools did not have to draft the recruiters' talking points.  No endorsement of the recruiters' views or practices was required.  All the law schools had to do was provide an empty space (or blank slate) for military recruiters to meet with students.  Providing a room for third parties to engage in their own speech is not expressive. *Id.* at 64.  The law schools were not engaged in any speech of their own. *See id.* at 64 (noting that law schools are "not speaking when they host interviews and recruiting receptions").  They simply allowed employers a physical space in which to speak "to assist their students in obtaining jobs." *Id.*

Given the lack of any pure speech or expressive conduct, the Supreme Court deemed the law schools' related provision of email or posters with the date, time, and location of military

recruiters' meetings irrelevant.  *Id.* at 61-62.  This speech was "incidental to the Solomon Amendment's regulation of [non-symbolic] conduct" and therefore was not protected.  *Id.* at 62.  The *FAIR* Court's logic makes sense when the provision of physical space for *others* to speak is all that is legally required.  *See also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980) (explaining that the law in question merely required allowing other citizens to "exercise [their own] state-protected rights of free expression and petition on shopping center property").  This would be analogous to Lorie selling web design software that others could use to create their own websites and speak their own messages.  That is, of course, something Lorie is perfectly willing to do, even if the software were used by others to celebrate a same-sex wedding.

But *FAIR*'s rationale does not apply to forcing Lorie to create speech *herself*.  The equivalent in *FAIR* would have been asking the law schools to draft a JAG officer's speech promoting the "Don't Ask Don't Tell" policy.  Indeed, Lorie's custom designs, graphics, and prose are pure speech that enjoy *per se* protection.  *See Cressman v. Thompson*, 798 F.3d 938, 952 (10th Cir. 2015) (explaining that "[t]he concept of pure speech is fairly capacious" and includes things like "the sale of original artwork").

In sum, designing custom wedding websites results in pure speech.  CADA compels Lorie to create pure speech celebrating same-sex weddings if she communicates the beauty of marriage between one man and one woman.  Because this requires Lorie to both speak a message she disagrees with and to "alter the [the content of her own] message by including one more acceptable to others," *Hurley*, 515 U.S. at 580, applying CADA in this way violates the First Amendment.

### 3.      Pure Speech is Not Subject to a "Reasonable Observer" Test.

The State argues that even if "any message is conveyed" by Lorie, designing custom wedding websites is "not constitutionally protected speech" because a "reasonable observer" would attribute Lorie's creative communication to a third party.  Defs.' MPI Resp. Doc. No. 38 at 13-15.  Compelled speech, however, is not subject to a "reasonable observer" test.

The State mistakenly relies on *Masterpiece* and *Elane Photography*, cases where no words were at issue and where the courts erroneously used a conduct-based test, akin to the *Spence-Johnson* expressive conduct test,[3] to determine whether the expression was protected.  Defs.' MPI Resp. Doc. No. 38 at 13-14.  This it is not the appropriate test to apply because pure speech—like Lorie's artistic website designs that contain images, words, symbols, and other modes of communication—"automatically warrants First Amendment protection" and is not subject to the "more demanding *Spence-Johnson* test."  *Cressman v. Thompson*, 719 F.3d 1139, 1154; *see also Anderson*, 621 F.3d at 1061 (rejecting that symbolic conduct analysis and the *Spence-Johnson* factors apply to artistic expression, like tattoos, that contain images and words).

Subjecting artistic expression like Lorie's to a "reasonable observer" test, where the government may compel expression so long as "the message is more likely to be attributed to" a third party, is antithetical to First Amendment principles.  Compelling someone to speak when no one is around to hear is still unconstitutional compelled speech.  This is because the purpose of the right against compelled speech and of the essential liberty interests protected by the First

---

[3] *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) (conduct of burning the flag was protected speech because it was intended to express a message and there was a "likelihood . . . that the message would be understood by those who view it"); *Spence v. State of Washington*, 418 U.S. 405, 410-11 (1974) (per curiam) (similar).

Amendment is to safeguard "the sphere of intellect" and the "individual freedom of mind" from official control. *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977). To the extent it is relevant, Lorie's custom design work is attributable to her. "Designed by 303Creative.com" will be on every wedding website. Ver. Compl. Doc. No. 1 at ¶ 152. And private speakers like Lorie are always intimately connected to speech they must engage in themselves. *See Hurley*, 515 U.S. at 576 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.").

