**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:16-cv-02372-CBS

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

      *Plaintiffs*,

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
ANTHONY ARAGON;
ULYSSES J. CHANEY;
MIGUEL "MICHAEL" RENE ELIAS;
CAROL FABRIZIO;
HEIDI HESS;
RITA LEWIS; and
JESSICA POCOCK, as members of the Colorado Civil Rights
Commission, in their official capacities; and
CYNTHIA H. COFFMAN, Colorado Attorney General,
in her official capacity,

*Defendants*.

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN
SUPPORT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 6

ARGUMENT .......................................................................................................... 14

I.     This Court Has Jurisdiction To Decide Plaintiffs' Claims. ............................. 14

     A.     Plaintiffs Suffer an Injury in Fact. ....................................................... 16

          1.     Plaintiffs Intend to Engage in Constitutionally Protected Speech Prescribed by Statute. ............................................................... 16

          2.     Lorie Faces a More Than Credible Threat of Enforcement. ...................... 17

     B.     Plaintiffs' Injury is Caused by the Defendants as the Enforcers of CADA. .......... 22

     C.     This Court Can Redress Plaintiffs' Injury. ........................................... 24

II.     Plaintiffs are Entitled to Summary Judgment as a Matter of Law. .................. 24

     A.     Defendants' Application of CADA Violates Plaintiffs' First Amendment Rights to Freedom of Speech, the Press, and Expressive Association. ............................. 24

          1.     Applying CADA to Force Plaintiffs to Create Speech Celebrating Same-Sex Weddings and to Prohibit Plaintiffs from Publishing Speech Communicating Their Religious View of Marriage Violates the Free Speech Clause. ......................................................................... 25

     B.     Defendants' Application of CADA Forces Lorie to Choose Between Operating an Expressive Business in Colorado and Her First Amendment Rights in Violation of the Unconstitutional Conditions Doctrine. ........................................... 53

     C.     Because CADA is Neither Neutral Nor Generally Applicable, Its Application to Lorie Violates the Free Exercise Clause. ............................................... 55

     D.     Defendants' Application of CADA Only to Expressive Businesses That Disfavor Same-Sex Marriage Violates the Equal Protection Clause. ............................. 60

     E.     Defendants' Application of CADA Violates Lorie's Right to Substantive and Procedural Due Process. ................................................................. 62

1.      The Banned-Speech Provision is Impermissibly Vague and Therefore Violates Lorie's Right to Procedural Due Process. .................................. 62

2.      Defendants' Application of CADA Deprives Lorie of the Right to Own and Operate Her Own Expressive Business and thus Violates Her Right to Substantive Due Process. ......................................................................... 66

F.      Under Governing Supreme Court Precedent, Defendants Have Violated Lorie's Personal Autonomy in Violation of the Due Process and Equal Protection Clauses By Precluding Her from Pursing Her Entrepreneurial Dreams, Stigmatizing Her Religious Beliefs About Marriage, Labeling Her as a Discriminatory Lawbreaker, and Threatening Her with Hefty Fines, Reeducation Programming, and Invasive Reporting Requirements. .................................................................................... 67

III.     Defendants' Application of CADA Fails Strict Scrutiny ................................................. 72

CONCLUSION .................................................................................................................... 75

## **TABLE OF AUTHORITIES**

*Cases*:

*ACLU v. Alvarez*,
   79 F.3d 583 (7th Cir. 2012) ..................................................... 20-21

*Agency for Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.*,
   133 S. Ct. 2321 (2013)..................................................... 31, 36, 54-55

*Anderson v. City of Hermosa Beach*
   621 F.3d 1051 (9th Cir. 2010) ..................................................29-30, 38-39

*Ariz. Right to Life PAC v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003) ..................................................16

*Armstrong v. Dist. of Columbia Pub. Library*,
   154 F. Supp. 2d 67 (D.D.C. 2001) ..................................................47, 64

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002)..................................................26

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)..................................................65

*Bd. of Comm'rs, Wabaunsee Cnty. v. Umbehr*,
   518 U.S. 668 (1996)..................................................53

*Bd. of Regents of State Colls. v. Roth*,
   408 U.S. 564 (1972)..................................................66, 68

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
   529 U.S. 217 (2000)..................................................45

*Bery v. City of New York*,
   97 F.3d 689 (2d Cir. 1996)..................................................29

*Boy Scouts of Am. v. Dale*,
   530 U.S. 640 (2000)................................................. *passim*

*Brandt v. Vill. of Winnetka*,
   612 F.3d 647 (7th Cir. 2010) ..................................................21

*Bronson v. Swensen*,
   500 F.3d 1099 (10th Cir. 2007) ..................................................22

*Brown v. Entm't Merch. Ass'n*,
  564 U.S. 786 (2011)................................................................26, 29, 63, 75

*Buehrle v. City of Key West*,
  813 F.3d 973 (11th Cir. 2015) ............................................. 29, 38-39

*Burson v. Freeman*,
  504 U.S. 191 (1992)................................................................72

*Burwell v. Hobby Lobby Stores, Inc*,
  134 S. Ct. 2751 (2014)................................................................ *passim*

*Campbell v. Robb*,
  162 F. App'x 460 (6th Cir. 2006) ................................................................43

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
  457 F.3d 376 (4th Cir. 2006) ................................................................45

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)................................................................ *passim*

*Church on the Rock v. City of Albuquerque*,
  84 F.3d 1273 (10th Cir. 1996) ................................................. 44-45

*Citizens United v. Federal Election Commission*,
  558 U.S. 310 (2010)................................................................31

*City of Boerne v. Flores*,
  521 U.S. 507 (1997)................................................................72

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)................................................................60

*City of Cleveland v. Nation of Islam*,
  922 F. Supp. 56 (N.D. Ohio 1995)................................................................33

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)................................................. 41, 46-47

*Clark v. Jeter*,
  486 U.S. 456 (1988)................................................................60

*Claybrooks v. Am. Broad. Cos.*,
  898 F. Supp. 2d 986 (M.D. Tenn. 2012)................................................................34, 41

*Colo. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976) ............................................................................... 15

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.,*
    724 F.3d 377 (3d Cir. 2013) ................................................................... 60

*Consumer Data Indus. Ass'n v. King,*
    678 F.3d 898 (10th Cir. 2012) ............................................................... 24

*Craig v. Masterpiece Cakeshop, Inc.,*
    370 P.3d 272 (2015) ............................................................................... 62

*Cressman v. Thompson,*
    719 F.3d 1139 (10th Cir. 2013) ............................................... 14-15, 22, 24, 38

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) ................................................................. *passim*

*Curtis Publ'g Co. v. Butts,*
    388 U.S. 130 (1967) ............................................................................... 49-50

*D.L.S. v. Utah,*
    374 F.3d 971 (10th Cir. 2004) ............................................................... 18

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
    51 F.3d 591 (5th Cir. 1995) ................................................................... 33

*DeBoer v. Vill. of Oak Park,*
    267 F.3d 558 (7th Cir. 2001) ................................................................. 54

*Diamond v. Charles,*
    476 U.S. 54 (1986) ................................................................................. 23

*Doe v. Bolton,*
    410 U.S. 179 (1973) ............................................................................... 20

*Doe v. Shurtleff,*
    628 F.3d 1217 (10th Cir. 2010) ............................................................. 27

*Elrod v. Burns,*
    427 U.S. 347(1976) ............................................................................... 53

*Emp't Div., Dep't of Human Res. of Or. v. Smith,*
    494 U.S. 872 (1990) ............................................................................... 58

*Ex Parte Young*,
    209 U.S. 123 (1908)..................................................................................22

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992)..................................................................................47

*Fowler v. Rhode Island*,
    345 U.S. 67 (1953)....................................................................................59

*Fox v. Maulding*,
    16 F.3d 1079 (10th Cir. 1994) ...............................................................15

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*,
    546 U.S. 418 (2006)..................................................................................72

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).............................................................................. 62-63

*Greene v. McElroy*,
    360 U.S. 474 (1959).............................................................................53, 66

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936)..................................................................................50

*Hands on Originals, Inc. v. Lexington-Fayette Urban Cnty. Human Rights Comm'n*
    No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015)...........................................40

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) .......................................................... 31-32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)......................................................................... *passim*

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)....................................................................................64

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)....................................................................................4

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) ........................................................... 38-39, 46

*Kaplan v. California*,
    413 U.S. 115 (1973)..................................................................................26

*Keyishian v. Board of Regents of Univ. of N.Y.*,
    385 U.S. 589 (1967)..............................................................................................64

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    132 S. Ct. 2277 (2012)........................................................................................52

*Kolender v. Lawson*,
    461 U.S. 352 (1983)......................................................................................63, 65

*Larson v. Valente*,
    456 U.S. 228 (1982)............................................................................................24

*Lawrence v. Texas*,
    539 U.S. 558 (2003)............................................................................................71

*Lee v. Bd. of Cnty. Comm'rs of Arapahoe Cnty.*,
    18 F. Supp. 2d 1143 (D. Colo. 1998)................................................................14

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................15,

*Mangual v. Rotger Sabat*,
    317 F.3d 45 (1st Cir. 2003)................................................................................17

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)............................................................................................24

*McDaniel v. Paty*,
    435 U.S. 618 (1978)............................................................................................52

*McDermott v. Ampersand Publ'g, Inc.*,
    593 F.3d 950 (9th Cir. 2010) .............................................................................28

*Miami Herald Publ'g Co. v Tornillo*
    418 U.S. 241 (1974)......................................................................................28, 40

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
    725 F.3d 571 (6th Cir. 2013) .............................................................................48

*Mink v. Suthers*,
    482 F.3d 1244 (10th Cir. 2007) .........................................................................18

*Miss. Gay Alliance v. Goudelock*,
    536 F.2d 1073 (5th Cir. 1976) ...........................................................................28

*Muscogee (Creek) Nation v. Pruitt,*
 669 F.3d 1159 (10th Cir. 2012) ........................................................22

*NAACP v. Alabama,*
 357 U.S. 449 (1958)........................................................................51

*NAACP v. Button,*
 371 U.S. 415 (1963)........................................................................63

*Nat'l Council for Improved Health v. Shalala,*
 122 F.3d 878 (10th Cir. 1997) ........................................................49

*Near v. Minnesota ex rel. Olson,*
 283 U.S. 697 (1931)...................................................................49, 51

*Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB,*
 636 F.2d 550 (D.C. Cir. 1980) ........................................................28

*Novotny v. Tripp County,*
 664 F.3d 1173 (8th Cir. 2011) ........................................................28

*Obergefell v. Hodges,*
 135 S. Ct. 2584 (2015).............................................................. *passim*

*Org. for a Better Austin v. Keefe,*
 402 U.S. 415 (1971)........................................................................64

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.,*
 475 U.S. 1 (1986)......................................................................31, 40

*Perry v. Sindermann,*
 408 U.S. 593 (1972)................................................................... 53-54

*Phelps v. Hamilton,*
 59 F.3d 1058 (10th Cir. 1995) ........................................................21

*Philadelphia Newspapers, Inc. v. Hepps,*
 475 U.S. 767 (1986)........................................................................14

*Plyler v. Doe,*
 457 U.S. 202 (1982 ........................................................................61

*Prairie Band Potawatomi Nation v. Wagnon,*
 476 F.3d 818 (10th Cir. 2007) ........................................................22

*R.A.V. v. City of St. Paul,*
      505 U.S. 377 (1992)..........................................................................................43

*Redgrave v. Bos. Symphony Orchestra,*
      855 F.2d 888 (1st Cir. 1988)...........................................................................38

*Reed v. Town of Gilbert,*
      135 S. Ct. 2218 (2015).......................................................................... *passim*

*Reno v. Am. Civil Liberties Union,*
      521 U.S. 844 (1997)..................................................................................26-27

*Reno v. Flores,*
      507 U.S. 292 (1993)..........................................................................................66

*Riley v. Nat'l Fed. of the Blind of N.C.,*
      487 U.S. 781 (1988)..........................................................................................41

*Roberts v. U.S. Jaycees,*
      468 U.S. 609 (1984)..........................................................................................51

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
      515 U.S. 819 (1995)..........................................................................................44

*S. Bos. Allied War Veterans Council v. City of Boston,*
      297 F. Supp. 2d 388 (D. Mass 2003) ..............................................................34

*Saxe v. State Coll. Area Sch. Dist.,*
      240 F.3d 200 (3d Cir. 2001)......................................................................47, 64

*Schneider v. New Jersey,*
      308 U.S. 147 (1939)..........................................................................................52

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
      467 U.S. 947 (1984)..................................................................................15-16

*Sherbert v. Verner,*
      374 U.S. 398 (1963)..........................................................................................56

*Snyder v. Phelps,*
      562 U.S. 443 (2011)..........................................................................................73

*Sorrell v. IMS Health Inc.,*
      564 U.S. 552 (2011)..................................................................................27, 41

*Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*
 307 F.3d 566 (7th Cir. 2002) ......................................................45

*Sprint Commc'ns, Inc. v. Jacobs,*
 134 S. Ct. 584 (2013) ...........................................................15, 21

*Steffel v. Thompson,*
 415 U.S 452 (1974)....................................................................19

*Susan B. Anthony List v. Driehaus,*
 134 S. Ct. 2334 (2014) ..............................................14-15, 19, 23-24

*Terminiello v. City of Chicago,*
 337 U.S. 1 (1949)......................................................................76

*Texas v. Johnson,*
 491 U.S. 397 (1989)...................................................................73

*Thomas v. Chicago Park Dist.,*
 534 U.S. 316 (2002)...................................................................46

*Thornhill v. Alabama,*
 310 U.S. 88 (1940).....................................................................50

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
 959 F.2d 468 (3d Cir. 1992)........................................................69

*Truax v. Raich,*
 239 U.S. 33 (1915)................................................................66, 69

*Turner v. Safley*
 482 U.S. 78 (1987).....................................................................60

*United States v. Playboy Entm't Grp., Inc.,*
 529 U.S. 803 (2000)..............................................................14, 30

*United States v. Powell,*
 423 U.S. 87 (1975).....................................................................64

*United States v. Stevens,*
 559 U.S. 460 (2010)...............................................................47-48

*Virginia v. Am. Booksellers Ass'n, Inc.,*
 484 U.S. 383 (1988)...............................................................17-18

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)............................................................................ 4-5, 71, 76

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ..........................................................................76

*Ward v. Utah*,
   321 F.3d 1263 (10th Cir. 2003) ............................................................ 14-15, 17

*White v. City of Sparks*,
   500 F.3d 953 (9th Cir. 2007) .................................................................... 28-29

*Wilson v. Stocker*,
   819 F.2d 943 (10th Cir. 1987) .................................................................. 22-23

*Winsness v. Yocum*,
   433 F.3d 727 (10th Cir. 2006) ........................................................................18

*Wooley v. Maynard*,
   430 U.S. 705 (1977)........................................................................ 3, 36, 48-49

*Yes On Term Limits, Inc. v. Savage*,
   550 F.3d 1023 (10th Cir. 2008) ......................................................................72

*Younger v. Harris*,
   401 U.S. 37 (1971).........................................................................................21

**Statutes and Regulations:**

3 C.C.R. § 708-1:10.2(H)................................................................................11, 58, 62

42 U.S.C. § 1981.......................................................................................................34

42 U.S.C. § 2000e-3.................................................................................................75

Colo. Rev. Stat. §§ 24-34-306(2)(a), -306(9), -602(1)(a), -605.................................5, 50

Colo. Rev. Stat. § 24-34-601(1)...............................................................................59

Colo. Rev. Stat. § 24-34-601(2)(a) ................................................................. *passim*

Colo. Rev. Stat. § 24-34-602(1)(A) ...........................................................................70

D.C. Stat. §§ 2-1401.01 & 2-1402.31 ........................................................................42

*Other Authorities*:

Billy Hallowell, The Blaze, *T-Shirt Maker Who Refused to Print Gay Pride Shirt is Being Punished — but These Lesbian Business Owners Reveal Why They're Supporting Him,* http://www.theblaze.com/news/2014/11/07/lesbian-business-owners-tell-glenn-beck-why-they-support-the-t-shirt-maker-whos-now-being-punished-for-refusing-to-print-gay-pride-shirts/ ..................................................................................................................36

Eleanor M. Fox, *The Modernization of Antitrust: A New Equilibrium,* 66 Cornell L. Rev. 1140, 1153-54 (1981)....................................................................................................................69

Job Eugene Scott, CNN, Mormon Tabernacle Choir member quits, http://www.cnn.com/2016/12/30/politics/mormon-tabernacle-choir-member-quits-trump-inauguration/. .......................................................................................................................35

KOB4, Business owner refusing service to Trump supporters, http://www.kob.com/albuquerque-news/business-owner-refusing-service-president-elect-donald-trump-supporters-matthew-blanchfield-1st-in-seo-internet-marketing-company/4325531/; Matthew Blanchfield, Linkedin, https://www.linkedin .com/ in/mathew-blanchfield-29b319b0 .....................................................................................35

Nick Younker, Inquisitr, Donald Trump Inauguration:  Rockette Willing to Lose Job Not to Perform at Ceremony, http://www.inquisitr.com/3844671/donald-trump-inauguration-rockette-willing-to-lose-job-not-to-perform-at-ceremony/ ..........................................................35

Robin Givhan, Washington Post, Should designers dress Melania and Ivanka? https://www.washingtonpost.com/news/arts-and-entertainment/wp/2017/01/12/should-designers-dress-melania-and-ivanka-the-question-is-more-complex-than-it-seems/?tid=a_inl&utm_term=.8c21491699ef..............................................................................35

Rosemary Feitelberg, LA Times, *Sophie Theallet vows not to dress Melania Trump*, http://www.latimes.com/fashion/la-ig-wwd-sophie-theallet-melania-trump-20161117-story.html. .............................................................................................................................34

COME NOW Plaintiffs 303 Creative LLC and Lorie Smith, who move for summary judgment on all of the claims in the Verified Complaint For Declaratory and Injunctive Relief, ECF No. 1 pursuant to Fed. R. Civ. P. 56.   In support of their motion, Plaintiffs rely on the arguments herein, Joint Statement of Stipulated Facts with Exhibits A through L, Affidavit of Lorie Smith in Support of Plaintiffs' Motion for Summary Judgment, Affidavit of Jeremy D. Tedesco in Support of Plaintiffs' Motion for Summary Judgment, Appendix in Support of Plaintiffs' Motion for Summary Judgment, the Verified Complaint, all documents previously filed with the Court, and any oral argument granted by the Court.

