# APPENDIX

**TABLE OF CONTENTS**
**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| September 21, 2016 Email from Stewart to 303 Creative Requesting Graphic Design and Website Design Services for Same-Sex Marriage | 001 |
| Brian Kraft Photography Webpage Excerpt | 003 |
| Sarah Roshan Wedding Photographer "We Believe" Webpage Excerpt | 004 |
| Sarah Roshan Wedding Photographer "Meet Sarah" Webpage Excerpt | 005 |
| Sarah Roshan Wedding Photographer "Same-Sex Wedding" Webpage Excerpt | 006 |
| Castle Rock News Press Story on Anginet Photography | 007 |
| Nicole Nichols Photography Blog Post Excerpt About a New Orleans Same-Sex Wedding | 008 |
| Nicole Nichols Photography Blog Post Excerpt About the Denver Pridefest | 009 |
| Nicole Nichols Photography Blog Post Excerpt About a Denver Same-Sex Wedding | 010 |
| Brief of the Colorado Civil Rights Commission in Opposition to Masterpiece Cakeshop's Petition for Writ of Certiorari Before the United States Supreme Court | 011 |
| Transcript from Colorado Civil Rights Commission Meeting *In re Charlie Craig and David Mullins v. Masterpiece Cakeshop, Inc. and Jack Phillips,* July 5, 2014 | 041 |

**Kate Anderson**

| | |
|---|---|
| **From:** | 303 Creative [info@303creative.com] |
| **Sent:** | Wednesday, September 21, 2016 12:34 PM |
| **To:** | Jeremy Tedesco |
| **Subject:** | Fwd: 303RequestForm Result #9741406 |

Lorie Smith
Sent from my iPhone

Begin forwarded message:

**From:** form_engine@fs21.formsite.com
**Date:** September 21, 2016 at 1:08:42 PM MDT
**To:** info@303creative.com
**Subject: 303RequestForm Result #9741406**
**Reply-To:** form_engine@fs21.formsite.com

| | |
|---|---|
| **Reference #** | 9741406 |
| **Status** | Complete |
| **Your Name \*** | Stewart |
| **Email \*** | stewcurran@gmail.com |
| **Phone** | 4155218593 |
| **Website:** | onlymoreneverless.com |
| **Briefly describe the nature of your business/organization \*** | Personal |
| **If your inquiry relates to a specific event, please describe the nature of the event and its purpose:** | My wedding. My name is Stewart and my fiancee is Mike. We are getting married early next year and would love some design work done for our invites, placenames etc. We might also stretch to a website. |
| **How can 303creative help you? \*** | Website Design Services<br>Graphic Design Services |
| **Last Update** | 2016-09-21 14:08:43 |
| **Start Time** | 2016-09-21 14:06:36 |
| **Finish Time** | 2016-09-21 14:08:43 |
| **IP** | 12.27.99.35 |
| **Browser** | Chrome |

1

**App. 001**

**OS**                          Mac

**Referrer**                    http://303creative.com/contact/

**App. 002**

**BRIAN KRAFT PHOTOGRAPHY**      +++ The Blog +++

# Denver Art Museum Wedding

Denver Art Museum Wedding. What a fun wedding this was. Brian and Adam live in Los Angeles, but planned their wedding for Denver at the C. Duncan Pavilion at the DAM (Denver Art Museum). Adam and Brian both work in the entertainment industry and wanted their wedding to feel a bit like one of the movie premier parties they attend in Hollywood.  That, in combination with the couple having such a sense of humor and having family and friends that really know how to have fun, it was a sure recipe for a great day to celebrate their love. There were so many great moments all day and night, but one of my favorites was over at the Hotel Monaco, where the two grooms got ready in a suite together. They got to spend time together beforehand, but when it came time to get dressed, they did so in separate rooms within the suite and revealed their wedding day outfits once dressed. It was a really special moment. So, now I'm going to get out of the way with less words and get on with the photos, but I just want to mention one more thing. It's a shame that I even feel the need to mention it– as it should be a non-issue, but as you enjoy these wedding photos of this wonderful same sex couple, please note how "right" everything is between these two and everyone that surrounds them, yet in the State of Colorado it is still not "right" (by law) to consider their union a "marriage," with the benefits that come with that. Fortunately, Adam and Brian live in California, where they are finally offered the rights they so deserve. Hopefully all states will follow suit as soon as possible. Ok, now on to the photos! Congratulations, guys!



**App. 003**

SARAH ROSHAN WEDDING PHOTOGRAPHER

HOME • ABOUT • CONTACT

BLOG • INFO • GALLERIES

## W E   B E L I E V E

The mountains are the best place to get married. Followed by a beach on the ocean.

A bride is not complete without her groom. (or her bride or a groom without his groom) It is a day not just about one person, it is about the whole that you are about to make. The day is about connection. To each other, to the people you choose to celebrate this union with.

There doesn't always have to be one bride and one groom. We fully support and love our LGBT couples. We are so happy that the US government is finally recognizing you for the beautiful people you are.

In always loving graciously.

There are no rules for your wedding. Traditional to non traditional a wedding is what you make it because of what YOU believe in and how you envision it. There is no right or wrong way to do a wedding.

There are no accidents. The universe has a way of working it self out.

Dogs are often more loyal than a person. The uncomplicated love they have for you is the best thing ever. They are always welcome wherever you go, especially to your wedding or engagement session.

Romantic is more how you see the world than how you see your partner. They just happen to coincide.

Marriage is the most epic adventure. One that doesn't end until the day you die and one that is constantly challenging you and changing you into the person you were meant to be.

In carefree living and letting the life roll off your back.



BLOG • INFO • GALLERIES

SARAH ROSHAN WEDDING PHOTOGRAPHER

# MEET SARAH

I was born for the theatre, and the magic of getting lost in someone else's story.

I could live on jelly bellys... and perfectly salted margaritas.

I believe My cabin is the best place on earth. It is filled with family stories, memories of my Grandpa, fishing, hiking, and the best stargazing in the world.

I believe one voice is enough to change the world.

I believe hot chocolate and puppy snuggles could solve most the world's problems.

I thrive on afternoon naps (outside in a hammock, of course). And I love rain. period. (Especially on a tin roof, thanks 'Nora.)

If I could Stitch Fix everything in my life, I would. I hate shopping but love clothes and pretty things for my home.

I believe that all true beauty lives in imperfection.

The feeling of the water over your waders and the cast of a fly rod is the epitome of relaxation to me. No distractions - just me, the water, and the fish.

I've been known to disappear into the mountain roads for entire afternoons. Just me, my jeep and the most beautiful state on earth.

I could live in Chacos or hiking boots. Going barefoot always works too.

I believe all people deserve to be loved graciously.

I believe being wrapped in hand-crafted blankets and being hypnotized by a fire that is too-large is heaven on earth.

I believe love is best as an adventure, because surprises should always be shared.

I believe in falling in love, over and over. Every. Single. Day.

XO,
Sarah

HOME • ABOUT • CONTACT



HOME  •  ABOUT  •  CONTACT

BLOG  •  INFO  •  FEATURED

SARAH ROSHAN WEDDING PHOTOGRAPHER

PHILLIP + GARY | CHAUTAUQUA
ELOPEMENT | SAME-SEX WEDDING
PHOTOGRAPHER

FEBRUARY 10, 2015

ELOPEMENTS, SAME-SEX WEDDINGS

After Colorado ruled that a ban on gay marriage was unconstitutional I had a wave of peace and just started to cry. This topic always is rooted so deep in what I believe not only about gay marriage but the world. I grew up doing theatre and so, as the stereotype would have it about half of my male friends were gay and a decent amount of my female friends as well. A truly believe that our differences and hate are taught. I was never taught that same-sex couples love any different than a heterosexual couple and therefor my views on this subject have always been love is love. I stand for love period. I am so happy that our country is moving in a direction of less and less judgement and more and more equality and love for each other. We are all different. That is what makes us beautiful. How we love is all the same.

When I got a phone call for Phillip and Gary's elopement back in October, I was so excited! This was to be my first same-sex wedding since the law took effect. They are from Texas and were visiting friends and decided that—since they were in Colorado—they would make it official. I found myself tearing up behind my lens. This means so much to so many people. Something that I took for granted they were finally able to do. Reading the piece of paper that said marriage. All of it was magical and such sweet sweet people.

My favorite part may be the incorporation of Gary's birth son and all the super heroes. It was beautiful to see all their relationships and how their family was made and will continue to be made.

