# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-02372-MSK-CBS

303 CREATIVE LLC, and
LORIE SMITH,

      Plaintiffs,

v.

AUBREY ELENIS,
ANTHONY ARAGON,
ULYSSES J. CHANEY,
MIGUEL RENE ELIAS,
CAROL FABRIZIO,
HEIDI HESS,
RITA LEWIS,
JESSICA POCOCK, and
PHIL WEISER[1],

      Defendants.

---

## OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Preliminary Injunction (**# 6**) and the Plaintiffs' Motion for Summary Judgment (**# 48**), the corresponding response and reply briefs, and the parties' recent supplemental briefing (**# 67, 68**).

## FACTS

Plaintiff Lorie Smith, through her wholly-owned company 303 Creative, LLC ("303"), is engaged generally in the fields of graphic design, website design, social media management and

---

[1]     The Court *sua sponte* modifies the caption in this case to reflect the election of a new Colorado Attorney General since this action was commenced. Phil Wieser is substituted for Cynthia Coffman for purposes of the official capacity claims against the Colorado Attorney General.

consultation, marketing, branding strategy, and website management training.  This case

concerns Ms. Smith's intention to expand 303's business into the design of custom websites for

customers planning weddings – that is, websites to keep a couple's friends and family informed

about the upcoming wedding.

Ms. Smith describes herself as a Christian and states that her religious beliefs are central

to her identity. She believes that she must use her talents in a manner that glorifies God and that

she must use her creative talents in operating 303 in a way that she believes will honor and

please him.  Consistent with those beliefs, Ms. Smith desire to limit the scope of her services.

Although she is willing to work with all people regardless of their race, religion, gender, and

sexual orientation, she "will decline any request to design, create, or promote content that:

contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports

the destruction of unborn children; incites violence; or promotes any conception of marriage

other than marriage between one man and one woman."  This restriction precludes provision of

wedding website services for same-sex couples.

Ms. Smith has prepared a proposed statement ("the Statement") that she intends to post

on 303's website to explain 303's policies:  It reads:

> I love weddings.
>
> Each wedding is a story in itself, the story of a couple and their
> special love for each other.
>
> I have the privilege of telling the story of your love and
> commitment by designing a stunning website that promotes your
> special day and communicates a unique story about your wedding -
> from the tale of the engagement, to the excitement of the wedding
> day, to the beautiful life you are building together.
>
> I firmly believe that God is calling me to this work. Why? I am
> personally convicted that He wants me - during these uncertain
> times for those who believe in biblical marriage - to shine His light

and not stay silent. He is calling me to stand up for my faith, to explain His true story about marriage, and to use the talents and business He gave me to publicly proclaim and celebrate His design for marriage as a life-long union between one man and one woman.

These same religious convictions that motivate me also prevent me from creating websites promoting and celebrating ideas or messages that violate my beliefs. So I will not be able to create websites for same-sex marriages or any other marriage that is not between one man and one woman. Doing that would compromise my Christian witness and tell a story about marriage that contradicts God's true story of marriage-the very story He is calling me to promote.

Ms. Smith acknowledges that her intended website activities conflict with Colorado law, specifically C.R.S. § 24-34-601(2).[2] That statute provides:

It is a discriminatory practice and unlawful for a person … directly or indirectly, to publish . . . any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of . . . sexual orientation. (Hereafter, the "Communication Clause")

Violations of the Communications Clauses are enforced administratively by the Colorado Civil Rights Commission ("CCRC") and may be independently prosecuted by the Colorado Attorney General.

Believing that these provisions of Colorado law abridge her rights under the U.S. Constitution, Ms. Smith commenced this action against the Defendants, the members of the

---

[2]     An earlier iteration of Ms. Smith's claims also challenged a separate provision of C.R.S. § 24-34-601(2), insofar as that statute prohibits persons from refusing to provide services to an individual or group because of, among other things, sexual orientation (the "Accommodation Clause").  Claims relating to the Accommodation Clause were dismissed by this Court on standing grounds.

CCRC (in their official capacities), and against Phil Weiser, Colorado's current Attorney General (also in his official capacity). At present, Ms. Smith asserts a challenge to the Communication Clause, contending that it violates the Free Speech, Free Press, and Free Exercise clauses of the First Amendment to the U.S. Constitution, and the Equal Protection and Due Process clauses of the Fourteenth Amendment. Because Ms. Smith has tendered the specific content of the Statement she intends to post, the Court treats her claims as asserting an as-applied challenge.[3]

Simultaneously with the Complaint, Ms. Smith sought a preliminary injunction (**#6**) to restrain the CCRC from enforcing the Communication Clause against her and 303. The parties eventually agreed that the Motion for Preliminary Injunction should be determined in conjunction with a determination on the merits through the mechanism of summary judgment. Consequently, the Plaintiffs filed their Motion for Summary Judgment (**#48**), and the parties filed stipulated facts (**#49**). Those facts are deemed incorporated herein and discussed in more detail below.

