UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-02372-PAB

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

    *Plaintiffs,*

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
SERGIO RAUDEL CORDOVA,
CHARLES GARCIA,
GETA ASFAW,
MAYUKO FIEWEGER, and
DANIEL S. WARD, as members of the Colorado Civil Rights
Commission, in their official capacities, and
PHILIP J. WEISER, Colorado Attorney General,
in his official capacity,

    *Defendants.*

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES AND COSTS**

---

## INTRODUCTION

Plaintiffs (Smith) filed this case in 2016. After seven years, two trips to the Tenth Circuit, and several rulings by this Court, the U.S. Supreme Court declared that Colorado could not apply its Anti-Discrimination Act (CADA) to force Smith "to speak in ways that … defy her conscience." *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023). The journey was long, complex, and ground-breaking. Colorado (and later the United States) raised legal obstacles at every turn—from abstention, standing, and remedies to claiming that an "unbroken" line of cases defeated Smith's legal position. No attorney in Colorado was willing and able to trek that

1

trail to reach this victory. Meanwhile, Smith's attorneys have collectively argued 18 cases before the Supreme Court, regularly practice there, and have national First Amendment expertise. For these reasons, Smith's counsel and staff are entitled to reasonable fees and costs totaling $1,969,981. The parties tried to but could not resolve these issues. D.C.COLO.LCivR. 7.1.

## ARGUMENT

A prevailing civil-rights party may recover reasonable attorney's fees and costs. 42 U.S.C. § 1988(b). Smith is already the prevailing party.[1] Docket No. 125 at 14–18; Docket No. 128 at 5. That leaves her attorneys' fees and costs. To calculate reasonable fees, courts multiply (I) the number of reasonable hours worked by (II) a reasonable hourly rate to arrive at (III) the lodestar. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). Applying that formula, Smith's requested fees are reasonable. And (IV) so are her requested costs.

**I.    Smith's counsel expended reasonable hours to litigate this case.**

Determining reasonable time is an art, not a science. Several considerations color the analysis. Those include the complexity of the case, "maneuvering" by the other side, time spent on each task, time ordinarily billed to clients, and billing judgment. *Robinson*, 160 F.3d at 1281. To see the whole picture, courts often take a step back and look at "the most critical" focal point of the tableau—"the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

From that perspective, Smith's requested time is reasonable. She obtained the relief she sought. Docket No. 125 at 16. And the Supreme Court adopted many of her arguments. Scruggs Decl. ¶ 54. Smith's requested time is also reasonable because (A) her case was complex; (B) her success demanded many hours in

---

[1] Smith is not seeking reimbursement for the hours associated with her first appeal. Docket No. 128 at 5; Scruggs Decl. ¶ 83. But she reserves the right to submit a request for fees-on-fees incurred after July 15, 2024. Scruggs Decl. ¶ 78.

2

litigation; and (C) her counsel exercised judgment to reduce the total request. Charts 1–4 summarizes the time billed, reduced, and sought by each attorney and staff member. *See* Scruggs Ex. 4. In short, Smith claims 2,174.4 hours in total.

### A. Smith's case involved complex legal theories and procedures.

When this case was filed, success was uncertain. The case remained complex throughout. And Smith prevailed only after winning at the Supreme Court. All of that demanded significant time. Consider this background.

In 2008, a New Mexico agency sanctioned a wedding photographer for violating its public-accommodations law. Scruggs Decl. ¶¶ 21–24. Following its lead, many agencies and courts ruled that public-accommodations laws could compel artists to create custom expression that violated their beliefs. *Id.* Colorado was no different. Just the year before Smith filed her suit, the Colorado Court of Appeals held that CADA could force a cake artist to celebrate a view of marriage that contradicted his beliefs. *Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015). Over time, the legal landscape shifted as courts adopted divergent approaches. Scruggs Decl. ¶¶ 27–34. This unsteady terrain increased the expended hours by adding obstacles that had to be navigated before the case was filed and then retraced throughout the litigation. It shows the complexity of Smith's First Amendment arguments. And it displays that "thoughtful jurists strongly disagreed" about how to resolve the issues presented here, *Robinson*, 160 F.3d at 1282—including jurists on the Tenth Circuit and Supreme Court, *303 Creative*, 600 U.S. at 603–40 (Sotomayor, J., dissenting); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1191–1215 (10th Cir. 2021) (Tymkovich, J., dissenting). *Cf.* Scruggs Decl. ¶¶ 36–54.

