## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:16-cv-02372-PAB

303 CREATIVE LLC, a limited liability company; and
LORIE SMITH,

     *Plaintiffs*,

vs.

AUBREY ELENIS, Director of the Colorado Civil Rights
Division, in her official capacity;
SERGIO RAUDEL CORDOVA,
CHARLES GARCIA,
GETA ASFAW,
MAYUKO FIEWEGER, and
DANIEL S. WARD, as members of the Colorado Civil Rights
Commission, in their official capacities, and
PHILIP J. WEISER, Colorado Attorney General,
in his official capacity,

     *Defendants*.

---

### DECLARATION OF SCOTT M. BROWNING IN SUPPORT OF
### MOTION FOR ATTORNEYS' FEES AND COSTS

---

I, Scott M. Browning, under penalty of perjury, declare as follows:

1.     I am over 21 years of age, of sound mind, and am otherwise competent and qualified to make this declaration. I have personal knowledge of the facts stated herein. I make this declaration in support of 303 Creative LLC's and Lorie Smith's (Smith) motion for attorney's fees.

**Introduction and Scope of Opinion**

2.     I have been retained by Smith to provide opinions about the reasonable hourly rates for the work performed by Alliance Defending Freedom (ADF) in the cases captioned *303 Creative LLC v. Elenis*, Case No. 1:16-cv-02372-PAB before this court, *303 Creative LLC v. Elenis*, No. 17-1344 and *303 Creative LLC v. Elenis*, No. 19-1413 before the U.S. Court of Appeals for the Tenth Circuit, and *303 Creative LLC v. Elenis*, No. 21-476 in the Supreme Court of the United States ("*303 Creative Litigation*"). This declaration sets forth my opinions.

3.     I have not been asked to provide an entry-by-entry analysis of ADF's invoices, to opine on the reasonableness of the time spent on individual tasks, or to comment on the reasonableness of the overall fees requested by ADF. My opinions are limited to the reasonableness of the hourly rates charged by ADF attorneys, local counsel, and support staff for the work they performed in the *303 Creative* Litigation, as well as the reasonableness of seeking out-of-district fees for litigation that went before the U.S. Supreme Court.

4.     I am being compensated at my current hourly rate of $770 per hour. Megan Fugier, a sixth year associate, assisted me with the preparation of this declaration. She is being compensated for her time at her current rate of $485 per hour. My compensation is not dependent on any particular outcome here. I have no interest in this matter other than as a neutral retained expert. No person or entity has attempted to unduly influence any of my opinions offered in this matter.

### Professional Background

5.     I have worked in private practice since 1994 in complex commercial litigation. My practice includes a relatively unique specialty representing religious organizations.

6.      I am admitted to practice law in Colorado, Pennsylvania, Arizona, and multiple federal courts, including the United States District Court for the District of Colorado, the Tenth Circuit Court of Appeals, and the Supreme Court of the United States. I am a member of good standing in the bars to which I've been admitted.

7.      I graduated with a Bachelor of Science degree in accounting from Trinity University in 1989, and I am a Certified Public Accountant. I graduated with a J.D. from William & Mary Law School in 1993.

8.      In 1993, my first year of practicing law, I clerked for the Chief Justice of the Colorado Supreme Court, Chief Justice William Erickson.

9.      In 1994, I began working as a litigation associate in the law firm then known as Rothgerber Johnson & Lyons LLP, which eventually became Lewis Roca. I became a partner at Lewis Roca in 2000, 24 years ago, and I previously served on the firm's Executive Committee, its governing body.

10.      In April of 2024, I left Lewis Roca and joined Husch Blackwell LLP, a national firm with more than 1,000 attorneys and a robust religious institutions practice, as an equity partner.

11.      Throughout my career, I have received many awards related to the practice of law. For example, I have been listed in Best Lawyers in America for Construction Litigation (2021-2024); Benchmark Litigation "Local Litigation Star" in Colorado (2016-2024); Colorado Super Lawyers, Business Litigation (2009-2018, 2021-2023); Pontifical Equestrian Order of St. Gregory the Great, Knight of St. Gregory (2018); and Denver Business Journal, "Forty Under 40" (2007). In addition, I have been rated AV/Preeminent Attorney by Martindale-Hubbell (1998-2017).

12.       In addition to a broad complex commercial litigation practice, I have a national practice serving many different religious organizations. I regularly

represent and advise religious institutions, including currently or previously serving as outside general counsel to the Archdiocese of Denver, the Archdiocese of Philadelphia, the Roman Catholic Diocese of Phoenix, and the Roman Catholic Diocese of Toledo. I have represented and tried cases for the Archdiocese of St. Louis and the Archdiocese of Los Angeles. My work has included representation of religious orders in various foreign countries in Latin America and Europe. I have represented personally multiple archbishops and cardinals, and I have the privilege of being personal counsel to Archbishop Charles J. Chaput.

13.     In addition to this work for various Catholic entities and individuals, I represent or have represented the Jewish Federation, the Church of Latter-Day Saints, the Anglican Union, and the Presbyterian Church. I presently am outside general counsel to the Siri Singh Sahib Corporation ("SSSC"), a nonprofit corporation affiliated with American Sikhism, which is a faith tradition with ashrams and a community all over the world including in the United States, Canada, Latin America, Europe, and China.