Forcing Lorie to create custom wedding celebration websites entails an entire artistic design process. Lorie must first interact with the couple and learn about their wedding and relationship before developing custom designs to honor their specific marital union. Ver. Compl. Doc. No. 1 at ¶¶ 144-153. Only then does she create the custom website. *Id.*. Much more than reciting or hosting an unwanted message is required. CADA, as applied here, forces Lorie to research and draft a message honoring same-sex marriage before bringing that message to life through her creative graphic designs and original prose. If that is not compelled speech, nothing is. *See Pac. Gas*, 475 U.S. at 16 (explaining that government cannot require speakers "to affirm in one breath that which they deny in the next").

Lorie wants to use her artistic expression to advocate the unique beauty of God's design for marriage. Ver. Compl. Doc. No. 1 at ¶¶ 138-64. She cannot do that if the State compels her to promote any message about marriage that a patron desires. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 ("[R]eligions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should

not be condoned.").

Lastly, the State conflates pure speech (Lorie's custom wedding website designs) with serving sandwiches at restaurants, or cutting hair at a salon, in order to claim a parade of horribles will result if Lorie is not required to design same-sex wedding websites. Defs.' MPI Resp. Doc. No. 38 at 15. Designing a website to celebrate a marriage, including its written content and custom graphics, conveys ideas. MPI Doc. No. 7 at 11-13. Making a sandwich, though it may take creativity and talent, does not. Courts are capable of making the distinction, and using such an excuse to deny Lorie's First Amendment rights shows little faith in our judiciary's ability to apply our system of constitutional restraints on government coercion.

### B.   CADA Violates the First Amendment Right to Freedom of the Press by Barring the Content Lorie Wishes to Publish on Her Website.

CADA operates as a prior restraint on Lorie's publication. It specifically prohibits her from publishing the website she has already prepared because it "directly or indirectly" indicates that requests for custom same-sex wedding websites would be "unwelcome" or "denied." Colo. Rev. Stat. § 24-34-601(2)(a); MPI Doc. No. 7 at 19-20. The State asserts without factual support that "Plaintiffs' speech is not chilled." Defs.' MPI Resp. Doc. No. 38 at 15. However, the sole reason that Lorie has not published her speech is because CADA bans it. MPI Doc. No. 7 at 20. The State cannot make this fact not so by simply asserting that no problem exists.

Critically, the State nowhere denies that CADA bans Lorie's speech. It merely claims that Lorie can put up a "disclaimer." Defs.' MPI Resp. Doc. No. 38 at 15. That fact is irrelevant. Lorie is *banned* from publishing her message. No disclaimer can remedy this violation of her right to freedom of speech and of the press. Although the State cites three cases in support of this

disclaimer theory, Defs.' MPI Resp. Doc. No. 38 at 15-16, none of them address a content-based prior restraint on speech, such as Colo. Rev. Stat. § 24-34-601(2)(a), and are thus inapplicable.

Furthermore, to the extent the State meant to include this disclaimer theory as a defense to compelling Lorie to create custom messages, the Supreme Court has made it clear since *PruneYard* that "the government [may not] require [corporate] speakers to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co.*, 475 U.S. at 16 (rejecting the claim that *Pruneyard* authorizes compelled, or compelled hosting of, speech so long as a disclaimer is available). "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster." *Id.* At bottom, the State fails to even attempt to justify in any meaningful way CADA's prior restraint on publication of Lorie's website and its violation of the First Amendment's right to Free Press.

### C. CADA Violates the First Amendment Right to Expressive Association.

The State cites no authority to contradict the clear violation of Lorie's expressive association rights. *Compare* Defs.' MPI Resp. Doc. No. 38 at 16 *with* MPI Doc. No. 7 at 20-21. Instead, the State argues that because Lorie can still attend church, practice religion, and belong to groups that share her views, she and 303 Creative's expressive associational rights are secure. Defs.' MPI Resp. Doc. No. 38 at 16.