## INTRODUCTION

This case is about protected expression and Defendants' efforts both to coerce and squelch it.   Plaintiff Lorie Smith owns and operates Plaintiff 303 Creative LLC, a small business that specializes in graphic design, website design, and related marketing, social media management, and consultation services.[1]   Joint Statement of Stipulated Facts ("Stipulated Facts") ¶¶ 42, 45, 48. Like many other creative professionals, Lorie started her own business to use her design skills in keeping with her unique artistic vision, which—in Lorie's case—is firmly grounded in her Christian faith. Stipulated Facts ¶¶ 42, 60.   This entrepreneurial venture would allow Lorie to use her talents in keeping with her faith by explaining on 303 Creative's website her reasons for (1) creating speech aligned with her religious values and (2) declining to create speech that does not.   Stipulated Facts ¶¶ 60-63, 66-69, 86-90.   But Defendants currently strip away Plaintiffs' freedom to do both.

---

[1] For simplicity's sake, this motion refers to both Plaintiffs collectively as "Lorie" whenever possible.

Colorado's Anti-Discrimination Act ("CADA") bars businesses (expressive and non-expressive alike) from discriminating on the basis of a person's disability, race, creed, color, sex, sexual orientation, marital status, and national origin or ancestry.  Colo. Rev. Stat.  § 24-34-601(2)(a); Stipulated Facts ¶ 1.  Lorie does not decide what speech to create based on any of these protected characteristics and CADA should thus have no application to her.  Stipulated Facts ¶¶ 66-69.  But Lorie does decide what speech to design and create based on her religious beliefs, including the conviction that marriage is a union instituted by God between one man and one woman.  *Id*.  It is undisputed here that Defendants interpret her message-based objection to celebrating same-sex marriage as sexual orientation discrimination prohibited by CADA.  Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 2, 6, ECF No. 38 ("Defs.' MPI Resp.") (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Defs.' Mot. to Dismiss V. Compl. for Decl. and Inj. Relief 2, ECF No. 37 ("Mot. to Dismiss") (stating same).  This improper application of CADA puts Lorie at imminent risk of state punishment.

In fact, Defendants apply CADA's ban on sexual orientation discrimination to require all expressive businesses like 303 Creative that design, create, and publish protected expression promoting marriages between one man and one woman to do the same for same-sex marriages.  *Id.*; *see also* Stipulated Facts ¶¶ 24-25, Ex. F, at 2 (Final Agency Order from the Colorado Civil Rights Commission ("Commission") ordering cake artist, Jack Phillips, to "cease and desist from discriminating against Complainants and other same-sex couples by refusing to sell them wedding cakes or any product [Phillips] would sell to heterosexual couples . . . .").  They deem it immaterial

that expressive businesses create constitutionally protected speech.  Whether a business cleans floors after a wedding ceremony or creates art celebrating it, Defendants treat them exactly the same, so long as they disfavor messages that promote same-sex marriage.  *Id.*   Defendants' interpretation of CADA thus requires Lorie to create graphic designs and custom webpages celebrating same-sex wedding ceremonies if she creates custom webpages celebrating weddings between one man and one woman.  *Id.*  Defendants effectuate this compelled-speech requirement by banning Lorie from making public statements that suggest she will decline requests to create designs or custom webpages promoting and celebrating same-sex weddings.[2]  *Id.*  But expressive business owners, like secular cake artists, that publicly refuse to send religious messages critical of same-sex marriage may create and speak freely because Defendants allow them to operate by different rules.  Stipulated Facts ¶ 28, Ex. G-L (the Commission found no probable cause for charges of discrimination against three bakeries who declined to create cakes with messages critical of same-sex marriage).

This application of CADA to Lorie and 303 Creative violates the First Amendment, the Unconstitutional Conditions Doctrine, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  A cardinal principle of the Free Speech Clause is that speakers—and, in particular, artists—have the right to control their own speech.  The government cannot compel creative professionals to remain silent or speak, let alone force them to send messages about marriage they find "morally objectionable."  *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977). Yet Defendants have done just that.  They apply CADA to silence Lorie's religious speech about

---

[2]  For the statements Lorie desires to publish, *see* Stipulated Facts ¶ 87, Ex. B.

marriage and force her to create custom graphics, webpages, and text that celebrate a conception of marriage that violates her faith. But the First Amendment's very purpose is to prevent such incursions into the "sphere of intellect and spirit," which must be free "from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The Constitution protects this freedom for at least two reasons. First, art inherently involves the "subtle shaping of thought" about marriage and any other subject in our society and thus deserves strong protection as pure speech. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); *see also Cressman v. Thompson*, 798 F.3d 938, 952 (10th Cir. 2015) (explaining that the definition of pure speech is "fairly capacious" and includes not only words, but also things like "pictures, paintings, drawings, and engravings" and "the sale of original artwork" (quotation and alterations omitted)). Here, Lorie wishes to design, create, and publish websites promoting biblical marriage for this very reason—to use her art to protest and ultimately change the prevailing view of marriage in our society. Stipulated Facts ¶¶ 71, 73-79.

Second, any attempt by the government to favor one viewpoint over another demands intense skepticism. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (explaining that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content" (quotation omitted)). Defendants are clearly playing favorites: they permit artists to speak and create messages favoring same-sex marriage and to decline promoting opposing messages but threaten with investigations, re-education training, and fines those who hold a contrary view and object to promoting viewpoints they find morally objectionable. Aff. of Lorie Smith in Supp. of Pls.' Mot. for Summ. J. ¶¶ 9-36 ("Lorie Smith Aff."); App. in Supp. of Pls.' Mot. for Summ. J. ("App.") 003-010 (excerpts from expressive businesses who provide

services for weddings and post messages in favor of same-sex marriage); Stipulated Facts ¶¶ 24-25, 28, Ex. C-L (Defendants found probable cause for a charge of discrimination against Jack Phillips and Masterpiece Cakeshop for declining to create a cake celebrating a same-sex marriage but found no probable cause for charges of discrimination against three bakeries that declined to create cakes conveying messages critical of same-sex marriage). Yet, unpopular speech is precisely what the First Amendment exists to protect. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (noting that free speech "shield[s] just those choices of content that in someone's eyes are misguided, or even hurtful"). When the government enforces ideological orthodoxy on marriage or any topic, no citizen is safe. *See Barnette*, 319 U.S. at 637 (recognizing that the First Amendment exists to protect "individual freedom of mind" against government coercion).

In this case, CADA and Defendants' discriminatory enforcement of it force Lorie to make an impossible choice. She can either (1) remain silent on the subject of marriage and abandon her right to create and publish the speech of her choosing, as directed by her religious beliefs, or (2) speak out on the subject of marriage, exercise her right to create and publish the speech of her choosing, and incur investigations, re-education training, mandatory reporting, and fines of up to $500 for each violation of CADA, or (3) design custom websites celebrating a view of marriage that she finds morally objectionable and speak a message that she would otherwise decline to speak absent compulsion by the state. Colo. Rev. Stat. §§ 24-34-306(2)(a), -306(9), -602(1)(a), -605; Stipulated Facts ¶¶ 92-97.

No American should be forced to choose between her constitutional rights and government punishment. Defendants' efforts to force Lorie to do so are unconstitutional. The Court should

grant summary judgment in her favor and hold—as other courts have already done—that when states interpret public accommodation laws to interfere with freedom of speech, the First Amendment preempts their enforcement.  *See Hurley*, 515 U.S. at 581 (applying a state public accommodation law to require private parade organizers to include the message of an LGBT group violates the First Amendment).  Otherwise, if Defendants' discriminatory actions are allowed to stand, the Supreme Court's promise that private individuals "who adhere to religious doctrines, may continue to advocate … that, by divine precepts, same-sex marriage should not be condoned" is a dead letter and citizens like Lorie will be excluded from society based on their religious identity and beliefs.  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015).

## STATEMENT OF FACTS

Lorie Smith started 303 Creative LLC to have the freedom to incorporate her faith into her work. Stipulated Facts ¶ 42.  After graduating from the University of Colorado Denver with a business degree in marketing, Lorie went to work for several years for traditional companies doing graphic design, website design, and marketing.  Stipulated Facts ¶¶ 40-41.  In these companies, Lorie found herself unable to use her artistic skills for a higher purpose in the way she always dreamed. Stipulated Facts ¶ 42.  This troubled Lorie because her Christian faith teaches that every talent comes from God and should be used to honor Him.  Stipulated Facts ¶¶ 37-38.  So Lorie started her own small business, 303 Creative LLC.  Stipulated Facts ¶¶ 42-45.

Lorie is 303 Creative's owner/operator and sole employee.  Stipulated Facts ¶ 44.  Through 303 Creative, Lorie offers a variety of creative services to the public, including graphic design and website design, and in concert with those design services social media management and consultation services, marketing advice, branding strategy, training regarding website

management, and innovative approaches for achieving client goals.  Stipulated Facts ¶ 45.  Lorie

controls the scope, mission, priorities, creative services, and standards of 303 Creative.  Stipulated

Facts ¶ 48.  She does not employ or contract work to any other individuals, so each new graphic

or website design is Lorie's original and custom work.  Stipulated Facts ¶¶ 49-50, 83.

In creating her custom works, Lorie draws on her personal inspiration and sense of beauty

to create websites and graphics, containing images, words, symbols, and other modes of expression

to enhance and effectively communicate particular messages.  Stipulated Facts ¶¶ 46-47, 54-55.

She devotes considerable attention to artistic principles, such as color schemes, fonts, font sizes,

positioning, harmony, balance, proportion, scale, space, interactivity, movement, navigability,

simplicity, in her website design work.  Stipulated Facts ¶¶ 51, 56-57.  She also considers color,

positioning, movement, angle, light, complexity, and other factors when designing graphics.

Stipulated Facts ¶¶ 50, 56-57.  Every aspect of Lorie's websites and graphics are designed to

enhance and effectively communicate the particular message.  Stipulated Facts ¶¶ 53-57.  Lorie

has been thrilled to be able to use 303 Creative to promote particular messages aligned with her

religious beliefs.  Stipulated Facts ¶ 71.

Guided by her faith, Lorie seeks to live and operate 303 Creative in accordance with the

tenets of her Christian faith and in a way that brings glory to God and shares His truth with her

clients and community.  Stipulated Facts ¶¶ 60-61.  She does this in many ways, including by

treating her clients with love, honesty, fairness, transparency, and excellence and by being

selective about the messages and events she creates and promotes—always ensuring they are

consistent with her religious beliefs.  Stipulated Facts ¶¶ 58, 62-63, 66-69.

To ensure this is the case and that all prospective clients are fully aware of 303 Creative's religious purpose, Lorie ultimately decided to include a special condition in her "Contract for Services" that allows the refusal to create any artwork, graphics, or textual content that communicates ideas or messages inconsistent with her beliefs. Stipulated Facts ¶ 67. Among other things, Lorie does not design, create, or promote content that: contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports the destruction of unborn children; incites violence; or promotes any conception of marriage other than between one man and one woman. Stipulated Facts ¶ 66. If a commission conflicts with its religious beliefs, Lorie will attempt to refer the prospective client to another graphic and website design company that can be of help. Stipulated Facts ¶ 69.

One key way Lorie felt called to serve God through her work was by designing, creating, and publishing custom wedding websites celebrating the union of a man and a woman. Stipulated Facts ¶¶ 73-80. Society's drift away from a biblical view of marriage was deeply troublesome to her. *Id.* Conveying the beauty of God's design for marriage by using her graphic design, web design, and marketing talents to celebrate the unique story of how a bride and groom met, fell in love, and got married was a perfect way for Lorie to convey her religious message about marriage in a compelling way. Stipulated Facts ¶¶ 73-80. All of Lorie's design work is artistic, expressive, and informational in nature, and her wedding websites will be the same, using images, words, graphics, and other modes of expression to tell a couple's unique story. Stipulated Facts ¶¶ 46-47, 81-83. Creating custom wedding websites will also give Lorie an opportunity to encourage her clients' marriages by sharing biblical truths with the bride and groom throughout the consultative process she uses to learn about them and their relationship. Stipulated Facts ¶ 80.

So Lorie prepared a special addition to 303 Creative's website announcing the expansion of her services to include custom wedding websites.  Stipulated Facts ¶¶ 85-87, Ex. B.  This webpage explains Lorie's excitement about the message of love and commitment told through each couple's union and her desire to create a wedding website that expresses their distinctive story.  Stipulated Facts ¶¶ 88-89.  It describes Lorie's religious motivation for offering this artistic service and her goal that God's design for marriage between a man and a woman would be clear to anyone viewing the final product.  *Id.*  To be open and transparent about the services Lorie will provide, 303 Creative's website addition also explains that Lorie "will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman" because "[d]oing that would compromise [her] Christian witness and tell a story about marriage that contradicts God's true story of marriage—the very story He is calling [her] to promote."  Stipulated Facts ¶¶ 90-91.  Plaintiffs desire, and are prepared, to publish the religious speech contained on this website immediately.  Stipulated Facts ¶¶ 92.

But 303 Creative's webpage for wedding website design services never saw the light of day because of Defendants' application of CADA.  Stipulated Facts ¶¶ 93-97.  CADA includes a provision—the Banned-Speech Provision—that makes it illegal

> directly or indirectly to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the … services … of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence … is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601(2)(a); Stipulated Facts ¶ 3.  Another CADA provision—the Compelled-Speech Provision—makes it "unlawful for a person, directly or indirectly, to refuse,

withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the … services … of a place of public accommodation." Colo. Rev. Stat. § 24-34-601(2)(a); Stipulated Facts ¶ 1.

Defendants have interpreted these provisions as prohibiting expressive businesses from declining to create speech that celebrates same-sex marriage for religious or moral reasons, but permitting expressive businesses that support same-sex marriage to decline to create religious speech critical of the practice.  For example, when a Christian bakery—Masterpiece Cakeshop—declined to design and create a custom wedding cake celebrating a same-sex marriage, the Civil Rights Division concluded that it engaged in illegal sexual orientation discrimination under CADA.  Stipulated Facts ¶¶ 24-25, Ex. C-D (the Civil Rights Division found probable cause for both charges of discrimination against Jack Phillips after he declined to create a cake celebrating a same-sex marriage based on his Christian faith).  The Civil Rights Division found it immaterial that the Christian baker would serve anyone regardless of sexual orientation and that he simply could not promote a message at odds with his faith.  *Id.*

Yet when a Christian customer later filed complaints against three other bakeries—Azucar Bakery, Le Bakery Sensual, Inc., and Gateaux, Ltd.—based on their refusal to create religious expression critical of same-sex marriage, the Civil Rights Division found no illegal discrimination under CADA based on creed.  Stipulated Facts ¶¶ 28, Ex. G ("The Commission has determined that there is insufficient basis to warrant further action and has affirmed the director's decision of no probable cause" against Azucar Bakery); *see also* Ex. H-I (making the same findings of "no probable cause" against Le Bakery Sensual, Inc. and Gateaux, Ltd); Ex. J-L (Division findings of

"no probable cause" against the three bakeries).   And it did so despite the fact that creed discrimination encompasses "all aspects of religious beliefs, observances, and practices … [including] *the beliefs or teachings of a particular religion*," 3 C.C.R. § 708-1:10.2(H) (emphasis added).   The only way the Civil Rights Division could resolve these matters in favor of the three bakeries was by recognizing (1) a distinction between discriminating based on a customer's protected status and declining a commission based on a disagreeable message and (2) the significance of the secular bakeries' willingness to create other items for a member of a protected class.   Stipulated Facts ¶¶ 28, Ex. J, at 3 (The Division found that Azucar Bakery's refusal was "based on the explicit message that the Charging Party wished to include on the cakes" not on his "creed" and noted that Azucar creates her cakes for Christians); *see also* Ex. K-L (finding the same in charges against Le Bakery Sensual, Inc. and Gateaux, Ltd.).   But the Civil Rights Division applies these factors only to expressive businesses that approve of messages promoting same-sex marriage.   *Id.*; Stipulated Facts ¶¶ 24-25, Ex. C-F (Division findings that Jack Phillips and Masterpiece Bakery violated CADA by declining to create a cake celebrating a same-sex marriage).   For the Christian bakery who disapproved of messages promoting same-sex marriage, they did not matter.   *Id.*   In stark contrast to the Civil Rights Division's exoneration of three secular bakeries from creed discrimination charges, the Civil Rights Division ruled that the Christian bakery committed unlawful discrimination under CADA.   *Id.*

303 Creative is in the same predicament as Masterpiece Cakeshop, the Christian bakery described above.   It creates expression and is happy to serve all people without reference to personal characteristics, such as race, creed, sexual orientation, and gender.   Stipulated Facts ¶¶ 64-65.   What 303 Creative cannot do is create speech that promotes messages at odds with its faith.