Colorado is not yet 6 months into allowing gay marriage so I am looking forward to many more weddings, and someday I hope that people won't even give it a second thought. Love is love after all.

App. 006

8/1/2016 News | Castle Rock Colorado | Castlerocknewspress.net



0  NEWS (/NEWS/)  ENTERTAINMENT (/ENTERTAINMENT/)  VOICES (/VOICES/)

## Wedding photographer celebrates court ruling

'Huge step forward' seen in same-sex decision



(/uploads/original/1435431623_7797.jpg)

Anginet Page has been photographing same-sex wedding ceremonies for years. Courtesy photo

Posted Saturday, June 27, 2015 2:02 am

**Ashley Reimers (mailto:areimers@coloradocommunitymedia.com)**

As long as she can remember, Anginet Page said, she supported same-sex marriage rights. Her passion for marriage equality even led her to leave the Mormon church.

"I was raised LDS, and one of the main reasons I left the church was because they didn't support the right for people to love freely," she said. "And so my whole life has been geared towards having same-sex marriage be legalized. The fact that it is incredible."

Page is a photojournalist and has been shooting weddings for over a decade, many of them same-sex ceremonies. She lives in Brighton, but works in the Denver metro area, along the Front Range and even internationally.

Upon hearing the news of the U.S. Supreme Court's ruling that legalized same-sex marriages across the United States, Page was overwhelmed with emotion. She said she never thought the day would come that all of her friends, regardless of their beliefs and regardless of how they love, could get married legally in all 50 states.

"It's a huge blessing to be part of the excitement and to be able to see this happen," said Page, holding back tears. "It's been a long time coming. It's one more step towards everybody truly understanding that love is pure and nonjudgmental."

Page, owner of Anginet Photography, is a member of EnGAYged Weddings, an LGBT wedding planning directory and forum for lesbian, gay, bisexual, transgender and straight couples. She said the organization has done an incredible job to rally around and support all couples.

Following the Supreme Court ruling, Page said she expects her business to get busier, which she welcomes with open arms.

"Just thinking about my friends who don't have to live in fear any longer is very exciting," Page said. "So many same-sex couples try to convince themselves that the paperwork doesn't matter, but it does. It's just a huge step forward."

### Keywords

gay marriage (/search_mode/keyword/browse.html#search_filter=gay marriage), Supreme Court (/search_mode/keyword/browse.html#search_filter= Supreme Court), Colorado (/search_mode/keyword/browse.html#search_filter= Colorado), Anginet Photography (/search_mode/keyword/browse.html#search_filter= Anginet Photography), (/search_mode/keyword/browse.html#search_filter=)

Tweet  Share 1  Share

### Comments

NO COMMENTS ON THIS STORY | PLEASE LOG IN TO COMMENT BY CLICKING HERE (/LOGIN.HTML)





No buy-in fees! All month-to-month rentals!
LincolnMeadowsSeniorLiving.com

(http://ccm.ads.communityv.com/www/delivery/ck.php?
oaparams=2__bannerid=1272__zoneid=35__cb=d0913e3cbf__oadest=http%3A%2F%2FLincolnMeadowsSeniorLiving.com)

THE LATEST

## News (/news/)



(/stories/Early-returns-show-Castle-Rock-mayor-likely-wont-be-recalled,231498)

**Recall fails, Castle Rock mayor remains in office (/stories/Early-returns-show-Castle-Rock-mayor-likely-wont-be-recalled,231498)**
TUESDAY, JULY 26

**Behavior changes may signal dementia onset (/stories/Behavior-changes-may-signal-dementia-onset,232744)**
YESTERDAY AT 12:36 PM

**Ranch resident launches nonprofit to combat human trafficking (/stories/Ranch-resident-launches-nonprofit-to-combat-human-trafficking,231449)**
MONDAY, JULY 25

**'I caught a Pikachu in her kitchen' (/stories/I-caught-a-Pikachu-in-her-kitchen,231044)**
MONDAY, JULY 25

## Sports (/sports/)



(/stories/Drivers-share-their-Bandimere-memories,231031)

**Drivers share their Bandimere memories (/stories/Drivers-share-their-Bandimere-memories,231031)**
MONDAY, JULY 25

**The Force is with the father (/stories/The-Force-is-with-the-father,231032)**
MONDAY, JULY 25

**App. 007**



## JEREMIE & JONATHAN'S WEDDING IN NEW ORLEANS – PICTURE PREVIEW

Posted in: Weddings



wedding reception at House of Blues in New Orleans

Jeremie & Jonathan recently celebrated their love with a beautiful ceremony at the Metropolitan Community Church followed by a reception at the House of Blues in the French Quarter.

We started with pictures of the wedding party in front of the church on Carrollton St., and we got even got lucky enough to have a streetcar stop for us to take some pictures in front of it. I loved their pastor's English accent & how he focused his sermon on how normal a gay union is, perhaps not popular, but certainly just as normal as any two people sharing their love & lives together. Throughout history gays have always been a part of reality, and always will be, its just unfortunate government & religion has not always recognized it. It was great to see that Jeremie & Jonathan's wedding was certainly full of lots of family & friends celebrating their love & bond.

After the wedding everyone jumped on a bus to the House of Blues downtown. Everyone danced & partied into the night with the awesome band, The Bucktown All Stars. Their cake & custom designed Mardi Gras beads were a perfect match to the antique New Orleans decor of the House of Blues. And the HOB's motto, "unity in diversity" couldn't have fit better. Thanks Jeremie & Jonathan for allowing me to be a part of your special event! Check out just a few of the shots from the wedding day below, much more to come!



## DENVER PRIDEFEST WITH CO GAY WEDDINGS

Posted in: Special Events / Documentary



2012 Denver Pridefest Pictures in Civic Center Park

### PRIDEFEST – COLORS, CULTURE, FASHION, LOVE

I am a strong believer that ALL should have the right to marry whomever he or she wants.

Other than for the art and the challenge, one of the reasons I became a wedding photographer is because I'm a lover...a sentimental romantic that has always "awed" when I see *any* two people in love. I have no enemies, I love everyone. Sure some have called me a naive idealistic hippie, but I *really* do believe love can change the world. And if someone wants to express their love to another person through a wedding, well they should have the right do get married, and get divorced, just like everyone else!

Not only am I a big supporter of gay rights...but also of brightly colored costumes, parades, and just having fun! So, on Sunday June 17th I was proud to be walking in support of CO gay weddings in the annual Denver Pridefest Parade. Wedding planner extraordinaire Mark of Events Unwrapped started CO Gay Weddings to help the gay and transgender community find LGBT friendly wedding professionals that don't discriminate on sexual orientation. The parade started early Sunday morning at Cheeseman Park, headed downtown through Capitol Hill, and ended at Civic Center Park in the heart of the city. Pridefest went all weekend long, filling Civic Center Park with live music, community booths, and lots of colorful people and entertainment.

Play the slideshow below to see some of my pictures of the parade, the party, and lots of unique interesting people! And if you are looking for a photographer for your commitment ceremony or gay wedding, please contact me. Even though it may not be yet technically legal in Colorado, I would love to document your special celebration. Check out this gay wedding in New Orleans I photographed a couple years ago for some inspiration.

# CO WEDDING PHOTOGRAPHER: DENVER BOTANICAL GARDENS & TIVOLI

Posted in: Weddings

## ASHLEY & PAIGE'S FUN MODERN WEDDING AT DENVER BOTANIC GARDENS



sunset pictures in front of the Tivoli in downtown Denver

I knew after photographing Ashley & Paige's engagement session that these two would be laid back and a lot of fun to work with.  You can check out their engagement pictures around downtown Denver here.  And their wedding day was certainly just that.  These two ladies got married at Denver Botanical Gardens last summer.  We set up a first sight with the brides in the Tropical Conservatory, which was such a beautiful romantic moment it almost brought me to tears.  The first sight allowed us to get a lot of their family and wedding party pictures out of the way, which is always a nice bonus on the wedding day.  Then when it was time to walk down the aisle, they each walked up to the ceremony site with their fathers, coming from different sides of the garden.  They pronounced their love in front of their family and closest friends in the "All American Selections Garden" and then afterwards we walked around the botanical gardens for more pictures.