After briefing was completed, the United States Supreme Court granted certiorari in a case involving similar facts and legal issues and raising issues of the constitutionality of the Public Accommodation Statute. This Court deferred consideration of the issues in this case, anticipating a dispositive substantive ruling by the Supreme Court on the issues presented here. However, in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n,*, 138 S.Ct. 1719

---

[3]     The CCRC has not given any formal opinion regarding the legality of Ms. Smith's proposed Statement nor threatened her with prosecution if she posts it. In the wake of the Supreme Court's ruling  and  criticism of the CCRC in *Masterpiece*, it is unclear what, if any, enforcement action the CCRC would seek to take *if* Ms. Smith actually posted her statement. Prior to the Supreme Court's ruling in *Masterpiece*, the Court found (**# 52**) that Ms. Smith has standing to challenge the application of the Communications Clause to her proposed disclaimer. In the absence of the Defendants tendering additional facts that now call that ruling into question, the Court will continue to assume, without necessarily finding, that Ms. Smith's standing is sufficient to proceed.

(2018), the Supreme Court avoided a ruling on the merits, returning the case to the lower courts. In light of the *Masterpiece* decision (and other decisions by the Supreme Court during the same term), the parties filed supplemental briefs **(# 67, 68).** The motions for preliminary injunction and summary judgment motions in this case are now ripe for determination.

For purposes of this ruling, the Court need only evaluate Ms. Smith's summary judgment motion. [4] That motion was filed prior to the Court's dismissal of any Accommodation Clause challenge, making it somewhat difficult to extract those remaining arguments that remain pertinent to the Communication Clause itself. It appears to the Court that Ms. Smith alleges that: (i) the CCRC's anticipated application of the Communication Clause to her Statement violates the Equal Protection clause of the 14th Amendment to the U.S. Constitution because the CCRC does not prosecute similarly-situated businesses expressing different religious beliefs; (ii) the Communication Clause violates the Substantive Due Process clause, in that it is vague and overbroad; (iii) the Communication Clause violates an otherwise unspecified constitutional right to "personal autonomy"; (iv) the Communication clause violates Ms. Smith's free speech rights in various ways, in violation of the First Amendment; and (iv) the Communication Clause constitutes a substantial burden on Ms. Smith's free exercise of religion, as guaranteed by the First Amendment, and does not survive strict scrutiny.

## ANALYSIS

The Court begins by recognizing certain facts that are not in dispute. As is clear under the Public Accommodations Law, the Colorado legislature has determined that discrimination against persons on the basis of sexual orientation is contrary to the public interest and thus, is

---

[4] Because the Court concludes that none of Ms. Smith's constitutional challenges have merit, it necessarily follows that she cannot establish a likelihood of success on the merits sufficient to support a preliminary injunction.

prohibited in this state.  This case does not invite this Court to weigh in on whether that law reflects sound policy or not.  Rather, it is simply a fact: it is an unlawful act for a person to discriminate against others on the basis of sexual orientation in Colorado in the circumstances covered by the Public Accommodations Law.

In addition, it appears to be undisputed that the act Ms. Smith wishes to engage in – posting the Statement on her website –would violate the Communication Clause.  Ms. Smith concedes that the Statement "indicates that the full and equal enjoyment of the services" that 303 provides "will be withheld from [potential customers] because of sexual orientation" - specifically, that same-sex couples could not hire 303 to design a website for their wedding, even though opposite-sex couples could.

The Court also emphasizes that it is not deciding whether Ms. Smith has a colorable constitutional right to refuse to provide wedding website services to same-sex couples.  That question implicates the Accommodation Clause of the Public Accommodations Law which is not challenged.[5]  Instead, in this action the Court is limited to analyzing the constitutionality of the application of the Communication Clause. Thus, the analysis is extremely narrow.  The Court assumes the constitutionality of the Accommodation Clause which prohibits discrimination against same-sex couples in the creation of wedding websites.[6]  The only question presented at this juncture is whether the Communication Clause unconstitutionally prohibits Ms. Smith from posting the Statement, which promises (or, if one would prefer, threatens) prospective customers

_____

[5]     The Court has already determined that Ms. Smith lacks standing to challenge anything other than the Communication Clause.

[6]     Whether Ms. Smith would adhere to the representations in the Statement by refusing to actually provide website services to same-sex couples if requested is irrelevant.  A violation of the Communication Clause occurs upon the posting of the offending notice or advertisement.

that she will refuse service to customers who wish her to create a wedding website for a same-sex wedding.

As to this issue the parties have stipulated to all pertinent facts, the Court applies the law to those facts to render a determination on the Plaintiffs' summary judgment motion. Fed. R. Civ. P. 56(a).