Citing some of these decisions, Colorado consistently argued that "unbroken" Supreme Court precedent undermined Smith's First Amendment arguments.

3

Scruggs Decl. ¶ 25. Many organizations filed amicus briefs supporting Colorado's position. *E.g.*, *303 Creative*, 6 F.4th at 1178, 1180 (citing adverse amicus curiae).

The doctrines of standing and ripeness added complexity. To be sure, parties regularly file pre-enforcement suits. But Smith still had to prove that her case satisfied standing factors unique to pre-enforcement suits. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). Smith also had to present a "sufficiently developed" record and demonstrate "hardship" in ways special to suits like hers. *Id.* at 167. Those facets enlarged the reasonable amount of time spent on this litigation. *Cf. Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1251 (10th Cir. 1998) (suggesting hours may increase "when the litigation involves particularly difficult questions of standing, mootness, or ripeness").

Colorado's strategy added to these difficulties. Colorado contested Smith's standing and ripeness at each step of this litigation—including in its merits briefing before the Supreme Court. Smith thus had to address (or be prepared to address) standing and ripeness in every brief and oral argument. *E.g.*, Transcript of Oral Argument (Transcript) at 5, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (No. 21-476), https://bit.ly/4cdIvFu ("Counsel, would you spend just a few minutes on whether or not this -- your case is ripe?").

Once at the Supreme Court, the complexity compounded. Prominent individuals and organizations filed 27 amicus briefs opposing Smith's legal position. Scruggs Decl. ¶¶ 43–44. The United States Office of the Solicitor General also intervened against Smith, filed a brief, and supported Colorado. *Id.* at ¶¶ 45–48. That office is uniquely adept at arguing before the Supreme Court and appears there often. *Id.*; Browning Decl. ¶ 37. Familiarity breeds success. One study showed that a party's win probability at the Supreme Court increased by thirteen percent if the office sided with that party. Scruggs Decl. ¶¶ 45–48.

4

Outside the courtroom, well-known scholars, politicians, and commentators debated the case in articles and op-eds. *The Atlantic* described *303 Creative* as "the most consequential First Amendment case this term." David French, *The Most Consequential First Amendment Case This Term*, The Atlantic (Dec. 2, 2022), https://bit.ly/3SaydxL. President Biden issued a press release after the Court ruled. *Statement from President Joe Biden on Supreme Court Decision in* 303 Creative LLC v. Elenis, The White House (June 30, 2023), https://bit.ly/3S7IScA. David Cole of the ACLU and law professors commented about the case in outlets like the New York Times and NPR. Scruggs Decl. ¶ 43. And both law schools in Colorado held events featuring the case.[2] These debates reflect the importance of the issues here.

All told, Smith's case "generated reams of legal analysis," attracted dozens of "amici briefs," required extensive briefing, and convinced—not just "tempted"—the Supreme Court to hear it. *Robinson*, 160 F.3d at 1282. "This procedural history unequivocally demonstrates that this case was far from 'simple'"—and justifies the billable hours request here. *Id.*

B.  **Smith obtained exceptional success in this high-stakes case.**

Smith's counsel's time was "'necessary' under the circumstances." *Robinson*, 160 F.3d at 1281; Thompson Decl. at ¶¶ 12–21 (confirming the time billed was reasonable based on his Supreme Court litigation experience). Necessity turns on "the vigor which the opponents bring to the dispute." *Robinson*, 160 F.3d at 1284. Complexity also goes hand-in-hand with necessity. *E.g.*, *Ramos v. Lamm*, 713 F.2d 546, 554 n.3 (10th Cir. 1983) ("If the complexity of a case demands an extraordinary number of hours to perform a task, those hours are properly billable."). On both