14.     This work for religious organizations over the last 20 years has resulted in my being the lead lawyer in hundreds of filed court cases, many of which implicated religious liberty and constitutional issues, and I have also overseen the resolution of more than 1,000 pre-litigation claims.

15.     Since becoming a partner 24 years ago, I have reviewed monthly bills for attorneys' fees issued to clients in matters involving all types of complex commercial litigation and class action litigation. I have also reviewed monthly bills for attorneys' fees as counsel for nonprofit organizations and religious institutions. Throughout my legal practice, I have exercised professional judgment in billing matters. The bills I regularly review contain my own time worked as well as the

time for other lawyers (partners, associates, and counsel), paralegals, and other billable staff.

16.     I have also regularly reviewed monthly bills for attorneys outside of my own firm. For example, as general counsel to various religious institutions, I have hired outside counsel to assist with those matters and reviewed their bills and rates. Currently, in an average month I will review approximately a dozen outside law firms' invoices for various clients to confirm if the charges are reasonable for the work I am managing for those clients. This review of other firms' bills for clients has been part of my regular work for more than 12 years.

17.     Both as outside general counsel for the Archdiocese of Philadelphia and Denver, and as the outside general counsel for the SSSC, I have hired many national law firms and nationally recognized attorneys to assist with matters specifically related to religious liberty. When those unique issues arise, I have found necessary to hire outside counsel with the expertise to handle those disputes.

18.     Importantly for this work, in 2011 I was working almost full time in Pennsylvania as the personal counsel to Archbishop Chaput, who was then the Archbishop of Philadelphia, and as the oversight counsel overseeing more than a dozen law firms that I helped interview and hire for the Archdiocese. My duties in that rule included negotiating these firms' engagement agreements, reviewing their invoices, and reporting to the finance council of the Archdiocese and the Archbishop on all financial matters related to the work of these law firms. I hired and worked regularly with George Terwilliger III of McGuire Woods and Paul Clement, then with Kirkland & Ellis, to manage very complicated First Amendment issues for the Archdiocese over the course of two years. At that time, in approximately 2012-2013, both of their hourly rates were above $1,500 an hour.

19.     I also collaborate regularly with other public interest law firms, including the Becket Fund for Religious Liberty, to ensure my religious clients receive the best possible legal representation when facing complex issues that implicate religious liberty and constitutional questions.

20.     Although most of the work I have performed during my career has been billed on an hourly basis, I have also worked on cases that involved a contingency fee arrangement and on cases that allowed for cost and attorney fee recovery based on statute. I am aware that in those kinds of cases, clients are not billed directly for the services rendered but attorneys may still recover fees under applicable statutes.

21.     Because of my experience as general counsel to various religious institutions, I am aware that the national pool of lawyers who specialize in constitutional litigation is quite small. In my own experience looking for outside counsel to advise and litigate constitutional issues that directly affect my religious institution clients, I have often faced challenges finding attorneys in private practice—even across a national pool—that have the necessary expertise to effectively represent them.

22.     I am also aware that when a novel issue of constitutional law arises, the national pool of lawyers who can successfully handle such issues shrinks considerably further. In my experience, even attorneys with a general litigation or appellate practice—regardless of how successful they are in their typical practice areas—are rarely equipped to handle cases involving novel questions of constitutional law because of the high level of expertise that is required to resolve such cases. When those cases require appeals or when those cases involve an issue

that has split courts across the country, even fewer attorneys have the requisite level of expertise.

23.    The difficulty in finding attorneys with the requisite level of skill is further complicated because, in my experience, very few attorneys are willing to accept cases against the state involving constitutional law when damages are unavailable and the attorneys must accept the representation on a contingency or pro bono basis.

24.    An additional complication for many religious liberty lawyers is the challenge from conflicts and business practices of many law firms that do not want to have professional practicing in this area of law. One of the most public of such situations involves Paul Clement's work and the multiple firms that have discouraged his First Amendment advocacy. This is emblematic of many firms that restrict or refuse to do this type of work, meaning the pool of competent lawyers in this field is further reduced.

25.    All of the above factors speak to the few lawyers nationwide with the necessary competence, experience, and resources to handle a case like the *303 Creative* Litigation.

26.    Based on my experience practicing law in Denver for nearly three decades with an emphasis in representing religious organizations; serving as a partner at Lewis Roca and Husch Blackwell for 24 years and being responsible for reviewing monthly bills of lawyers and non-lawyers; having hired outside counsel to help my clients litigate and resolve issues involving constitutional questions; and regularly corresponding with other attorneys who have a national practice and unique constitutional law expertise, I am familiar with the rates charged locally,

regionally, and nationally by attorneys of various qualifications in general litigation and in litigation involving constitutional questions.