But the right to expressive association is violated when "the ability of like-minded individuals to associate for the purpose of expressing commonly held views [is] curtailed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012). And that is precisely CADA's impact as applied to Lorie's custom wedding website design work. Lorie desires to associate and artistically collaborate with persons who share her expressive purpose of promoting

marriage between one man and one woman.  But the State says that if Lorie does so, then CADA requires her to also associate and artistically collaborate with persons who desire to send conflicting messages about marriage.  CADA plainly "affects in a significant way [Lorie's] ability to advocate public or private viewpoints," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, because she must either (1) collaborate with persons for the purpose of sending messages about marriage with which she disagrees, or (2) abandon collaborating with persons who share her expressive purposes in relation to marriage.  No amount of attending church, practicing religion, or joining groups can cure this constitutional violation, for "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939).

### D.     CADA Violates the Equal Protection Clause Because the State Applies it Only Against Expression that Disfavors Same-Sex Marriage.

The State applies CADA differently to expressive business owners who support same-sex marriage and those that do not in violation of the Equal Protection Clause.  MPI Doc. No. 7 at 23-25.  The State attempts to avoid that conclusion in two ways.  First, it argues that Defendant, the Director of the Civil Rights Commission, did not issue a probable cause determination against the bakeries that disagreed with the religious cakes.  Since these decisions "have no binding precedent or effect," the State asserts, Lorie has "failed to state a claim."  Defs.' MPI Resp. Doc. No. 38 at 16-18.  The State fails to acknowledge that the Commission, Defendants here, affirmed those no probable cause determinations.  *See* App. to MPI Doc. No. 6-2, at App. 32-34.  These orders "constitute final agency action," Colo. Rev. Stat. § 24-34-306(15), and prove that the Commission applies CADA unequally based on a respondent's view of marriage.  Further, even in the absence of the Commission's ratification, the Director's decisions on what cases to pursue, given her

enforcement authority under CADA, plainly can be relied on as evidence of how the State enforces the law.

Second, the State asserts that in a footnote the Colorado Court of Appeals addressed "the same arguments" and distinguished the inequitable prosecutions in *Masterpiece*.  Defs.' MPI Resp. Doc. No. 38 at 18.  But there was no equal protection claim before the court in *Masterpiece*, nor did the court purport to address any such claim.  *See Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. Ct. App. 2015).  The State also cements its unequal treatment of Lorie by affirming the position that a bakery may refuse to print words opposing homosexuality (because it declines the message) but Lorie may be forced to create and publish words celebrating same-sex marriage.  Defs.' MPI Resp. Doc. No. 38 at 18.  Even the *Masterpiece* Court recognized that cake designs and inscriptions may convey protected messages, though it found none in that particular case.  *Masterpiece Cakeshop, Inc.*, 370 P.3d at 288.  But the State here asserts a much farther reaching unequal enforcement of CADA that directly implicates fundamental free speech rights.

> **E.**    **The State has Failed to Establish that it has a Compelling Interest in Forcing Lorie to Create Same-Sex Wedding Websites or that it Uses the Least Restrictive Means to Accomplish its Asserted Interests.**

When the government infringes fundamental rights like free speech, free association, and equal protection, as it has here, it must satisfy strict scrutiny.  MPI Doc. No. 7 at 25.  Curiously, the State argues that it does not have to meet this burden because it claims "CADA is a neutral law of general applicability."  Defs.' MPI Resp. Doc. No. 38 at 18-19.  This unique standard, however, when met, exempts only free exercise claims from strict scrutiny.  *See e.g. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532-33 (1993).  While Lorie pled

a free exercise claim, she did not offer it as a basis for the present motion for preliminary injunction. The State's citation to a free exercise standard is beside the point.[4]

The State also contends that it meets strict scrutiny by merely asserting a broad and general interest in "eradicating discrimination in places of public accommodation." Defs.' MPI Resp. Doc. No. 38 at 16-17, 19-20. Strict scrutiny, however, "look[s] beyond broadly formulated interests justifying the general applicability of government mandates" and determines whether this searching form of scrutiny "is satisfied through application of the challenged law 'to the person'—the particular claimant whose" rights are being infringed. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006); *see also Hobby Lobby*, 134 S. Ct. at 2779. The government cannot meet this exacting test simply by proffering a generic interest in eradicating discrimination. Instead, under strict-scrutiny analysis, the government must prove that it has an interest sufficiently compelling to justify requiring Lorie herself to create custom same-sex wedding websites in violation of her conscience. *Id.*