Stipulated Facts ¶¶ 63, 66-68. But, according to Defendants, declining to create speech celebrating a same-sex marriage violates CADA. Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same). This interpretation of CADA has severely chilled Plaintiffs' protected speech, particularly as CADA's Banned-Speech Provision bans Lorie from directly or indirectly publishing any religious message that could conceivably make same-sex couples feel unwelcome. Stipulated Facts ¶¶ 92-97. It has also kept her from entering the wedding industry to create custom wedding websites. *Id.*

Further, all named Defendants have enforcement power under CADA. Mot. to Dismiss 3-4,17-19; Stipulated Facts ¶¶ 4-23. For example, Ms. Elenis, the Civil Rights Division Director ("Director") has authority to investigate all charges alleging discrimination or unfair practice, issue subpoenas make probable cause findings and conduct compulsory mediation. Stipulated Facts ¶¶ 9-13, 18-19. Mr. Aragon, Mr. Chaney, Mr. Elias, Ms. Fabrizio, Ms. Hess, Ms. Lewis, and Ms. Pocock, as commissioners on the Civil Rights Commission, have authority to independently file charges alleging discrimination or unfair practice, hear appeals from the Directors' probable cause findings, issue notices to set hearings, preside over hearings, and make findings and issue orders pursuant to those hearings, including ordering an accused individual or business to engage in remedial measures. Stipulated Facts ¶¶ 14-17, 20-21. Ms. Coffman, the Colorado attorney general has authority to independently file charges alleging discrimination or unfair practice, triggering a mandatory investigation by the Director. Stipulated Facts ¶¶ 14, 22-23.

Because of the looming threat of an enforcement action, Lorie has not made viewable to the public the portion of 303 Creative's website that announces the availability of custom wedding websites and its religious reasons for creating only messages that promote marriage between a man and a woman.  Stipulated Facts ¶¶ 93-97.  She has also not begun creating custom wedding websites.  *Id.*  But for Defendants' interpretation of CADA, Lorie would have already published this website and began offering creative services for the creation, design, and publication of wedding websites that promote marriages between one man and one woman.  Stipulated Facts ¶¶ 95-97.  CADA is the only reason that Lorie has not done so.  Stipulated Facts ¶ 96.  If Plaintiffs obtain relief from this Court, Lorie will immediately publish the website described above and begin work creating, designing, and publishing wedding websites that communicate her religious view of marriage.  Stipulated Facts ¶ 97.

However, despite not being in the wedding industry, Lorie has received a request to provide custom graphic and website design services for a same-sex wedding ceremony.  Lorie Smith Aff. ¶¶ 3-8; App. 001-002.  If she were in the wedding industry, this request would place Lorie in the impossible situation she seeks to avoid by filing this lawsuit—create the celebratory message and violate her beliefs or decline to create the celebratory message and violate the law.  Stipulated Facts ¶¶ 94-95.

## STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(a) if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Plaintiffs and Defendants agree that no material facts are in dispute and that this case should be decided as a matter of law.  *See* Law & Mot. Hr'g Tr. 9: 13-20 (Jan. 11, 2017), ECF No. 47 ("Hr'g Tr. (Jan.

11, 2017)") ("[W]e don't believe that any facts are in dispute in this matter.  Certainly the facts

that we think are material to this are defendants' business and their operations and their intent and

their personal beliefs…. [W]e don't dispute that.  We certainly dispute their statement of what the

law is …."). And rightly so, for the determination of whether "speech warrants constitutional

protection is a question of law to be resolved by the court on a motion for summary judgment."

*Lee v. Bd. of Cnty. Comm'rs of Arapahoe Cnty.*, 18 F. Supp. 2d 1143, 1157 (D. Colo. 1998).

"When the Government restricts speech, the Government bears the burden of proving the

constitutionality of its actions."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816

(2000); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("In the

context of governmental restriction of speech, it has long been established that the government

cannot limit speech protected by the First Amendment without bearing the burden of showing that

its restriction is justified.").  The state's burden in cases of content or viewpoint discrimination is

even greater because "the usual presumption of constitutionally afforded [state] enactment is

reversed," courts deem the law "presumptively invalid," and the state "bears the burden to rebut

that presumption."  *Playboy*, 529 U.S. at 817 (quotation omitted).

## ARGUMENT

### I.     This Court Has Jurisdiction To Decide Plaintiffs' Claims.

*Susan B. Anthony List*, *Cressman*, and *Ward* control the standing inquiry in this case.  *Susan

B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2346 (2014) (ruling that two advocacy groups' had

standing to bring First and Fourteenth Amendment pre-enforcement challenges to a state law

criminalizing false statements about candidates during political campaigns because of the chilling

effect on their speech); *Cressman v. Thompson*, 719 F.3d 1139, 1147 (10th Cir. 2013) (concluding

that a motorist had standing to bring a First Amendment pre-enforcement challenge to a state law prohibiting him from covering an image on his license plate to which he had a religious objection); *Ward v. Utah*, 321 F.3d 1263, 1269-70 (10th Cir. 2003) (holding that an animal rights activist had standing to bring a pre-enforcement challenge to a state hate-crime statute because of the chilling effect on his speech.).   All three cases involved pre-enforcement challenges to state law.   *Id.*   All three cases found standing.   *Id.*   And all three cases dictate standing in Lorie's case because she currently stands unable to exercise her First Amendment rights for fear of government punishment. *Id.*

These three cases also set out the test for pre-enforcement standing—namely that a plaintiff who intends to engage in a course of conduct, arguably protected by the constitution but prescribed by statute, suffers an injury in fact so long as there is some a credible threat of enforcement.   *Susan B. Anthony List*, 134 S. Ct. at 2342; *Cressman*, 719 F.3d at 1145; *Ward*, 321 F.3d at 1267.   This test satisfies the "injury in fact" requirement under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992), and triggers the Court's "virtually unflagging" duty to decide the merits of the case, *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013) (*quoting Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see also Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994) (quoting same), so long as a plaintiff names defendants with enforcement authority under the law, thus meeting the causation element of standing, and the Court can redress the plaintiff's injury.   *Susan B. Anthony List*, 134 S. Ct. at 2341; *Cressman*, 719 F.3d at 1144; *Ward*, 321 F.3d at 1266.   The test is most leniently applied when, as here, the plaintiff's injury is the "chilling effect on h[er] desire to exercise h[er] First Amendment rights."   *Ward*, 321 F.3d at 1266-67; *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)

("Because of the significance of First Amendment rights, the Supreme Court 'has enunciated other concerns that justify a lessening of prudential limitations on standing.'"); *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

Lorie readily satisfies the aforementioned test for pre-enforcement standing.

**A.      Plaintiffs Suffer an Injury in Fact.**

**1.      Plaintiffs Intend to Engage in Constitutionally Protected Speech Prescribed by Statute.**

Lorie desires to exercise her First Amendment right to speak on the subject of marriage between one man and one woman.  Stipulated Facts ¶¶ 71-97.  She intends to do this by creating custom wedding websites that celebrate such marriages and by posting her religious beliefs about marriage on 303 Creative's website, along with her policy of taking only those creative projects that accord with her religious beliefs. *Id.*; Stipulated Facts ¶¶ 66 ("Among other things, Plaintiffs will decline any request to design, create, or promote content that:  contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports the destruction of unborn children; incites violence; or promotes any conception of marriage other than marriage between one man and one woman.").  As this statement pertains to marriages, Lorie's website will inform her customers that she cannot create any custom websites that celebrate marriage as a union other than between one man and one woman. *Id.*  Lorie's custom wedding websites are pure speech and she has taken concrete steps towards publishing this speech.  Stipulated Facts ¶¶ 81-89.

As explained in detail below, Lorie's creation of custom wedding websites and the publishing of statements regarding marriage on Lorie's website are pure speech protected by the First and Fourteenth Amendments. *See infra* Part II.A.l.a..  Both are Lorie's original works of

texts and graphics published on the internet for the world to see.  Stipulated Facts ¶¶ 93-97.  Both are central to Lorie's desire to speak freely on the subject of marriage.  Stipulated Facts ¶¶ 71-80, 90. And both are inextricably intertwined since the speech on 303 Creative's website serves the primary purpose of describing the views and policies by which Lorie runs her expressive business, including the creation of custom wedding websites.  Stipulated Facts ¶¶ 88-91.

Lorie's speech is prohibited by both the Banned Speech Provision and the Compelled Speech Provision of CADA.  *See* Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same); Hr'g Tr. (Jan. 11, 2017) 8:7-10 ("…[C]ertainly I think someone would have an argument that they are not being denied service but someone is committing an illegal act by posting this discriminatory language on a website.").  Because of this, Lorie must chill her desired speech.  Stipulated Facts ¶¶ 93-97. And that is a concrete injury in fact sufficient to provide standing for a pre-enforcement challenge.

### 2. Lorie Faces a More Than Credible Threat of Enforcement.

Courts "assume a credible threat of prosecution in the absence of compelling contrary evidence."  *Ward*, 321 F.3d at 1269 (quoting *Mangual v. Rotger Sabat*, 317 F.3d 45, 57 (1st Cir. 2003)); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume

otherwise.").[3]  However, this Court need not assume anything here because the Defendants have

confirmed the threat of enforcement.

 At the January 11th hearing in this case, Defendants' counsel conceded that the Defendants

will investigate any and all charges of discrimination or unfair practice against Lorie as soon as

they receive a complaint that she has either posted content on her website that someone finds

"unwelcoming" or that she operates her business in a way that someone finds discriminatory by,

for instance, declining to create a custom wedding website for a same-sex couple.  Hr'g Tr. (Jan.

11, 2017), 7:17-20 ("If it was determined that they had jurisdiction, for instance, it was filed timely,

and it fell under the statute, then the Civil Rights Division would initiate an investigation."); 8:7-

10 (". . .[C]ertainly I think someone would have an argument that they are not being denied service

but someone is committing an illegal act by posting this discriminatory language on a website.");

9:4-5 ("The only discretion it exercises is jurisdictional" so the Division "has no discretion whether

it could accept a complaint as long as it is filed.").  In their briefing, Defendants' repeatedly

identified Lorie's speech as "discriminat[ion]," Mot. to Dismiss 2, in "violation of Colorado's

Anti-discrimination Act." Defs.' MPI Resp. 2.  Defendants also accused Lorie of "assert[ing] her

religious beliefs as a reason to discriminate against same-sex couples," Defs.' MPI Resp. 6, and

characterized views, like hers, that are critical of same-sex marriage on religious grounds, as

---

[3] Compelling contrary evidence historically has included evidence that a statute is moribund, *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004), or clear statements from the state defendants denouncing any intent to enforce the law, *Winsness v. Yocum*, 433 F.3d 727, 731 (10th Cir. 2006) ("[A]ssurances from prosecutors that they do not intend to bring charges are sufficient to defeat standing…." (quoting *D.L.S.*, 374 F.3d at 975)); *Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007).  The Defendants have not denounced an intent to enforce and instead have stated they will enforce the law to punish Lorie if she speaks as she desires. *See infra.*

"derogatory, and offensive message[s]." Defs.' MPI Resp. 18.  These statements leave no question as to the Defendants' view of the legality of Lorie's protected speech.  Indeed, Defendants' past enforcement of CADA against Masterpiece Cakeshop confirms their aggressive application of the statute to punish similar religious expression.   Stipulated Facts ¶¶ 24-25, Ex. C-F.

The credible threat is further supported by the Division's punishment of Jack Phillips, the cake artist who owns and operates a Colorado bakery called Masterpiece Cakeshop.  *See Susan B. Anthony List*, 134 S. Ct. at 2345 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not "'chimerical.'"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (stating the same).  Like Lorie, Phillips believes marriage is an institution between one man and one woman.  Stipulated Facts ¶¶ 24-25, Ex. E, at 3 ("Phillips believes . . . that God's intention for marriage is the union of one man and one woman.").  In line with his beliefs, he declined to design and create a custom cake celebrating a same-sex wedding. *Id*.  After the same-sex couple filed a charge of discrimination, the Division aggressively prosecuted Phillips all the way to the U.S. Supreme Court.  *Id.*  And Defendants' require Phillips to create custom cakes promoting same-sex ceremonies, submit to re-education training for himself and his staff, and file regular reports with the Division justifying any decision he makes to decline an order for any reason. Stipulated Facts ¶¶24-25, Ex. F (Commission's Final Agency Order). With such prospects of onerous and expensive investigations, subpoenas, hearings, appeals, findings, and orders, Lorie cannot take the risk of speaking freely.

Defendants will likely respond, as they did in their Motion to Dismiss, by referring the Court to an irrelevant ten-item list of events they claim must occur before they will enforce CADA. Mot. to Dismiss 6-7. This list is inapposite.  Nearly everything on that list is what Lorie can only

avoid by chilling her protected speech.  The only remaining item is the request from a third party to create a custom wedding website for a same-sex ceremony and that does not impact pre-enforcement standing.  Under the Defendants' interpretation of CADA, Lorie violates the Banned Speech Provision as soon as she posts her desired statements on her own website regardless of any third party requests.  Defendants ignored this fact in their prior briefing but confirmed at the January 11th hearing that as soon as Lorie posts her statements she violates CADA and can be investigated and punished. *See supra*.  Similarly, under Defendants' interpretation of CADA, Lorie violates the law as soon as she begins creating custom wedding websites for any marriages between one man and one woman because she is doing so under a policy that states she will only create custom wedding websites for such unions and not for other types of marriages, including same-sex weddings.  Stipulated Facts ¶¶ 90-91. That policy, as she posts it on her website, will violate CADA regardless of any third party request.  Hr'g Tr. (Jan. 11, 2017) 7:17-20, 8:7-10; 9:4-5. This forces Lorie to make the decision about what she can and cannot create before entering the industry and, based on her convictions, puts her in immediate violation of the law if she enters the wedding market.  Moreover, Lorie has already received a request to design materials for a same-sex wedding, as explained below.

The suggestion that lack of a third party request negates standing is contradicted by caselaw.  That exact issue was presented in *Doe v. Bolton*, 410 U.S. 179, 188 (1973), a case in which the U.S. Supreme Court considered a challenge to an abortion statute.  The Court affirmed the physician plaintiffs' standing even though they could not violate the law absent a request by a third party to perform an abortion.  *Id.*; *see also ACLU v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) (recognizing that "[p]reenforcement suits always involve a degree of uncertainty about

future events."); *Brandt v. Vill. of Winnetka*, 612 F.3d 647, 649 (7th Cir. 2010) ("Any pre-enforcement suit entails some element of chance.").

The Supreme Court's holding makes eminent sense because any other result would bar Lorie, and pre-enforcement plaintiffs like her, from federal court. In addition to violating CADA upon entering the industry by merely announcing her policy against promoting non-biblical marriage, Lorie will also violate CADA when she effectuates that policy by declining a request to create a website promoting a same-sex marriage. Based on the customers' complaint which Defendants must investigate—they have no discretion to decline—or their own independent charge of discrimination, Defendants can immediately commence investigations and other enforcement actions against Lorie. Hr'g Tr. (Jan. 11, 2017) 7:17-20 ("If it was determined that they had jurisdiction [over a complaint], for instance, it was filed timely, and it fell under the statute, then the Civil Rights Division would initiate an investigation."). This state court proceeding mandates abstention by federal courts, therefore precluding Lorie from a federal venue in which to vindicate her constitutional rights. *Sprint Commc'ns*, 134 S. Ct. at 591-94 (2013); *see also Younger v. Harris*, 401 U.S. 37, 41 (1971); *Phelps v. Hamilton*, 59 F.3d 1058, 1063-64 (10th Cir. 1995). Therefore, Lorie's only opportunity to exercise her right to bring a pre-enforcement lawsuit in federal court is to bring that suit before she violates the law which means *before* she receives a third party request. Anything else forces Lorie to gamble with her conscience and her rights as she enters an expressive business knowing she will likely receive a request, and trigger punishment.

Notably, any claim that Lorie will never receive a request to create a custom website celebrating a same-sex ceremony is no longer legitimate because Lorie has received such a request.

Aff. ¶¶ 3-8, App. 001-002. Even though she is not currently in the wedding industry, Lorie received

an email inquiry on September 21, 2016 asking her to "design…invites, placenames, etc." as well

as maybe "stretch[ing] to a website" for a same-sex wedding ceremony.  *Id.*  If Lorie were already

in the wedding industry, that request would have placed her in the impossible position of choosing

between compliance with CADA and compliance with her conscience.  Stipulated Facts ¶¶ 93-97.

That impossible choice is the very one she seeks to avoid by filing this pre-enforcement lawsuit.

*Id.*  Once Lorie begins promoting her custom wedding websites, she will likely get more requests.

She should not have to choose between violating her conscience and violating the law.