We then all headed to the historic Tivoli building on the Auraria Campus in downtown Denver.  We did more pictures with the wedding party around this historic landmark which was originally home to the Tivoli Brewing Company.  And then it was time for the party to begin!  Ashley & Paige rented out the Turnhalle in the Tivoli, a unique urban venue with brick walls, a wrap-around balcony, and great views of the Denver city skyline.  They decorated the venue with their wedding colors of navy blue, mint green, and grey, and added modern DIY touches such as painted vases and table cards named after different parts of Denver.  After they did their first dance they each danced with their father and then they swapped and danced with each other's dads, which was a great personal touch.  The brides and all their guests certainly enjoyed a fun-filled party.  Their friends and family got down on the dance floor, enjoyed the fun photo booth, playing corn hole, and choosing treats from the all green candy bar.  And for their bouquet toss Ashley & Paige each tossed their bouquet of flowers to male and female single guests.  It was fun non-traditional twist to the bouquet toss and gave people two chances to catch the bouquet.  When it was time for the party to end the guests gathered outside for a fun sparkler send-off and the brides were whisked away in a bike buggy.

It was an honor to witness and be able to document the strong endearing love Ashley & Paige share.  And I'm so proud of not only our state of Colorado, but the nation, for finally legalizing gay and lesbian marriages.  All men and women should share the same rights that a legal marriage allows, from getting to file taxes together to being allowed to visit your spouse in severe hospital situations.  Hopefully the rest of the world will soon follow.  Love conquers all.

**App. 010**

No. 16-111

# In the Supreme Court of the United States

MASTERPIECE CAKESHOP, LTD.,
AND JACK C. PHILLIPS,

*Petitioners*,

v.

COLORADO CIVIL RIGHTS COMMISSION,
CHARLIE CRAIG, AND DAVID MULLINS,

*Respondents.*

*On Petition for Writ of Certiorari
to the Colorado Court of Appeals*

**BRIEF OF THE COLORADO CIVIL RIGHTS
COMMISSION IN OPPOSITION**

CYNTHIA H. COFFMAN
    Attorney General

FREDERICK R. YARGER
    Solicitor General
    *Counsel of Record*

Office of the Colorado
    Attorney General
1300 Broadway
10th Floor
Denver, Colorado 80203
Fred.Yarger@coag.gov
(720) 508-6168

GLENN E. ROPER
    Deputy Solicitor General

STACY L. WORTHINGTON
    Senior Assistant
    Attorney General

*Counsel for Respondent
Colorado Civil Rights Commission*

i

## QUESTION PRESENTED

Colorado's public accommodations law forbids sexual-orientation discrimination by businesses engaged in sales to the public. The question presented is whether that law impermissibly compels speech when it is applied to a commercial bakery that refuses to sell a wedding cake of any kind to any same-sex couple.

ii

## TABLE OF CONTENTS

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . .  iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

REASONS FOR DENYING THE PETITION . . . . .  8

I.  This case is an improper vehicle to address the question presented because the record does not support the compelled expression claim on which the question is based. . . . . . .  9

II.  There is no split in authority for this Court to resolve. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

A. Courts have uniformly upheld the application of public accommodations laws in similar contexts. . . . . . . . . . . . . .  12

B. Petitioners' asserted inter-jurisdictional conflicts are not implicated by this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

III.  The decision below does not conflict with this Court's compelled-speech and free-exercise precedent. . . . . . . . . . . . . . . . . . . . . . . . . . .  20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . .  23

iii

## TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
133 S. Ct. 2321 (2013) . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) . . . . . . . . 14, 15, 16

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) . . . . . . . . . . . . 19

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005) . . . . . . . . . . . . . . 17

*Bd. of Dirs. of Rotary Int'l v. Rotary Club*,
481 U.S. 537 (1987) . . . . . . . . . . . . . . . . . . . . 1, 22

*Brush & Nib Studio, LC v. City of Phoenix*,
CV 2016-052251 (Sup. Ct. of Ariz., Maricopa Cty., Sept. 16, 2016) . . . . . . . . . . . . . . . . . . . . . . . 14

*Buehrle v. City of Key West*,
813 F.3d 973 (11th Cir. 2015) . . . . . . . . 14, 15, 16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . . . . 22

*Church of the Am. Knights of the KKK v. Kerik*,
356 F.3d 197 (2d Cir. 2004) . . . . . . . . . . . . . . . . 17

*Elane Photography, LLC v. Willock*,
309 P.3d 53 (N.M. 2013), *cert. denied*, 134 S. Ct. 1787 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**App. 014**

iv

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
     494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . . . . 23

*Fraternal Order of Police Newark Lodge No. 12 v.*
     *City of Newark*,
     170 F.3d 359 (3d Cir. 1999) . . . . . . . . . . . . . . . . 19

*Gifford v. McCarthy*,
     137 A.D.3d 30 (N.Y. App. Div. 2016) . . . . . . . . . 13

*Heart of Atlanta Motel, Inc. v. United States*,
     379 U.S. 241 (1964) . . . . . . . . . . . . . . . . . . . . . . . 1

*Holloman v. Harland*,
     370 F.3d 1252 (11th Cir. 2004) . . . . . . . . . . . . . 17

*Hurley   v.   Irish-American   Gay,   Lesbian   and*
     *Bisexual Group of Bos.*,
     515 U.S. 557 (1995) . . . . . . . . . . . . . . . . . . *passim*

*Jack v. Azucar Bakery*,
     Charge No. P20140069X . . . . . . . . . . . . . . . . . . 11

*Jack v. Gateaux, Ltd.*,
     Charge No. P20140071X . . . . . . . . . . . . . . . . . . 11

*Jack v. Le Bakery Sensual, Inc.*,
     Charge No. P20140070X . . . . . . . . . . . . . . . . . . 11

*Miami Herald Publ'g Co. v. Tornillo*,
     418 U.S. 241 (1974) . . . . . . . . . . . . . . . . . . . . . . 21

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
     475 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Roberts v. U.S. Jaycees*,
     468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . 1

v

*Rumsfeld v. Forum for Acad. and Institutional Rights*,
  547 U.S. 47 (2006) . . . . . . . . . . . . . . . . . . . . 20, 21

*Spence v. Washington*,
  418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . 16, 17

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) . . . . . . . . . . . . . . . 17

*Texas v. Johnson*,
  491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . 16, 17

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) . . . . . . . . . . . . . . 19

*Washington v. Arlene's Flowers, Inc.*,
  No. 13-2-00871-5, (Wash. Sup. Ct. Feb. 18,
  2015), *hr'g granted*, 2016 Wash. LEXIS 349
  (Wash. Mar. 2, 2016) . . . . . . . . . . . . . . . . . . 13

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . 21

*Wooley v. Maynard*,
  430 U.S. 705 (1977) . . . . . . . . . . . . . . . . . . . 21

**CONSTITUTION**

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . 1

**STATUTES**

COLO. REV. STAT. § 24-34-301 *et seq.* . . . . . . . . . . . 1

COLO. REV. STAT. § 24-34-301(7) . . . . . . . . . . . . . . 5

COLO. REV. STAT. § 24-34-302 . . . . . . . . . . . . . . . 4

**App. 016**

vi

COLO. REV. STAT. § 24-34-303 . . . . . . . . . . . . . . . . . 4

COLO. REV. STAT. § 24-34-306(2)(a)  . . . . . . . . . . . . 5

COLO. REV. STAT. § 24-34-601(1) . . . . . . . . . . . . . 4, 5

COLO. REV. STAT. § 24-34-601(2)(a)  . . . . . . . . . . . . 4

COLO. REV. STAT. § 24-34-601(3) . . . . . . . . . . . . . . . 5

**OTHER AUTHORITIES**

*The Essential Guide to Cake Decorating* (2010) . . . 10

1

## INTRODUCTION

Public accommodations laws have long operated across the country to "eliminat[e] discrimination and assur[e] citizens equal access to publicly available goods and services." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). Because they "plainly serve[ ] compelling state interests of the highest order," *id*., these laws have repeatedly survived First Amendment challenge. "Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Bos.*, 515 U.S. 557, 572 (1995); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 549 (1987); *Roberts*, 468 U.S. at 626–27; *cf. Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 259–60 (1964).

Colorado's Anti-Discrimination Act, COLO. REV. STAT. § 24-34-301 *et seq*. (the "Act"), has been in effect for more than 100 years. It prohibits businesses that sell goods to the public from discriminating based on race, creed, sex, and other protected characteristics. In 2008, the Act was expanded to prohibit discrimination based on sexual orientation. In this case, the Act was applied to a commercial bakery that refused to sell any wedding cake, of any design, to any same-sex couple. Petitioners challenge that application of the Act as unconstitutional under the First Amendment.