## A. Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Except as may be noted below, Ms. Smith generally bears the initial burden of making a *prima facie* showing that the Communication Clause infringes upon the various constitutional rights she invokes.  In certain circumstances, such a showing shifts the burden of proof to the Defendants to defend the constitutionality of the statute.

## B.  Equal Protection Clause

The Equal Protection Clause of the 14th Amendment requires the state to treat similarly-situated persons similarly, or to provide a sufficient justification for any dissimilar treatment.  As a result, an essential element of a claim of an Equal Protection violation is a showing that the plaintiff was similarly-situated to those persons that were treated more favorably.   To be "similarly-situated," the plaintiff's position must be identical to the comparators "in all relevant

respects," a particularly fact-intensive inquiry. *Grissom v. Roberts*, 902 F.3d 1162, 1173 (10th Cir. 2018).

Ms. Smith contends that the CCRC "ha[s] applied [the Communication Clause] only to expressive business owners like [herself] that disfavor messages promoting same-sex marriage," but, in contrast, has refused to cite business who refused requests by customers to produce products bearing a pro-religious message. Specifically, Ms. Smith points to:

• The fact that "the only business that [the CCRC has] prosecuted for declining to create speech promoting an unwelcome message is a Christian Bakery" – that is, Masterpiece Cake Shop.

• That the CCRC refused to prosecute several complaints by a patron whose requests to "secular cake artists" to create cakes with messages criticizing same-sex marriage, promoting white supremacist messages, and denigrating the Koran were denied.

• That the CCRC "does not apply [the Communications Clause] to expressive business owners that strongly advocate the acceptance of same-sex marriage and whose messages directly or indirectly indicate that requests from religious customers with opposing beliefs would be unwelcome or denied." The evidence Ms. Smith cites in support of this contention is a website of a Colorado photographer whose webpage included photographs from a same-sex wedding, along with text that states that praises the couple involved and states that "it's just unfortunate government & religion has not always recognized [same-sex marriage]."

None of the situations identified by Ms. Smith in her briefing involve comparators who are "similarly-situated" to her in all of the pertinent respects. Her citations to the CCRC's prosecution of Masterpiece Cake Shop, and its refusal to prosecute other bakers who refused to bake particular cakes, do not implicate the <u>Communication Clause</u>, the sole portion of Colorado law that Ms. Smith challenges here. Situations in which a commercial entity <u>actually</u> refused service to a customer implicate the Accommodation Clause, but the Court has dismissed Ms. Smith's Accommodation Clause challenge. Ms. Smith's claims here are limited to challenges under the Communication Clause, and she has not shown that the bakers she refers to "publish[ed]" any "notice or advertisement" like the Statement, indicating that certain classes of

individuals would be denied the full enjoyment of those bakers' services.  Thus, she is not similarly-situated to those bakers for purposes of an Equal Protection challenge to the Communication Clause.

She is also not similarly-situated to the photographer whose website promotes her willingness to photograph same-sex weddings.  The photographer's website's praise of same-sex weddings gives no indication whatsoever that the photographer would <u>refuse</u> to photograph an opposite-sex wedding (or, for that matter, a wedding between two religious adherents).[7]  Because the Communication Clause is only concerned with advertisements or messages that threaten to refuse services on discriminatory grounds, nothing in the photographer's website would violate the Communication Clause in any way.  Ms. Smith's own proffered Statement is unambiguous in stating that Ms. Smith intends to refuse her services to same-sex couples: "I will not be able to create websites for same-sex marriages."[8]  Thus, Ms. Smith is not similarly-situated to the photographer.  In the absence of evidence that a similarly-situated comparator has received more favorable treatment than Ms. Smith anticipates, the Defendants are entitled to summary judgment on her Equal Protection claim.

## C.  Due Process Clause

---

[7]     Although Ms. Smith's affidavit refers only to selected portions of the photographer's website highlighting same-sex weddings, a review of the photographer's "Portfolio" page shows that she has photographed the weddings of numerous opposite-sex couples.

[8]     Because Ms. Smith brings this case as an as-applied challenge, the Court will not speculate as to whether the outcome might be different if Ms. Smith's proposed Statement limited itself to reciting her faith in general terms, without stating an express or implied intention to refuse service to certain categories of individuals.  The Court examines only the Statement in its entirety as tendered.