---

[2] *Panelists to discuss Supreme Court decision, LGBTQ+ communities Oct. 25*, CU Boulder (Oct. 17, 2023), https://bit.ly/3WmVoY3; *Defending Colorado's Anti-Discrimination Laws at the Supreme Court: Eric Olson Speaks on 303 Creative*, American Constitution Society (Apr. 20, 2023), https://bit.ly/3Lr7hpM.

counts—vigor and complexity—this case scores high marks. Especially once Smith's case rose to the Supreme Court, the "crucible of case-by-case litigation" became uncommonly hot. *United States v. Mariscal*, 285 F.3d 1127, 1132 (9th Cir. 2002). A small sliver of an error at the district court could have become an irreparable fracture at the Supreme Court. *E.g.*, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397–99 (2024) (remanding without addressing merits for the lack of sufficient details in pleadings and briefs about relief sought). Take three examples: (a) oral arguments; (b) the parties' briefs; and (c) amicus briefs.

Smith's counsel presented oral arguments before this Court, the Tenth Circuit, and the Supreme Court. Each court referenced counsels' statements at those arguments for at least one substantive point. *See 303 Creative*, 600 U.S. at 580, 592–93, 595; *id.* at 624–25, 630, 632 (Sotomayor, J., dissenting); *303 Creative*, 6 F.4th at 1192, 1192 n.2, 1201, 1210 (Tymkovich, J., dissenting); Docket No. 52 at 9 (referencing Colorado's counsel's statement at the "January 11 hearing" to confirm Smith's standing to challenge the Communication Clause). Because spur of the moment responses have lasting litigation consequences, Smith's counsel reasonably expended much time preparing for these oral arguments. Such preparation rationally included assigning research projects, participating in moot courts, individualized study for the advocate, and other preparations. Thompson Decl. ¶ 19.

The parties' briefs were equally crucial. The Tenth Circuit and the Supreme Court quoted and cited them liberally. *See 303 Creative*, 600 U.S. at 590, 592–94, 598; *303 Creative*, 6 F.4th at 1172–79. Again, because any phrase could become part of the ruling and affect the outcome, Smith's counsel took special care on each brief. That time was reasonable in the context of the case's procedural and substantive complexities, particularly once it reached the Supreme Court.

Smith's petition for a writ of certiorari demanded unique attention. Such petitions are nuanced, complicated, and unlike any other kind of legal filing in the

United States. The Supreme Court receives around 7,000–8,000 petitions each year. Browning Decl. ¶ 36. The Court grants about eighty of them (or 1%). *Id.* With those odds, there's no room for error. Any extra time spent on the petition was reasonable, especially because a grant of certiorari was Smith's last available means for relief.

Finally, the amicus briefs were influential. Smith cited some and refuted others in her merits briefing at the Supreme Court. The Tenth Circuit and the Supreme Court relied on them as well. *303 Creative*, 600 U.S. at 589–90, 591 n.2, 601 n.7; *303 Creative*, 6 F.4th at 1178–81, 1189. And they came up several times during the Supreme Court oral argument. *See* Transcript at 32, 42, 72–73, 97. Given this, Smith's counsel sensibly reviewed the amicus brief in detail, summarized them, incorporated them into briefing, and came prepared to discuss them at argument. All that took time. But that time was well spent.

### C. Smith's counsel exercised reasonable billing discretion on tasks normally attributable to the client.

Smith's requested hours are also reasonable because her counsel exercised billing discretion and billed for tasks normally billable to a client. In proposing hours, a fee applicant "should exercise billing judgment" to "winnow[]" the "hours actually expended down to hours reasonably expended." *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1257 (10th Cir. 2005). Smith's counsel has done that.

Smith's counsel reviewed and adjusted various time entries for timekeepers in this case to ensure reasonable time was spent on each billed task. Scruggs Decl. ¶¶ 78–92. For example, Smith only requests reimbursement for 2,174.4 hours of time from a total of 3,374.9 billed hours (a 36% overall reduction). *Id.* at ¶¶ 88–90; Scruggs Exs. 2 & 4 Chart 2. In cutting that time, Smith's counsel reduced or zeroed out duplicative time entries; time claimed for tasks like research, drafting briefs, and oral-argument preparation; time spent by attorneys who helped with moot courts and oral-argument preparation; and time for many internal communications.