27.     Additional information on my professional background and qualifications are in Exhibit 1.

## Information Considered

28.     In preparing this Declaration, I reviewed the following information:

   a. This Court's docket, the docket in U.S. Court of Appeals for the Tenth Circuit No. 19-1413, and the docket in the U.S. Supreme Court No. 21-476.

   b. Select opinions and judgments, including the

      i. Order Granting in Part and Denying in Part Motion to Dismiss and Denying Motion for Preliminary Injunction and Motion for Summary Judgment, With Leave to Renew (ECF No. 52);

      ii. Opinion and Order Denying Motion for Preliminary Injunction and Motion for Summary Judgment (ECF No. 72);

      iii. Opinion and Order Granting Summary Judgment (ECF No. 79);

      iv. U.S. Court of Appeals for the Tenth Circuit's Decision in No. 19-1413; and

      v. U.S. Supreme Court's decision in No. 21-476.

   c. Smith's Petition for a Writ of Certiorari filed with the U.S. Supreme Court;

   d. The declarations for each ADF attorney and support staff from ADF discussed herein;

e.  Confidential statistical hourly billing rate information and market data for the Denver area, which I developed;

f.  Case law regarding reasonable attorneys' fees, some of which is cited herein; and

g.  Relevant pleadings and information regarding the fee petition and award in *Curtis Park Grp., LLC v. Allied World Specialty Ins. Co.*, No. 20-CV-00552-CNS-NRN, 2023 WL 5624981 (D. Colo. Aug. 31, 2023) as discussed herein.

### The *303 Creative* Litigation

29.   Based on my review, I understand that the *303 Creative* Litigation involved a pre-enforcement suit brought by Smith against various Colorado officials (Colorado). Smith alleged that Colorado's Anti-Discrimination Act (CADA) violated her constitutional rights to free speech and free exercise under the First Amendment and to equal protection and due process under the Fourteenth Amendment.

30.   From a legal perspective, this case was incredibly complex even from its initial filing in district court. That complexity grew more pronounced as this case proceeded through the U.S. Court of Appeals for the Tenth Circuit up to the U.S. Supreme Court. In my view, several aspects of the *303 Creative* Litigation necessitated the retention of attorneys who specialize in constitutional litigation, and specifically pre-enforcement public accommodation and First Amendment cases.

31.   First, ADF attorneys had to develop a stipulated record with all the facts necessary to resolve this case, which would take a significant amount of legal expertise and forward thinking. ADF attorneys had to anticipate the legal issues

that might arise during the litigation and include the relevant facts in the stipulated record. Then, ADF attorneys presumably had to negotiate the stipulated facts with Colorado.

32.     Second, this was a pre-enforcement action where Colorado disputed Smith's Article III standing and the ripeness of her claims before this Court and the Tenth Circuit. Standing is a jurisdictional prerequisite to a court addressing the merits, while ripeness is a prudential consideration that courts also evaluate before addressing the merits of a claim. Judge Krieger initially held that Smith only had standing to challenge CADA's Communication Clause but lacked standing to challenge CADA's Accommodation Clause. Thus, the procedural posture of this case added a layer of complexity from the beginning.

33.     Third, this case presented a complicated question of how the First Amendment's Free Speech Clause interacts with public accommodation laws like CADA. That complexity is aptly demonstrated by the fact that the Tenth Circuit split 2-1 over how to resolve Smith's free speech claim, and the U.S. Supreme Court ruled 6-3 in Smith's favor. In other words, there was disagreement amongst esteemed judges over the proper legal resolution of Smith's case. And as Smith explained in her Petition for a Writ of Certiorari, courts across this country are divided about how to resolve this issue. Pet. For a Writ of Cert. at 11–18, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (No. 21-476), 2021 WL 4459045 at *11–18.

34.     Fourth, Smith's case raised important questions about the First Amendment's Free Exercise Clause. In her Petition for a Writ of Certiorari, Smith asked the U.S. Supreme Court to decide "[w]hether a public-accommodation law that authorizes secular but not religious exemptions is generally applicable under

[*Employment Division v. Smith*, 494 U.S. 872 (1990)], and if so, whether this Court should overrule *Smith*." *Id.* at i. Although the U.S. Supreme Court declined to take up that question—and instead ruled in Smith's favor on the Free Speech Clause—it permeated the dispute in the lower courts, further complicating this litigation.

35.     Fifth, because Judge Krieger dismissed Smith's action in part on standing and in part on the merits, Smith had to persuade the Tenth Circuit on appeal that Judge Krieger's opinion was wrong on both standing and the merits.

36.     Sixth and finally, because the Tenth Circuit ruled against Smith, she had to appeal her decision to the U.S. Supreme Court to obtain relief. This required Smith's legal team to draft a Petition for a Writ of Certiorari and strategically determine the best way to frame the Questions Presented in that petition to convince the Supreme Court to hear the case. The U.S. Supreme Court rarely grants petitions for certiorari. According to its website, the Court receives approximately 7,000-8,000 petitions for a writ of certiorari each term and grants about 80 petitions each year—or in about 1% of cases.[1] Furthermore, once the Supreme Court agreed to hear Smith's case, ADF attorneys had to prepare legal briefs and deliver an oral argument that would convince the Court to rule in Smith's favor.

37.     These tasks were made more difficult by the fact that the office of the Solicitor General of the United States participated in the appeal to defend CADA. That office is incredibly experienced with litigating before the U.S. Supreme Court. According to its website, the office "supervise[s] and conduct[s] governmental litigation in the United Supreme Court" and was "involved in approximately two-

---

[1] https://www.supremecourt.gov/about/faq_general.aspx

thirds of all the cases the U.S. Supreme Court decides on the merits each year."[2] The office is also very successful. By one count, that office had an overall win rate of 67% during a recent term.[3] In other words, not only did ADF attorneys have to rebut Colorado's arguments, but they also had to address the arguments made by the office of the Solicitor General of the United States.