In addition, the cases the State cites to support its generic nondiscrimination interest are factually distinguishable. In *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) and *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), requiring the groups to include women did not "affect in any significant way the existing members' ability to carry out their various purposes." 481 U.S. at 548; 468 U.S. at 627. Here, requiring Lorie and 303 Creative to create, design, and publish custom messages celebrating same-sex marriage, significantly affects—indeed cripples—their ability to carry out their expressive purpose which is to "publicly

---

[4] Lorie reserves the right to proffer her Free Exercise claim and refute the assertion that the law is neutral and generally applicable in further merits proceedings but is not required to respond to this allegation at this time because it relates to a claim not at issue in these proceedings.

proclaim and celebrate [God's] design for marriage as a life-long union between one man and one woman." Ver. Compl. Doc. No. 1 at ¶ 161.  Expressive association was not an issue in *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983).  Furthermore, the State ignores *Dale*, where the Supreme Court affirmed that eliminating sexual-orientation discrimination is not a sufficiently compelling interest to justify "significantly burden[ing]" the right of expressive association.  530 U.S. at 659.

The State's citation to *Hobby Lobby* in an attempt to "concretely establish[]" its interest is also misplaced since that case addressed a completely different interest.  Defs.' MPI Resp. Doc. No. 38 at 19.  There, the Court recognized, in *dicta*, the compelling government interest in eradicating *racial* discrimination in the *employment* context.  *Hobby Lobby*, 134 S. Ct. at 2783.  Applying sexual orientation non-discrimination laws to speech or association (even when the law does not target speech), in stark contrast, is a "decidedly fatal objective."  *Hurley*, 515 U.S. at 578–79 (1995); *see also Dale*, 530 U.S. at 659 (same).

Lastly, the State merely asserts that "CADA is narrowly tailored" without further explanation. Defs'. MPI Resp. Doc. No. 38 at 20.  This unsubstantiated statement proves nothing and CADA's lack of narrow tailoring should be deemed admitted.  Nonetheless, it is clear that there are less restrictive means that the State may use to accomplish its asserted interests.  For example, it could exempt from CADA businesses and individuals who create expression when the law would compel them to express a message with which they disagree.

### F.     Attempting to Avoid the Clear Holdings of the Supreme Court, the State Relies on a Misconstruction of Non-Binding State Court Cases.

Despite the Supreme Court's holdings, from *Barnette* to *Boy Scouts*, protecting private expression from government coercion, in the last five years state and local tribunals have

vigorously prosecuted creative professionals who refuse to create or host messages that violated their consciences.  These artists have been subject to biased state tribunals,[5] boycotts,[6] threats,[7] and hateful messages,[8] because they cannot in good conscience promote a government-mandated message affirming same-sex marriage, though they happily serve all people.

The State asserts that these other artists "have filed near identical lawsuits around the country, in an effort to create an issue where none exists,"—suggesting that Lorie is somehow doing the same—and that "courts have unanimously rejected" these artist's "effort[s] to create an issue."  Defs.' MPI Resp. Doc. No. 38 at 6.  In doing so, the State cites *its own prosecution* of a Colorado cake artist as well as other states' crusades against political dissenters—only one of whom, like Lorie, preemptively challenged the law.  In all other cases, it was the government who prosecuted these artists simply for following their faith.

---

[5] In Colorado, one Commission member asserted the following during the course of an administrative hearing in *Masterpiece*:
> I would also like to reiterate what we said in the hearing or the last meeting. Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust, whether it be – I mean, we – we can list hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to – to use their religion to hurt others.

Transcript of the July 25, 2014 Meeting of the Colorado Civil Rights Commission, excerpt available at 292a-294a, PDF page 284, http://www.adfmedia.org/files/Masterpiece CertPetition.pdf.

[6] Scott Sloan, *Hands On Originals T-Shirt Company Accused of Discrimination*, Lexington Herald Leader, (March, 26, 2012), *available at* http://www.kentucky.com/news/business/article44164008.html (describing boycott efforts against *Hands on Originals*).