### B.      Plaintiffs' Injury is Caused by the Defendants as the Enforcers of CADA.

"It is well-established that when a plaintiff brings a pre-enforcement challenge to the

constitutionality of a particular statutory provision, the causation element of standing requires the

named defendants to *possess authority to enforce the complained of provision*."  *Cressman*, 719

F.3d at 1145 (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007)) (emphasis in

original).  *Ex Parte Young* and its progeny set out this exception to Eleventh Amendment

Sovereign Immunity, which allows a plaintiff to seek prospective relief against a state law by

naming those enforcement officials with "some connection" to "the enforcement of the act."  *Ex

Parte Young*, 209 U.S. 123, 157 (1908); *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166

(10th Cir. 2012); *Prairie Band Potawatomi Nation v. Wagno*n, 476 F.3d 818, 827-28 (10th Cir.

2007); *Wilson v. Stocker*, 819 F.2d 943, 945-46 (10th Cir. 1987).  As the Tenth Circuit confirmed

in *Wilson*, "'[a] suit against a state officer in his official capacity is of course, a suit against the

State' … thus a controversy exists not because the state official is himself a source of injury, but

because the official represents the state whose statute is being challenged as the source of injury."

819 F.2d at 947 (quoting *Diamond v. Charles*, 476 U.S. 54, 57 n.2 (1986)).

Although Defendants have disputed the legal standard for "causation," they do not dispute

each Defendants' specific "connection" to "the enforcement" of CADA.  Stipulated Facts ¶¶ 4-23;

*see also* Mot. to Dismiss 3-4,17-19. The parties agree that under CADA the Defendants have the

following authority. Defendant Elenis, as Director of the Colorado Civil Rights Division, has

authority over all investigations of all charges of discrimination or unfair practice received by the

Division.  Stipulated Facts ¶¶ 9-13, 18-19.  Defendant Elenis also has the power to issue subpoenas,

determine whether probable cause exists for crediting charges of discrimination or unfair practice,

dismiss charges, issue probable cause determinations, and commence compulsory mediation.  *Id.*

Defendants Aragon, Chaney, Elias, Fabrizio, Hess, Lewis, and Pocock, as members of the

Commission have the power to file charges of discrimination or unfair practice, hear appeals from

the Directors' findings, issue notices and complaints to set hearings before the Commission or an

ALJ, make findings at hearings before the Commission, and after a finding by the Commission or

an ALJ that an individual or business violated CADA, the power to issue orders including cease-

and-desist orders and other remedial measures. Stipulated Facts ¶¶ 14-17, 20-21. Defendant

Coffman, as Colorado Attorney General, has authority to file charges of discrimination.  Stipulated

Facts ¶¶ 14, 22-23.  Each of these powers enforces CADA.  *Susan B. Anthony List*, 134 S. Ct. at

2345-46 ("We take the threatened Commission proceedings into account because administrative

action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement

review.  The burdens that Commission proceedings can impose ... are of particular concern [when]

…. the target of a … complaint may be forced to divert significant time and resources to hire legal counsel and respond to discovery requests….") (internal citation omitted).

No question exists that Defendants have the authority to enforce CADA.  The parties both agree that they do.  Importantly, the precise nature of that authority is not significant because Defendants are sued only in their official capacities and Plaintiffs do not seek to impose personal liability upon them.

### C.       This Court Can Redress Plaintiffs' Injury.

Redressability need not be "complete" and is satisfied where "the risk of harm 'would be reduced *to some extent* if petitioners received the relief they seek.'"  *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007)); *see also Larson v. Valente*, 456 U.S. 228, 243 (1982); *Cressman*, 719 F.3d at 1146-47.  A favorable decision from this Court will redress Plaintiffs' injuries by barring Defendants from enforcing CADA to ban or compel Lorie's protected speech.  It will also significantly reduce, if not eliminate, the chances that a private plaintiff would file a lawsuit in an attempt to compel her to create speech she cannot create or punish her for publishing statements regarding her religious beliefs about marriage.

### II.     Plaintiffs are Entitled to Summary Judgment as a Matter of Law.

As previously noted, the material facts of this case are not in dispute.  Plaintiffs and Defendants simply have differing views of the legal principles that control this case.  For the reasons outlined below, the Court should decide those legal questions in Lorie's favor.

### A.       Defendants' Application of CADA Violates Plaintiffs' First Amendment Rights to Freedom of Speech, the Press, and Expressive Association.

Defendant's application of CADA to Lorie and 303 Creative violates three rights guaranteed by the First Amendment:   (1) freedom of speech, (2) freedom of the press, and (3) freedom of expressive association, as explained below.

> **1.      Applying CADA to Force Plaintiffs to Create Speech Celebrating Same-Sex Weddings and to Prohibit Plaintiffs from Publishing Speech Communicating Their Religious View of Marriage Violates the Free Speech Clause.**

CADA violates Lorie's rights under the Free Speech Clause of the First Amendment in at least five separate ways.  It not only punishes Lorie's religious speech about marriage based on its content and viewpoint, but also fails to offer any protection against viewpoint discrimination by enforcement officials.  What is more, CADA compels Lorie to create morally-objectionable speech promoting same-sex marriage and bans Lorie from publishing religious speech opposing same-sex marriage.   The statute's speech-coercing and speech-squelching terms also employ facially overbroad language that covers a substantial amount of protected expression.   Last but not least, CADA renders it impossible for Lorie to form an artistic partnership or expressive association solely with those who share her expressive purpose of promoting biblical marriage.   These critical errors render CADA's application to Lorie unlawful and parts of the statute unconstitutional on their face.

> **a.      The Free Speech Clause Protects Plaintiffs' Right to Speak and Create Art.**

Lorie's custom wedding webpages, which are composed of images, words, graphics, and other forms of expression, are pure speech protected by the First Amendment.  Stipulated Facts ¶¶ 46-47.  The Tenth Circuit has recognized that "[t]he concept of pure speech is fairly capacious." *Cressman*, 798 F.3d at 952.  Pure speech includes not just the written or spoken word but "music

without words, dance, theater, movies, and pictures, paintings, drawings, and engravings," as well as "tattoos, artwork, custom-painted clothing, and stained-glass windows."  *Id.* at 952 (internal quotations and alterations omitted).  Lorie's custom wedding websites, which are composed of custom text and graphics, as well as other forms of expression, fit comfortably into this description of pure speech.

It is important to note that although pure speech extends well "beyond written … words," it unquestionably includes them.  *Hurley*, 515 U.S. 569.  The custom text Lorie writes celebrating the union of a man and a woman, as well as the words Lorie authors explaining her religious reasons for declining to promote same-sex marriage, is therefore unquestionably speech protected by the First Amendment.  Stipulated Facts ¶¶ 86-89, 91; *see also Cressman*, 798 F.3d at 954 (noting that courts dealing with "images in the context of … accompanying … text" have routinely assumed that protected speech exists).

So are the custom graphics Lorie designs for her custom webpages.  Stipulated Facts ¶¶ 50, 55, 79.  For they are simply the modern equivalent of traditional visual media like "pictures, … paintings, drawings, and engravings" that courts have protected as speech for over forty years.  *Kaplan v. California*, 413 U.S. 115, 119 (1973).  In fact, Lorie's graphic design business deals in nothing less than "an artist's sale of [her] own original work," which always qualifies as pure speech because Lorie creates custom graphic designs for each client and incorporates those designs into her custom websites.  *Cressman*, 798 F.3d at 953; *see* Stipulated Facts ¶ 59.[4]  While those

-------

[4] Numerous courts have found electronic text, images, and graphics to be protected speech.  *See, e.g., Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (video games are protected speech); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-51 (2002) (virtual child pornography is protected speech); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (noting that the

websites may contain both original and pre-existing content, the website as a whole is a new, original creation.  Stipulated Facts ¶¶ 50, 56-59.  For instance, the meaning of any pre-existing images and videos that Lorie incorporates into her website designs are changed by the new overarching context that she alone creates.  *See Hurley*, 515 U.S. at 569-70 ("[A] private speaker does not forfeit constitutional protection … by failing … to generate, as an original matter, each item featured in the communication.").  Lorie's web designs are—simply put—the modern digital equivalent of incorporating another's "pictorial rendition" into "a larger collage," a well-known artistic practice, which the Tenth Circuit has acknowledged results in pure speech.  *Cressman*, 798 F.3d at 953; *see* Stipulated Facts ¶¶ 50-59.

Indeed, Lorie's business of graphic and webpage design is inherently expressive in every respect.  Stipulated Facts ¶¶ 46-47; c*f. Hurley*, 515 U.S. at 568 (recognizing that parades are inherently expressive).  Not only is Lorie's artistic and informational product expressive, so too is her artistic design process, and the business of creating graphics and webpages itself.  Stipulated Facts ¶¶ 45-59; *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("This Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment.").  It is well settled that the processes expressive businesses use to create speech are themselves entitled to First Amendment protection.  Take newspapers, for example; in some

---

internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue."); *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010) ("The Supreme Court has also made clear that First Amendment protections for speech extend fully to communications made through the medium of the internet.").

respects, they are businesses like any other.  But they deal in speech not widgets.  Thus, if a decision effects a newspapers' choice of content, that choice is constitutionally protected.

An unbroken line of federal caselaw proves this point.  Newspapers have the freedom to select their own writers and editorial staff because those employment decisions—which are generally subject to pervasive government regulation—affects their speech.  *See, e.g.*, *McDermott v. Ampersand Publ'g, Inc.*, 593 F.3d 950, 962 (9th Cir. 2010) (the First Amendment protects a "publisher's choice of writers"); *Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980) ("[E]ditorial control [is] within the First Amendment's zone of protection ….").  Likewise, no law may compel newspapers to publish a written work because they have the right to editorial control or speaker autonomy.  *See, e.g.*, *Miami Herald Publ'g Co. v Tornillo*, 418 U.S. 241, 256 (1974) ("[A]ny … compulsion to publish that which reason tells them should not be published is unconstitutional" (quotation omitted)); *Novotny v. Tripp County*, 664 F.3d 1173, 1177 (8th Cir. 2011) ("requir[ing] that a privately owned newspaper publish [a] letter to the editor" would "infringe upon the right of the newspaper itself to decide what content it includes on its own editorial page").  Newspapers' right to control their own speech extends even to their commercial decisions whether to accept an ad.  *See, e.g.*, *Miss. Gay Alliance v. Goudelock*, 536 F.2d 1073, 1075 (5th Cir. 1976) (holding "the First Amendment interdicts judicial interference with the editorial decision" to reject an ad).

Less iconic expressive businesses receive the same constitutional protection.  The First Amendment protects speech creation of both high and low varieties.  Few are able to make a living selling their original paintings and other works of visual art.  But an artist's creation and sale of her original artwork is constitutionally protected.  *See, e.g.*, *White v. City of Sparks*, 500 F.3d 953,

957 (9th Cir. 2007) ("[A]n artist's sale of his original paintings is entitled to First Amendment

protection."); *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996) (holding that "[v]isual art

is as wide ranging in its depiction of ides, concepts and emotions as any book, treatise, pamphlet

or other writing, and is similarly entitled to full First Amendment protection" and that "[t]he sale

of protected materials is also protected").

Not many people would find the design and sale of violent video games comparable to the

business of dealing in visual art.  But the Supreme Court has held that "video games communicate

ideas—and even social messages—through many familiar literary devices (such as characters,

dialogue, plot, and music) and through features distinctive to the medium (such as the player's

interaction with the virtual world).  That suffices to confer First Amendment protection."  *Brown*

*v. Entm't Merchants Ass'n*, 564 U.S. at 790.  As a result, government regulation of violent video

games engenders strict scrutiny, even when mere age restrictions on their purchase are at issue.

*See id.* at 799 ("Because the Act imposes a restriction on the content of protected speech, it is

invalid unless California can demonstrate that it passes strict scrutiny ….").

The same is true of the business of designing and creating tattoos, which is conventionally

considered one of the lower forms of art available.  No less than two courts of appeals have

invalidated restrictions on operating a tattoo parlor based on the Free Speech Clause of the First

Amendment.  *See Buehrle v. City of Key West*, 813 F.3d 973, 976 (11th Cir. 2015) ("We join the

Ninth Circuit in holding that the act of tattooing is sheltered by the First Amendment, in large part

because we find tattooing to be virtually indistinguishable from other protected forms of artistic

expression."); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1063 (9th Cir. 2010) ("[T]he

business of tattooing qualifies as purely expressive activity … and is therefore entitled to full constitutional protection ….").

This line of diverse precedents demonstrate that the government's ability to regulate expressive businesses, *i.e.*, those that deal in speech creation, is constitutionally limited. Precedent is so well established in this regard that, in its filings with the Supreme Court in the *Masterpiece* case, the State of Colorado admitted that bakeries operated by cake artists may qualify for free speech protection. App. 032 ("[C]reating a cake could … be expressive and could therefore implicate the First Amendment."); App. 033 (admitting regulation of a cake shop "could give rise to a First Amendment claim"). It could hardly do otherwise because the state had previously admitted that the Christian cake artist in question's work demonstrated "considerable skill and artistry." Stipulated Facts ¶¶ 24-25, Ex. E, at 7. If newspapers, painters, video game developers, tattooists, and cake artists all receive a First Amendment shield in operating their businesses because they produce speech, Lorie's operation of her graphic and web design business is protected by the Free Speech Clause as well.[5] That is because Lorie's custom wedding webpages are composed of unique combinations of images, words, graphics, and other forms of expression that—individually and collectively—qualify as pure speech. Stipulated Facts ¶¶ 46-47.

The Free Speech Clause thus offers Lorie and 303 Creative strong protection against Defendants' speech-coercing and speech-squelching application of CADA. *Cressman*, 798 F.3d at 951 (noting that "'pure speech' activities are rigorously protected regardless of meaning").

_____

[5] Indeed, the Supreme Court protected even expressive businesses that deal in pornography because the parties agreed that they produced speech. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811 (2000) (noting that because Playboy's television programming is not "obscene" all parties agreed that it "has First Amendment protection").

Indeed, the right to speak and the right not to speak are simply two sides of the same coin.  *See Agency for Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." (quotation omitted)).  It would be utterly meaningless for Lorie to publish an explanation of why she cannot design websites for same-sex weddings if Colorado may force her to actually create them in practice.  Stipulated Facts ¶ 91; *see Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (explaining that free speech "protection would be empty" if "the government could require speakers to affirm in one breath that which they deny in the next").

Moreover, the speech that Lorie creates as the sole owner and operator of 303 Creative equally belongs to her and her closely-held corporation.  They both may accordingly challenge the state's unconstitutional actions here.  Seven years ago in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), the Supreme Court recognized "that First Amendment protection extends to corporations," *id.* at 342,  because "[w]hen the Government seeks to use its full power … to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought.  This is unlawful.  The First Amendment confirms the freedom to think for ourselves," *id.* at 356.

A couple of years later in *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1135 (10th Cir. 2013) (en banc), the Tenth Circuit clarified how *Citizens United*'s holding applies to joint religious speech by closely-held-for-profit businesses and their owners.  It held that protected speech is equally attributable to the closely-held business, *see id.* ("We see no reason the Supreme Court would recognize constitutional protection for a corporation's political expression but not its

religious expression."), and its owner(s), *see id.* ("A religious individual may enter the for-profit realm intending to demonstrate to the marketplace that a corporation can succeed financially while adhering to religious values.  As a court, we do not see how we can distinguish this form of evangelism from any other.").

The Supreme Court affirmed the Tenth Circuit's reasoning in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768 (2014), when it clarified that "[a] corporation is simply a form of organization used by human beings to achieve desired ends…. And protecting the free-exercise rights of corporations like Hobby Lobby, Conestoga, and Mardel protects the religious liberty of the humans who own and control those companies."  The same is true of free speech.  *See Hobby Lobby*, 723 F.3d at 1135 ("We see no reason the Supreme Court would recognize constitutional protection for a corporation's political expression but not its religious expression.").  Tellingly, the individual owners of Hobby Lobby and Conestoga were named plaintiffs along with their closely-held corporations during the entire course of litigation that resulted in victory at the Supreme Court.  *See Hobby Lobby*, 134 S. Ct. at 2765 ("The Hahn's and Conestoga sued HHS and other federal officials and agencies under RFRA and the Free Exercise Clause of the First Amendment …."); *id.* at 2766 ("The Greens, Hobby Lobby, and Mardel sued HHS and other federal agencies and officials to challenge the contraceptive mandate under RFRA and the Free Exercise Clause.").  Thus, Lorie and 303 Creative's constitutional rights are identical and they are both proper plaintiffs here.  *See id.* at 2785 ("The contraceptive mandate, as applied to closely held corporations, violates RFRA.  Our decision on that statutory question makes it unnecessary to reach the First Amendment claim raised by Conestoga and the Hahns.").

**b.      Free Speech Exceptions to Nondiscrimination Laws are Routinely Mandated by Federal Courts.**

The potential of nondiscrimination laws to unconstitutionally interfere with protected expression has long been recognized by federal courts.  *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657 (2000) (noting "the potential for conflict between state public accommodation laws" and "the First Amendment"); *Hurley*, 515 U.S. at 572 (characterizing as "peculiar" and striking down the application of a state public accommodation law to speech).  Defendants' extreme position that CADA regulates only conduct and thus allows for no free speech exception directly conflicts with this precedent.  Title VII is a widely revered nondiscrimination statute but even it "steers into the territory of the First Amendment" when "pure expression is involved." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995).  For this reason, the Supreme Court has twice rejected attempts to apply public accommodation laws to interfere with private speech.  *Dale*, 530 U.S. at 658; *Hurley*, 515 U.S. at 578.