Because the record does not support the claim of compelled speech on which Petitioners' question presented is based, because there is no split in authority among lower courts, and because the decision

2

below is consistent with this Court's precedents, certiorari should be denied.

3

## STATEMENT

***Factual background.*** Petitioner Masterpiece Cakeshop, Ltd., is a Colorado limited liability company that sells both pre-made and custom-baked goods to the public, including birthday cakes, cookies, brownies, and wedding cakes. Petitioner Jack Phillips owns and operates the company. Petitioners are willing to serve gay and lesbian customers and will create custom cakes for them for a variety of occasions. But Petitioners have a policy, based on Phillips's religious beliefs, of refusing to sell any wedding cake of any design to a same-sex couple. Pet. App. 53a, 65a.

Respondents Charlie Craig and David Mullins are a Colorado same-sex couple. In 2012, they planned to marry in Massachusetts and have a reception afterward in Colorado.[1] Accompanied by Craig's mother, Craig and Mullins went to Masterpiece to buy a wedding cake for their reception. *Id.* at 5a, 64a.

At the shop, the couple was met by Phillips. When they told Phillips that they were interested in purchasing a wedding cake for their wedding, he replied that it was his standard business practice not to provide cakes for same-sex weddings. He explained that he would sell the couple other baked goods, including "birthday cakes, shower cakes, … cookies and brownies." But, he said, "I just don't make cakes for same-sex weddings." *Id.* at 4a–5a, 64a–65a.

-----

[1] At the time, same-sex marriage was legal in Massachusetts but prohibited in Colorado. Pet. App. 5a.

4

Craig, Mullins, and Craig's mother immediately left. They never discussed details about the cake that Craig and Mullins were seeking, such as the cake's design or whether it would include any special features or messages. *Id.* at 4a, 65a.[2]

***Review by the Civil Rights Division.*** Craig and Mullins each filed a discrimination complaint with the Colorado Civil Rights Division,[3] charging a violation of the public accommodations provisions of the Act. *Id.* at 260a–62a, 269a–71a. Under those provisions, it is a discriminatory practice to deny to anyone "because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry … the full and equal enjoyment of the goods [and] services … of a place of public accommodation." COLO. REV. STAT. § 24-34-601(2)(a), Pet. App. 93a–94a. A "place of public accommodation" includes any "place of business engaged in any sales to the public." COLO. REV. STAT. § 24-34-601(1), Pet. App. 93a.[4] "Sexual orientation"

---

[2] The next day, Craig's mother called Masterpiece to ask Phillips why he had turned them away. Phillips responded that he would not make a wedding cake for a same-sex couple due to his religious beliefs. Again, the two did not discuss any details regarding the cake that Craig and Mullins had hoped to buy. Pet. App. 65a.

[3] The Colorado Civil Rights Division is the agency charged with enforcing Colorado's anti-discrimination laws in the areas of employment, housing, and public accommodations. COLO. REV. STAT. § 24-34-302. The Colorado Civil Rights Commission, Respondent here, is the bipartisan board that conducts hearings of cases investigated and prosecuted by the Division. COLO. REV. STAT. § 24-34-303.

[4] The public accommodations provisions of the Act contain exceptions similar to those found in other state and federal public

5

means "an individual's orientation toward heterosexuality, homosexuality, bisexuality, or transgender status or another individual's perception thereof." COLO. REV. STAT. § 24-34-301(7), Pet. App. 97a.

The Colorado Civil Rights Division conducted an investigation of Craig's and Mullins's complaints under COLO. REV. STAT. § 24-34-306(2)(a). After completing its investigation, the Division concluded that the claims of unlawful discrimination were supported by probable cause because Craig and Mullins are members of a protected class and had been denied a type of service usually offered by Masterpiece under circumstances that gave rise to an inference of unlawful discrimination. Pet. App. 5a. The Division attempted to resolve the charge through conciliation; when that effort failed, the case was referred to the Colorado Civil Rights Commission.

***Administrative proceedings.*** The Commission issued notices of hearing and formal complaints. The cases were consolidated and assigned to an Administrative Law Judge. The parties agreed to various factual stipulations and filed cross-motions for summary judgment, both asserting that there were no genuine issues of material fact. *See id.* at 64a–65a. Based on the undisputed facts, the judge rejected

---

accommodations laws. *See* Pet. App. 42a–43a. For example, those provisions do not apply to churches, synagogues, mosques, or other places used primarily for religious purposes. COLO. REV. STAT. § 24-34-601(1), Pet. App. 93a. Moreover, a place of public accommodation may be restricted to one sex if a patron's sex bears a bona fide relationship to the goods, services, or facilities offered there. COLO. REV. STAT. § 24-34-601(3), Pet. App. 94a–95a.

6

Petitioners' argument that requiring Phillips to bake a wedding cake for a same-sex couple was tantamount to compelling him to speak. Phillips "categorically refused" to accept the cake order "before there was any discussion about what that cake would look like." *Id.* at 75a. He "was not asked to apply any message or symbol to the cake" that could be reasonably interpreted as endorsing or advocating for same-sex marriage, and, the judge observed, "[f]or all Phillips knew at the time, [Craig and Mullins] might have wanted a nondescript cake that would have been suitable for consumption at any wedding." *Id.*

The judge distinguished hypothetical scenarios involving bakeries that might refuse to serve customers because of the particular design of a requested cake. "In [those] cases, it [would be] the explicit, unmistakable, offensive message" that would allow the baker to refuse the order. *Id.* at 78a. In this case, in contrast, Petitioners refused to bake any cake, without regard to what was written on it or what it might look like. *Id.*

The judge concluded that Petitioners had violated the Act and ordered them to cease and desist discriminating against same-sex couples by refusing to sell them a product that they would sell to heterosexual couples. *Id.* at 87a–88a. The Commission unanimously affirmed the judge's decision. *Id.* at 57a–58a.

***The Colorado Court of Appeals decision.*** Petitioners appealed, and the Colorado Court of Appeals affirmed.

7

The court unanimously held that Petitioners had refused to serve Craig and Mullins "because of" their sexual orientation and concluded that under Colorado law, Petitioners could not "refuse services to Craig and Mullins that [they] otherwise offer[ ] to the general public." *Id.* at 13a, 19a. In so holding, the court again distinguished circumstances under which other Colorado bakeries have refused to sell cakes to members of the public "because of the offensive nature of the requested message" that was to appear on the cakes. *Id.* at 20a n.8. Facts like those, the court held, are not presented by this case. *Id.*

The court also rejected Petitioners' First Amendment claims, basing its decision largely on Petitioners' refusal to make Craig and Mullins a cake "before any discussion of the cake's design." *Id.* at 28a; *see also id.* at 4a, 35a. The only conduct at issue, the court observed, was Petitioners' "basing [their] decision to serve a potential client, at least in part, on the client's sexual orientation." *Id.* at 29a. Prohibiting that conduct, the court held, did not violate the First Amendment. *Id.* at 29a, 35a–36a, 45a–46a.

The Colorado Supreme Court denied review of the unanimous decision of the court of appeals. *Id.* at 54a–55a.

8

## REASONS FOR DENYING THE PETITION

This Court should deny the Petition for three reasons.

First, this case is an improper vehicle to address Petitioners' compelled expression claim, which is the basis of the question presented. According to the stipulations and undisputed facts, Petitioners declined to sell Craig and Mullins a wedding cake of any design based solely on the fact that they are a same-sex couple. Had Petitioners refused to serve the couple because they sought a cake with a particular design or which featured a specific message, this case would have presented different legal issues. As postured, however, this case does not raise Petitioners' question.

Second, this case presents no split of authority that requires resolution by this Court. Jurisdictions across the country have consistently agreed with the position taken by the Colorado Court of Appeals—that public accommodations laws may prohibit businesses from refusing to serve same-sex couples. And any conflicts among the cases that Petitioners cite are inapplicable here.

Third, the ruling by the Colorado Court of Appeals adhered to this Court's precedents and does not conflict with this Court's compelled speech and free exercise decisions.

9

I.    **This case is an improper vehicle to address the question presented because the record does not support the compelled expression claim on which the question is based.**

The question presented is premised on a factual assertion that is not supported by the record. Petitioners argue that under the decision below, Colorado's public accommodations law "compel[s] Phillips to create expression that violates his sincerely held religious beliefs." Pet. i. More specifically, Petitioners claim that "Colorado requires [Phillips] … to interview the same-sex couple and develop a custom design celebrating their union," to "research and draft [a] message" he disagrees with, and "to conceive and form an artistic monument to a concept of marriage he finds morally objectionable." *Id.* at 16–17.