Ms. Smith articulates two theories as to how the Communication Clause violates her rights under the Substantive Due Process Clause.[9]

The Court summarily rejects Ms. Smith's first challenge, which asserts that the Communication Clause is void for vagueness because its prohibition against notices or advertisements that indicate that a putative customer's patronage or presence "is unwelcome, objectionable, unacceptable, or undesirable" uses concepts that are so ill-defined as to invite the risk of arbitrary and discriminatory enforcement by the CCRC. Although the Court is unpersuaded by this argument, it need not reach it. Even if the Court were to agree that the quoted language in the Communication Clause were unconstitutionally vague and struck it, the remaining unchallenged portion of the Communication Clause would still suffice to render Ms. Smith's Statement unlawful. As noted above, Ms. Smith's Statement unambiguously states that she intends to deny certain services to individuals preparing for a same-sex wedding. Because unambiguous provisions of the Communication Clause clearly proscribe the message Ms. Smith seeks to convey, she cannot successfully challenge some other portion of the Communication Clause on vagueness grounds. *See Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144, 1151 (2017).

Ms. Smith's second argument is less well-defined, seemingly assembled from selective snippets extracted, without context, from various Supreme Court opinions. She asserts that she has a constitutionally-guaranteed "right to own and operate her own expressive business," and that the Communication Clause deprives her of that right. Her sources for such a claim are off-point. First, quoting *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972), she argues that the

---

[9]     Although her briefing refers to asserting Procedural Due Process claims as well, none of her theories fit squarely within that rubric. Thus, the Court has evaluated her arguments through the lens of the Substantive Due Process clause only.

Fourteenth Amendment confers upon her a constitutional right "to engage in any of the common occupations of life . . . and to worship God according to the dictates of [her] own conscience." The quoted passage is mere dicta, listing a variety of the rights that the Supreme Court has found to be secured by the concept of "liberty" guaranteed by the 14th Amendment; it also includes "the right of the individual to contract, . . . to acquire useful knowledge, to marry, establish a home and bring up children," and others. *Roth* certainly does not stand for the proposition that the 14th Amendment guarantees individuals the right to operate a business constrained only by their religious beliefs; rather, *Roth* held that a non-tenured university professor had no constitutionally-guaranteed interest in continued employment or renewal of his teaching contract, absent a showing that the state had stigmatized him or restricted his ability to obtain other work.

She also cites *Reno v. Flores*, 507 U.S. 292, 301-02 (1993), for the proposition that "when the government infringes upon such liberty interests" – presumably the interest in engaging in an occupation and worshipping God – "courts apply strict scrutiny." *Flores* does state that strict scrutiny review applies to governmental infringements on "certain fundamental liberty interests," but the very next sentence of *Flores* is even more germane here. It emphasizes that a Substantive Due Process analysis "must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Id.* *Flores* refused to find that juvenile immigration detainees who lacked available relatives had a constitutionally-guaranteed right to be released to the custody of other private custodians, rather than being detained in state child-care institutions. It further noted that "the mere novelty of such a claim is reason enough to doubt that substantive due process sustains it." *Id.* at 303. Thus, to the extent *Flores* has some relevance to this case, it is not in support of Ms. Smith's vague invocation of a constitutional

right to engage in a business that follows her religious beliefs instead of state law. Indeed, *Flores* suggests that the Court should exercise restraint in recognizing new constitutional rights worthy of protection under the Substantive Due Process clause. It is not enough to cobble together an asserted constitutional right from isolated sentences and clauses found scattered among various Supreme Court cases, and thus, the Court finds that Ms. Smith's vaguely-defined Substantive Due Process claim invoking her right to operate an "expressive business" constrained only by "the dictates of her own conscience" fails.

**D. "Personal autonomy"**

Ms. Smith's briefing also detours into an ill-defined claim that the Communication Clause infringes upon a judicially-recognized "right of citizens to have dignity in their own distinct identity," citing *Obergefell v. Hodges*, 135 S.Ct. 2584, 2596 (2015). She argues that if cases like *Obergefell* can afford constitutional protection to "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and belief," that same rationale should apply to protect "identity grounded in sincerely held religious beliefs" as well. The problem with this argument is that the Constitution already affords protections to religious beliefs pursuant to the Free Exercise and Establishment Clauses. There is little need to contort the principles underlying *Obergefell* – a case recognizing that the fundamental right to marry extends to same-sex marriages – into a new right protecting religious exercise when such protections exist within the First Amendment. Accordingly, to the extent any of Ms. Smith's claims invoke this claimed constitutional right to "personal autonomy" or "personal identity," they duplicate her other First Amendment challenges.