7

Scruggs Decl. ¶¶ 78–92. Even before submitting the requested hours, Smith's counsel entirely eliminated well over one thousand hours spent on case-related tasks like legal research, drafting memorandums of law on peripheral issues, brief-writing, internal strategy meetings, administrative or clerical jobs, media presentations, and other work. *Id.* at ¶ 82.

And Smith is not pursuing *any* time for several attorneys who conducted research, reviewed amicus briefs, and performed other tasks for this case. *Id.* at ¶ 84. Eliminating their time crops 338.3 hours. *Id.* at ¶ 85–86; Scruggs Ex. 2.

Smith's counsel also cost-effectively litigated this matter. The parties stipulated to facts which obviated the need for time-consuming discovery. Docket No. 49. In assigning work like research and brief drafting in this Court and the Tenth Circuit, Smith's counsel delegated matters to lower-rate billing personnel when possible and appropriate to save costs. Scruggs Decl. ¶¶ 78–79.

That calculus changed at the Supreme Court. There, Smith's counsel relied on seasoned attorneys with prior Supreme Court experience. *Id.* at ¶ 80. This choice was reasonable considering the complexity of Supreme Court litigation. Thompson Decl. at ¶¶ 12–21. It was also reasonable because the Office of the Solicitor General joined Colorado at the Supreme Court. So Smith's counsel had to match experience with experience. To account for that choice, Smith trimmed the billed time of other attorneys who assisted with the Supreme Court litigation, but who lacked equivalent experience in that court. Scruggs Decl. ¶ 88; Scruggs Ex. 4 Chart 4.

All this provides "ample evidence that plaintiffs' counsel appropriately exercised billing judgment." *Echon v. Sackett*, 2019 WL 8275344, at *15 (D. Colo. Feb. 12, 2019) (finding civil-rights counsel used discretion with similar reductions).

**II. Smith's counsel's and staff's rates are reasonable because of their expertise and the lack of comparable attorneys in Colorado.**

Smith's counsel also request a reasonable hourly rate based on their expertise and the lack of comparable lawyers in Colorado. In typical cases, courts peg rates by determining what "lawyers of comparable skill and experience" in the market "charge for their time." *Ramos*, 713 F.2d at 555. But in atypical cases—like ones where the issue is "so unusual or requires … special skills"—courts may award out-of-market rates. *Okla. Intrastate Transmission, LLC v. 25 Foot Wide Easement*, 908 F.3d 1241, 1247 (10th Cir. 2018) (cleaned up); *see also Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1229 (10th Cir. 2009). This case (A) is "unusual" and required skills and resources that few, if any, willing in-state attorney possessed. In turn, Smith's requested rates are reasonable (B) in Denver for the Colorado litigation and (C) in Washington, D.C. for the Supreme Court litigation.

**A. High-end and out-of-market rates are justified here.**

Top-end and out-of-market rates may apply when "no one" in the market could offer analogous representation or when the case demands unique "expertise." *Okla. Intrastate Transmission, LLC*, 908 F.3d at 1247. Such awards are peculiarly appropriate when the case presents "esoteric issues of constitutional law," when "the law" is "not well developed," and when "specialized knowledge and skills in the areas of … the First Amendment, and appeals in the federal courts of appeal" may be invaluable. *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.* (*RMCC*), 2010 WL 3703224, at *5 (D. Colo. Sept. 13, 2010). *Accord Animal Legal Def. Fund v. Kelly*, 2020 WL 4000905, at *7 (D. Kan. July 15, 2020) (similar). Those considerations apply here.

For example, Scott Browning—a partner at Husch Blackwell with over twenty-five years of relevant experience—often serves as outside counsel for religious organizations across the country. Browning Decl. ¶¶ 9–20. When his

9

clients confront "complex …religious liberty and constitutional questions," he often turns to "outside counsel with the expertise to handle those disputes." *Id.* at ¶¶ 17–21. He has found that few lawyers in the *country* are equipped to handle those issues. *Id.* at ¶¶ 22–25. This already arid pool dries up considerably when the case requires an appeal or raises an issue that divides courts. *Id.* at ¶¶ 20–22, 48–50.