38.     In addition to the participation of the U.S. Solicitor General, according to my review of the U.S. Supreme Court docket in this case, 27 amicus briefs were filed in support of Colorado. These briefs were filed by prominent entities, organizations, and individuals such as the ACLU, the American Bar Association, the New York State Bar Association, the State of Massachusetts, 137 Members of Congress, the American Psychological Association, and many scholars.

39.     The *303 Creative* Litigation spanned almost seven years and involved two appeals to the Tenth Circuit and a successful appeal to the Supreme Court. For all the reasons above, the *303 Creative* Litigation required uniquely skilled constitutional lawyers to litigate Smith's claims to a successful resolution.

## Legal Standards

40.     To determine a reasonable fee request, courts calculate the "lodestar amount" by multiplying the number of billed "hours reasonably expended" by the "reasonable hourly rate." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (cleaned up). As I previously mentioned, I have only been retained to

---

[2] https://www.justice.gov/osg/about-office

[3] https://www.law.com/nationallawjournal/2022/07/28/us-solicitor-general-scored-well-overall-last-term-but-lost-most-of-the-biggest-cases/#:~:text=The%20Office%20of%20U.S.%20Solicitor,it%20was%20an%20amicus%20party

opine on the hourly rate for ADF's attorneys and support staff. For that reason, my legal analysis and ultimate opinions only address the reasonableness of the hourly rates for ADF's attorneys and support staff and the reasonableness of awarding out-of-district rates for Supreme Court litigation.

41.     A reasonable hourly rate is usually defined as "the prevailing market rate in the relevant community." *Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006) (cleaned up). That rate should also be consistent with "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983). This Court and the Tenth Circuit sit in Denver, Colorado, so Denver is the relevant market for litigation in those courts.

42.     That said, after reviewing ADF's declarations and other information, I also understand that ADF is seeking out-of-market rates for the work it performed before the U.S. Supreme Court. Specifically, ADF attorneys and support staff are seeking Washington, D.C. rates for their Supreme Court litigation. I do not express an opinion about the reasonableness of hourly rates in the Washington, D.C.-market. But I do express an opinion about the propriety of awarding out-of-market rates for ADF's litigation before the U.S. Supreme Court.

43.     In evaluating the reasonableness of ADF's hourly rates and the propriety of awarding out-of-market rates for ADF's Supreme Court litigation, I am informed by the following cases and others not mentioned that are within my knowledge.

44.     Courts in this district are willing to award rates at or near the top of the Denver market based on the skills and experience of the attorneys or support staff requesting fees and based on the complexity of the underlying case. *See, e.g.*,

*Curtis Park Group, LLC*, 203 WL 5624981, at *6 (recognizing that the "excellent skills, experience, and reputations" of the attorneys and non-attorney staff justified high rate); *Stenson v. Edmonds*, No. 118CV01968JLKSTV, 2021 WL 7400721, at *4 (D. Colo. May 21, 2021) (recognizing that the fees awarded "are on the high end of rates charged in Denver for similar services but are nevertheless reasonable considering the attorneys' skill, experience, and reputation"); *Biax Corp. v. NVIDIA Corp.*, No. 09-CV-01257-PAB-MEH, 2013 WL 4051908, at *7 (D. Colo. Aug. 12, 2013) (awarding rates "toward the top of the applicable range … given the complexity of the subject matter, the high stakes of the case, and the contentiousness of the dispute"); *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 06-CV-00554-REB-BNB, 2010 WL 3703224, at *5 (D. Colo. Sept. 13, 2010) (awarding fees "'on the higher end of the range of typical Denver market rates'" in case "present[ing] many esoteric issues of constitutional law and issues concerning" the Religious Land Use and Institutionalized Persons Act).

45.     Courts may also consider the factors listed in Colorado Rules of Professional Conduct 1.5 to evaluate reasonable rates. *See Realtime Adaptive Streaming LLC v. Sling TV L.L.C.*, No. 17-CV-02097-RBJ, 2022 WL 4356897, at *2–7 (D. Colo. Sept. 19, 2022); *Gen. Cas. Co. of Wisconsin v. Wilson*, No. 22-CV-02444-GPG-NRN, 2023 WL 4893184, at *4 (D. Colo. May 16, 2023). Those factors include: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained;

14

(5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." C.R.C.P. 1.5(a)(1)–(8).

46.    Finally, rates charged outside of the relevant market may also influence the reasonable rate within the market, especially when the litigation involves specialized skills. For example, in *Fresquez v. BNSF Railway Company*, Judge Martínez considered "the prevailing rates for [Federal Railroad Safety Act (FRSA)] litigation" across the country "given Plaintiff's counsel's specialized knowledge." No. 17-CV-0844-WJM-SKC, 2020 WL 1322920, at *3 (D. Colo. Mar. 20, 2020). Based on that "specialized knowledge," Judge Martínez evaluated the requested rates in light of "the national rates for experienced FRSA" lawyers as one factor to determine the attorneys' reasonable rates. *Id*.