[7] Patrick Gregory, *Meet the Florist Sued over Refusing a Same-sex Wedding Order*, Bloomberg Law, (Oct. 31, 2016), http://www.bna.com/meet-florist-sued-b57982079128/ (last visited, Oct. 30, 2016) (business received "bomb threats").

[8] Nicholas K. Geranios, *Gay-wedding Bias Case Big Surprise to Florist*, Seattle Times (April 22, 2015), *available at* http://www.seattletimes.com/seattle-news/gay-wedding-bias-case-big-surprise-to-florist/ (70-year-old florist, Barronelle Stutzman received hate mail and threats).

Moreover, the State's "unanimous" claim is curious given that *Hands on Originals, Inc. v. Lexington-Fayette Urban Cnty. Human Rights Comm'n*, is the most on point and came down on the side of expressive business owners, like Lorie.  No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015) available at http://perma.cc/75FY-Z77D.  There, the Court held that applying the non-discrimination ordinance at issue to compel Hands On Originals (HOO) to print messages about same-sex relationships that plaintiffs desired on t-shirts for a gay pride parade "violates the recognized constitutional rights of HOO and its owners to be free from compelled expression." *Id.* at *7-13.  Similarly, CADA forces Lorie to compose, design, and publish messages about same-sex relationships in violation of the First Amendment.  § I.A-C, *supra*.

Other than *Hands on Originals*, these cases are out of step with the majority view in state and federal courts.  Even antidiscrimination statutes as revered as Title VII "steer[] into the territory of the First Amendment" when "pure expression is involved."  *DeAngelis v. El Paso Mun. Police Officers, LLC*, 51 F.3d 591, 596-97 (5th Cir. 1995); *see also McDermott v. Ampersand Publ'g, Inc.*, 593 F.3d 950, 962 (9th Cir. 2010) (explaining that the Frist Amendment protects a "publisher's choice of writers").  This principle is equally true in the public accommodation context.  Here are just a few relevant examples:

- *City of Cleveland v. Nation of Islam*, 922 F. Supp. 56 (N.D. Ohio 1995):  Cleveland prevented Nation of Islam ministers from delivering "separate speeches to men and women" at a conference pursuant to a state public accommodations law that prohibited sex discrimination.  *Id.* at 59.  The court held that forcing ministers to speak to a mixed gender audience would necessarily change "the content and character of the speech" and barred application of the law.  *Id.*

- *Claybrooks v Am. Broadcasting Cos.*, 898 F. Supp. 2d 986, 989-90 (M.D. Tenn. 2012):  African-American men who auditioned for, but were rejected by, ABC's television show *The Bachelor* sued for racial discrimination under 42 U.S.C. § 1981.  *Id.* at 989-90, 1000.  The court dismissed the suit because "the First Amendment protects the producers' right unilaterally to control their own creative content" and base their casting decisions "on

whatever considerations the producers wish to take into account." *Id.* at 999-1000.

- *S. Bos. Allied War Veterans Council v. City of Boston*, 297 F. Supp. 2d 388 (D. Mass 2003): Boston officials forced parade organizers to allow a Veterans for Peace group to march at the end of their St. Patrick's Day parade, even though they had denied the anti-war group's request to take part. *Id.* at 394. A federal district court held that these private speakers had the right "not [to] have the message of an opposing group forced on them by the state," *id.* at 393, and that a distance of "no less than a mile" between the groups was required to adequately "distinguish the two sets of speech." *Id.* at 399.

The lesson taught by these cases is that constitutional protections "can trump the application of antidiscrimination laws to protected speech," *Claybrooks*, 898 F. Supp. 2d at 993, a lesson that echoes the teachings of the U.S. Supreme Court's decisions in *Hurley* and *Dale*. Thus, to the extent that the cases cited by the State stand for the proposition that the First Amendment must give way to nondiscrimination laws, they are clear outliers.