Lower federal courts have correctly received the Supreme Court's message:  where free speech and nondiscrimination laws come into conflict, free speech wins.[6]  Here are just a few relevant examples where federal district courts have held just that:

•    *City of Cleveland v. Nation of Islam*, 922 F. Supp. 56 (N.D. Ohio 1995):  Cleveland prevented Nation of Islam ministers from delivering "separate speeches to men and women" at a conference held in a city convention center pursuant to a state public accommodations law that prohibited sex discrimination.  *Id.* at 59.  A federal district court held that forcing ministers to speak to a mixed gender audience would necessarily change "the content and character of the speech" and barred that particular application of the nondiscrimination law.  *Id.*

---

[6] If Defendants properly interpreted the MHRA, there would be no conflict between the statute and Lorie's free speech rights.  Lorie selects her website and graphic design projects based on the message requested, not the sexual orientation of her patrons.  Stipulated Facts ¶¶ 58, 63-69.

- *Claybrooks v. Am. Broad. Cos.*, 898 F. Supp. 2d 986, 989-90 (M.D. Tenn. 2012):  African-American men who auditioned for, but were rejected by, the producers of ABC's television show *The Bachelor* sued for racial discrimination under 42 U.S.C. § 1981.  *Id.* at 989-90, 1000.  A federal district court dismissed the suit because "the First Amendment protects the producers' right unilaterally to control their own creative content" and base their casting decisions "on whatever considerations the producers wish to take into account."  *Id.* at 1000.

- *S. Bos. Allied War Veterans Council v. City of Boston*, 297 F. Supp. 2d 388 (D. Mass 2003):  Boston officials forced parade organizers to allow a Veterans for Peace group to march at the end of their St. Patrick's Day parade, even though the organizers had previously denied the anti-war group's request to take part.  *Id.* at 394.  A federal district court held that these private speakers had the right "not [to] have the message of an opposing group forced on them by the state," *id.* at 393, and that a distance of "no less than a mile" between the groups was required to adequately "distinguish the two sets of speech," *id.* at 399.

These cases establish that even nondiscrimination laws have their limits.  One is private speech.

### c.    Creative Professionals Regularly Select Projects Based on Their Values and Preferred Message.

In the creative professions, it is standard practice for artists to operate based on their values and to associate their professional work with a certain message to the exclusion of others.  Recent controversy surrounding the election of President Trump has brought this to light.  Perhaps the first creative professional to object publically to the election result was Sophie Theallet, a well-known fashion designer who often dressed first lady Michelle Obama.  Theallet views her "family-owned company" as "not just about money" but as a vehicle for exercising her "artistic freedom" and "philosophical ideas," which include the "celebration of diversity."   Because she viewed President Trump as compromising those values, Theallet issued a letter stating that she would not provide her fashion designs to his wife.[7]  The Washington Post's fashion critic defended Theallet's and certain other fashion designers' stance in this regard, explaining:  "[F]or those designers for

---

[7] Rosemary Feitelberg, LA Times, *Sophie Theallet vows not to dress Melania Trump*, http://www.latimes.com/fashion/la-ig-wwd-sophie-theallet-melania-trump-20161117-story.html.

whom fashion serves as their voice in the world, they should not feel obligated to say something in which they do not believe."[8]

Controversy regarding whether artists should perform at the presidential inauguration followed Theallet's letter. Some accepted, while others declined. Media speculation ran rampant for weeks regarding whether members of the Radio City Rockettes would lose their jobs because they refused to perform.[9] And at least one member of the Mormon Tabernacle Choir resigned rather than "endorsing" what she viewed as "tyranny and fascism by singing for this man."[10] But not all creative professionals' objections were so limited. One website designer and internet marketing provider in New Mexico went so far as to say that his company would refuse service to any Republican or supporter of President Trump because "he has a moral obligation to stand up for what he believes is right."[11]

Expressive business owners of all stripes share this principle even if they do not take it to such extremes. The lesbian owners of a New Jersey t-shirt company, for example, defended the decision of a Christian t-shirt printing shop to decline to create t-shirts promoting a local LGBT

---

[8] Robin Givhan, Washington Post, *Should designers dress Melania and Ivanka?* https://www.washingtonpost.com/news/arts-and-entertainment/wp/2017/01/12/should-designers-dress-melania-and-ivanka-the-question-is-more-complex-than-it-seems/?tid=a_inl&utm_term=.8c21491699ef.

[9] Nick Younker, Inquisitr, *Donald Trump Inauguration: Rockette Willing to Lose Job Not to Perform at Ceremony*, http://www.inquisitr.com/3844671/donald-trump-inauguration-rockette-willing-to-lose-job-not-to-perform-at-ceremony/.

[10] Job Eugene Scott, CNN, *Mormon Tabernacle Choir member quits*, http://www.cnn.com/2016/12/30/politics/mormon-tabernacle-choir-member-quits-trump-inauguration/.

[11] KOB4, *Business owner refusing service to Trump supporters*, http://www.kob.com/albuquerque-news/business-owner-refusing-service-president-elect-donald-trump-supporters-matthew-blanchfield-1st-in-seo-internet-marketing-company/4325531/; Matthew Blanchfield, Linkedin, https://www.linkedin .com/ in/mathew-blanchfield-29b319b0.

pride festival on the ground that creative professionals often refuse "to do something against what they believe in."  For them, the moral objection would be to creating t-shirts for the Westboro Baptist Church, but the same principle controlled.[12]  Professional speech creators may not use proper legal terminology but their instincts are correct.  Federal courts have recognized their right to speaker autonomy, *i.e.*, private speakers' right to control their own speech.  *See, e.g.*, *Cressman*, 798 F.3d at 952 (discussing a wide range of "media" that are safeguarded because "their expressive character … falls within a spectrum of protected speech" (quotation omitted)).

> ### d.   Defendants' Application of CADA Unlawfully Forces Lorie to Create Speech.

The Free Speech Clause grants "both the right to speak freely and the right to refrain from speaking at all."  *Wooley*, 430 U.S. at 714.  This latter aspect, known as the compelled speech doctrine, bars the government from coercing unwanted expression.  *See Alliance for Open Soc.*, 133 S. Ct. at 2327 ("It is … a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." (quotation omitted)).

The First Amendment's ban on compelled speech applies just as strongly to public accommodation laws as it does to any other statute.  For example, the Supreme Court in *Hurley,* 515 U.S. at 572-75, held that Massachusetts' public accommodation law could not be used to force the organizers of a St. Patrick's Day parade to admit an LGBT contingent expressing an unwanted message regarding the "unqualified social acceptance of gays and lesbians."  The Court held that

---

[12] Billy Hallowell, The Blaze, *T-Shirt Maker Who Refused to Print Gay Pride Shirt is Being Punished — but These Lesbian Business Owners Reveal Why They're Supporting Him,* http://www.theblaze.com/news/2014/11/07/lesbian-business-owners-tell-glenn-beck-why-they-support-the-t-shirt-maker-whos-now-being-punished-for-refusing-to-print-gay-pride-shirts/.

Case 1:16-cv-02372-MSK-CBS   Document 48   Filed 02/01/17   USDC Colorado   Page 50 of 92

any effort to declare the parade "sponsors' speech itself to be the public accommodation" was bound to fail because the state "may not compel affirmance of a belief with which the speaker disagrees." *Id.* at 573. Lorie, like the parade organizers in *Hurley*, has "the autonomy to choose the content of [her] own message" and cannot be compelled to express an unwanted message by the state. *Id.*; *see also Dale*, 530 U.S. at 642 (invalidating the application of a public accommodation law that interfered with speech).

A more straightforward violation of the compelled speech doctrine than Defendant's mandate that Lorie design, create, and publish custom websites celebrating same-sex weddings is hard to fathom. Making out a compelled-speech claim in the Tenth Circuit requires that "a party … establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman*, 798 F.3d at 951. All three factors are met here. First, Lorie's custom wedding websites are pure speech, as explained above. *See supra* Part II.A.1.a. Second, it is clear that Lorie has strong religious objections to creating speech that promotes same-sex marriage. Stipulated Facts ¶¶ 60-61, 63, 66-71, 73-80, 88-92, 94. In fact, Lorie desires to publish speech explaining that such unions "contradict[] God's true story of marriage—the very story He is calling [303 Creative] to promote." Stipulated Facts ¶ 91. Third, Defendants seek to apply CADA to compel Lorie to design, create, and publish that speech. Stipulated Facts ¶ 95; Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same). Defendants' prosecution of Masterpiece Cakeshop proves that they require expressive business owners that object to same-sex marriage—

like Lorie—to create and publish speech promoting same-sex weddings if they create and publish speech celebrating weddings between one man and one woman.  Stipulated Facts ¶¶ 24-25, Ex. C-F (Commission orders related to Masterpiece Cakeshop).  But the compelled speech doctrine prevents a speaker from "being forced to speak" on the subject of same-sex marriage.  *Cressman,* 719 F.3d at 1152 (quotation omitted).

That is particularly true here where Lorie designs, creates, and publishes artistic expression.  *See Redgrave v. Bos. Symphony Orchestra*, 855 F.2d 888, 905 (1st Cir. 1988) ("[T]he law's typical reluctance to force private citizens to act, … augments its constitutionally based concern for the integrity of the artist.").  The Free Speech Clause protects not only the pure speech Lorie creates, but also her process for creating that pure speech.  Stipulated Facts ¶¶ 46-47, 50-59; *see Cressman*, 798 F.3d at 954 (noting that artistic "creation is itself an act of self-expression"); *Buehrl*e, 813 F.3d at 977 (refusing to "draw[] a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded." (quoting *Anderson*, 621 F.3d at 1061)).

Because Lorie wants to design custom webpages for the express purpose of honoring God's design for marriage, Stipulated Facts ¶¶ 71, 73-79, a critical part of her creative process is subject matter selection:  Lorie will use the unique stories of brides and grooms to communicate, in an engaging way, the distinctive beauty of marriage between one man and one woman to the general public.  Stipulated Facts ¶¶ 79-81.  Modifying Lorie's artistic subject matter to include same-sex weddings fundamentally changes her message about marriage and what merits celebration in that context.  Weddings are, after all, inherently expressive events that celebrate "the uniting of two people in a committed long-term relationship."  *Kaahumanu*, 682 F.3d 789, 799 (9th Cir. 2012).

It is impossible for Lorie to communicate that such unions should *only* be between a man and a woman if Colorado may force her to design and create custom websites promoting and celebrating same-sex weddings in practice. *Id.*; Stipulated Facts ¶¶88-91, 94.

Lorie is rightly proud of her artistic work and an important means of defining her religious message about marriage is placing the text "Designed by 303Creative.com" on all of her custom wedding websites. Stipulated Facts ¶ 83. No one in our society listens to hypocrites. Yet forcing Lorie to communicate a celebratory message about same-sex marriage would "compromise [her] Christian witness and tell a story about marriage that contradicts" the teachings of her faith before a watching world. Stipulated Facts ¶ 91. Colorado's attempts to force Lorie to promote a view of marriage she does not hold must necessarily fail because, under the First Amendment, Lorie has the "autonomy to choose the content of [her] own message." *Hurley*, 515 U.S. at 573; *see also id.* at 576 (explaining that the government cannot "require speakers to affirm in one breath that which they deny in the next" (quotation omitted)).

Defendants will invariably claim that these free speech protections do not apply because (1) Lorie's speech belongs to her clients and (2) 303 Creative is a for-profit business. But neither argument holds water. Federal courts have rejected the peculiar notion that free speech protections apply only to those who commission an expressive work and not to the artist who creates it. *Buehrle*, 813 F.3d at 977 ("The First Amendment protects the artist who paints a piece just as surely as it protects … the buyer who purchases it …."); *Anderson*, 621 F.3d at 1062 (recognizing that both the artist and the patron "are engaged in expressive activity"). Lorie's custom wedding websites consist of unique combinations of graphics, images, and text that promote the bride's and groom's story of love and commitment in a way that promotes biblical marriage. Their creation

is "an act of self-expression" on Lorie's part that promote her religious vision of marriage to society at large. *Cressman*, 798 F.3d at 954. Lorie's pure speech is attributable to her not only because it is her original artwork, but also because the wedding websites she designs will bear the text "Designed by 303Creative.com." Stipulated Facts ¶83. Lorie is thus "intimately connected with the communication advanced" on any website she creates and publishes. *Hurley*, 515 U.S. at 576. And in those circumstances, the forced "dissemination of a view contrary to one's own" violates "the speaker's right to autonomy over the message." *Id.*; *see also Obergefell*, 135 S. Ct. at 2607 (recognizing that "[t]he First Amendment ensures that religious organizations and persons [like Lorie] are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faith, and to their own deep aspirations to continue the family structure they have long revered.").

Just as importantly, *Hurley*, 515 U.S. at 574, recognized that the freedom not to engage in or publish unwanted speech is "enjoyed by business corporations generally" and "professional publishers" in particular. Precedent supports no other view, as the Supreme Court has protected for-profit businesses against compelled speech for at least forty years. *See, e.g.*, *Pac. Gas*, 475 U.S. at 5-6 (protecting a for-profit electric company); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (shielding a for-profit newspaper). In keeping with this precedent, a trial court in Kentucky invalidated the application of a public accommodation law to compel an expressive business to print t-shirts for a gay-pride festival. *Hands on Originals, Inc. v. Lexington-Fayette Urban Cnty. Human Rights Comm'n*, No. 14-CI 04474 (Fayette Cir. Ct. Apr. 27, 2015).[13]

---

[13] The *Hands on Originals* opinion is available at http://perma.cc/75FY-Z77D.

This Court should do the same here because Defendants are similarly compelling Lorie to speak in an unlawful manner.  *See also Claybrooks*, 898 F. Supp. 2d at 1000 (holding that a federal anti-discrimination law could not be used to compel a for-profit television studio to engage in race-blind casting decisions).  "[A] speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed. of the Blind of N.C.*, 487 U.S. 781, 801 (1988); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (explaining that "a great deal of vital expression" results from an "economic motive").  Supreme Court caselaw is unambiguous in this respect:  "[T]he degree of First Amendment protection is not diminished merely because the [expression] is sold rather than given away." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988).

Because Defendants' interpretation of CADA forces Lorie to create pure speech against her will, that application of the statute is unconstitutional and should be held invalid.  *See Dale*, 530 U.S. at 659 (noting that in *Hurley* the Court "applied traditional First Amendment analysis to hold the application of [a] public accommodations law to [protected expression] violated the First Amendment" without engaging in strict scrutiny).

> **e.     CADA Regulates Speech Based on Its Content and Viewpoint, and Unconstitutionally Allows for Viewpoint Discrimination.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226.  Defendants apply CADA in a content-based manner by targeting speech critical of same-sex marriage for censure and punishment, while allowing speech in favor of same-sex marriage to flourish.  Stipulated Facts ¶¶ 24-25, 28, Ex C-L (Commission and Division rulings finding probable cause for charges of

discrimination against Jack Phillips and Masterpiece Bakery but finding no probable cause against Azucar Bakery, Gateaux, Ltd, or Le Bakery Sensual, Inc.); App. 003-010 (websites from other artists who provide expressive services for weddings who have posted messages in favor of same-sex marriage); Defs.' MPI Resp. 18 (characterizing views, like Lorie's, that are critical of same-sex marriage as "derogatory, and offensive message[s].").

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. Because CADA guards against discrimination based on a narrow set of characteristics, that is certainly true here. Colo. Rev. Stat. § 24-34-601(2)(a). Only ideas or messages related to protected characteristics may implicate CADA's Banned-Speech or Compelled-Speech Provisions. For example, CADA does not require a Democrat speech writer to draft a speech for a Republican because political affiliation is not a protected characteristic. *But see* D.C. Stat. §§ 2-1401.01 & 2-1402.31 (banning discrimination by a public accommodation based on "political affiliation"). Sexual orientation is protected, however, so under Defendants' interpretation of CADA, Lorie is forced to design, create, and publish custom wedding websites that promote and celebrate a same-sex wedding. Stipulated Facts ¶¶ 93-97; Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same). In short, the message expressed determines whether CADA applies. The First Amendment, however, does not allow Colorado to impose "special prohibitions on … speakers who express views on disfavored subjects" without first bearing the burden of

overcoming strict scrutiny.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992); *cf. Campbell v. Robb*, 162 F. App'x 460, 468 (6th Cir. 2006) (ruling that the Fair Housing Act's similar publication ban is content based).

The Supreme Court's decision in *R.A.V.* proves this point.  In that case, a city ordinance banned only a limited class of fighting words that insulted based on a person's "race, color, creed, religion, or gender."  505 U.S. at 391.  Only invectives relating "to one of the[se] disfavored topics" implicated the speech ban.  *Id.*  As a result, those who insulted based on "political affiliation, union membership, or homosexuality [were] not covered."  *Id.*  The Supreme Court held that the ordinance was content based and that, in its real operation, it resulted in "viewpoint discrimination" because speakers sharing the city's values in favor of "tolerance and equality" could use fighting words, such as "aspersions upon a person's mother," at will.  *Id.*  Only "opponents" of the city's ideology were subject to the speech ban because they chose to address someone's race, color, creed, religion, or gender in a negative manner.  *See, e.g.*, *id.* at 391-92 ("One could hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.'").  But government has "no such authority to license one side of a debate to fight freestyle, while requiring the others to follow Marquis of Queensberry rules."  *Id.* at 392.