None of this is accurate. The parties stipulated that the "conversation between Phillips and [Craig and Mullins] was very brief, with no discussion between the parties about what the cake would look like." Pet. App. 65a; *see also id.* at 287a (statement by Phillips conceding that the "entire interaction lasted no more than 20 seconds"). It is undisputed that Petitioners declined to serve Craig and Mullins without any consideration of whether the cake would be pre-made or custom-made, and regardless of what elements or design the particular cake would include. Petitioners acted not based on the design of the requested cake or the message it might have conveyed, but based on a blanket policy of refusing to sell a wedding cake of any kind to any same-sex couple. *See id.* at 65a (Phillips "informed [Craig and Mullins] that he does not create wedding cakes for same-sex weddings"); *id.* at 75a

**App. 026**

10

(Phillips "categorically refused" to serve Craig and Mullins "before there was any discussion about what th[e] cake would look like").[5]

The Colorado Court of Appeals repeatedly emphasized that the record did not allow it to determine whether the process of making Craig's and Mullins's cake, or the cake itself, would have been "sufficiently expressive" to raise First Amendment concerns. *Id.* at 29a. "[B]ecause Phillips refused to prepare a cake for Craig and Mullins before any discussion of the cake's design," the court held, "the ALJ could not determine whether Craig's and Mullins' desired wedding cake would constitute symbolic speech." *Id.* at 28a. The court recognized that a case with different facts might require a different outcome:

> We recognize that a wedding cake, in some circumstances, may convey a particularized message celebrating same-sex marriage and, in such cases, First Amendment speech protections maybe implicated. However, we need not reach this issue. We note, again, that Phillips denied

---

[5] The Petition includes a discussion of the history of cake making, asserting that "wedding cakes are uniquely personal to the newly married couple and require significant collaboration between the couple and the artist to create the perfect design." Pet. 4–5. This discussion is unsupported by record facts, and neither the administrative law judge nor the court of appeals below made any findings regarding those assertions. Instead, as support for its assertions, the Petition cites an instructional guide for cake decorating and an appellate brief that Petitioners filed before the Colorado Civil Rights Commission (which itself relies on the instructional guide). *Id*. (citing *The Essential Guide to Cake Decorating* (2010) and Pet. App. 185a).

11

Craig's and Mullins' request without any discussion regarding the wedding cake's design or any possible written inscriptions.

*Id.* at 34a–35a.

Indeed, in cases involving requests to create cakes that feature specific designs or messages that are offensive to the vendor, Colorado law dictates a different result. The Colorado Civil Rights Division has dismissed complaints by a customer who claimed that three bakeries refused to serve him because of his religion when they declined to create specific, custom-designed cakes featuring particular messages. The customer had requested that the bakeries make cakes shaped like an open Bible, inscribed with messages such as "Homosexuality is a detestable sin. Leviticus 18:2" or images such as two groomsmen holding hands before a cross, with a red "X" over them. *Id.* at 20a n.8; *see also id.* at 300a. Each bakery refused to create cakes with those specific designs. *Jack v. Le Bakery Sensual, Inc.*, Charge No. P20140070X, Pet. App. 310a; *Jack v. Azucar Bakery*, Charge No. P20140069X, Pet. App. 301a; *Jack v. Gateaux, Ltd.*, Charge No. P20140071X, Pet. App. 320a. The Division concluded that none of the bakeries had refused service because of the customer's religious beliefs, and they all would have refused to create cakes "for anyone, regardless of creed, where a customer requests derogatory language or imagery." Pet. App. 307a; *see also id.* at 297a–98a, 316a.

Here, had Petitioners been asked to prepare a custom cake featuring a message concerning same-sex marriage, this case would present a different record and raise different issues. Petitioner is correct that,

12

under Colorado law, "[a]n African-American baker may decline to create a custom cake celebrating the racist ideals of a member of the Aryan Nation" and "a Muslim baker may refuse to create a custom cake denigrating his faith for the Westboro Baptist Church." Pet. 31. And, of course, Phillips himself may not be compelled to create "cakes with offensive written messages" such as "anti-American or anti-family themes, atheism, racism, or indecency." *Id.* at 5. But this is not because of the identity of the customer; it is because of the specific messages and designs that the customer would be requesting. The record here does not raise the compelled speech claim for which Petitioners seek review.

## II.     There is no split in authority for this Court to resolve.

The Petition implies that courts across the country are divided in their approach to various legal questions bearing on cases like this one. In fact, the courts are uniform. Petitioners cite not a single case that has exempted a wedding vendor from a public accommodations law due to an objection to same-sex marriage. And while First Amendment cases often present difficult legal questions, the various purported splits in authority that Petitioners do identify are not implicated by this case.

### A. Courts have uniformly upheld the application of public accommodations laws in similar contexts.

In the past three years, a number of courts have applied public accommodations laws to wedding

13

vendors that have refused to serve same-sex couples. Each court has sided with the decision below.

In *Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013), *cert. denied*, 134 S. Ct. 1787 (2014), a wedding photographer refused to provide services for a same-sex couple's wedding. The photographer argued that New Mexico's antidiscrimination law violated her First Amendment speech and free exercise rights. The New Mexico Supreme Court rejected the photographer's challenge, holding that "if [the photographer] offers its services to the public, [it must] provide those same services to clients who are members of a protected class." *Id*. at 68.

In *Washington v. Arlene's Flowers, Inc.*, No. 13-2-00871-5, (Wash. Sup. Ct. Feb. 18, 2015), *hr'g granted*, 2016 Wash. LEXIS 349 (Wash. Mar. 2, 2016), a florist refused to provide flower arrangements for a same-sex couple's wedding. The florist argued that Washington's antidiscrimination law violated her First Amendment speech and religion rights. The court rejected those arguments, explaining that "[t]he existing jurisprudence on this issue … is soundly against the [florist]." *Id*. slip op. 39–40.

In *Gifford v. McCarthy*, 137 A.D.3d 30 (N.Y. App. Div. 2016), the owners of a wedding venue refused to rent the venue for a same-sex couple's wedding. The venue owners argued that New York's human rights law violated their free speech and free exercise rights. *Id*. at 38–42. The New York appeals court rejected those challenges, concluding that state law "simply requires them to … offer the same goods and services to same-sex couples that they offer to other couples." *Id*. at 41.

14

Finally, in *Brush & Nib Studio, LC v. City of Phoenix*, CV 2016-052251 (Sup. Ct. of Ariz., Maricopa Cty., Sept. 16, 2016) (unreported), a stationery vendor sought to refuse to serve same-sex couples. The stationer sued the City of Phoenix, arguing that it should be enjoined from enforcing its antidiscrimination law under the First Amendment. The court rejected this claim, explaining that "the only thing compelled by the ordinance is the sale of goods and services to persons regardless of their sexual orientation. There is nothing about the ordinance that prohibits free speech or compels undesired speech." *Id*. slip op. 9.

Petitioners cite no example of a court that has disagreed with the analysis reflected in these decisions.

### B. Petitioners' asserted inter-jurisdictional conflicts are not implicated by this case.

Unable to identify a split among courts confronting similar factual and legal issues, Petitioners cite cases arising in a wide variety of contexts, claiming that the decision below either creates or exacerbates splits with those cases on three separate legal questions. None of those alleged splits in authority—to the extent they exist at all—are implicated here.

***Zoning cases***. First, Petitioners claim that the decision below conflicts with cases from the Ninth and Eleventh Circuits involving municipal codes that banned tattoo parlors. Pet. 18–22. Those cases—*Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015) and *Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010)—have no relevance here. Neither case involved a claim of compelled expression,

15

and neither case involved a public accommodations law. The tattoo parlors in those cases did not seek to avoid serving a subset of customers; they sought instead to avoid government regulation that entirely prohibited them from engaging in expressive conduct. The constitutional doctrine that was central to those cases—the "time, place, manner" doctrine—played no role in the decision below.

Petitioners nonetheless assert that because *Buehrle* and *Anderson* found that tattoos are, as a general matter, a form of protected expression, the ruling below necessarily conflicts with those decisions. Pet. 21. This is incorrect for two reasons.

First, a ruling about the expressive nature of tattoos has limited relevance to a ruling about the claimed medium of expression at issue here. The First Amendment is necessarily fact-specific. *Hurley*, 515 U.S. at 567 ("[T]he reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection."). Here, the record does not disclose the features or the messages that might have been part of the particular cake at issue and instead involves a business's categorical policy not to serve a particular product to a particular subset of customers.