**E. Free Speech**

Ms. Smith offers several arguments as to why the Communication Clause violates the guarantee of Free Speech contained in the First Amendment. Several of those arguments, proffered before the Court dismissed her challenge to the Accommodation Clause, are no longer viable. For example, her argument that Colorado law impermissibly compels her to speak when she would prefer to remain silent might have been cognizable as a challenge to the Accommodation Clause – that is, if a customer had actually asked her to create a same-sex wedding website and she refused – but one can hardly say that the Communication Clause compels her to speak. To the contrary, the Communication Clause prohibits Ms. Smith from engaging in the very speech she wishes to engage in: posting her Statement. Thus, the Court ignores Ms. Smith's arguments that are not germane to the Communication Clause. Similarly, Ms. Smith offers extensive argument as to whether her creation of wedding websites, like the creation of cakes in *Masterpiece*, is itself expressive conduct entitled to constitutional protection. Again, because this case has been narrowed to address only the Communication Clause, the Court does not reach that issue. The sole question before this Court concerns the Statement that Ms. Smith wishes to post on 303's website. Thus, the Court turns to those arguments by Ms. Smith that are germane to that limited issue.

1. Content-neutrality

Ms. Smith's first pertinent argument is that the Communication Clause acts as an impermissible content-related restriction on her proposed speech in the Statement. As a general rule, the government is prohibited from regulating speech based upon its content or the particular message it conveys. Such content-based restrictions are presumptively unconstitutional, and the government bears the burden of showing that they are narrowly-tailored to serve compelling

governmental interests. *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992).

However, the Supreme Court has recognized that the government may engage in a content-based restriction to prohibit speech that proposes an illegal act or transaction. In *Pittsburgh Press Co. v. Human Relations Commn.*, 413 U.S. 376 (1973), the City of Pittsburgh's Human Relations Ordinance prohibited, among other things, discrimination in employment on the basis of sex. In furtherance of that proscription, the city's Human Relations Commission promulgated an ordinance that prohibited employers from "publish[ing] or circulat[ing] any notice or advertisement relating to employment . . . which indicates any discrimination because of sex," and further prohibited any person from assisting an employer in doing any act that violated the ordinance. The Commission prosecuted a newspaper publisher that published "help wanted" classified ads that were categorized separately as jobs of "Male Interest" and "Female Interest" based on the employer's specifications. The newspaper challenged the ordinance as violating the First Amendment. *Id.* at 378-80.

The Supreme Court rejected the newspaper's First Amendment challenge. It stated that "we have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." It conceded that unlawful sex discrimination might be "less overt" than those examples, but no different in principle: such discrimination was prohibited by the ordinance and the legality of such a prohibition was not subject to challenge in the case. The Court held that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the

commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id.* at 388-89.

More recently, the Supreme Court hinted that this same line of analysis remains viable (albeit under a somewhat different rubric). In *R.A.V.*, the Court implied that "sexually derogatory 'fighting words'" could be regulated by the government because they "may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." 505 U.S. at 389-90. *R.A.V.* suggested that such a regulation would be valid under the Court's "secondary effects" jurisprudence – that [w]here the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *Id.*

These cases suggest that the Communication Clause, although nominally content-based, nevertheless survives constitutional scrutiny (so long as the Accommodation Clause is constitutional, which this Court assumes it is for purposes of this ruling). Much as the extant law in *Pittsburgh Press* prohibited sex discrimination, it is undisputed here that Colorado law prohibits discrimination on the basis of sexual orientation in the provision of public accommodations like those provided by 303. Thus, Ms. Smith's Statement expressing her intention to engage in such discrimination, like the newspaper's advertising of sex-segregated jobs, is a statement promoting an act that is illegal. *Pittsburgh Press* makes clear that the government's ability to regulate unlawful economic activity allows it to prohibit advertisements of this type, even if it must do so by defining the prohibited message based on its content. *R.A.V.* reinforces this idea: the government may prohibit speech that would violate duly enacted anti-discrimination laws, even if it does so by reference to the speech's content, because the government's target is not the speech's "expressive content" but rather its tendency to cause the

prohibited discrimination.  The same concerns clearly underlie the Communications Clause here: the CCRC is not targeting Ms. Smith because of the expressive content of her Statement – that is, her professed love of weddings or even her belief that God calls her to make wedding websites. It targets her because her express statement that she "will not . . . create websites for same-sex marriages" is a specific promise to engage in unlawful discrimination against customers based on their sexual orientation. [10]  In such circumstances, the analysis of *Pittsburgh Press* (and the dicta of *R.A.V.*) make clear that the Communication Clause does not run afoul of the Free Speech clause of the First Amendment.

2. <u>Overbreadth</u>

Ms. Smith also makes a somewhat unclear argument that the Communication Clause is overbroad because it potentially applies to "newspapers, book publishers, printers, web designers, and other creative professionals who deal in pure speech."  She argues that these types of businesses – presumably of which she considers 303 to be one – "have the constitutional right to (1) create speech that accords with their beliefs; (2) solicit the expressive work they desire, and (3) decline to create speech with which they disagree."