What's more, attorneys in small and large firms in Colorado likely would not have been able to represent Smith. Theresa Sidebotham owns a small firm that specializes in constitutional law and appeals. Sidebotham Decl. ¶¶ 4–7. But it would not have been "economically or practically feasible" for her firm—or other "small-to-mid-sized" law firms—to represent Smith. *Id.* at ¶¶ 8–10. Jeremy Moseley has practiced at large law firms in Denver during his career. Moseley Decl. ¶ 2. In his experience, "it would be extraordinarily difficult, if not impossible," to convince "experienced counsel" at a large law firm to accept the case due to its "controversial subject matter," "the longevity and complexity of the litigation," and internal pro bono approval processes. *Id.* at ¶ 12–13. Large law firms' past amicus practice in this case and *Masterpiece* bolster that insight. Gajdzis Decl. ¶¶ 18–24.

Even if Colorado counsel were willing, none possess Smith's counsel's First Amendment Supreme Court experience. Sidebotham Decl. ¶ 11; Nussbaum Decl. ¶ 12; Browning Decl. ¶¶ 52–57, 73–77. By one count of Colorado appellate lawyers included in distinguished 2023 lists, only two argued before the Supreme Court between 2015 and 2023—the roughly relevant dates for Smith's case. Gajdzis Decl. ¶¶ 7–17. One attorney is not admitted in Colorado. *Id.* ¶ 16. The other represented Colorado at the Supreme Court in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), and took legal positions adverse to Smith's. *Id.* ¶ 17. He would have been an unlikely candidate to represent her.

Meanwhile, Smith's counsel and staff are First Amendment experts with a successful Supreme Court practice. Scruggs Decl. ¶¶ 11–56; Waggoner Decl. ¶ 8;

Cortman Decl. ¶¶ 9–10; Browning Decl. ¶¶ 52–57. Members of her legal team have argued a combined 18 times before the Supreme Court, served as co-counsel in other Supreme Court cases, collectively argued dozens of times before federal courts of appeal, litigated hundreds of First Amendment cases, obtained clerkships, and litigated many cases presenting similar issues to Smith's case—i.e., how the First Amendment intersects with public accommodations laws—including *Masterpiece Cakeshop*.[3] Some of those cases were pre-enforcement actions that confronted standing and ripeness arguments like Colorado raised here. Scruggs Decl. ¶ 12. And Smith's attorneys regularly communicate with public and academic audiences about First Amendment issues. *E.g., id.* at ¶ 13; Gray Decl. ¶ 5; Hawley Decl. ¶¶ 20–22; Neihart Decl. ¶ 15; Waggoner Decl. ¶ 12–13.

These experiences were brought to bear here. They uniquely qualified Smith's legal team to successfully litigate her case. And they justify two sets of rates. Denver rates for the Colorado litigation in this Court and the Tenth Circuit. And Washington, D.C. rates for the Supreme Court litigation.

### B.     The Denver-market rates are reasonable.

Smith's counsel and staff request a reasonable Denver rate for the Colorado litigation. Smith's "attorneys and non-attorney staff have excellent skills, experience, and reputations," engage in a "niche practice," and litigated this "high stakes" case. *Curtis Park Grp., LLC v. Allied World Specialty Ins. Co.*, 2023 WL 5624981, at *6 (D. Colo. Aug. 31, 2023) (cleaned up). Those elements warrant "the high end of rates charged in Denver." *Id.* (cleaned up). Chart 5 lists their Denver rates. *See* Scruggs Ex. 4. The rates are reasonable based on Colorado's market. *See*

---

[3] *See* Anderson ¶¶ 4–13; Bursch Decl. ¶¶ 5–19; Barnett Decl. ¶¶ 5–15; Cortman Decl. ¶¶ 5–14; Eville Decl. ¶¶ 4–8; Hawley Decl. ¶¶ 3–23; Francisco Decl. ¶¶ 3–20; Gray Decl. ¶¶ 3–15; Green Decl. ¶¶ 6–15; Neihart Decl. ¶¶ 5–16; Perske Decl. ¶¶ 3–8; Peterson Decl. ¶¶ 3–7; Rouleau Decl. ¶¶ 3–13; Scruggs Decl. ¶¶ 6–19, 56–78; Tedesco Decl. ¶¶ 3–18; Waggoner Decl. ¶¶ 2–13; Warner Decl. ¶¶ 5–17.