47.    Many other courts in this circuit and elsewhere take the same approach. *See, e.g.*, *Oklahoma Intrastate Transmission, LLC v. 25 Foot Wide Easement*, 908 F.3d 1241, 1245–247 (10th Cir. 2018) (affirming award of Washington, D.C. rates for Oklahoma litigation when no in-market attorney possessed requisite level of expertise); *Courthouse News Serv. v. Schaefer*, 484 F. Supp. 3d 273, 278–79 (E.D. Va. 2020) (awarding out-of-jurisdiction rates for case involving "sophisticated constitutional issue of first impression"); *Arkansas Oklahoma Gas Corp. v. BP Energy Co.*, No. 2:21-CV-02073, 2023 WL 4865014, at *6 (W.D. Ark. July 31, 2023) (awarding out-of-market rates because case was so "complex" the legal "market in question is nearly nonexistent").

48.    In my experience, there is a lack of attorneys and support staff with "comparable skill" to ADF's attorneys and support staff practicing in Denver for this

type of case. *Ramos*, 713 F.2d at 555. To be sure, there are attorneys in private practice in Denver with general experience litigating civil rights and constitutional cases. But to my knowledge, few, if any, of those cases have reached the Supreme Court recently.

49.     For example, *Counterman v. Colorado*, 600 U.S. 66 (2023) is a recent case involving constitutional rights that originated as a criminal prosecution in Colorado. When the case went to the Supreme Court, attorneys outside of Colorado were called upon to litigate the case at the Supreme Court. According to the petition for a writ of certiorari, Mr. Counterman was represented by the Colorado State Public Defender's Office.[4] But the counsel of record for the case, and the attorney who eventually argued the case, was John Elwood, an attorney based in Washington, D.C.[5] That the Colorado State Public Defender's Office saw fit to elicit help from an attorney outside of Colorado demonstrates the unique skill set required to litigate before the Supreme Court.

50.     For this reason, I do not believe that the fees generally awarded in civil rights cases or other cases involving constitutional issues are the appropriate comparator if they do not require Supreme Court intervention. Rather, my assessment of what constitute reasonable fees for ADF is detailed below.

### Reasonable Rates for Comparable Work

51.     Based on the above legal standards, I considered the following information in arriving at an opinion regarding the reasonable hourly rates of

---

[4] https://www.supremecourt.gov/DocketPDF/22/22-138/233120/20220809155927708_Petition%20--%20ready%20to%20file%20-%20TO%20PRINT.pdf

[5] *Id.*; https://www.oyez.org/cases/2022/22-138

ADF's attorneys, local counsel, and support staff, as well as the reasonableness of awarding out-of-district rates for Supreme Court litigation.

### ADF's Unique Expertise and Ultimate Success

52.     As I have previously described in paragraphs 29-39, the *303 Creative* Litigation was incredibly complex. It involved complicated issues of jurisdiction, the First and Fourteenth Amendments, public accommodation laws, and other topics. Moreover, it required the ADF attorneys to address standing and other jurisdictional issues alongside merits-based arguments on which courts across the country are divided. Succeeding on the various legal issues presented, in the legal landscape in which the case proceeded, required a high level of expertise in a highly specialized practice area, even within the religious freedom and constitutional litigation spheres. Beyond that, Smith only obtained full relief by appealing her case to the United States Supreme Court.

53.     Despite my significant experience with representing religious institutions across the nation, I do not personally have experience arguing before the Supreme Court. Nor do I have experience litigating pre-enforcement cases involving the First Amendment and public accommodations law. For these reasons, I would be unable to litigate these particular issues before the Supreme Court without the aid of attorneys experienced in these areas.

54.     There are few attorneys nationwide who practice First Amendment litigation, much less in Colorado. Even fewer have experience doing so before the Supreme Court, and fewer still have the opportunity to present oral argument before that Court. I know of no in-district counsel in private practice who has argued a case before the Supreme Court in the last several years, which means I also do not know of any attorney who possesses the experience that Smith's

challenge required. For that reason, Smith justifiably retained out-of-district counsel with particular expertise in the First Amendment.

55.     ADF attorneys, in litigating the case below, had to develop the appropriate record and legal arguments necessary for the Supreme Court to eventually agree to hear the case. In other words, the complexity of this case did not begin at the Supreme Court; rather, it was evident throughout the litigation. ADF's expertise throughout this litigation was crucial in securing a favorable decision in Smith's favor from the Supreme Court.

56.     In addition, ADF's attorneys and support staff obtained full relief for Smith. As the Supreme Court explained, Smith brought this suit to obtain "an injunction to prevent the State from forcing her to create wedding websites celebrating marriages that defy her beliefs." *303 Creative LLC v. Elenis*, 600 U.S. 570, 580 (2023). The Court held Colorado could not "force" Smith "to speak in ways that … defy her conscience about a matter of major significance"—i.e., marriage, thus giving her the relief she sought. *Id.* at 602.

57.     For these reasons, the *303 Creative* Litigation is the type of complex constitutional litigation that justifies the use of attorneys with unique specialties, including substantial experience litigating cases before the U.S. Supreme Court, possessed by ADF attorneys and support staff.