## II.     Lorie is Currently Suffering Irreparable Harm Caused by CADA.

The State asserts broadly that CADA's injuries to Lorie are "speculative [and] vague." Defs.' MPI Resp. Doc. No. 1 at 20. It is not speculative (or vague) that CADA bans Lorie from publishing her already-prepared website. Ver. Compl. Doc. No. 1 ¶¶ 156-180. But for the State's application of CADA, Lorie would publish the website. *Id.* This alone constitutes concrete irreparable harm every day the CADA speech-ban remains in place. It is not speculative that were Lorie to make her custom website design services available to the public but not create custom websites for same-sex weddings that she would be violating CADA. Ver. Compl. Doc. No. 1 at ¶¶ 55-57, 61-72, 85. It is not speculative that she is thus refraining from entering into the marketplace because of CADA. Ver. Compl. Doc. No. 1 at ¶¶ 177-78, 276-79.

The State, in essence, argues that Lorie must risk publishing messages that violate CADA's publication ban, announce her intent to violate the law, and wait for the Commission to

prosecute her—only then may she raise her constitutional rights as a defense. Defs.' MPI Resp. Doc. No. 38 at 21. The Constitution does not require such risk. Indeed, "it is not necessary [for a person to] first expose himself to … prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (holding that an "enforcement action is not a prerequisite to challenging the law."). Every day that CADA's speech ban remains in place, and every day Lorie is prohibited from entering the custom web design marketplace because CADA would force her to create messages that violate her conscience, is a day Lorie's constitutional rights are being violated and she is being irreparably harmed.

### III.   Lorie Satisfies the Other Factors for a Preliminary Injunction to Issue.

The State makes much of the Tenth Circuit's "strong" or "heightened" standard when an injunction would alter the status quo, but Lorie easily meets it here. When a law is "*likely* unconstitutional*,*" the government's interests "do not outweigh [a plaintiff's interest] in having [her] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012) (emphasis added); *see also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235-38 (10th Cir. 2005) (standard for mandatory preliminary injunction was met when First Amendment violation was established). Here, Lorie has demonstrated that CADA is unconstitutional as applied to her custom wedding website designs. MPI Doc. No. 7 at 10-25; § I., *supra*.

Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Despite this unequivocal legal standard, the State raises a strawman. It asserts that Lorie's interest is in her "desire to refuse services to same-sex

couples," and that the State's interest in anti-discrimination outweighs this "desire."  Defs.' MPI

Resp. Doc. No. 38 at 22.  This is a mischaracterization of the facts, since Lorie is happy to serve

all people, including members of the LGBT community, Ver. Compl. Doc. No. 1 at ¶ 112. At

issue here is the State compelling her to create custom speech to celebrate a position on marriage

that she cannot in good conscience promote.  That compulsion is plainly unconstitutional and it

is in the public interest to enjoin it.

## **CONCLUSION**

A preliminary injunction is warranted here to preserve Lorie's First and Fourteenth

Amendment rights. Plaintiffs respectfully request that the Court issue one as soon as possible.

Respectfully submitted this 2nd day of November, 2016.

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
Jonathan A. Scruggs (Arizona Bar No. 030505)
Samuel D. Green (Arizona Bar No. 032586)
Katherine L. Anderson (Arizona Bar No. 033104)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org
jscruggs@ADFlegal.org
sgreen@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
Rory T. Gray (Georgia Bar No. 880715)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)

dcortman@ADFlegal.org
rgray@ADFlegal.org

Michael L. Francisco (Colorado Bar No. 39111)
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
(303) 723-8679 (facsimile)
MLF@mrdlaw.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2016, the foregoing was filed with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following:

Jack D. Patten, III
Assistant Attorney General
Civil Litigation and Employment
Law Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6592
Fax: (720) 508-6032
jack.patten@coag.gov

Vincent E. Morscher
Deputy Attorney General
Civil Litigation and Employment Law Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6588
Fax: (720) 508-6032
vincent.morscher@coag.gov

Attorneys for Defendants

Eric Maxfield
First Assistant Attorney General
Colorado Department of Law
Office of the Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Business & Licensing Section
Denver, Colorado 80203
720-508-6404 Direct
720-508-6000 Main
eric.maxfield@coag.gov

Leanne B. De Vos
Senior Assistant Attorney General
Office of the Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Business & Licensing Section
Denver, Colorado 80203
720-508-6411 Direct
720-508-6000 Main
Fax: (720) 508-6037
Leanne.DeVos@coag.gov

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org