That is precisely what Colorado has done by allowing expressive businesses who support same-sex marriage to speak freely, while subjecting expressive businesses that oppose same-sex marriage to an onerous set of speech-compelling and speech-squelching rules.  When the Christian owner of Masterpiece Cakeshop declined to design and create a cake celebrating a same-sex union because it communicated an unwelcome message about marriage, the Civil Rights Division ruled

that he must "cease and desist from discriminating against … same-sex couples." Stipulated Facts ¶¶ 24-25, Ex. F, at 2. But when three secular cake artists declined commissions to create cakes with a religious message critical of same-sex marriage for a Christian patron based on their unwelcome message, the Civil Rights Division found no evidence of unlawful discrimination because the "denial was based on the explicit message that the [customer] wished to include on the cakes," Stipulated Facts ¶ 28, Ex. J, at 4; *see also* Ex. K, L, which Defendants arbitrarily deem "derogatory, and offensive message[s]," Def.'s MPI Resp.18. This interpretation of CADA is inherently content and viewpoint based.

According to Defendants, whether an expressive business may decline a commission based on its message depends solely on its view of same-sex marriage. Expressive businesses that oppose same-sex marriage and decline an order based on its opposing message violate CADA, whereas those who support same-sex marriage and decline an order based on its opposing message do not. Stipulated Facts ¶¶2 4-25, 28, Ex. C-L (Defendants found probable cause for a charge of discrimination against Jack Phillips and Masterpiece Cakeshop for declining to create a cake celebrating a same-sex marriage but found no probable cause for charges of discrimination against three bakeries that all declined to create cakes conveying messages critical of same-sex marriage.). This is blatant viewpoint discrimination—the most egregious form of content discrimination possible—because Defendants differentiate among similarly situated expressive businesses based solely on their "specific motivating ideology or … opinion or perspective." *Reed*, 135 S. Ct. at 2230 (quotation omitted); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Church on*

*the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279 (10th Cir. 1996) (explaining that viewpoint discrimination occurs when "[t]he prohibited perspective, not the general subject matter" trigger[s] the decision to bar … private expression (quotation omitted)).

Just as Defendants force artists to *create* expression celebrating same-sex marriage under the Compelled-Speech Provision, they apply the Banned-Speech Provision to ban any *speech* "directly or indirectly" suggesting artists—like Lorie—would decline such a commission based on their religious viewpoint. Stipulated Facts ¶ 3; Hr'g Tr. 8:7-10 ("…[C]ertainly I think someone would have an argument that they are not being denied service but someone is committing an illegal act by posting this discriminatory language on a website."). But when the government "favor[s] some speakers over others" due to preference for certain content—in this case, speech favorable towards same-sex marriage—strict scrutiny applies. *Reed*, 135 S. Ct. at 2230 (quotation omitted). And rightly so, for the First Amendment's very purpose is to prevent the government from wielding laws like CADA "to suppress disfavored speech" in a manner that could potentially serve "invidious, thought-control purposes." *Id.* at 2229 (quotation omitted).

In fact, it is impossible for a speech-regulating law like CADA to be viewpoint neutral unless it incorporates affirmative "protection … for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). "[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.,* 457 F.3d 376, 384 (4th Cir. 2006); *see also Southworth v. Bd. of Regents of Univ. of Wisc. Sys.,* 307 F.3d 566, 579 (7th Cir. 2002) ("[W]e conclude that the prohibition against unbridled discretion is a component of the viewpoint-

neutrality requirement."); *Kaahumanu,* 682 F.3d at 806 (joining the Seventh and Fourth Circuits in holding "that the viewpoint neutrality requirement includes the prohibition on a licensing authority's unbridled discretion").   Laws generally meet this requirement by incorporating "reasonably specific and objective" guidelines that are "narrowly drawn" and which contain "reasonable and definite standards" for enforcement.   *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (quotation omitted).

CADA contains no such guidelines or standards.  To the contrary, it gives Defendants *carte blanche* authority to decide whether an expressive business's decision to turn down an order was based on its message or "because of" a protected characteristic.  Colo. Rev. Stat. § 24-34-601(2)(a). It makes no difference whether Defendants have demonstrably misused the unbridled discretion provided by CADA because it is "the *pervasive threat inherent in its very existence* that constitutes the danger to freedom of discussion."   *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (quotation omitted) (emphasis added).   But Defendants have, in fact, used their unbridled discretion in a viewpoint-based manner to require expressive businesses that oppose same-sex marriage on religious grounds to create speech celebrating it, whereas they have allowed expressive businesses that support same-sex marriage to refuse to create religious speech critical of the practice.  Stipulated Facts ¶¶ 24-25, Ex. C-L.

Likewise, CADA provides no guidelines or standards to restrict Defendants' ability to decide that expressive businesses' communications are off-putting enough to make members of a protected group feel "unwelcome, objectionable, unacceptable, or undesirable."  Colo. Rev. Stat. § 24-34-601(2)(a); Stipulated Facts ¶ 3.   The vagueness and subjectivity of these terms cannot be overstated. Speech that would make some people feel unwanted would be perfectly congenial to

others.  No objective standard of "unwelcomeness" or "objectionability" exists and CADA makes no effort to define these terms in order to provide one.  That is, in and of itself, sufficient to render CADA unconstitutional.  *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (invalidating a school policy that banned "any unwelcome verbal … conduct which offends … because of" protected characteristics); *Armstrong v. Dist. of Columbia Pub. Library*, 154 F. Supp. 2d 67, 79-80 (D.D.C. 2001) (striking down a library regulation that denied access to patrons with an "objectionable" appearance).

State officials enforcing the statute are, in practice, left to their own devices, which—as we know—includes a willingness to coerce speech from expressive businesses that reject same-sex marriage and unwillingness to coerce speech from expressive businesses that share their pro-same-sex-marriage views.  Stipulated Facts ¶¶ 24-25, 28, Ex. C-L; *see, e.g.*, *City of Lakewood*, 486 U.S. at 771 (explaining that when there are no "limits as to what reasons [government officials] may give" for their decisions and their rulings "need not be made with any degree of specificity," the "standards necessary to insure constitutional decisionmaking" are absent).  CADA's failure to establish any "narrowly drawn, reasonable and definite standards" to guide Defendants' exercise of discretion and their failure to "rely on any objective factors" in enforcing the statute results in the vesting of "unbridled discretion in … government official[s]."  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 132-33 (1992).  This allows for viewpoint discrimination, which violates the First Amendment.

**f.      CADA's Banned-Speech Provision is an Unconstitutionally Overbroad Prior Restraint on Speech.**

A law must be facially "invalidated as overbroad if a 'substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States*

*v. Stevens*, 559 U.S. 460, 473 (2010).  That is true in regards to CADA's Banned-Speech Provision, which makes it unlawful to "directly or indirectly" publish, circulate, issue, display, post, or mail "any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry."   Colo. Rev. Stat. § 24-34-601(2)(a); Stipulated Fact ¶ 3.

Because the Speech-Ban Provision is not limited to non-expressive businesses, it applies to newspapers, book publishers, printers, web designers and other creative professionals who deal in pure speech.    These private speakers all have the constitutional right to (1) create speech that accords with their beliefs, (2) solicit the expressive work they desire, and (3) decline to create speech with which they disagree, as outlined above.   *See supra* Parts II.A.1.c and d; *cf. Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 578 (6th Cir. 2013) (declining to interpret the Fair Housing Act's publication ban to prohibit statements that would "discourage an ordinary reader of a particular protected class … [because] using 'discourage' could create First Amendment concerns by creating an overly broad restriction on speech").  Yet CADA robs them of that right if they oppose same-sex marriage.

In addition, the Banned-Speech Provision is remarkably broad in scope, extending to speech that "directly or *indirectly*" makes any member of a protected class feel undesirable as a patron.   Colo. Rev. Stat. § 24-34-601(2)(a) (emphasis added).   This vague and subjective prohibition bans the expression of any number of opinions critical of others' political, religious, and social views, even though such speech lies at the heart of the First Amendment.  *See Wooley*,

430 U.S. 714 (recognizing that the First Amendment "secures the right to proselytize religious, political, and ideological causes").  CADA's Banned-Speech Provision also encompasses positive statements that are exclusive in nature, such as communications indicating that only one religion is true and of eternal significance.  For that would mean all other religions are untrue and their adherents are simply wasting their time.  That would surely make some protected class members feel unwelcome.

Because CADA's Banned-Speech Provision bans a broad swathe of expression that might cause others offense, it is overbroad and facially unconstitutional regardless of this Court's holding regarding Lorie's speech here.  *See Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 882 (10th Cir. 1997) ("[A]n overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." (quotation omitted)).

> **g.      Defendants' Application of CADA's Banned-Speech Provision Violates Plaintiffs' Rights Under the Free Press Clause.**

The chief purpose of the Free Press Clause is "to prevent previous restraints upon publication."  *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931).  Although some perceive this clause as protecting only news media, the freedom of press is far broader.  It is "a guarantee to individuals of their personal right to make their thoughts public and put them before the community."  *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 149 (1967).  The Free Press Clause protects Lorie's right to publish religious speech on her website explaining why same-sex marriage should not be condoned without fear of retribution or censorship.  Stipulated Facts ¶ 91.  Indeed, one of the functions of that clause is to protect private speakers like Lorie from "fear [of] physical or economic retribution solely because of what they choose to think and publish."  *Curtis*, 388 U.S.

at 151; *see also Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940) (noting the freedom of press protects the ability "to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment" by the government).

But Defendants apply CADA's Banned-Speech Provision to forbid Lorie from publishing religious speech critical of same-sex marriage on 303 Creative's website because that speech might "directly or indirectly" indicate that requests for custom same-sex wedding websites would be "unwelcome" or "denied." Colo. Rev. Stat. § 24-34-601(2)(a); *see* Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same); Hr'g Tr. 8: 7-10 ("…[C]ertainly I think someone would have an argument that they are not being denied service but someone is committing an illegal act by posting this discriminatory language on a website."). And they do so on pain of investigations, re-education training, reporting requirements, and fines of up to $500 for each violation. Colo. Rev. Stat. §§ 24-34-306(2)(a), -306(9), -602(1)(a), -605; Stipulated Facts ¶¶ 5-17. Defendants' application of CADA to expressive businesses is the only reason that Lorie has not published speech on 303 Creative's website explaining her religious reasons for promoting only marriages between a man and a woman. Stipulated Facts ¶¶ 95-97. This significant restraint on Lorie's right to publish violates the Free Press Clause. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 249–50 (1936) (explaining that "any action of the government" that prevents the "free and general discussion of public matters" violates the Free Press Clause). Accordingly, the Court should declare the Banned-Speech Provision unlawful.

It is no answer to say that Lorie's speech may be proscribed because 303 Creative is a business or that CADA makes such speech about marriage illegal.  As the Supreme Court explained in *Near*, 283 U.S. at 720-21, over eighty years ago,

> [c]haracterizing [Plaintiffs'] publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint…. Nor can it be said that the constitutional freedom from previous restraint is lost because charges are made of derelictions which constitute crimes…. The freedom … from previous restraint has never been regarded as limited to such animadversions as lay outside the range of penal enactments.

### h. Defendants' Application of CADA's Compelled-Speech Provision Violates Plaintiffs' Freedom of Expressive Association.

Implicit in the First Amendment is a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); *see also NAACP v. Alabama*, 357 U.S. 449, 460 (1958) (explaining that associating "for the advancement of beliefs and ideas is an inseparable aspect of … freedom of speech" and that "it is immaterial whether the beliefs sought to be advanced … pertain to political, economic, religious or cultural matters").  Lorie's collaboration with individuals who desire custom wedding websites that reflect the beauty of God's design for marriage is expressive association of the classic sort between a like-minded artist and patrons. Stipulated Facts ¶¶ 55-59, 79-82; *see Dale*, 530 U.S. at 648 (noting that only "some form of expression" with others is required to raise a free association claim).  This freedom of expressive association includes a right "not to associate" with those promoting competing views. *Id.* (quotation omitted).  Defendants violate that right here by applying CADA's Compelled-Speech Provision to require Lorie to engage in expressive associations with persons seeking to promote a view of marriage that directly opposes her own.

Just like in *Dale*, where applying a public accommodation law to force the Boy Scouts to associate with a gay scoutmaster would send the conflicting message that "homosexual conduct [is] a legitimate form of behavior," *Dale*, 515 U.S. at 653, requiring Lorie to design, create, and publish custom websites promoting same-sex weddings would send the message that she celebrates same-sex marriage. This would undoubtedly "affect[] in a significant way" Lorie's ability to promote the unique beauty of God's design for one-man-one-woman marriage through the creation of custom wedding websites. *Id.* at 648; *see* Stipulated Facts ¶¶ 71, 73-79, 88-89. Indeed, it would force Lorie either "to propound a point of view contrary to [her] beliefs" or stop collaborating with those who share her expressive purpose of promoting only marriage between a man and a woman. *Dale*, 515 U.S. at 654; *see* Stipulated Facts ¶¶ 88-89. But "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed" in this way. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012). CADA does not justify such a "severe intrusion" into Lorie's freedom of expressive association. *Dale*, 515 U.S. at 642.

It makes no difference that Colorado does not *also* limit Lorie's ability to attend church and join strictly religious groups that often engage in internally-focused religious expression. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939). That Lorie's "public debate of religious ideas [about marriage], like any other, may arouse emotion, may incite, may foment religious divisiveness and strife does not rob it of constitutional protection." *McDaniel v. Paty*, 435 U.S. 618, 640 (1978).

In short, Defendants' application of CADA places a "serious burden" on Lorie's right to expressive association and thus violates the First Amendment. *Dale*, 530 U.S. at 658; *see also id.* at 659 ("The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association. That being the case, we hold that the First Amendment prohibits the State from imposing such a requirement through the application of its public accommodations law.").

**B.     Defendants' Application of CADA Forces Lorie to Choose Between Operating an Expressive Business in Colorado and Her First Amendment Rights in Violation of the Unconstitutional Conditions Doctrine.**

Defendants cannot force Lorie to forgo the exercise of her First Amendment rights as a condition of operating an expressive business in Colorado. *See Greene v. McElroy*, 360 U.S. 474, 492 (1959) (noting that the "right … to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts" of the Due Process Clause); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (explaining the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"). The unconstitutional conditions doctrine bars the state not just from prohibiting Lorie's exercise of her rights to free speech, the press, and expressive association outright, but also from "deter[ing], or chilling" the exercise of those rights. *Bd. of Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (quotation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 358 n.11 (1976) (explaining the unconstitutional conditions doctrine applies "however slight the inducement … to forsake [constitutional] rights"). Here, Defendants have severely chilled Lorie's exercise of her First Amendment rights by applying CADA to force her to design, create, and publish custom wedding websites promoting same-sex weddings if she does so for weddings

between one man and one woman.  Stipulated Facts ¶¶ 95-98; Defs.' MPI Resp. 2, 6 (describing

Lorie's efforts to live and work in accordance with her religious beliefs about marriage as

"seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's

Anti-discrimination ACT…" and asserting "her religious beliefs as a reason to discriminate");

Mot. to Dismiss 2 (stating same).

A fundamental principle of First Amendment law is that the government may not dilute a

private person's speech "by forcing the inclusion of all views on" a given topic.  *DeBoer v. Vill.*

*of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (citing *Hurley*, 515 U.S. at 575-76).   Yet

Defendants have conditioned Lorie's right to operate a business that creates expression about

marriage between a man and a woman on her agreement to create unwanted expression about

same-sex weddings.  Stipulated Facts ¶¶ 24-25, 95; Defs.' MPI Resp. 2, 6 (describing Lorie's

efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] …

permission to discriminate against same-sex couples… in violation of Colorado's Anti-

discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to

Dismiss 2 (stating same); *cf.. Hobby Lobby.*, 134 S. Ct. at 2783 (expressing concern that the

Affordable Care Act would "effectively exclude [some religious] people from full participation in

the economic life of the Nation.").  This indirect attempt to force Lorie to design and create speech

promoting same-sex marriage, something Defendants plainly could not do directly, violates the

unconstitutional conditions doctrine.  *See Perry*, 408 U.S. at 597 (explaining the government

cannot deny a benefit to "produce a result [it] could not command directly") (quotation omitted)).

Defendants' application of CADA to Lorie violates the unconstitutional conditions

doctrine and should accordingly be invalidated.  *See Alliance for Open Soc'y Int'l*, 133 S. Ct. at

2329 ("[W]e have held that the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit." (quotation omitted)).

### C.    Because CADA is Neither Neutral Nor Generally Applicable, Its Application to Lorie Violates the Free Exercise Clause.

"Marriage is sacred to those [like Lorie] who live by their religions ...." *Obergefell*, 135 S. Ct. at 2594.  Her belief that marriage "is by its nature a gender-differentiated union of man and woman" ordained by God has long "been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world." *Id.*  Lorie's faith requires that she not create or promote a message contrary to the teachings of the Bible.  Stipulated Facts ¶¶ 60-61, 63.  As a result, she cannot design a custom website for a same-sex wedding because that would entail speaking a message about marriage that is contrary to God's design.  Stipulated Facts ¶ 94.  Just as importantly, Lorie's faith requires her to explain her religious beliefs about marriage and the religious reasons for and meaning of her expression.  Stipulated Facts ¶¶ 73-78.  In fact, her purpose for entering the marriage market in the first place is to "affect the current cultural narrative regarding marriage" by promoting God's design for marriage between one man and one woman.  Ver. Compl. ¶¶ 3-4; Stipulated Facts ¶¶ 73-78.  She cannot do that without communicating her religious view that biblical marriage is correct and all other views on marriage are "wrong ... based on [the] decent and honorable religious ... premises" of her Christian faith.  *Obergefell*, 135 S. Ct. at 2602.