Second, the Colorado Court of Appeals recognized that the act of creating a cake could, in certain circumstances, be expressive and could therefore implicate the First Amendment. *See* Pet. App. 34a–35a. Thus, a "municipal ban" on cake shops, *cf. Anderson*, 621 F.3d at 1055, or "an ordinance strictly limiting the number of [cake shops] permitted to operate," *Buehrle*,

16

813 F.3d at 975, could give rise to a First Amendment claim—just as bans on tattoo parlors can. Here, however, under the particular facts and legal framework of this case, "the compelled conduct [at issue] is the Colorado government's mandate that [Petitioners] comport with [Colorado law] by not basing [the] decision to serve a potential client, at least in part, on the client's sexual orientation." Pet. App. 29a. In applying that mandate to the facts presented here, the court below did not conflict with *Buehrle* or *Anderson*.

**Cases applying the Spence-Johnson *factors*.** Petitioners next claim that the federal circuits disagree regarding the legal test that determines whether conduct is "expressive" and therefore protected by the First Amendment. Pet. 22–25. Petitioners assert that the circuits have used three separate approaches: some, Petitioners argue, adhere to *Texas v. Johnson*, 491 U.S. 397 (1989) and *Spence v. Washington*, 418 U.S. 405 (1974); some hew to what Petitioners describe as a more lenient test under *Hurley*; and some take what Petitioners call "an intermediate approach." Pet. 23–24. Petitioners do not argue that the Colorado Court of Appeals explicitly chose one of these three approaches but that its analysis "most closely resembles" what Petitioners call the "stringent approach." *Id.* at 24–25.

Whether or not the purported split is real, the decision below does not implicate it. All of the cases that Petitioners cite recognize that, regardless of what legal test is employed, the outcome of a Free Speech claim depends heavily on the facts and the context, and it is the person seeking to avoid the application of state law that bears the burden of proving the

17

expressiveness of the relevant conduct.[6] Here, the court of appeals applied both the *Spence-Johnson* test and the approach from *Hurley*. Pet. App. 26a, 32a–33a. Rather than attempt to narrow the scope of its analysis to a single formulation of the expressive-conduct test, the court rejected Petitioners' claims under *both* lines of cases. *Id*. And it repeatedly emphasized that the outcome was dictated by the stipulated and undisputed facts, not by reliance on any particular analytical approach: "Phillips refused to prepare a cake for Craig and Mullins before any discussion of the cake's design, [and] the [administrative law judge] could not determine whether Craig's and Mullins' desired wedding cake would constitute symbolic speech subject to First Amendment protection." *Id*. at 28a; *id*. at 32a ("Nothing in the record supports the conclusion that a reasonable observer would interpret Masterpiece's providing a wedding cake for a same-sex couple as an

---

[6] *Blau v. Fort Thomas Pub. Sch. Dist*., 401 F.3d 381, 389–90 (6th Cir. 2005) (examining the record to conclude that the plaintiffs "ha[d] not met their burden of showing that the First Amendment protects" a middle-schooler's desire to "wear clothing that she likes"); *Holloman v. Harland*, 370 F.3d 1252, 1269 (11th Cir. 2004) (holding that "the record amply supports Holloman's contention that the defendants violated his constitutional right to be free from compelled speech"); *Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 205–07 (2d Cir. 2004) (stating that "[t]he party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies" and carefully examining the evidentiary record to determine whether wearing masks amounted to expressive conduct); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 161–65 (3d Cir. 2002) (noting the plaintiffs' burden to prove the expressiveness of their conduct and concluding that "the plaintiffs ha[d] not introduced evidence" of expressiveness).

18

endorsement of same-sex marriage ….”); *see also id.* at 29a–30a.

Even Petitioners concede that the test the court applied below was not dispositive; they assert only that they “would be far more likely to receive free speech protection” under their preferred test. Pet. 25. Given the record, this case does not present the opportunity to resolve the purported conflict that Petitioners identify.

***Cases examining the unequal application of government policy****.* Finally, Petitioners claim that the decision below conflicts with cases from the Third, Sixth, and Tenth Circuits. *Id.* at 30–31. Those cases hold that if a state law or policy contains various exceptions, but refuses to permit an exception for religious exercise, then the law or policy must be reviewed under heightened scrutiny. Again, those cases are inapposite here, and the decision below did not diverge from them.

In Petitioners’ view, the Act contains a “myriad of exceptions”:

> An African-American baker may decline to create a custom cake celebrating the racist ideals of a member of the Aryan Nation. Likewise, a Muslim baker may refuse to create a custom cake denigrating his faith for the Westboro Baptist Church. Three secular cake artists my reject a Christian’s custom cake order because they find his religious message critical of same-sex marriage offensive.

*Id.* at 31–32. These factual scenarios do not describe “exceptions” to Colorado law. They describe how public

19

accommodations laws work in general. A business may refuse service for a number of reasons, such as the specific design of the product a customer asks the business to create. They may not refuse service based on the identity of the customer.

The cases Petitioners cite, in contrast, *did* involve government policies that denied exceptions to accommodate religion but granted exceptions for other reasons. *Ward v. Polite*, 667 F.3d 727, 735–37 (6th Cir. 2012) (allowing counseling students to decline to engage in various counseling-related services, but not for religious reasons); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298–99 (10th Cir. 2004) (excusing a Jewish student from coursework, but not a Mormon student, and applying exceptions to the Mormon student inconsistently); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (allowing police officers to grow beards for medical but not religious reasons). None of those cases suggests—as Petitioners do—that a public accommodations law forbidding discrimination against same-sex couples must be subject to heightened scrutiny if it allows a "Muslim baker [to] refuse to create a custom cake denigrating his faith." Pet. 31. Petitioners identify no court that has taken that radical position. They thus present no split in authority for this Court to resolve.

**App. 036**

20

### III. The decision below does not conflict with this Court's compelled-speech and free-exercise precedent.

As a final matter, Petitioners claim that the decision below conflicts with this Court's compelled speech and free exercise precedent. Neither assertion is correct.

***Compelled Speech.*** Petitioners assert that the court of appeals rejected their compelled speech claim "based on the feeble justification that Phillips' speech is legally required." Pet. 18. That is not an accurate description of the court of appeals' analysis. The court instead determined that the "compelled conduct" at issue—ceasing to discriminate based on a customer's identity—cannot reasonably be misconstrued as carrying a message about same-sex marriage. Pet. App. 29a–30a. Thus, the court rested its conclusion not only on the fact that nondiscrimination is legally required in Colorado but also on the fact that the mandated conduct, in the context of this case, did not amount to forced expression. *Id.* at 36a ("[W]e conclude that the compelled conduct here is not expressive ...."). Identical reasoning led to a similar conclusion in *Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47 (2006). There, the Court held that law schools could be compelled to host military recruiters despite First Amendment objections because "a law school's decision to allow recruiters on campus is not inherently expressive." *Id.* at 64.

21

Of course, if businesses or individuals are in fact forced to express the messages of the government[7] or a third party,[8] the First Amendment is implicated. But mandating nondiscrimination by a business open to the public "is a far cry from the compelled speech" that violates the Constitution. *Id.* at 62.

This Court's decision in *Hurley* does not suggest otherwise. Contrary to Petitioners' characterization, Pet. 17, it illustrates why the decision below, and its understanding of Colorado law and the First Amendment, is correct. *Hurley* involved a "peculiar" application of a public accommodations law and was decided in the specific "context of an expressive parade." 515 U.S. at 572, 577. The parade's organizers did not exclude any person from marching because of that person's identity; they excluded a particular "contingent" of marchers that wished to engage in an "expressive demonstration of their own." *Id.* at 572–73. Here, consistent with the First Amendment, Colorado law does not prohibit a business from exercising its

---

[7] *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013) (prohibiting the government from mandating that aid organizations publish a policy opposing prostitution); *Wooley v. Maynard*, 430 U.S. 705 (1977) (prohibiting a State from requiring citizens to display an ideological motto on their license plates); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (prohibiting a State from punishing students who decline to salute the flag and recite the pledge of allegiance).

[8] *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986) (prohibiting a regulator from requiring a utility company to include a consumer group's message in its mailings); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (requiring a newspaper to publish a politician's speech).