This argument fails to hit the Communication Clause target.  The Communication Clause simply prohibits Ms. Smith from stating that she will not provide 303's wedding website services to same-sex couples.  It does not prohibit her form "solicit[ing] expressive work" – presumably wedding websites – generally, nor does it appear to prohibit her from "creat[ing] speech that accords with" her love of God or her view of the significance of marriage.  And, as noted above, noting in the Communication Clause compels her to "create" any speech that she might disagree

---

[10]     Once again, this Court expresses no opinion as to whether a differently-worded Statement might be analyzed differently.

with, it simply prevents her from stating her intention to unlawfully discriminate. As such, the Court sees no colorable overbreadth challenge that Ms. Smith can bring against the Communication Clause.

### 3. Free speech vs. Nondiscrimination laws

Finally, Ms. Smith argues that "where free speech and nondiscrimination laws come into conflict, free speech wins," and thus, the Court should strike down any anti-discrimination law, including the Communications Clause, that purports to prohibit or regulate otherwise expressive speech. Pithy as it may be, Ms. Smith's argument is not an accurate statement of the law.

Cases like *Pittsburgh Press* make clear that the government's interest in eradicating unlawful discrimination trumps the free speech rights of a person who wishes to advertise their willingness to unlawfully discriminate. Similarly, statutes like Title VII may expose a speaker or employer to liability for engaging in discriminatory remarks or comments that could be argued to constitute protected First Amendment speech, yet no court has ever declared that Title VII must yield to a speaker's constitutional right to utter discriminatory speech in the workplace. In *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984), an employer accused of discriminating against female candidates for partnership argued that Title VII's anti-discrimination policies violated its First Amendment right to freedom of association. The Supreme Court disagreed, explaining that "invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *See also Baty v. Willamette Industries, Inc.*, 172 F.3d 1232, 1246 (10th Cir. 1999) (" Title VII, in general, does not contravene the First Amendment"); *R.A.V.*, *supra* (acknowledging that Title VII's anti-discrimination requirements might justify content-based restrictions on otherwise-protected speech).

To be sure, there have been occasions where First Amendment speech or associational rights have been found to prevail over the application of state anti-discrimination laws. In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court weighed the tension between a state law requiring non-discrimination on the basis of sexual orientation in public accommodations and the free expression rights of the organizers of a St. Patrick's Day parade who refused to allow a unit of gay and lesbian marchers to participate. The trial court ruled in favor of the marchers, ordering the organizers to allow the marchers in the parade. On appeal, the Supreme Court reversed. It drew a careful distinction between the public accommodation of the parade itself – which gay and lesbian individuals could participate in as, say, members of marching bands or other social groups invited to march – and the organizers' message embodied by the parade as a whole. "The state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation," the Court explained, such that "any contingent of protected individuals with a message would have the right to participate in petitioners' speech." Doing so would deprive the organizers of the ability to choose the content of the message the parade was to convey. 515 U.S. at 573. The Court acknowledged that the anti-discrimination law in question served a valuable purpose in ensuring that gay and lesbian individuals would have equal access to public accommodations, but held that it could not be applied to expressive activity where "its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose." *Id.* at 578.

But *Hurley* acknowledges limits in application of its teachings. It notes that "the State may at time prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information," expressly citing *Pittsburgh*

*Press*, among others. 515 U.S. at 573. *Hurley* states that "outside that context" – commercial advertising – the government "may not compel affirmance of a belief with which the speaker disagrees," implicitly suggesting that <u>within</u> the realm of commercial advertising, the state may require a speaker to acknowledge the state's non-discrimination objectives (even if the speaker does not subjectively believe in them). *Id.* Here, the Communications Clause is expressly directed at advertising and other written promotional messages concerning public accommodations and services. Measured by the Supreme Court's reasoning, Ms. Smith's claims fall within the ambit of *Pittsburgh Press* analysis, rather than that found in *Hurley*. As explained above, *Pittsburgh Press* holds that an advertiser's speech rights must yield to the state's anti-discrimination interests. Because Ms. Smith's posting of the Statement occurs in the context of advertising or promoting the business of 303 (and not, say, in Ms. Smith's own private website or social media page), the same result applies. Thus, Ms. Smith's free speech challenge to the Communication Clause fails.

### F. Free Exercise

Finally, the Court comes to that portion of the First Amendment that guarantees Ms. Smith the right to engage in the free exercise of her religious beliefs. The Court accepts as true that Ms. Smith's objections to same-sex marriage derive from her religious beliefs and are sincerely held. The Court will also assume (without necessarily finding) that the Communication Clause's prohibition against Ms. Smith announcing the effects of her religious beliefs via 303's advertising constitutes a substantial burden on Ms. Smith's exercise of her religious beliefs.