*id.* at *7 (awarding rates between $940/hour to $225/hour for attorney and non-attorney staff); *Realtime Adaptive Streaming LLC v. Sling TV L.L.C.*, 2022 WL 4356897, at *3 (D. Colo. Sept. 19, 2022) (discussing rates of $900/hour and $685/hour). Browning also justifies them.

He has decades of experience and works with attorneys across the country on religious freedom matters. Browning Decl. ¶¶ 9–27. On a monthly basis, he reviews bills of other lawyers and staff at his firm, as well as the invoices of roughly a dozen outside law firms. *Id.* at ¶ 16. He drew on this experience to determine the market-value rates of Smith's counsel and staff. *Id.* at ¶ 26.

Browning also considered the skill and experience of Smith's counsel, the complexity of this case, and the quality of Colorado's representation. *Id.* at ¶¶ 29–39; 52–77. He compared these features to attorneys in his practice group and nationally experienced lawyers. *Id.* Despite his background, he found it difficult to identify Denver attorneys with "comparable skill" because none matched Smith's counsel's unique skillset. *Id.* at ¶ 48. Evaluating this information, Browning set Smith's counsel's and staff's rates in the Denver market. *Id.* at ¶¶ 78–86.

These rates are *less* than those charged by Colorado's *303 Creative* prior counsel. *See Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1267 (D. Kan. 2017) ("The Court may properly consider the rate of opposing counsel when setting reasonable hourly rates."). For example, Eric Olson argued on behalf of Colorado at the Supreme Court, and he and Isabel Broer signed the merits briefing. Scruggs Decl. ¶ 63. They now practice at a small law firm. Scruggs Ex. 5 Olson Decl. ¶¶ 10, 16–17. After recently winning a trial in Denver, Olson requested rates of $1,300 an hour for himself and $850 an hour for Broer. *Id.* Olson described these rates as "more than reasonable" based on his "five years" as Colorado's Solicitor General, prior practice, and market research. *Id.* at ¶¶ 35–40. But Olson has less Supreme Court oral-argument experience than Bursch, Cortman, *and* Waggoner; and Broer

12

has fewer years in practice and less practical experience than Anderson, Gray, Green, Francisco, Hawley, Neihart, Tedesco, Scruggs, *and* Warner. *Compare* Olson Decl. ¶¶ 10, 16–17 *with* n.3 *supra.* Even so, Olson and Broer demand far higher rates than Smith's more-experienced counsel. If Olson's and Broer's rates are "more than reasonable," Smith's attorney's and staff's rates are a bargain.

### C. The Washington, D.C. rates are also reasonable.

Smith's counsel and staff also request a reasonable Washington, D.C. rate for the Supreme Court litigation. Chart 5 lists those rates. *See* Scruggs Ex. 4.

David Thompson confirms these rates. He is the managing partner at Cooper & Kirk PLLC, a Washington, D.C.-based law firm. Thompson Decl. ¶ 1. He has litigated civil-rights cases across the country, personally argued three cases before the Supreme Court, and been involved with many other Supreme Court matters. *Id.* at ¶¶ 4–6. As managing partner, he is familiar with billing rates in Washington, D.C. for firms with Supreme Court experience. *Id.* at ¶¶ 7–8.

He developed his opinion on Smith's counsel's rates based on his experience, Smith's counsel's and staff's experience, the complexity of the case, and the rates charged by other attorneys with a Supreme Court practice that regularly exceed $1,500 per hour. *Id.* at ¶¶ 9–28. After considering this information, Thompson set the rates he found reasonable for Smith's counsel and staff to charge in the Washington, D.C. market. *Id.* at ¶ 22. Because no one in Colorado had comparable Supreme Court experience, this Washington, D.C. rate is reasonable and appropriate here for Smith's Supreme Court litigation.