*Assessment of Reasonable Rates*

58.     I have drawn on my religious institutions practice and experience litigating matters related to religious freedom, as well as the fact that my legal practice is centered in Colorado, as the starting point for my assessment of reasonable rates for ADF's attorneys and support staff for its Colorado work on *303 Creative*.

59.     I began with a range of reasonable rates in the Denver market for partners, associates, and support staff with litigation experience in the religious freedom sphere and with varying degrees of expertise in constitutional law. These ranges also acknowledge that rates increased over the six years that the *303 Creative* case was pending, and thus reflect a general average of the reasonable rate ranges during the relevant time period. Finally, these rates reflect what would be collectible from clients, not just chargeable; they are comparable to those that my own firms and others in the Denver market regularly collect after client involvement in billing matters.

60.     Based on these parameters, it is my opinion that reasonable rates in the Denver market generally are as follows:

- Paralegals or support staff - $235 to $275 per hour
- Junior associates (1-2 years of experience) - $280 to $310 per hour
- Mid-level associates (3-5 years of experience) - $300-$440 per hour
- Senior associates (6-8 years of experience) - $425-$500 per hour
- Junior partners (9-15 years of experience) - $490-$650 per hour
- Partners (15-25 years of experience) - $575-$700 per hour
- Senior partners (25+ years of experience) - $650-$980 per hour

61.     Given the factors discussed in paragraphs 52-57, I would expect the ADF attorneys to command rates on the high end of what the Denver market supports.

62.     However, that is not the end of the inquiry. While the rate ranges listed reflect those chargeable for highly skilled lawyers in the Denver market, there is a much smaller pool of Colorado attorneys with a national practice comparable to that of many of the ADF attorneys involved here. There are even

fewer, if any, Colorado-based attorneys with a comparable level of experience litigating and arguing before the U.S. Supreme Court as that held by several of the ADF attorneys involved in the *303 Creative* Litigation.

63.     Starting with a baseline of the Colorado-based lawyers at Lewis Roca and Husch Blackwell, and focusing on the lawyers with practices involving religious institutions and/or constitutional issues, I reviewed the experience of our lawyers in this area and compared it to the ADF lawyers involved in the *303 Creative* Litigation. I then applied my knowledge of nationally experienced lawyers where applicable, because it is apparent that finding attorneys with truly comparable experience to many of the ADF lawyers involved in this case requires examining the rates for attorneys nationally, particularly those in the Washington D.C. market. In my experience, having provided legal services nationally and hired national firms, prevailing rates for these specialists are at least 20% higher than in the Denver market, and even higher than that for attorneys with repeat experience arguing before the U.S. Supreme Court.

64.     I also note that the lawyers on the other side of the *303 Creative* case are exceptionally qualified lawyers with their own deep experience in many of these issues, as well as extensive practice in the involved courts. For example, attorney Eric Olson, who served as Solicitor General of Colorado during *303 Creative*'s pendency and argued the case before both the Tenth Circuit and the U.S. Supreme Court, was a former trial lawyer at renowned firm Bartlit Beck and clerked for Supreme Court Justice John Paul Stevens and D.C. Circuit Judge Harry Edwards, among others. Likewise, Colorado Attorney General Phil Weiser clerked for U.S. Supreme Court Justices Byron White and Ruth Bader Ginsburg and Judge Ebel at the Tenth Circuit. This level of advocacy shows the quality of the representation

required and, in turn, the need for very experienced counsel.  My experience is that if these public service-based lawyers were in private practice, they would command national rates, and often do when they leave the public sector and return to private practice.

65.     Furthermore, of the factors mentioned in Colorado Rules of Professional Conduct 1.5, I find 1.5(a)(1) (novelty and difficult of the question and requisite skills), 1.5(a)(2) (preclusion of other employment), 1.5(a)(4) (results obtained), 1.5(a)(7) (quality of attorneys litigating the case), and 1.5(a)(8) (the contingent nature of the fees) to be particularly relevant. The *303 Creative* Litigation was uniquely challenging, precluded other employment because of the amount of time and energy dedicated to it, was ultimately successful, and required representation consistent with the experience, reputation, and ability of ADF's attorneys and support staff.

66.     In my review of recent decisions from this district, I have found attorney rates that range from $225 to $940 per hour. *See Curtis Park Grp., LLC v. Allied World Specialty Ins. Co.*, No. 20-CV-00552-CNS-NRN, 2023 WL 5624981, at *7 (D. Colo. Aug. 31, 2023) (awarding rates between $940/hour to $225/hour for attorney and non-attorney staff); *Realtime Adaptive Streaming LLC v. Sling TV L.L.C.*, No. 17-CV-02097-RBJ, 2022 WL 4356897, at *3 (D. Colo. Sept. 19, 2022) (discussing rates of $900/hour and $685/hour).

67.     I believe *Curtis Park Group, LLC* is particularly instructive as to Denver's current market rates. Those fees were awarded recently, in August 2023. And the court described the attorneys as possessing "excellent skills, experience, and reputations" in a "complex [insurance] dispute with high stakes." 2023 WL 5624981, at *7. The *303 Creative* Litigation contains those same features.