Defendants' interpretation of CADA's Compelled-Speech Provision substantially burdens the exercise of Lorie's religious beliefs by making it impossible for her to speak exclusively in favor of biblical marriage through the design of custom wedding websites without incurring state

investigations, prosecutions, and penalties.   Stipulated Facts ¶¶ 5-17; Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same). Lorie must therefore choose between complying with the demands of her faith and incurring significant government punishment or violating her religious beliefs in order to avoid state censure.  *Id.* Stipulated Facts ¶ 95; *cf. Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.  Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.").   In the same vein, CADA's Banned-Speech Provision puts Lorie between a rock and a hard place.  She can either comply with her religious beliefs by publishing religious statements regarding God's design for marriage and be investigated, prosecuted, and fined by the state or forfeit her First Amendment rights, comply with the speech ban, and abandon the callings of her faith.  *Id*.  Either way, Lorie may only comply with one set of commands—the state's or God's. *Cf. Hobby Lobby*, 134 S. Ct. at 2778 (asking whether the law in question "impose[d] a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*").

A statute "burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Defendants' application of CADA to Lorie fails on both counts.  First,

a law is not neutral if authorities apply it in a biased manner.  In *Lukumi,* for instance, officials interpreted an ordinance banning the unnecessary killing of animals as rendering "[k]illings for religious reasons … unnecessary, whereas most other killings [fell] outside the prohibition." *Id.* at 537.  As a result of this prejudicial interpretation of the statute by enforcement officials, the Supreme Court concluded that the law was not religiously neutral. *Id.* at 537-38.  Equally important to the Supreme Court's holding was the fact that state officials engaged in "an evaluation of the particular justification for [each] killing" and thus created "a system of individualized governmental assessment of the reasons for the relevant conduct." *Id.* at 537.  For it is hornbook law that the government may not refuse to extend a system of individualized exemptions "to cases of religious hardship without compelling reason." *Id.* (quotation omitted).

Defendants' application of CADA is just as biased and case-specific as that of the enforcement officials in *Lukumi*.  *See* App. 051-052 (commissioner stating that "[f]reedom of religion and religion has been used to justify all kinds of discrimination throughout history," such as "slavery" and "the holocaust," and opining that using "freedom of religion" to "justify discrimination … is one of the most despicable pieces of rhetoric that people can use"); Def.'s MPI Resp. 2, 6 (denigrating Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate" and asserting "her religious beliefs as a reason to discriminate").  In fact, they have already punished a Christian cake artist under CADA because he objected to speaking a message that promotes same-sex marriage on religious grounds. Stipulated Facts ¶¶ 24-25, Ex. F.  But when three secular cake artists who supported same-sex marriage refused to speak a customer's religious message critical of same-sex marriage, which included requested cites to the Bible, Defendants decided that no violation of CADA occurred

because the cake artists' refusal was "based on the explicit message that the [customer] wished to include on the cakes." Stipulated Facts ¶ 28, Ex. G-L. Defendants reached this conclusion despite the fact that creed or religious discrimination under CADA encompasses "all aspects of religious beliefs, observances, and practices … [including] *the beliefs or teachings of a particular religion*." 3 C.C.R. 708:1:10.2(H) (emphasis added). What is more, the state has indicated that it is perfectly acceptable for "[a]n African-American baker [to] decline to create a custom cake celebrating the racist ideals of a member of the Aryan Nation" and for "a Muslim baker [to] refuse to create a custom cake denigrating his faith for the Westboro Baptist Church." App. 029. This interpretation of the law is inherently biased and viewpoint based. *See supra* Part II.A.1.e.

Defendants plainly assess the expressive business owners' specific rationale in determining whether declining an order violates CADA. That is precisely why they required the owner of Masterpiece Cakeshop to submit "compliance reports" documenting "the number of patrons denied service … and the *reasons* the patrons were denied service." Stipulated Facts ¶¶ 24-25, Ex. F, at 2 (emphasis added). CADA is not neutral as a result because Defendants employ a system of individualized, ad-hoc exemptions in enforcing the statute. The First Amendment therefore prohibits Defendants from denying a religious exception to Lorie because doing so would "devalue[] religious reasons for [declining an order] by judging them to be of lesser import than nonreligious reasons" and single out her "religious practice [of declining to speak unwanted messages] for discriminatory treatment." *Lukumi*, 508 U.S. at 537-38.

Second, CADA cannot be considered generally applicable in any meaningful sense. *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990) (establishing "a generally applicable criminal law" that brooked no exception as the gold standard under the Free

Exercise Clause).  To Plaintiffs' knowledge, the only expressive business to which CADA has *ever* been applied is Masterpiece Cakeshop.  Stipulated Facts ¶¶ 24-25, Ex. C-F.  Defendants exempted three secular bakeries that refused to create speech criticizing same-sex marriage for a Christian customer.  Stipulated Facts ¶ 28, Ex. G-L.  They also indicated that African-American cake artists may refuse to speak an offensive white-supremacist message for the Aryan Nation and that Muslim cake artists are not required to create offensive speech denigrating the Quran.  App. 029.  It is therefore plain that Defendants have "fail[ed] to prohibit nonreligious conduct that endangers [CADA's interest in non-discrimination] in a similar or greater degree than" Lorie's actions do.  *Lukumi*, 508 U.S. at 543.  Due to this substantial underinclusiveness, CADA fails the general-applicability test.  *See id.* (ruling that a law banning animal killing was "underinclusive for [its] ends" and thus lacked general applicability).  It is, by now, quite apparent that CADA's onerous speech restrictions are burdens "that society is prepared to impose upon [religious objectors to same-sex marriage] but not upon itself."  *Id.* at 545.  And that is the "precise evil … the requirement of general applicability is designed to prevent."  *Id.* at 546.

The Free Exercise Clause also forbids the state from "preferring some religious groups over" others.  *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953).  CADA includes a categorical exemption for any "church, synagogue, mosque, or other place that is principally used for religious purposes."  Colo. Rev. Stat. § 24-34-601(1).  Lorie objects to celebrating same-sex marriage on the same religious grounds as a church, yet the state denies her an exemption from CADA and requires her to create speech promoting same-sex marriage that violates her conscience and contravenes her faith.  Stipulated Facts ¶¶ 73, 89, 91, 95.  No legitimate reason exists for the government to exempt some religious believers from CADA but not others.  *Cf. Hobby Lobby*, 134

S. Ct. 2786 ("RFRA is inconsistent with the insistence of an agency such as HHS on distinguishing between different religious believers—burdening one while accommodating the other—when it may treat both equally by offering both of them the same accommodation."); *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 415 (3d Cir. 2013) (Jordan, J., dissenting), *rev'd by Hobby Lobby*, 134 S. Ct. 2751 (2014) (noting that religious discrimination is inherent in the attempt "to say that some religiously motivated [groups]—the ones picked by the government—are exempt while others are not"). After all, the state would hardly have exempted churches from CADA unless it recognized that marriage has profound spiritual implications for many. *See Turner v. Safley*, 482 U.S. 78, 96 (1987) ("[M]any religions recognize marriage as having spiritual significance …."). Such differential treatment is of "paramount concern when a law has the incidental effect of burdening religious practice" and it renders CADA not generally applicable. *Lukumi*, 508 U.S. at 542.

Because CADA is neither neutral nor generally applicable, Defendants must justify their application of the statute to Lorie under the rigorous strict scrutiny test. *See id.* at 446 ("To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." (quotations omitted)).

### D. Defendants' Application of CADA Only to Expressive Businesses That Disfavor Same-Sex Marriage Violates the Equal Protection Clause.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Distinctions among similarly-situated groups that affect fundamental rights "are given the most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), and discriminatory intent is presumed,

*see Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) ("[W]e have treated as presumptively invidious those classifications that … impinge upon the exercise of a 'fundamental right.'").  Because Defendants' disparate application of CADA impinges Plaintiffs' fundamental rights to free speech, the press, and expressive association, as well as free exercise, discriminatory intent is presumed here.  *See supra* Part II.A. and II.C.

Defendants have applied CADA's Compelled-Speech Provision only to expressive business owners like Lorie that disfavor messages promoting same-sex marriage.  The *only* business that Defendants have prosecuted for declining to create speech promoting an unwelcome message is a Christian bakery that declined to create a custom wedding cake celebrating a same-sex marriage.  Stipulated Facts ¶¶ 24-25, Ex. C-F.  Three similarly situated secular cake artists who refused to create cakes criticizing same-sex marriage for a Christian patron were not prosecuted, an African–American cake artist may refuse to create a custom cake with a white-supremacist message for the Aryan Nation, and a Muslim cake artist may decline a custom order from the Westboro Baptist Church denigrating the Quran.  Stipulated Facts ¶ 28, Ex. G-L; App. 029.  Yet Defendants apply CADA's Compelled-Speech Provision to force Lorie to design, create, and publish custom wedding websites promoting and celebrating same-sex weddings because they label her religious conviction "discrimination."  Defs.' MPI Resp. 2, 6.

Moreover, Defendants do not apply CADA's Banned-Speech Provision to expressive business owners that strongly advocate the acceptance of same-sex marriage and whose messages "directly or indirectly" indicate that requests from religious customers with opposing beliefs would be "unwelcome" or "denied."  Colo. Rev. Stat. § 24-34-601(2)(a); Lorie Smith Aff. ¶¶ 009-036; App. 003-010.  Nicole Nichols Photography, a Denver-based photography company, for example,

has published speech criticizing "religion" for "not always recogniz[ing]" same-sex marriage, praising the *Obergefell* decision, and announcing its participation in the Denver Pridefest. Lorie Smith Aff. ¶ 31-32; App. 009. Just as with the three cake artists discussed above, Defendants would consider this speech compliant with CADA. But if sexual orientation and celebrating same-sex marriage is "closely correlated" enough to strip away speaker autonomy under CADA, *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272, 279 (2015), surely the Christian creed and religious criticism of same-sex marriage are as well. *See* 3 C.C.R. 708-1:10.2(H). Yet Defendants have concluded that only speech by expressive business owners like Lorie that find same-sex marriage morally objectionable is banned.

This disparate treatment of similarly situated speakers for no rational, let alone compelling, reason violates the Equal Protection Clause. As such, this Court should strike down Defendants' application of CADA to Lorie as violative of the Fourteenth Amendment.

**E.  Defendants' Application of CADA Violates Lorie's Right to Substantive and Procedural Due Process.**

The Fourteenth Amendment protects every citizens' right to life, liberty, and property from state deprivation. U.S. Const. amend. XIV, sec. 1. Defendants' application of CADA violates Lorie's rights to procedural and substantive due process because the statute is impermissibly vague and deprives her of the fundamental liberty to own and operate an expressive business and earn a livelihood free from unreasonable governmental interference.

**1.  The Banned-Speech Provision is Impermissibly Vague and Therefore Violates Lorie's Right to Procedural Due Process.**

The Due Process Clause proscribes impermissibly vague statutes. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is

void for vagueness if its prohibitions are not clearly defined."). A vague statute is a peculiar evil because it prevents a person of ordinary intelligence from "know[ing] what is prohibited" and conforming her actions to the law. *Id.* Vague statutes also invite arbitrary and discriminatory enforcement, leaving people subject to the unknowable whim of government officials charged with enforcing the law. *Id.* When a vague statute implicates First Amendment rights, "a heightened vagueness standard" applies. *Brown*, 564 U.S. at 793; *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) ("For standards of permissible statutory vagueness are strict in the area of free expression…. These freedoms are delicate and vulnerable, as well as supremely precious in our society.").

To determine whether a statute is impermissibly vague, the Court must evaluate (1) whether the statute is sufficiently definite to allow ordinary people to understand what is prohibited and (2) whether the statute encourages "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The U.S. Supreme Court focuses most closely on the second part of this test because of its concern that statutes void of minimal enforcement guidelines allow government officials to dangerously and arbitrarily "pursue their personal predilections" in the enforcement of the law. *Id.* at 358. When government officials are afforded "virtually complete discretion" to enforce a law, lawmaking power is effectively stripped from the people and vested in the "moment-to-moment judgment" of enforcement officials, *id.* at 358-60, increasing the likelihood that less popular people or viewpoints will be unlawfully discriminated against. The Due Process Clause does not permit such unrestrained government power.

The Banned-Speech Provision is impermissibly vague because it lacks sufficient definiteness to apprise an ordinary person of what is unlawful and the legislature did not establish

minimal enforcement guidelines to prevent arbitrary and discriminatory enforcement. Specifically, the Banned-Speech Provision prohibits a business from publishing statements indicating an individual within a protected class is "unwelcome, objectionable, unacceptable, or undesirable," Colo. Rev. Stat. § 24-34-601(2)(a), without establishing *any*—yet alone minimal— enforcement guidelines to stave off discriminatory or capricious enforcement. For example, the legislature did not define how statements may be determined to be objectively "unwelcome," "objectionable," "unacceptable," or "undesirable." And the vagueness and subjectivity of these terms are in a class of their own.

As stated in Section II.A.1.e *supra*, no objective standard of "unwelcomeness" or "objectionability" exists, rendering the Banned-Speech Provision unconstitutional on its face. *See Saxe,* 240 F.3d at 215 (3d Cir. 2001) (Alito, J.) (invalidating a school policy that banned "any unwelcome verbal… conduct which offends… because of" protected characteristics); *Armstrong*, 154 F. Supp. 2d at 79-80 (striking down a liberty regulation that denied access to patrons with an "objectionable" appearance). People experience offense and displeasure when they encounter differing viewpoints in a pluralistic society everyday. But no one in this country has an interest "in being free from public criticism," *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971), even if exposure to opposing views causes "severe emotional distress," *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988). While the Constitution does not require absolute clarity, *United States v. Powell*, 423 U.S. 87, 96 (1975), a statute, such as the Banned-Speech Provision, that leaves people of common intelligence completely guessing as to its meaning runs afoul of the Due Process Clause, *Keyishian v. Board of Regents of Univ. of N.Y.*, 385 U.S. 589, 604 (1967).

This alone renders the Banned-Speech Provision unconstitutionally vague but the Colorado legislature also failed to define the necessary discriminatory nexus between an unwelcoming "indirect" communication (versus a "direct" communication) and an individual's membership in a protected class.  Without such minimal guidance, enforcement officials are impermissibly granted power to interpret CADA however they like.  *Kolender*, 461 U.S. at 358-60.  And Defendants' enforcement history—allowing expressive businesses that support same-sex marriage to speak freely, while muzzling and imposing severe penalties on expressive businesses that oppose same-sex marriage and wish to speak a different message—belies any suggestion of restraint.  Stipulated Facts ¶¶ 24-25, 28, Ex. C-L.

Based on the vague language in the statute, Defendants have unbridled discretion to censor speech out of a dislike for particular viewpoints—viewpoints on subject matters that extend much more broadly than the same-sex marriage context.   Even a person of highest intelligence would have difficulty understanding what statements and messages are within the basket of unlawful expression outlawed by the Banned-Speech Provision and, therefore, would "steer far wider of the unlawful zone." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (internal quotation marks and citations omitted).  The only criteria informing Defendants' findings of unlawful discrimination is their own *ad hoc* judgment.  Because the Banned-Speech Provision invites government agents to "pursue their personal predilections" in the enforcement of the law—an invitation Defendants have readily accepted—it is impermissibly vague and violates Lorie's right to procedural due process. *Kolender*, 461 U.S. at 357-61.

2.      **Defendants' Application of CADA Deprives Lorie of the Right to Own and Operate Her Own Expressive Business and thus Violates Her Right to Substantive Due Process.**

"[W]ithout doubt," the Fourteenth Amendment protects a person's freedom "to engage in any of the common occupations of life… and to worship God according to the dictates of [her] own conscience." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972); *see also Truax v. Raich*, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."); *Greene*, 360 U.S. at 492 ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of [due process]."). These liberties are "essential to the orderly pursuit of happiness by free men." *Roth*, 408 U.S. at 572. When the government infringes on such fundamental liberty interests, courts apply strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

Defendants' application of CADA impermissibly interferes with Lorie's right "to engage in any of the common occupations of life… [and] to worship God according to the dictates of [her] own conscience…," *Roth*, 408 U.S. at 572, by conditioning her ability to participate in the wedding industry on the forfeiture of her religious convictions and the violation of her conscience. Stipulated Facts ¶ 95. The Constitution protects "more than just freedom of belief." *Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring). It protects "the right to express those beliefs and to establish one's religious (or non-religious) self-definition in the political, civic, and economic life of our larger community." *Id.* Defendants' application of CADA, however, forces Lorie to choose whose commands she will obey—the state's or God's. Stipulated Facts ¶ 95. If she chooses

incorrectly, the state precludes Lorie from participating in the "economic life" of the "larger community," a result the Constitution does not tolerate. *See Hobby Lobby*, 134 S.Ct. at 2785 (Kennedy, J., concurring); Stipulated Facts ¶¶ 5-17. As explained in Section III *infra*, Defendants can show no compelling interest to warrant such an unreasonable infringement of Lorie's fundamental liberty interest to own and operate a family business, which is protected as both a liberty and property interest under the Due Process Clause.