22

speech rights: "an Islamic cake artist [may] refus[e] to create a cake denigrating the Quran." Pet. 1. And the conduct that Colorado law prohibits—declining to serve couples because of their sexual orientation—does not raise the First Amendment concerns that motivated *Hurley*. "[S]elling a wedding cake to all customers free of discrimination does not convey a celebratory message …." Pet. App. 30a. Marching as a "parade unit carrying its own banner," in contrast, does. *Hurley*, 515 U.S. at 572.

***Free exercise***. Petitioners' final argument, Pet. 25–26, is that the court of appeals' decision conflicts with this Court's holding in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). That case involved an ordinance whose "object" was "suppression of the central element of the … worship service" of a disfavored religion. *Id*. at 534. Its reasoning has never been extended to suggest that a generally applicable public accommodations law like Colorado's—which "serves the State's compelling interest in eliminating discrimination," *Bd. of Dirs. of Rotary Int'l*, 481 U.S. at 549—cannot be applied to prevent discrimination against same-sex couples or any other identifiable group of customers.[9] This Court has

---

[9] Petitioners quote a statement of one Colorado Civil Rights Commissioner expressing the opinion that religion has been used to justify discrimination. Pet. at 29. This statement, Petitioners claim, reflected hostility to religious belief. Even if that were true, that statement did not reflect the views of the Commission as a whole, nor does it show that the Act, generally or as applied here, singles out religious conduct for unfavorable treatment in contravention of *Lukumi*. No other member of the Commission supported the statement, nor was that statement or any similar sentiment included in the Commission's Order.

23

"never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990). In rejecting Petitioners' claims below, the court of appeals did not depart from this Court's free exercise precedent.

## CONCLUSION

The Petition should be denied.

Respectfully submitted,

CYNTHIA H. COFFMAN
   Attorney General

GLENN E. ROPER
   Deputy Solicitor General

FREDERICK R. YARGER
   Solicitor General
   *Counsel of Record*

STACY L. WORTHINGTON
   Senior Assistant
   Attorney General

Office of the Colorado
   Attorney General
1300 Broadway
10th Floor
Denver, Colorado 80203
Fred.Yarger@coag.gov
(720) 508-6168

*Counsel for Respondent*
*Colorado Civil Rights Commission*

November 29, 2016

**App. 040**

1   STATE OF COLORADO

2   CITY AND COUNTY OF DENVER

3   _____

4   Colorado Civil Rights Commission Meeting

5   Held on July 25, 2014

6   Colorado State Capitol

7   200 East Colfax Avenue, Old Supreme Court Chambers

8   _____

9   In re:  CHARLIE CRAIG and DAVID MULLINS v.

10  MASTERPIECE CAKESHOP, INC.

11  Case No:  P20130008X, CR2013-0008

12  _____

13

14

15          This transcript was taken from an audio

16  recording by Katherine A. McNally, Certified

17  Transcriber, CET**D-323.

18

19

20

21

22                      ARIZONA REPORTING SERVICE, INC.
                         Audio Transcriptions
23                          Suite 502
                       2200 North Central Avenue
24                    Phoenix, Arizona  85004-1481

25

```
 1              P R O C E E D I N G S

 2              *    *    *    *    *

 3

 4         (Commencement of audio at 00:00.0.)

 5         THE CHAIRMAN:  Calling the meeting to order.

 6   This is the Friday, July 25th, 2014, meeting of the

 7   Colorado Civil Rights Commission.

 8         Would all of those that are present please feed

 9   your name into the record?

10         COMMISSIONER VELASQUEZ:  Susie Velasquez,

11   Greeley, Colorado.

12         COMMISSIONER RICE:  Diane Rice, Loveland,

13   Colorado.

14         MS. McPHERSON:  Jennifer McPherson, with the

15   Division.

16         MS. MALONE:  Shayla Malone, with the Division.

17         MR. MORTURE:  Vince Morture (phonetic), Deputy

18   Attorney General, counsel for the Division.

19         MR. MAXFIELD:  Eric Maxfield, First Assistant

20   AG, from the Division.

21         COMMISSIONER ADAMS:  Commissioner Adams,

22   Fountain, Colorado Springs, Colorado.

23         COMMISSIONER HESS:  Commissioner Hess, from

24   Grand Junction, Colorado.

25         COMMISSIONER SAENZ:  Rosa Saenz, from Denver.
```

**App. 042**

1          COMMISSIONER JAIRAM:  Raju Jairam, Fort Collins

2    Colorado.

3          THE CHAIRMAN:  And --

4          MS. MARTIN:  Oh, I'm just observing.

5          THE CHAIRMAN:  Yes, ma'am.  But you need to tell

6    us who you are, please.

7          MS. MARTIN:  Oh, I'm Nicolle Martin.

8          THE CHAIRMAN:  Okay.  Nicolle Martin with --

9          MS. MARTIN:  Counsel for complainants -- I'm

10   sorry.  Counsel for respondents and appellants --

11         THE CHAIRMAN:  Oh.  Okay, (indiscernible).

12         MS. MARTIN:  -- (indiscernible) Masterpiece.

13         THE CHAIRMAN:  Okay.  Thank you.

14         And I guess we do have a quorum.

15         (Conclusion of audio at 01:13.8; commencement of

16   audio at 08:40.0.)

17         THE CHAIRMAN:  Okay.  Eric.

18         MR. MAXFIELD:  So there is a Motion to Stay

19   final agency order filed by respondents in the Craig v.

20   Masterpiece Cakeshop case.  There is a complainant's

21   response in option to the Motion for Stay that was

22   filed, I think, yesterday.  And (indiscernible) has to

23   take a look at that.

24         Procedurally, the -- either party

25   (indiscernible) a stay of the final agency order from

ARIZONA REPORTING SERVICE, INC.    (602) 274-9944
www.az-reporting.com                    Phoenix, AZ

**App. 043**

1    the Commission.  And then if that is granted, there'll

2    be a stay in place.  If it's denied, then they may also

3    seek a stay from the Court of Appeals.  The Court of

4    Appeals could grant or deny the stay during the pendency

5    of the appeal, which was also noticed by Masterpiece,

6    Inc.

7             So if there are questions about the Commission's

8    authority and the reasoning around the possible granting

9    of the stay or denial, I can try to answer those.  It

10   is -- and then that's something that I can do here and

11   now to you, you know, in open session, or if you would

12   want to waive attorney/client privilege, or you could

13   ask to go into -- make a motion to go into executive

14   session, and we could have a closed session for attorney

15   advice on the merits of the Motion to Stay.

16            THE CHAIRMAN:  My question is, Do we need to

17   respond to this or make a motion today or need a motion

18   today?

19            MR. MAXFIELD:  Yes.  This -- this ought to

20   receive action today, either a grant or denial of the

21   stay.

22            THE CHAIRMAN:  Okay.

23            MALE SPEAKER:  I would like to have an

24   opportunity to read this.  I don't know about the

25   others.

1          FEMALE SPEAKER:  And maybe we can sometime take

2      a short break, and when we finish the public -- and at

3      the beginning of our executive session and a few minutes

4      to read this stuff, because we --

5          MALE SPEAKER:  Yes.

6          FEMALE SPEAKER:  -- I don't think we've seen it

7      until now.

8          MALE SPEAKER:  (Indiscernible) last night.

9          MR. MAXFIELD:  One thing that I could offer is

10     that the -- the legal standard identified by both

11     parties in the general sense is the same.  So I don't

12     think that there's a contest about that.  And so you'll

13     see the elements -- four elements set out clearly by

14     both parties, and for which I think there's agreement.

15         FEMALE SPEAKER:  Okay.

16         MALE SPEAKER:  And then if we need any advice,

17     then we could go into closed session?

18         MR. MAXFIELD:  Yes.

19         THE CHAIRMAN:  Okay.

20         MR. MAXFIELD:  Yeah.

21         THE CHAIRMAN:  So it -- I guess we all finished

22     through the public session, take maybe a 10-, 15-minute

23     break, give everyone have a chance to read this --

24         MALE SPEAKER:  Um-hmm.

25         THE CHAIRMAN:  -- and then we'll discuss it.

**App. 045**

1            MALE SPEAKER:  Okay.

2            THE CHAIRMAN:  Does that work?

3            FEMALE SPEAKER:  Um-hmm.  And then if we --

4    before we break up executive session --

5            THE CHAIRMAN:  Before -- yeah, if we need to go

6    into executive session (indiscernible).

7            FEMALE SPEAKER:  Okay.  (Indiscernible) --

8            THE CHAIRMAN:  (Indiscernible) merit.

9            FEMALE SPEAKER:  -- if we have this on the

10   agenda, we'll (indiscernible) --

11           THE CHAIRMAN:  Yes.

12           FEMALE SPEAKER:  -- have to go into executive

13   session (indiscernible), okay?