The level of scrutiny applied to a state law like the Communications Clause depends on whether the law is one of general applicability whose burden on religious exercise is only incidental or whether the law is one that specifically seeks to regulate conduct <u>because</u> of that

conduct's religious motivation.  That distinction is aptly demonstrated by *Employment Division v. Smith*, 494 U.S. 872 (1990) and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

In *Smith*, the plaintiff was an adherent of the Native American Church.  He participated in rituals of that church that included followers ingesting peyote, a psychedelic plant that was regulated by federal and state law as a controlled substance.  When his employer, a drug rehabilitation organization, learned of his peyote use, it terminated his employment.  The plaintiff then applied for unemployment benefits from the State of Oregon, but the state found that his unlawful use of a controlled substance constituted "misconduct" that disqualified him from receiving such benefits.  The plaintiff sued the state, arguing that denial of benefits violated his free exercise rights under the First Amendment.  In assessing the interplay between the state law prohibiting the use of controlled substances and the plaintiff's use of peyote in exercise of his religious beliefs, the Supreme Court began by recognizing that a state would likely be violating the First Amendment if it prohibited certain acts – such as the use of a particular substance – "only when they are engaged in for religious reasons or only because of the religious belief that they display."  494 U.S. at 877-78 (emphasis added).  But it drew a distinction between that situation and a state law requiring "an individual to observe a generally applicable law that requires (or forbids) the performance of an act that his religious beliefs forbid (or requires)."  *Id.* at 878.  In the latter situation, the Court explained, "prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision."  *Id.*  Because the prohibition on the use of peyote was a law of general applicability, applying to all persons in Oregon and enacted for reasons unrelated to religious suppression, the Court affirmed the denial of benefits to Mr. Smith, even though the

*law* had the incidental effect of suppressing his religious exercise.  Put differently, the Court refused to grant Mr. Smith a religious exemption to an otherwise valid law of general applicability.

In *Lukumi*, the religion in question was Santeria, a faith whose rituals included the practice of animal sacrifice.  When members of the church announced an intention to found a house of worship in the city of Hialeah, Florida, city officials expressed "concern . . . that certain religions may propose to engage in practices which are inconsistent with public morals, peace, and safety."  Thereafter, the city enacted several ordinances that prohibited, among other things, the killing of an animal "in a public or private ritual or ceremony not for the primary purpose of food consumption."  The church sued to overturn the ordinances as a violation of its free exercise rights.  The Supreme Court summarized its prior rule in *Smith* as stating that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  508 U.S. at 531.  But it held that a law that was <u>not</u> both "of general applicability" and "neutral" would be subject to strict scrutiny, requiring the government to demonstrate a compelling interest and narrow tailoring.  The Court found that the ordinances in question were not "neutral," because they were specifically directed at animal sacrifices <u>because of</u> their religious motivation, hence the city's use of words like "ritual" and "sacrifice."  The Court also found that the law was not one of "general applicability," because they were carefully drafted only to target religiously-motivated animal killings and not, say, animal killings resulting from sport fishing and the euthanizing of stray animals.  Thus, the Court held that the ordinances should be subject to strict scrutiny and, upon such scrutiny, struck them down.

Here, there Communication Clause is both neutral and of general applicability. Unlike the ordinances in *Lukumi*, there is no suggestion that it is not neutral – that is, that it was specifically enacted in response to and with the purpose of frustrating anyone's religious exercise. In 2008, the Colorado legislature added sexual orientation as a prohibited basis for discrimination in Colorado's existing anti-discrimination framework governing public accommodations, housing, employment, club licensing, juror service, and various other incidents of daily life. 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-022). The parties have not proffered any legislative history that addresses the reasons for the legislature's actions in 2008, although it is notable that Section 1 of S.B 08-200 provides that "the general assembly hereby finds, determines, and declares that nothing in this act is intended to impede or otherwise limit the protections contained in section 4 of article II of the state constitution concerning the free exercise and enjoyment of religious profession and worship," suggesting that the legislature's goal was <u>not</u> to suppress religious exercise.

Moreover, the Communications Clause has general applicability, regulating the statements that discriminate against same-sex couples regardless of whether such statements are based on religious or other beliefs. There is nothing inherent in discrimination on the basis of sexual orientation that suggests that such a practice is necessarily linked to a particular religion or with religion itself. The Communications Clause is equally applicable to sexual orientation discrimination that arises from purely secular prejudices – for example based on fears that homosexuals will transmit HIV/AIDS, will transmit homosexuality itself, will attempt to "convert" heterosexuals to a "gay lifestyle", will engage in pederasty or rape or other forms of sexual licentiousness, will cause society's extinction because they do nor reproduce, and so on. Such views can exist independently from any religious belief. Thus, a law that seeks to eradicate

sexual orientation discrimination is not inherently a law that targets religious exercise; rather, it is a law of general applicability that only incidentally affects those whose opposition to same-sex marriage springs from religious, not merely secular, objections.