### III. Smith's requested lodestar amount is presumptively reasonable.

That leaves the lodestar calculation. Multiplying hours by rates "produces a presumptively reasonable fee." *Stenson v. Edmonds*, 86 F.4th 870, 879 (10th Cir. 2023). So too here. Although an upward adjustment would be appropriate due to the

13

"rare" and "exceptional" nature of this case and its outcome, Smith's counsel has already factored things like "performance," "novelty," "complexity," "special skill," and "experience" into the lodestar variables. *Perdue v. Kenny*, 559 U.S. 542, 552–54, 555 n.5 (2010). And there is no basis for a downward adjustment. Smith's success on her free-speech claim "precludes the reduction of attorney fees [even though her] other causes of action were dismissed." Docket No. 125 at 16.

The lodestar for Smith's total fee request is $1,959,898. Scruggs Decl. ¶ 4. Chart 1 details the lodestar calculation for each fee earner. *Id.* at ¶ 91; Scruggs Ex. 4 Chart 1. The total reflects 848.8 hours of Colorado litigation, 1,325.6 hours of Supreme Court litigation, and the Denver or D.C. rates charged by Smith's counsel and staff for their work in those respective jurisdictions. *Id.* As explained above, the hours are reasonable. The rates are reasonable. So the lodestar is reasonable too.

## IV. Smith's costs are reasonable for out-of-state counsel.

Smith may also be awarded out-of-pocket expenses as part of her fee award. *See Brown v. Gray*, 227 F.3d 1278, 1297 (10th Cir. 2000) (distinguishing 42 U.S.C. § 1988 costs-as-attorneys'-fees from 28 U.S.C. § 1920 costs). Incidental travel costs are one kind of recoverable expense if usually billed to Colorado clients. *E.g.*, *id.* (travel); *RMCC*, 2010 WL 3703224, at *7 (meals). Smith requests $10,083.86 in costs, including flights, transportation, meals, and hotel rooms. Those costs and receipts are detailed in Scruggs Exhibit 3. Private clients in Colorado typically pay for this. Moseley Decl. ¶ 8; Olson Decl. ¶ 48. And the expenses were reasonable because Smith needed to obtain counsel from outside of Colorado and all parties traveled to Washington, D.C. to appear before the Supreme Court. *Supra* § I.C.

## CONCLUSION

Fee-shifting provisions ensure aggrieved parties have access to counsel to vindicate their constitutional rights and advance the public interest. *See Robinson*,

14

160 F.3d at 1281. Just so here. After years of litigation, Smith prevailed with a Supreme Court ruling and a final judgment that prohibits Colorado from compelling her to create messages that violate her beliefs on marriage. That ruling benefits all Americans, including "the Muslim movie director," the "atheist muralist," the LGBT website designer, and countless others. *303 Creative*, 600 U.S. at 589–90. This important outcome justifies the fees and costs requested by Smith's attorneys and staff.

Respectfully submitted this 24th day of July, 2024.

By: s/ *Bryan D. Neihart*

Jonathan A. Scruggs (AZ Bar No. 030505)
Bryan D. Neihart (AZ Bar No. 035937)
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

Rachel A. Rouleau (VA Bar No. 97783)
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
rrouleau@ADFlegal.org

David A. Cortman (GA Bar No. 188810)
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
Fax: (770) 339-6744
dcortman@ADFlegal.org

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2024 the foregoing brief was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Alison Faryl Kyles
Jack Davy Patten, III
Vincent Edward Morscher
Billy Lee Seiber
Andrew Williams
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6000
Fax: 720-508-6032
alison.kyles@coag.gov
jack.patten@coag.gov
vincent.morscher@coag.gov
billy.seiber@coag.gov
drew.williams@coag.gov

                              s/ *Bryan D. Neihart*
                              Bryan D. Neihart (AZ Bar No. 035937)
                              **Alliance Defending Freedom**
                              15100 N. 90th Street
                              Scottsdale, AZ 85260
                              Telephone: (480) 444-0020
                              Fax: (480) 444-0028
                              bneihart@ADFlegal.org

                              *Attorney for Plaintiffs*