68.    The following fees were awarded to the following individuals in *Curtis Park Group, LLC* based on their years of experience. I have also included a column of the attorneys' and staffs' experience working on cases for which the Supreme Court granted review based on the material submitted:

| Attorney | Years of Experience | Supreme Court Experience | Rate Awarded |
|---|---|---|---|
| Ernest Martin | 37 | None | $940 |
| Andrew Guthrie | 12 | None | $760 |
| Daniel Mabery | 28 | None | $587.50 |
| Kathleen Repko | 13 | None | $584 |
| Emily Buchanan | 7 | None | $500 |
| Support Staff | Position | Supreme Court Experience | Rate Awarded |
| Casey McGovern | Paralegal | None | $235 |
| DiAnna Gaeta | ESI Consultant | None | $225 |
| Michael Brockwell | Trial Consultant | None | $225 |

69.    I compiled this table and the information below after reviewing the *Curtis Park Group, LLC* opinion, the Declaration of Christopher R. Mosley, filed in that case as ECF No. 323-8, and the attachments to Mosley's Declaration.

70.    According to the information in Mosley's Declaration and its attachments, none of these attorneys or support staff have participated in merits briefing before the Supreme Court or argued a case before the Supreme Court. None of these attorneys list expertise in the First Amendment as part of their qualifications aside from Guthrie, who has argued one First Amendment case before the Fifth Circuit and one First Amendment case before the Dallas Court of Appeals.

ECF No. 323-8 at 41-42. My independent research shows that Andrew Guthrie appeared as of counsel in one Supreme Court case since Mosley's declaration was filed. Guthrie did not argue the case, and his client lost. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 423 (2023).

71.     By contrast, as explained below in paragraphs 78-86, ADF's attorneys have collectively argued 18 cases before the Supreme Court, participated in the merits briefing of more than two dozen cases before the Supreme Court, and have participated in hundreds of cases involving the First Amendment across multiple federal court of appeals.

72.     For these reasons, I would expect the Denver-market rate for ADF's attorneys and support staff to be at least equivalent to, but more appropriately higher than, the rates listed in paragraph 68 above.

*Propriety of Out-of-Market Rates*

73.     Although I do not opine on the reasonableness of what an out-of-district hourly rate would be for ADF attorneys and support staff, in my experience representing religious institutions and hiring outside counsel to address novel issues of constitutional law, I believe that an out-of-district hourly rate exceeding the Denver market rate would be appropriate in this case for work at the Supreme Court.

74.     As I previously explained above, in my experience there are no similarly situated attorneys in Colorado who have the requisite expertise to have litigated the *303 Creative* Litigation to reach a comparable result.

75.     Beyond legal expertise, practical considerations would likewise prevent law firms in Colorado from agreeing to represent Smith.

76.     Based on my experience working in the Denver market for almost 30 years, it would be extraordinarily difficult, if not impossible, to bring in experienced counsel from law firms similar to Lewis Roca or Husch Blackwell to litigate such a novel and complex case, particularly given the case's hot-button subject matter and the contingent nature of receiving compensation.

77.     A large law firm would be the most likely candidate for having the resources to staff, litigate, and win a case like this. But a case like this one would likely have to go through the *pro bono* approval process given the non-pecuniary nature of the claims and the likely inability of Smith to pay a firm's customary rates. And given my own experience litigating and trying to get approval to pursue *pro bono* cases at these types of firms, it is highly unlikely that a large law firm would agree to take on a case like this. The controversial subject matter, coupled with the longevity and complexity of the litigation (seven years and multiple appeals to reach a final resolution), would mean most firms with the requisite experience would be either unable or unwilling to litigate a case like this one.

**Reasonable Hourly Rates Charged by ADF**

78.     I have reviewed the biographical information of the lawyers and support staff who worked on this matter as described in more detail in their separately filed declarations.

79.     I have also considered the complexity of the case, Smith's success at the Supreme Court, the experience and expertise of ADF attorneys and support staff, my own personal experience in practice in the Denver market for decades, the relevant case law, and the other information contained in the preceding paragraphs of this declaration.

80.     ADF seeks to recover fees for attorneys (1) John Bursch; (2) David Cortman; (3) Kristen Waggoner; (4) Jeremy Tedesco; (5) Erin Hawley; (6) Jonathan Scruggs; (7) Michael Francisco; (8) Rory Gray; (9) Katherine Anderson; (10) Samuel Green; (11) Jake Warner; (12) Bryan Neihart; (13) Cody Barnett; and (14) Rachel Rouleau.

81.     Based on my review of each of these attorneys' declarations, I note that their experience ranges from four years to almost thirty years; that they have cumulatively argued 18 cases before the Supreme Court; that they specialize in First Amendment litigation and have been cumulatively involved with hundreds of First Amendment cases; that many of them have further specialized in cases involving the intersection of the First Amendment and public accommodations laws; and that many of them have clerked, including for justices and judges on the U.S. Supreme Court, federal appellate courts, federal district courts, and a state supreme court.

82.     In my experience, it is reasonable and common for litigation that has spanned almost seven years to employ a team of attorneys who have been assigned different tasks throughout the courts of the litigation. In my experience, cases with this longevity that involve several appeals benefit from having multiple attorneys work on the case so that each attorney can lend their particular skill and expertise to the appropriate stage of litigation. In addition, multiple attorneys may work at different levels of litigation to ensure continuity of argument and to inform others of institutional knowledge about the case, which is especially necessary given that attorneys may leave a firm or transfer to work on different cases.

83.     ADF also seeks to recover fees for support staff and legal assistants (1) Cindy Eville; (2) Julie Peterson; and (3) Jessica Perske.

84.     Based on my review of each of their declarations, I note that their experience ranges from 16 to 30 years of experience.

85.     In my experience, it is reasonable and common to employ the services of legal staff to facilitate organizing the case file, proofreading and cite-checking briefs, and performing other administrative tasks. There are several advantages to utilizing staff members for these tasks, including reducing the overall costs of litigation because they typically bill at a lower rate than attorneys.

86.     Given the nature and complexity of the issues presented in the *303 Creative* Litigation; the specialized expertise required to competently represent the plaintiffs; the very limited pool of attorneys with the requisite experience, resources, and expertise to take on such representation; the caliber of the attorneys representing the opposing parties in the matter; the increased rates commanded by attorneys with national practices and experience before the U.S. Supreme Court; and ADF's ultimate success in this litigation; it is my opinion that reasonable rates for ADF's attorneys and support staff's work in Colorado are as follows:[6]

| Attorney | Years of Practice | Highlights of Specialized Experience from Declarations | Reasonable Rate |
|---|---|---|---|
| David Cortman | 28 | Argued 2 cases before SCOTUS; co-counsel on 11 others; entire career practicing con law; lead/co-counsel in hundreds of 1st Am cases. | $1,176 |
| John Bursch | 27 | Clerked at 8th Circuit; MI Solicitor Gen.; 12 SCOTUS arguments and 35 state Sup. Ct. cases. | $1,176 |
| Kristen Waggoner | 27 | WA Sup. Ct. clerk; argued 3 1st Am cases before SCOTUS including *303 Creative* and has overseen 14 SCOTUS victories; | $1,062 |

---

[6] I provide this chart as a comparator to the one above documenting the Supreme Court experience and accompanying rates awarded by the court in *Curtis Park*. I have relied on the information in each attorney's declaration to develop the highlights of their specialized experience.

| | | lead or co-counsel in dozens of other 1st Am cases. | |
| Jeremy Tedesco | 20 | Lead or co-counsel in 3 SCOTUS cases; argued before 8th Circuit and CO Ct. Appeals; litigated dozens of 1st Am cases. | $803 |
| Erin Hawley | 19 | SCOTUS clerk; 4th Circuit clerk; Dept of Justice; argued 1 SCOTUS case and litigated several others; argued before 5th Circuit and D.C. Circuit. | $803 |
| Jonathan Scruggs | 18 | Argued before 5th, 6th, 7th, 9th, and 10th Circuit, AZ Sup. Ct., and fed district courts; lead or co-counsel in 16 public accommodation/1st Am cases. National practice. | $734 |
| Michael Francisco | 17 | Clerked for Justice Gorsuch (post-rep) and 10th Circuit judge; private practice, CO AG Asst Solicitor General; argued 4 CO Sup Ct. cases, 8 amici briefs before Supreme Court (but no oral argument). National practice based in CO. | $714 |
| Rory Gray | 17 | Clerked at 4th and 10th Circuit; extensive brief writing experience (no oral argument mentioned). National practice with SCOTUS drafting experience. | $683 |
| Katherine Anderson | 15 | Lead counsel in 1 public accommodations/1st Am case and co-counsel in 5-6 others. National practice. | $673 |
| Samuel Green | 13 | Extern/clerked at 9th Circuit and 8th Circuit; co-counsel in approx. 7 1st Am cases. National practice. | $636 |
| Jake Warner | 13 | Fed district court clerk; argued/will argue 3 cases before 2nd and 8th Circuits; co-counsel in 2 other public accommodations/1st Am cases. National practice. | $612 |
| Bryan Neihart | 10 | Clerked in CO fed court and CO Ct. App.; argued 1 at 2nd Circuit and 6th Circuit; co-counsel in 2 other cases in 6th and 9th Circuits. National practice. | $575 |
| Cody Barnett | 7 | 6th Circuit and D.C. appellate clerk; oral arguments at 6th, 9th, and 10th Circuit. | $526 |

| | | National practice. | |
|---|---|---|---|
| Rachel Rouleau | 5 | Interned at state court/fed district court level. | $332 |
| Support Staff | Position | Relevant Experience | Rate |
| Cindy Eville | Paralegal | 30 years as legal assistant/paralegal | $270 |
| Julie Peterson | Paralegal | 35 years as legal assistant/paralegal | $275 |
| Jessica Perske | Paralegal | 26 years as legal assistant/paralegal | $265 |

**Conclusion**

87.     These are my opinions as to the reasonable hourly rate for ADF's attorneys, local counsel, and support staff discussed herein and my opinions as to the propriety of awarding out-of-district rates. In reaching these opinions, I have considered the information contained within this declaration, the documents cited within this declaration, and my own personal experience with practicing law in Denver and billing in this market for 30 years.

## Declaration

I, Scott Browning, declare under penalty of perjury that the foregoing is true and correct.

Signed this 19th day of July, 2024.

Scott Browning
Partner