F.     **Under Governing Supreme Court Precedent, Defendants Have Violated Lorie's Personal Autonomy in Violation of the Due Process and Equal Protection Clauses By Precluding Her from Pursing Her Entrepreneurial Dreams, Stigmatizing Her Religious Beliefs About Marriage, Labeling Her as a Discriminatory Lawbreaker, and Threatening Her with Hefty Fines, Reeducation Programming, and Invasive Reporting Requirements**.

The Supreme Court's decisions in *Obergefell*, l35 S. Ct. at 2596, and underlying cases have recognized a right of citizens "to have dignity in their own distinct identity."   To the extent such right has been recognized by recent Supreme Court precedent, the Due Process and Equal Protection Clauses of the Fourteenth Amendment protect "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," particularly where sexual preference is concerned. *Id.* at 2597.  If personal identity related to sexual preference is constitutionally protected, identity grounded in sincerely held religious beliefs must be equally safeguarded as well.

In this case, Lorie's personal identity is rooted in her Christian beliefs.  Stipulated Facts ¶¶ 30-32, 33-38.  Lorie identifies first and foremost as a Christian—a follower of Jesus Christ—and her decision to act consistently with her religious understanding of marriage defines her personal identity.  Stipulated Facts ¶ 30.  For that reason, Lorie believes that "everything she does – personally and professionally – should be done in a manner that glorifies God." Stipulated Facts ¶

34.   Lorie's desire to engage in the marketplace by celebrating weddings as she believes God designed them is an expression of her personal identity and her religious understanding of marriage, both of which are central to her equal dignity as a citizen and personal autonomy. Stipulated Facts ¶¶ 30-34, 36.

Supreme Court caselaw recognizes Lorie's autonomy to express her Christian identity through her work.  One of the Court's primary concerns in *Hobby Lobby*, 134 S. Ct. at 2783, was that the government's interpretation of the Affordable Care Act would "effectively exclude [Christian family business owners] from full participation in the economic life of the Nation" because they could not "in good conscience provide" insurance coverage for abortifacient drugs. In his concurrence, Justice Kennedy expounded upon this liberty to start a family business and operate it accordance with one's faith:

> In our constitutional tradition, freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law.  For those who choose this course, free exercise is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts.  Free exercise in this sense implicates more than just freedom of belief.  It means, too, the right to express those beliefs and to establish one's religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community.

*Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring).  Justice Kennedy's reasoning in *Hobby Lobby* has roots in the Due Process Clause of the Fourteenth Amendment, which has long protected citizens' right to engage "in any of the common occupations of life … to worship God according to the dictates of [their] own conscience[s], and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men." *Roth*, 408 U.S. at 572 (quotation and alteration omitted).

Yet Defendants have interpreted CADA to exclude Lorie from the economic life of the nation based on her religious beliefs about marriage and thus rendered it impossible for her to pursue the American dream of starting a family business and working to make it a success. *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 500 (3d Cir. 1992) ("[I]ndependent entrepreneurs have been seen as the heart and lifeblood of American free enterprise, and freedom of economic activity and opportunity has been thought central to the preservation of the American free enterprise system." (quoting Eleanor M. Fox, *The Modernization of Antitrust: A New Equilibrium,* 66 Cornell L. Rev. 1140, 1153-54 (1981))). Courts have long recognized that the "right to earn a livelihood and to continue employment unmolested" is essential to the pursuit of happiness. *Truax*, 239 U.S. at 38. Defendants rob Lorie of that freedom here by applying the Compelled-Speech Provision to force her to eschew the wedding business unless she is willing to abandon the commands of her faith and promote same-sex weddings in which she does not believe. Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and work in accordance with her religious beliefs about marriage as "seek[ing] … permission to discriminate against same-sex couples… in violation of Colorado's Anti-discrimination Act…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same); Stipulated Facts ¶¶ 24-25, Ex. C-F; *see Obergefell*, 135 S. Ct. at 2594 (recognizing that "[m]arriage is sacred to those who live by their religions" and that many religious people view marriage, "by its nature" as "a gender-differentiated union of man and woman"). What is more, Defendants apply the Banned-Speech Provision to forbid Lorie from communicating her religious understanding of marriage to the public at large even though the Supreme Court has recognized that the Constitution "ensures that religious … persons are given proper protection as they seek to

teach the principles" of their faith in regards to marriage and other subjects. *Obergefell*, 135 S.

Ct. at 2607.

Defendants' heavy prohibitions are backed up by substantial threats.  They have already

investigated, prosecuted, and punished a Christian cake artist for politely declining to design an

artistic wedding to cake to celebrate a same-sex couple's nuptials.  Stipulated Facts ¶¶ 24-25, Ex.

C-F.  After subjecting him to years of costly inquiries, hearings, and appeals, Defendants labeled

him a "discriminator" and ordered him to create any cakes for "same-sex couples" that he would

create for "heterosexual couples," no matter what text they contain or what message they sent.

Stipulated Facts ¶¶ 24-25, Ex. F, at 2.  Defendants further ordered the Christian cake artist to

reeducate his employees through "comprehensive staff training" on CADA in order to change their

beliefs regarding same-sex marriage and mandated that he provide invasive "quarterly compliance

reports" for a period of "two years" describing these "remedial [education] measures," as well as

"the number of patrons denied service … and the reasons the patrons were denied service."

Stipulated Facts ¶¶ 24-25, Ex. F, p.2.  In this case, Defendants have indicated they would do the

same to Lorie if she creates or publishes original speech about biblical marriage.  Defs.' MPI Resp.

2, 6 (characterizing Lorie's efforts to live and work in accordance with her religious beliefs about

marriage as "seek[ing] … permission to discriminate" and asserting "religious beliefs as a reason

to discriminate").  She is imminently threatened not only with the costly litigation, "discriminator'

label, speech-coercing and speech-squelching order, and intrusive reporting requirements

mentioned above, but also with a fine of up to $500 for *each* decision to decline an artistic

commission based on her religious beliefs that Defendants arbitrarily deem violative of CADA.

Colo. Rev. Stat. § 24-34-602(1)(A); Stipulated Facts ¶ 5.

In short, Defendants have excluded Lorie from the marketplace based on her beliefs and public message about marriage. *But see Obergefell*, 135 S. Ct. at 2607 ("[I]t must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned."). Yet if "there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, national, religion, or others matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. The state is free to support same-sex marriage by any number of means but when that preference turns into "enacted law and public policy" that expels religious objectors from public life, things have gone too far. *Obergefell*, 135 S. Ct. at 2602.

At that point, "the imprimatur of the State itself [is placed] on an exclusion that soon demeans or stigmatizes those [like Lorie] whose own liberty is then denied." *Id.*; *cf. Lawrence v. Texas*, 539 U.S. 558, 571 (2003) ("The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the … law."). It "disaparage[s]" Lorie's spiritual choices and "diminish[es] [her] personhood" for Defendants to bar her religious message, *Obergefell*, 135 S. Ct. at 2602, malign her as a "discriminator," and threaten her with investigations, reeducation training, fines, and reporting requirements simply for seeking to express her religious "beliefs" and establish her "religious … self-definition in the political, civic, and economic life of our larger community," *Hobby Lobby*, 134 S. Ct. at 2785 (Kennedy, J., concurring). Prohibiting Lorie from operating an expressive business in the State of Colorado "serves to disrespect and subordinate" her in an unconstitutional manner by rendering

her a societal outcast and robbing her of the ability to pursue the American dream by expanding her closely-held business. *Obergefell*, 135 S. Ct. at 2604.

**III.     Defendants' Application of CADA Fails Strict Scrutiny**

Because Defendants' application of CADA to Plaintiffs violates their fundamental constitutional rights, it must satisfy strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). Satisfying this standard requires Defendants to show that their application of CADA is narrowly tailored to serve a compelling state interest. *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008). "[I]t is the rare case in which … a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

An interest in eliminating discrimination is not compelling in the abstract. The Court must "look beyond broadly formulated interests" in prohibiting discrimination in general and consider only Defendants' interest in applying CADA to Lorie, "the particular claimant" whose constitutional rights are infringed. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-31 (2006). In "other words," the Court must "look to [Defendants'] marginal interest in enforcing" CADA against Lorie here, *Hobby Lobby* 134 S. Ct. at 2779.

As the Supreme Court explained in *Hurley*, applying public accommodation laws to expressive activity does not serve a valid—let alone a compelling—state interest. 515 U.S. at 578-79 (noting it would be a "decidedly fatal objective" to apply a public accommodation law to coerce government-favored messages from private speakers). CADA's failure to satisfy the compelling interest test is further cemented by the fact that custom wedding website designs are available from expressive businesses nationwide. Stipulated Facts ¶¶ 98-101. Powerful market forces weigh in

favor of expressive businesses promoting same-sex weddings.  Few expressive business owners are willing to lose income and engender negative press by declining to celebrate them.   Thus, allowing Lorie to speak freely will not limit anyone's access to expressive services, particularly in a state like Colorado where many citizens hold progressive beliefs regarding marriage and other subjects.  Lorie Smith Aff. 009-036; App. 003-010.

Furthermore, it is well established that a law "cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 135 S. Ct. at 2232.  Defendants have applied CADA's speech-coercing and speech-squelching terms *only* to religious opponents of same-sex marriage—expressive business owners who support same-sex marriage are exempt.  Stipulated Facts ¶¶ 24-25, Ex. C-F.  That, in and of itself, demonstrates that applying CADA only to Lorie and those who share her religious marriage views does not serve a compelling government interest.

Nor do Defendants serve a valid state interest by banning Lorie's publication of religious speech about God's design for marriage simply because some patrons may find it "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  "In most circumstances, the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer.  Rather, the burden normally falls upon the viewer to avoid further bombardment of his sensibilities simply by averting his eyes." *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) ((quotation and alterations omitted)).  No one is forced to look at Lorie's website and those offended by her religious statements about marriage are free to avert their eyes and look elsewhere.  Critically, "[d]isapproval of a [public accommodation's] statement does not legitimize use of the [state's]

power to compel the speaker to alter the message by including one more acceptable to others."

*Hurley*, 515 U.S. at 581.  Society's changing views on marriage do not justify burdening Lorie's

First Amendment rights.  As the Supreme Court explained in *Dale*, "the fact that an idea may be

embraced and advocated by increasing numbers of people is all the more reason to protect the First

Amendment rights of those who wish to voice a different view." 530 U.S. at 660.

CADA is also far from narrowly tailored.  When the government pursues its "proffered

objectives," such as an interest in combatting discrimination, against religious conduct—as

Defendants have done in applying CADA to Masterpiece Cakeshop and Lorie—but does "not

pursue[] [it] with respect to analogous non-religious conduct"—as Defendants have done by

refusing to apply CADA to three secular bakeries who discriminated based on creed—the law is

underinclusive and not narrowly tailored.  *Lukumi*, 508 U.S. at 546.  The obvious answer to this

narrow tailoring problem is for Defendants to apply the same message-based exception to Lorie

that it applied to three secular bakeries.  *See* Stipulated Facts ¶ 28, Ex. G-L (exempting a secular

bakery from CADA because its refusal to promote a religious message critical of same-sex

marriage "was based on the explicit message" and the bakery "regularly creates cakes … ordered

by Christian customers").  Lorie is also happy to serve LGBT individuals and simply has a

religious message-based objection to promoting same-sex marriage.  Stipulated Facts ¶¶ 63-67,

89, 91.  But Defendants apply CADA's speech-coercing and speech-squelching terms to her and

not other expressive business owners because she disagrees, on religious grounds, with the state's

policy favoring same-sex marriage.  Defs.' MPI Resp. 2, 6 (describing Lorie's efforts to live and

work in accordance with her religious beliefs about marriage as "seek[ing] … permission to

discriminate against same-sex couples… in violation of Colorado's Anti-discrimination ACT…" and asserting "her religious beliefs as a reason to discriminate"); Mot. to Dismiss 2 (stating same).

In the alternative, Defendants could employ a far narrower publication ban that does not reach protected expression, such as the one contained in 42 U.S.C. § 2000e-3, which relates only to discriminatory statements about employment—the means by which citizens support their families. But instead, Colorado compels Lorie to design, create, and publish custom wedding websites promoting same-sex weddings—a pure luxury—against her will and bans her from publishing any speech that might "directly or indirectly" make some patrons subjectively feel "unwelcome" or undesirable. Such broad speech-coercing and speech-squelching measures are not tailored (let alone narrowly tailored) in any sense. Defendants cannot demonstrate that they are "actually necessary" to solve "an 'actual problem,'" as the Constitution requires. *Brown*, 564 U.S. at 799. Indeed, Defendants' decision not to enforce CADA against anyone but religious objectors to promoting same-sex marriage shows that discrimination by expressive businesses on protected grounds is not a significant problem in Colorado. Stipulated Facts ¶¶ 24-25, 28, Ex. C-L; *see Lukumi*, 508 U.S. at 547 ("[T]he ordinances are underinclusive to a substantial extent with respect to each of the interests that respondent has asserted, and it is only conduct motived by religious conviction that bears the weight of the governmental restrictions.").

## CONCLUSION

No matter how commendable their goals, Defendants cannot pursue them in an unconstitutional manner. Colorado may prohibit invidious discrimination without resorting to art manipulation, speech bans, and idea extraction. As a society, we have seen such efforts "to coerce uniformity of sentiment" before. *Barnette*, 319 U.S. at 640. That is why the Constitution exists,

to ensure that neither the "legislatures, courts, [n]or dominant political or community groups" may standardize the ideas that are acceptable in society about marriage or anything else. *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949). The Court should grant summary judgment in Lorie's favor to ensure that "individual freedom of mind in preference to officially disciplined uniformity" is preserved for all Americans to enjoy. *Barnette*, 319 U.S. at 637. "Tolerance is a two-way street" that applies to proponents of same-sex marriage as well as to religious dissenters. *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012). "Otherwise, [CADA] mandates orthodoxy, not anti-discrimination." *Id.*

Accordingly, Plaintiffs respectfully request that the Court grant summary judgment in their favor and issue:

1.     A permanent injunction ordering Defendants and anyone acting in concert with them from enforcing the Banned-Speech Provision facially and as applied to Plaintiffs' (a) desired communications promoting marriage as an institution between one man and one woman, (b) declining to create custom websites or graphics promoting events or ideas that violate their religious beliefs about marriage, including custom websites for same-sex weddings, and (c) explaining their religious beliefs about what they can and cannot create;

2.     A declaration that the Banned-Speech Provision violates the First Amendment to the U.S. Constitution's Free Speech, Free Press, and Free Exercise Clauses, as well as the Fourteenth Amendment to the U.S. Constitution's Equal Protection and Due Process Clauses facially and as-applied to Plaintiffs' (a) desired communications promoting marriage as an institution between one man and one woman, (b) declining to create custom websites or graphics promoting events or ideas that violate their religious beliefs about marriage, including custom

websites for same-sex weddings, and (c) explaining their religious beliefs about what they can and cannot create;

3.     A permanent injunction to stop Defendants and anyone acting in concert with them from enforcing the Compelled-Speech Provision to require Plaintiffs to create custom websites or graphics promoting events or ideas that violate their religious belief that marriage is an institution between one man and one woman, including custom websites promoting same-sex weddings; and

4.     A declaration that the Compelled-Speech Provision violates the First Amendment to the U.S. Constitution's Free Speech, Free Press, and Free Exercise Clauses, as well as the Fourteenth Amendment to the U.S. Constitution's Equal Protection and Due Process Clauses as applied to force Plaintiffs to create custom websites or graphics promoting events or ideas that violate their religious beliefs that marriage is an institution between one man and one woman, including custom websites promoting same-sex weddings.

Respectfully submitted this 1st day of February, 2017.

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
Jonathan A. Scruggs (Arizona Bar No. 030505)
Samuel D. Green (Arizona Bar No. 032586)
Katherine L. Anderson (Arizona Bar No. 033104)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org
jscruggs@ADFlegal.org
sgreen@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
Rory T. Gray (Georgia Bar No. 880715)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org
rgray@ADFlegal.org

Michael L. Francisco (Colorado Bar No. 39111)
MRD Law
3301 West Clyde Place
Denver, CO 80211
(303) 325-7843
(303) 723-8679 (facsimile)
MLF@mrdlaw.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2016, the foregoing was filed with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following:

Jack D. Patten, III
Assistant Attorney General
Civil Litigation and Employment
Law Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6592
Fax: (720) 508-6032
jack.patten@coag.gov

Vincent E. Morscher
Deputy Attorney General
Civil Litigation and Employment Law Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6588
Fax: (720) 508-6032
vincent.morscher@coag.gov

Attorneys for Defendants

Eric Maxfield
First Assistant Attorney General
Colorado Department of Law
Office of the Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Business & Licensing Section
Denver, Colorado 80203
720-508-6404 Direct
720-508-6000 Main
eric.maxfield@coag.gov

Leanne B. De Vos
Senior Assistant Attorney General
Office of the Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Business & Licensing Section
Denver, Colorado 80203
720-508-6411 Direct
720-508-6000 Main
Fax: (720) 508-6037
Leanne.DeVos@coag.gov

*s/ Jeremy D. Tedesco*

Jeremy D. Tedesco (Arizona Bar No. 023497)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jtedesco@ADFlegal.org