14           THE CHAIRMAN:  Is that acceptable?

15           FEMALE SPEAKER:  Yes.

16           THE CHAIRMAN:  All right.  Any audience

17   participation?

18           (Conclusion of audio at 11:48.4; commencement of

19   audio at 17:35.1.)

20           THE CHAIRMAN:  Okay.  What we have here in front

21   of us is -- anyway, we're here to discuss the

22   Masterpiece Cakeshop, Case (indiscernible).  Anyway,

23   here's the agenda.

24           FEMALE SPEAKER:  Oh, yeah.

25           THE CHAIRMAN:  Oh, here it is.  Okay.  We're

1   here to discuss Case P2013008X, CR2013-00H, Charlie

2   Craig and David Mullins versus Masterpiece Cakeshop.

3            MALE SPEAKER:  Um-hmm.

4            THE CHAIRMAN:  There's a motion for a stay of

5   the final Commission -- I mean, the Commission's final

6   order, and then there's a response by the defendant in

7   opposition.  And then there's -- we've also been given a

8   notice of appeal regarding a court, the appellate court,

9   I guess.

10           So anyone want to lead off?

11           FEMALE SPEAKER:  I'll lead.

12           Mr. Chair, I move that the Commission deny the

13  Motion to Stay in -- for the Commission case.

14           FEMALE SPEAKER:  Second.

15           THE CHAIRMAN:  Okay.  There's a motion on the

16  floor and a second to deny the respondent's motion for a

17  stay of the final order by this Commission.

18           MALE SPEAKER:  Um-hmm.

19           THE CHAIRMAN:  Okay.  Are there any comments or

20  discussions about this before I put it to a vote?

21           FEMALE SPEAKER:  Yes, sir.

22           THE CHAIRMAN:  Go ahead.

23           FEMALE SPEAKER:  I'd like to make a couple

24  comments.

25           First of all, I think for us to grant a stay

1   would be to say that we disagree with our own order,

2   final order.  And of the arguments that are made, I

3   think there is -- by virtue of our order, we determined

4   that there is a public -- bless you --

5          FEMALE SPEAKER:  Thank you.

6          FEMALE SPEAKER:  -- there is a public interest

7   in enforcing this, that clearly the public is hurt by

8   actions such as those taken by Masterpiece Cake.

9   Complying with the order is not harmful or irreparable

10  to Masterpiece Cake.  I don't see that any harm is done

11  there.

12         I -- I further believe that if you're going to

13  do business in Colorado, you have to follow the Colorado

14  Antidiscrimination Act, and for us to give a stay in

15  this case would be to say, oh, unless you don't want to.

16  So anyway, I -- I believe that we have to live by our

17  convictions and our orders (indiscernible) the

18  respondent to do so.

19         THE CHAIRMAN:  Susan?

20         FEMALE SPEAKER:  I would just like to point out,

21  and I agree with the documents of the plaintiffs that --

22  that the document that was in front of us from the --

23  the plaintiffs' response.

24         THE CHAIRMAN:  Oh, okay.

25         FEMALE SPEAKER:  -- that they have not

1  demonstrated a likelihood of success, because they were

2  rejected three times before.  And as Diane pointed out,

3  we made a decision then.  And I don't believe that --

4  that they have a likelihood of success.

5            THE CHAIRMAN:  Okay.  Commissioner Saenz?

6            FEMALE SPEAKER:  I --

7            THE CHAIRMAN:  No comments?

8            FEMALE SPEAKER:  No.

9            THE CHAIRMAN:  Commissioner Hess?

10           COMMISSIONER HESS:  I agree with what's been

11  said.

12           THE CHAIRMAN:  Commissioner Adams?

13           COMMISSIONER ADAMS:  I would agree with

14  Commissioner Rice's and (indiscernible) assessment of

15  what has transpired.

16           FEMALE SPEAKER:  I have one more comment.

17           THE CHAIRMAN:  Go ahead.

18           FEMALE SPEAKER:  In regard to the respondent's

19  argument -- endless argument, this is that they -- this

20  argument's been made before, and it -- it holds no

21  water, as far as I'm concerned, whatsoever.  You -- and

22  we said this in the hearing, and we need to repeat this

23  over and over, you cannot separate the fact that these

24  men -- their -- their sexual orientation from the action

25  of wanting to celebrate the marriage, anymore than you

**App. 049**

1  could a case between races in many years gone past.

2         And the U.S. Supreme Court has found over and

3  over that you cannot discriminate on the basis of race,

4  and sexual orientation is a status absolutely like race

5  or -- so -- and you can't separate the fact that these

6  gentlemen want to marry from the fact that they are

7  homosexual.

8         THE CHAIRMAN:  Okay.  (Indiscernible.)

9         I have some comments, and that is, you know,

10  Mr. Phillips says that he wants to be respected or his

11  views and religious views to be respected, and I believe

12  that the general public also needs to -- you know, their

13  views need to be respected.

14         The -- the issue here is whether or not the

15  couple that went in to get service were treated with

16  dignity and respect, and the fact of the matter are they

17  were not, and it's also clear that they were turned

18  away.  And those have all been established.

19         And I don't believe that the individual's right

20  to practice his religion violates other people's rights

21  to free access, especially when the business is open to

22  the public and serving the public.

23         Now, what Mr. Phillips does in private is his

24  own business.  And I agree that, you know, we cannot

25  separate same sex marriage and say that I'm not

**App. 050**

1    discriminating against gay couples, because I mean, by

2    the very definition, when two people of the same sex

3    want to get married, it tells me that they are of a

4    certain sexual orientation.  So that argument, again,

5    fails.

6            Go ahead.

7            FEMALE SPEAKER:  Well, I just want to point out

8    that this -- this case is really not about same sex

9    marriage.  It's -- it's about a couple -- it's just

10   about a gay couple that wanted a cake to celebrate a

11   life event in their life.

12           FEMALE SPEAKER:  Um-hmm.

13           FEMALE SPEAKER:  That doesn't really -- it could

14   have been a civil union.  It could have been a -- you

15   know, let's wrap, you know, ribbon around a tree and --

16   and -- and say that we hope, you know, the world gets to

17   be a better place with us in it as a couple.  So it's

18   not -- I mean, I think there's some rhetoric that this

19   is a case about same sex marriage.  Well, it's really

20   not.  It's really about a case about denial of service.

21           FEMALE SPEAKER:  You -- yeah, you're exactly

22   right --

23           MALE SPEAKER:  Um-hmm.

24           FEMALE SPEAKER:  -- Commissioner Hess.

25           I would also like to reiterate what we said in

1   the hearing or the last meeting.  Freedom of religion

2   and religion has been used to justify all kinds of

3   discrimination throughout history, whether it be

4   slavery, whether it be the holocaust, whether it be -- I

5   mean, we -- we can list hundreds of situations where

6   freedom of religion has been used to justify

7   discrimination.  And to me it is one of the most

8   despicable pieces of rhetoric that people can use to --

9   to use their religion to hurt others.  So that's just my

10  personal point of view.

11          THE CHAIRMAN:  Okay.  Any other comments?

12          Okay.  So there's a motion on the floor to deny

13  the respondent's Motion for Stay of our final order.

14  And all those in favor, please signify by saying aye.

15          (A chorus of ayes.)

16          THE CHAIRMAN:  Those opposed?

17          Any abstentions?

18          Therefore the Commission denies the respondent's

19  motion for a stay of our final order.

20          (Conclusion of audio at 27:54.1.)

21                    *    *    *    *    *

22

23

24

25

        ARIZONA REPORTING SERVICE, INC.    (602) 274-9944
        www.az-reporting.com                   Phoenix, AZ

**App. 052**

1                    C E R T I F I C A T E

2

3            I, Katherine McNally, Certified

4    Transcriptionist, do hereby certify that the foregoing

5    pages 1 through 12 constitute a full, true, and accurate

6    transcript, from electronic recording, of the

7    proceedings had in the foregoing matter, all done to the

8    best of my skill and ability.

9

10           SIGNED and dated this 8th day of August

11   2014.

12

13

14

15

16

17           KATHERINE A. McNALLY
             Certified Electronic Transcriber
18           CET**D323

19

20

21

22

23

24

25

         ARIZONA REPORTING SERVICE, INC.    (602) 274-9944
         www.az-reporting.com                Phoenix, AZ

**App. 053**