Neutral laws of general applicability will be upheld against First Amendment challenge if the government demonstrates that the law is rationally related to a legitimate governmental interest. *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006). Ms. Smith does not contend that the Communication Clause does not satisfy this deferential standard. Indeed, states have a paramount interest in protecting historically-disfavored groups from discrimination in the provision of public services.[11] *See e.g. R.A.V.*, 505 U.S. at 395 (stating that "we do not doubt" that the state interests in "ensur[ing] the basic human rights of members of groups that have historically been subjected to discrimination . . . are compelling"); *Board of Directors of Rotary Intl. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (recognizing compelling state interest in "eliminating discrimination against women"). If the state's interest in preventing discrimination on the basis of sexual orientation is compelling, it necessarily must follow that the state has a similarly-compelling interest in preventing persons or businesses from threatening to do that which the law prohibits. For example, the state's interest in prohibiting businesses from engaging in racial discrimination would be rendered a mockery if businesses could nevertheless post a "WHITES ONLY" sign near the entrance to the business with the intent of discouraging patronage, even if the proprietors agreed to admit any minority individuals who dared to ignore the sign and seek entrance. Thus, the Court finds that the

---

[11]     Ms. Smith has not argued that the State of Colorado's decision to extend anti-discrimination protection on the basis of sexual orientation presents a less compelling governmental interest than does extending anti-discrimination protections to other protected classes. Cases like *Obergefell* and *Lawrence v. Texas*, 539 U.S. 558 (2003), make it abundantly clear that same-sex couples enjoy the same rights to equal protection of the laws as others.

Communication Clause is supported by an important (indeed, compelling) state interest in discouraging discrimination against protected groups.  For the same reasons, the Court also finds that the Communication Clause is rationally related to the state's interest in discouraging discrimination in the provision of public accommodations and business services.[12]

Accordingly, Ms. Smith cannot show that the Communication Clause violates her free exercise rights under the First Amendment.

### G.  Order to Show Cause

---

[12]    Were the Court to instead apply strict scrutiny analysis to the Communication Clause, as Ms. Smith proposes it should, its conclusion would remain the same. The state's interest in discouraging discrimination in public services is not only important, it is also compelling. Although the parties offer a minimal factual record on this point, the Court is hard-pressed to conceive of a less-restrictive means by which the state could serve that interest than by prohibiting business owners from advertising their intention to engage in acts of discrimination that are prohibited by law.

Ms. Smith proposes that Colorado could impose less-restrictive measures by, say, applying the Communication Clause only to threats by business owners to discriminate in providing employment, rather than other services.  (Ms. Smith distinguishes between "the means by which citizens support their families" and "pure luxur[ies]" such as wedding websites.)  But in doing so, she ignores the scope of the Accommodation Clause.  The state's compelling interest in it is to ensure that citizens can access all types of public accommodations without discrimination. It makes no distinction between necessary and luxury services.  Because the Court must assume its constitutionality, and it is evident that the Communications Clause is designed to serve the same purposes, the measures that Ms. Smith suggests would be impermissibly narrow.

Ms. Smith also suggests that the state does not need a Communication Clause for industries where there are many competing providers and "powerful market forces weigh in favor" of those businesses providing services without discrimination.  In short, Ms. Smith suggests that because there are many wedding website providers who don't discriminate on the basis of sexual orientation, same-sex couples would not be harmed if only she (and presumably like-minded website creators) were allowed to promote their intention to do so.  As the Court explained in *Fulton v. City of Philadelphia*, ___ F.3d ___, 2019 WL 1758355 (3d. Cir. Apr. 22, 2019), "[t]he government's interest lies not in maximizing the number of establishments that do not discriminate against a protected class, but in minimizing—to zero—the number of establishments that do."  Thus, exempting Ms. Smith from the Communication Clause simply because she is one of only a few business owners that wish to engage in unlawful discrimination is not a less-restrictive means of achieving the state's compelling interest in eradicating discrimination altogether.

Pursuant to Fed. R. Civ. P. 56(f), where consideration of a motion for summary judgment appears to indicate that not only should the motion be denied but that it may also be appropriate to enter judgment in favor of the <u>non-movant</u>, the Court should give the parties notice and an opportunity to be heard as to why such judgment should not be entered.

Here, the parties represented to the Court on January 11, 2017 that all of the pertinent evidence necessary for resolving the motions for injunctive relief and summary judgment were undisputed and that the matters could be decided entirely on briefs. Having now had the opportunity to consider the parties' stipulated facts, and in light of the analysis above, it would appear to the Court that it is appropriate to enter summary judgment in favor of the <u>Defendants</u> on all claims. Accordingly, within 21 days of this Order, the Plaintiffs shall show cause why summary judgment should not be entered in favor of the Defendants.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** the Plaintiffs' Motion for Preliminary Injunction (**# 6**) and Motion for Summary Judgment (**# 48**).

Dated this 17th day of May, 2019.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge